# EXHIBITS 101-102,110-116

Exhibit 101

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GCP APPLIED TECHNOLOGIES INC., a Delaware corporation,<br><br>          *Plaintiff*,<br><br>          v.<br><br>AVM INDUSTRIES, INC., a California corporation,<br><br>          *Defendant*. | Case No.: 2:19-cv-07475-MWF-RAO<br><br>**CONTAINS CONFIDENTIAL – ATTORNEYS' EYES ONLY MATERIAL** |

## EXPERT REPORT OF DOUGLAS R. STIEVE REGARDING INFRINGEMENT



**Exhibit**
GCP vs AVM
Douglas Stieve
**0101**

I, Douglas R. Stieve, am over 18 years of age.  I have personal knowledge of the facts and opinions herein and could competently testify to both as a witness in this case.

## I.       INTRODUCTION

1.       I have been retained on behalf of GCP Applied Technologies, Inc. ("GCP") to offer opinions on several technical matters relevant to the above-captioned case.

2.       The patent at issue in this case is U.S. Patent No. 8,713,879 ("the '879 patent" or "Asserted Patent").

3.       I understand the claims at issue in this case are claims 1-5, 7-8, 10-13, and 15-17 of the '879 patent (the "Asserted Claims").

4.       I have been asked by GCP for my expert opinion regarding whether (a) certain versions of the AUSSIE SKIN® line of products sold by AVM Industries, Inc. ("AVM" or "Defendant") have certain features described in the Asserted Claims; and (b) whether there are non-infringing alternative products available.

## II.      SUMMARY OF OPINIONS

5.       It is my opinion that the AUSSIE SKIN® 550 and 560 products have all of the features described in the Asserted Claims.

6.       It is my opinion that the AUSSIE SKIN® 550G and 560G products have all of the features described in the Asserted Claims.

7.       It is my opinion that while there were multiple systems to choose from, the technical benefits of HDPE fully-adhesive pre-applied membranes for use in blind-side applications are recognized in the industry, and would not ultimately be substitutable with other non-infringing alternatives for many customers.

1

CONFIDENTIAL – ATTORNEYS' EYES ONLY

### III.   QUALIFICATIONS

8.    Attached as Appendix A is a true and correct copy of my current CV.

9.    I am a building envelope consultant with a specialization in roof and waterproofing consulting as well as masonry construction.

10.    I have provided professional services for over eight hundred buildings and other structures. I have experience with many types of materials, including low- and steep-slope roofing as well as plaza deck, vegetative roof, and subgrade waterproofing systems.

11.    I also have experience with masonry, glazed curtain walls, natural stone, and Exterior Insulation and Finish Systems (EIFS).

12.    I have managed the design and construction period services for several multimillion-dollar repair and rehabilitation projects as well as provided consulting services to architects, contractors, and owners for new buildings.  My work includes some of the largest and most complicated waterproofing projects in the New York metropolitan area.

13.    Projects that I have been involved with have won awards at the national, state, and local levels from organizations including the American Institute of Architects, Engineering News Record, and the National Trust for Historic Preservation.

14.    I have also authored several articles and technical papers and has lectured throughout the United States on the subjects of roofing, waterproofing, and masonry construction.

15.    I hold a Bachelor of Architecture *cum laude* from the University of Oklahoma.

16.    I am a registered architect in Connecticut, Delaware, Massachusetts, New Jersey, New York, Pennsylvania, North Carolina, and Florida.

17.    I obtained a National Council of Architectural Registration Boards Certificate and I am a registered roof consultant.

2

CONFIDENTIAL – ATTORNEYS' EYES ONLY

18.     I am a member of ASTM C15.02 - Brick and Structural Clay Tile and ASTM D08.20 - Roofing Membrane Systems.  I am the Vice Chair of the New York City Department of Buildings - Construction Requirements and Materials Committee.

19.     I serve as Chair of the Technical Advisory Committee for IIBEC Inc.

## IV.    COMPENSATION AND PRIOR TESTIMONY

20.     My firm Wiss, Janney, Elstner Associates, Inc. ("WJE") is being compensated based upon hours incurred and the hourly rates of the personnel involved.  Payment to WJE is not contingent upon my findings or the outcome of this matter.  WJE is being compensated at a rate of $400 per hour for my time.  Hourly rates for other staff at WJE working on this matter range from $100 per hour, depending upon the level and experience of the staff involved.

## V.     MATERIALS RELIED UPON

21.     Appendix B to this Report contains a list of materials I reviewed and/or relied upon to form the opinions in this Report.

22.     Some of the exhibits that I may use to summarize or support my opinions are referenced and shown in the body of this report or in attached exhibits.  I may also refer to any of the materials that I considered in forming my opinions in Attachment B  At trial, I may use any of the above referenced materials, as well as demonstrative exhibits, to explain the opinions that I have set forth in my report, such as sketches or graphical representations of the concepts that I have discussed, markups of any of the documents that I have discussed, and the like.

## VI.    LEGAL STANDARD FOR INFRINGEMENT

23.     I have been informed that to determine literal infringement, the fact finder compares the accused product or method against the properly interpreted claims of the patent to determine

3

CONFIDENTIAL – ATTORNEYS' EYES ONLY

whether the accused product or method contains each of the elements of the claim exactly as in the claim.

## VII.   OVERVIEW OF THE TECHNOLOGY

24.    The '879 patent relates to a waterproofing membrane that bonds to concrete cast against it in a "blindside" waterproofing application.

25.    Blindside waterproofing is a method of waterproofing buildings and other structures, especially within tight work sites, typically in urban environments, where the site to be waterproofed is close to the property line or an existing structure.  In these situations, there is not enough room to install the waterproofing membranes after the structure is built.  In the general method of blindside waterproofing, the membrane is placed against the support of the excavation and then the concrete is placed directly against the waterproofing.  This is especially useful during construction of cast-in place concrete structures.

26.    Blindside waterproofing membranes generally that bond to concrete similar to the '879 patent generally have at least a support sheet and a layer of adhesive on one side of the support sheet; the concrete is cast against the adhesive.  In waterproofing membrane products that predate the membrane of the '879 patent, a liner (or release sheet) was required to be placed over the adhesive layer.  The liner served a number of functions.  Waterproofing membranes are produced in long sheets and are generally rolled up for shipment and storage.  The liner prevented the adhesive from sticking to the back of the support sheet of the membrane when the product was rolled up.  Additionally, waterproofing membranes, specifically for commercial concrete projects, are often positioned or installed for substantial periods of time before concrete is cast against them. The release liner, covering substantially all of the otherwise exposed surface of the adhesive layer,

4

CONFIDENTIAL – ATTORNEYS' EYES ONLY

protects the adhesive from degradation from solar radiation, heat, and foot traffic between the time the membrane was positioned/installed until concrete was cast against it.

## VIII.   PERSON OF ORDINARY SKILL IN THE ART

27.     I have been told that a person of ordinary skill in the art ("POSA"), in United States patent law, is a hypothetical person having an ordinary level of knowledge, training, and experience in the relevant field of the invention at a specific time.

28.     The relevant time frame for the time of the inventions in the '879 patent is February 8, 2010, which I am told is the filing date of the patent application to which the '879 patent claims priority.

29.     Using this guidance, in my opinion, a POSA at the time of the invention of the '879 patent would have had at least seven to ten years of experience with building materials, especially those designed to repel water or prevent water ingress and damage, specifically in commercial waterproofing applications.

## IX.    THE ACCUSED PRODUCTS

30.     AVM distributes and sells the AUSSIE SKIN® 550, 560, 550G, and 560G products. AUSSIE SKIN® products are "waterproofing membranes" that are used in blind-side waterproofing applications.[1]

31.     AUSSIE SKIN® membranes are comprised of a high-density polyethylene ("HDPE") sheet that has been coated with a pressure sensitive adhesive.[2]

32.     The AUSSIE SKIN® 560 and 560G products have a thicker HDPE sheet than the AUSSIE SKIN® 550 and 550G products; the thicker HDPE sheet provides a barrier to methane

---

[1] Ex. 1 (AVMI90100000069-150); Ex. 2 (AVMI90100000151-210); Ex. 3 (AVMI90100010015-10136); Ex. 4 (AVMI90100011060-11061).
[2] Ex. 1 (AVMI9010000069-150); Ex. 5 (AVMI00028731-33); Ex. 6 (Caserta Dep. at 12).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

passage.[3]  Therefore, unless otherwise noted, my opinions as to the AUSSIE SKIN® 550 and 550G apply equally to the AUSSIE SKIN® 560 and 560G membranes.

33.     Cementitious particles are broadcast into the pressure sensitive adhesive during manufacture that prevent the adhesive from bonding the membrane to itself, when it is in its rolled form, prior to installation.  The membrane is rolled and typically shipped on pallets to a material distribution warehouse and then to various job sites.

34.     The AUSSIE SKIN® 550G and 560G are intended to be substantially the same in all respects to non-G 550 and 560 products except as to the whiteness value of the cementitious particles adhered to the pressure sensitive adhesive,[4] which, as described more fully below, can vary based on the batch of "G" product.  Therefore, unless otherwise noted, all of my opinions relating to the AUSSIE SKIN® 550 and 560 products apply to the AUSSIE SKIN® 550G and 560G products except for the whiteness value of the inorganic particles.

35.     I relied upon testing performed by GCP's in-house engineers and technicians on AVM products as identified in this Report in forming my below opinions.  I visited GCP's Cambridge testing facilities on May 6, 2021, and observed the methods and procedures by which GCP's personnel performed testing on various AUSSIE SKIN® products.  I also spoke with GCP's Xia Cao about the testing.  As described more fully below, I am confident these tests were performed accurately and in accordance with sound scientific principles.

---

[3] Ex. 2 (AVMI90100000151-210), Ex. 4 (AVMI90100011060-11061); Ex. 7 (Rudyan Dep. at 13); Ex. 6 (Caserta Dep. at 82).
[4] Ex. 7 (Rudyan Dep. at 85); Ex. 8 (Miller Dep. at 29-30); Ex. 17 (AVMI90100006158).

6

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## X.    OVERVIEW OF THE '879 PATENT

36.    The '879 patent, titled "Waterproofing Membrane," discloses a waterproofing membrane intended to be used in post-cast concrete applications.  The membrane includes a flexible carrier sheet and pressure sensitive adhesive on one side of the flexible carrier sheet.

37.    Unlike prior waterproofing membranes, the membrane disclosed in the '879 patent includes reflective inorganic particles adhered directly to the pressure sensitive adhesive such that the particles (1) cover a large portion of the adhesive, and (2) have an average diameter that is as great or greater than the thickness of the pressure sensitive adhesive.

38.    The membrane disclosed by the '879 patent does not require a liner/release sheet because of the presence of the reflective inorganic particles adhered to the adhesive.  The particles act to protect the adhesive in lieu of a liner/release sheet.  The diameter of the particles prevents them from being covered by or completely submerged in the adhesive layer.  The particles are reflective, and because they cover and stick out past the adhesive layer, they mitigate damage from solar radiation and heat.  Additionally, because the particles cover the adhesive and/or protrude above it, the particles mitigate damage to the adhesive from foot traffic.

## XI.    ASSERTED CLAIMS

39.    The Asserted Claims read as follows:

1[pre]  A waterproofing membrane comprising

  1[a]    a flexible carrier sheet with two opposed surfaces,

  1[b]    an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet such that

  1[c]    the pressure sensitive adhesive has an average thickness in the range of 75 μm to 500 μm and has an outer exposed surface, and

  1[d]    substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive,

7

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1[e]     wherein the substantially reflective inorganic particles have an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer,

1[f]     wherein the substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface,

1[g]     wherein the waterproofing membrane does not include a removable release sheet.

2.  The waterproofing membrane of claim 1 wherein the substantially reflective inorganic particles comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.

3.  The waterproofing membrane of claim 2 wherein the pressure sensitive adhesive has an average thickness in the range of 125 μm to 375 μm.

4.  The waterproofing membrane of claim 3 wherein the substantially reflective particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive.

5.  The waterproofing membrane of claim 3 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive.

7.  The waterproofing membrane according to claim 1 wherein the reflective surface of the membrane exhibits a whiteness value greater than 55%.

8.  The waterproofing membrane according to claim 1 wherein the reflective surface of the membrane exhibits a whiteness value greater than 65%.

10.  The waterproofing membrane of claim 1 wherein the substantially reflective inorganic particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive, and provide a reflective surface that exhibits a whiteness value greater than 65%.

11.  The waterproofing membrane according to claim 1 wherein the carrier sheet has a thickness of about 0.05 to 2.0 mm.

12.  The waterproofing membrane according to claim 11 wherein the carrier sheet comprises a polymer film or a polymer coated fabric.

13.  The waterproofing membrane according to claim 11 wherein the carrier sheet comprises polyethylene, polypropylene, ethylene-propylene copolymers, ethylene-olefin copolymers, ethylene-vinyl acetate copolymers, polyvinyl acetate, polyethyl acrylate,

8

CONFIDENTIAL – ATTORNEYS' EYES ONLY

polytetrafluoroethylene, polyvinylidene fluoride, polyethylene terephthalate, polyvinyl chloride, polyamides or a combination of two or more of these materials.

15.  A method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane.

16.  The method of claim 15 wherein the substantially reflective inorganic particles of the waterproofing membrane comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.

17.  The method of claim 16 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide a reflective surface that exhibits a whiteness value greater than 65%.

## XII.  CLAIM CONSTRUCTION

40.    I have been advised that the Court has construed the following terms for the '879 patent.

| Term of Phrase | Court's Construction[5] |
|---|---|
| membrane | "a thin pliable sheet of material forming a barrier or lining" |
| flexible carrier sheet | "a thin film, extrusion coating, or fabric that is the mechanical backbone of the membrane" |
| waterproofing pressure sensitive adhesive | plain and ordinary meaning |
| outer exposed surface | "the surface of the layer of the adhesive opposite the surface that is bonded to the carrier sheet and is accessible to have concrete cast directly against it" |
| substantially reflective inorganic particles | "inorganic particles that, when covering 70-100% of the surface of a layer of pressure sensitive adhesive, impart a minimum whiteness value to the surface as measured by reflectometry" |
| substantially reflective surface | "the outer exposed layer of the pressure sensitive adhesive, 70-100% covered by substantially reflective inorganic particles, so |

[5] Dkt. 101.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | as to exhibit a whiteness value of greater than 55% as measured by reflectometry" |
|---|---|
| substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive | "70-100% of the surface area of the outer exposed surface of the pressure sensitive adhesive is coated with the particles, as measured by electron microscopy" |
| removable release sheet | "a film or paper that covers the outer exposed adhesive layer in whole or in large part to prevent that layer from adhering to the carrier sheet of the membrane when the membrane is rolled up" |

## XIII.   THE AUSSIE SKIN® 550 AND 560 PRODUCTS HAVE ALL THE FEATURES DESCRIBED IN THE ASSERTED CLAIMS

41.   My opinions in this section of the Report reflect my understanding of the documents reviewed as noted in Appendix B as well as my examination of AUSSIE SKIN® products and my observations of the test procedures used on the sampled AUSSIE SKIN® products as described below.

### A.   Claim 1

#### 1.   1[Pre]  A waterproofing membrane [comprising]

42.   Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and review of documents produced in this action by AVM, it is my opinion that the AUSSIE SKIN® 550 and 560 products are waterproofing membranes.

43.   I have been advised that the Court construed "membrane" as a thin pliable sheet of material forming a barrier or lining."

44.   Based upon my review of the AUSSIE SKIN® products and associated technical literature, and my knowledge and experience in the commercial waterproofing industry, it is my opinion that the AUSSIE SKIN® products are waterproofing membranes.  All observed AUSSIE

10

CONFIDENTIAL – ATTORNEYS' EYES ONLY

SKIN® products are pliable and their intended purpose is to be used to provide a waterproofing barrier to commercial concrete projects.

45.     Specifically, I am aware that AVM describes the AUSSIE SKIN® 550 and 560 products as waterproofing membranes in their respective technical data sheets and in its disclosure to the City of Los Angeles Department of Building Safety for approval of AUSSIE SKIN® products.[6]

46.     I am aware that AVM has admitted that the AUSSIE SKIN® 550 and 560 products are "membranes that bond to post-cast concrete."[7]

        *2.     1[a]  a flexible carrier sheet with two opposed surfaces,*

47.     Based upon my review of the AUSSIE SKIN® 550 and 560 products and my knowledge and experience in the commercial waterproofing industry, it is my opinion that the AUSSIE SKIN® 550 and 560 products comprise a flexible carrier sheet with two opposed surfaces.

48.     I have been advised that the Court construed "flexible carrier sheet" as "a thin film, extrusion coating, or fabric that is the mechanical backbone of the membrane."

49.     Based upon my review of the AUSSIE SKIN® products and my knowledge and experience in the commercial waterproofing industry, it is my opinion that the AUSSIE SKIN® products include a flexible carrier sheet.

50.     The technical data sheets for the AUSSIE SKIN® 550 and 560 products describe the products as containing "HDPE sheet[s]."[8]

---

[6] Ex. 5 (AVMI90100028731-28733).
[7] Ex. 9 (RFA Response No. 9).
[8] Ex. 1 (AVM90100000069-150); Ex. 2 (AVMI90100000151-210).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

51.     AVM describes the carrier sheet of its AUSSIE SKIN® products as "an HDPE-based plastic material[.]"[9]

52.     I am aware that AVM has admitted the AUSSIE SKIN® 550 and 560 products "include an HDPE-based plastic material which extends edge to edge of the membrane[.]"[10]

53.     The HDPE film serves as the "mechanical backbone" of the AUSSIE SKIN® products.  It is on the HDPE film that the layer of pressure sensitive adhesive has been applied.  The HDPE film gives structure to the product; without the HDPE film, there would be nothing for the adhesive to rest on.  Further, the HDPE film becomes the waterproof barrier after it bonds to the concrete that is cast against it.  The outer limits of the HDPE sheet indicate the end of the membrane.

54.     HDPE is a flexible film.  For example, waterproofing membranes formed with HDPE carrier sheets, like the AUSSIE SKIN® products, are able to be rolled.  For installation, the products are unrolled and installed generally without any breakage to the HDPE sheet.

---

[9] Ex. 1 (AVM90100000069-150); Ex. 2 (AVMI90100000151-210).
[10] Ex. 9 (RFA Response No. 10).

12

CONFIDENTIAL – ATTORNEYS' EYES ONLY



55.      HDPE sheet material is cited in the '879 patent as the preferred material for use as the carrier sheet.[11]

56.      Any sheet, including one made from HDPE, has two opposed surfaces (not including the sides of the sheet that represent the thickness of the material), which can be described as the bottom and top of the sheet.

>      3.      1[b]  an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet [such that]

57.      Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550 and 560 products have an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet.

---

[11] '879 patent, col. 4, lines 54-56.

13

CONFIDENTIAL – ATTORNEYS' EYES ONLY

58.   I have been advised that the Court ruled that "waterproofing pressure sensitive adhesive" is to be given the plain and ordinary meaning of the term to a POSA.

59.   A waterproofing pressure sensitive adhesive is a single-component, non-reactive glue which forms a bond when pressure is applied to mate two surfaces to the adhesive.

60.   AVM describes the adhesive on the AUSSIE SKIN® products as including a "pressure sensitive adhesive."[12]  AVM admits that the adhesive covers the entire surface of one side of the HDPE-based plastic material (i.e., the carrier sheet).[13]

61.   The City of Los Angeles Department of Building and Safety describes the AUSSIE SKIN® 550 and 560 products as comprising a layer of "pressure sensitive adhesive."[14]

62.   The '879 patent includes a long list of suitable pressure sensitive adhesives.

63.   Based upon my observation of the products, the AUSSIE SKIN® products have pressure sensitive adhesive on only one surface of the HDPE carrier sheet.

64.   Based upon my review of the AUSSIE SKIN® products, it is my opinion that the pressure sensitive adhesive is approximately uniform across the carrier sheet and was approximately uniform as it was applied to the HDPE sheet, and before the particles were added.

---

[12] Ex. 1 (AVM90100000069-150); Ex. 2 (AVMI90100000151-210).
[13] Ex. 9 (RFA Response No. 12).
[14] Ex. 5 (AVMI90100028731-28733).

14

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Optical



Ex. 10 (GCP00069889-69893).

65.     In forming my opinions with respect to the approximate uniformity of the pressure

sensitive adhesive, as referenced above, I also relied upon the testing performed by GCP engineers

and technicians.  In order to determine the thickness of the adhesive, GCP's engineers used a

micrometer on the selvedge in order to obtain an accurate measurement of the thickness of the

membrane without the particles.  After measuring the carrier sheet and membrane, the adhesive

was then physically removed and the thickness of the carrier sheet was measured using the

micrometer.   Multiple tests are made and averaged to determine the result.   I observed a

representative test being conducted during my visit to GCP's Cambridge facility on May 6, 2021.

It is my opinion that said testing was performed accurately and in accordance with sound scientific

principles.

66.     GCP engineers and technicians measured the adhesive thickness of the selvedge

area of a sample of AUSSIE SKIN® 550, batch number 20161111.[15]  The thickness measured was

15 mils, or 381 µm.  In my opinion, within the field of building materials containing laminated or

---

[15] Ex. 11 (GCP00069673); Ex. 12 (GCP00070103).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

applied layers, a POSA would consider the layer to be approximately uniform even if some depressions or elevations were present.  Such imperfections can be caused by the coating process by which such materials are applied, and a POSA would still consider the layer to have approximately uniform thickness.

> 4.    *1[c] the pressure sensitive adhesive has an average thickness in the range of 75 µm to 500 µm and has an outer exposed surface[, and]*

67.    Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the pressure sensitive adhesive on the AUSSIE SKIN® 550 and 560 products has an average thickness in the range of 75 µm to 500 µm.

68.    As noted above, using a micrometer, the thickness of the layer in the AUSSIE SKIN® 550 product, batch number 20161111, at the selvedge as undisturbed by particles, measured 15 mils, or 381 µm.[16]

69.    Another method to determine the average thickness of the pressure sensitive adhesive layer of the AUSSIE SKIN® products is referred to as the solvent method.

70.    This method uses a portion of the product that has been cut.  The area is determined for the cut portion.  The adhesive is then dissolved using a solvent.  The solvent is evaporated and the remaining adhesive is weighed to determine the mass of the adhesive from the cut portion of the membrane.  Using the density of the adhesive, the thickness of the adhesive is determined.

---

[16] Ex. 11 (GCP00069673).

16

CONFIDENTIAL – ATTORNEYS' EYES ONLY

71.     It is my opinion that this solvent testing method is a fair and accurate method for
which to measure the average thickness of the pressure sensitive adhesive.  It is my opinion that
said testing was performed accurately and in accordance with sound scientific principles.

72.     The results of said solvent testing demonstrates that the pressure sensitive adhesive
layer of AUSSIE SKIN® 550 is between approximately 383 μm[17] and 394.4 μm.[18]

73.     The results of said testing demonstrates that the pressure sensitive adhesive layer
of the tested AUSSIE SKIN® 560 product, batch number 20181007, is approximately 307 μm.[19]

74.     I have been made aware that the Court defined "outer exposed surface" as "the
surface of the layer of the adhesive opposite the surface that is bonded to the carrier sheet and is
accessible to have concrete cast directly against it."

75.     Based upon my review of the AUSSIE SKIN® products and my knowledge and
experience in the commercial waterproofing industry, it is my opinion that the adhesive has an
outer exposed surface as defined by the Court.

76.     On the AUSSIE SKIN® products, the side of the adhesive not against the HDPE
carrier sheet is exposed to have concrete cast against it.

77.     It is my understanding that AVM has admitted that the AUSSIE SKIN® products
have "adhesive with a surface opposite the surface that is adhered to the carrier sheet."[20]

> 5.     *1[d] substantially reflective inorganic particles adhered directly to the
> outer exposed surface of the pressure sensitive adhesive,*

78.     Based upon my review of the AUSSIE SKIN® 550 and 560 products, my
knowledge and experience in the commercial waterproofing industry, and my review of the tests

---

[17] Ex. 13 (GCP00069880); Ex. 14 (GCP00071228).
[18] Ex. 13 (GCP00069880); Ex. 15 (GCP00069907); Ex. 12 (GCP00070103).
[19] Ex. 13 (GCP00069880)
[20] Ex. 9 (RFA Response No. 16).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

performed by GCP's engineers and technicians, it is my opinion that substantially reflective

inorganic particles are adhered directly to the outer exposed surface of the pressure sensitive

adhesive in the AUSSIE SKIN® 550 and 560 products.

79.     Based upon my review of various AUSSIE SKIN® products, it is my opinion that

there are particles adhered to the outer exposed surface of the adhesive.  Touching the outer

exposed surface of the AUSSIE SKIN® products indicates the feel of small, rough particles

adhered to the adhesive.

80.     I further understand that AVM has admitted that both AUSSIE SKIN® 550 and

560 contain "inorganic particles adhered to the surface of the adhesive oppose the surface bonded

to the HDPE-based plastic material[.]"[21]

81.     As to the composition of the particles, I also relied upon the testing performed by

GCP engineers and technicians.  It is my opinion that said testing was performed accurately and

in accordance with sound scientific principles.

82.     Using x-ray diffraction, it was determined that the particles in the AUSSIE SKIN®

550 products were made of hydrated white cement.[22]  X-ray diffraction is a scientifically sound

and common method used to determine the composition of crystalline particles.

83.     I have been informed that the Court construed "substantially reflective inorganic

particles" to mean "inorganic particles that, when covering 70-100% of the surface of a layer of

pressure sensitive adhesive, impart a minimum whiteness value to the surface as measured by

reflectometry."

---

[21] Ex. 9 (RFA Responses Nos. 18, 24); *see also* Ex. 8 (Miller Dep. at 27-28); Ex. 16
(AVMI90100029127); Ex. 17 (AVMI90100006158).
[22] Ex. 18 (GCP00069825-69848); Ex. 19 (GCP00069601-69606); Ex. 20 (GCP00069579-
69583).

18

CONFIDENTIAL – ATTORNEYS' EYES ONLY

84.     In the industry, and as disclosed in the '879 patent, reflectivity (the whiteness value)
of a surface can be measured with a NOVO-SHADE reflectometer.

85.     Based upon my observation of the AUSSIE SKIN® 550 and 560 products, it is my
observation that the products appear uniformly bright white in color.

86.     In forming my opinions with respect to the reflectivity/whiteness value of the
AUSSIE SKIN® 550 and 560 products, I also relied upon the testing performed by GCP engineers
and technicians.  In order to determine reflectivity/whiteness value of the AUSSIE SKIN® 550
and 560 products, GCP's engineers used a NOVO-SHADE reflectometer to measure the
whiteness/reflectivity value of the products.  I observed said tests being demonstrated during my
visit to GCP's Cambridge facility on May 6, 2021.

87.     GCP engineers and technicians, using a NOVO-SHADE reflectometer, measured
the reflectivity of AUSSIE SKIN® 550, batch number 20161111, at around 62.9%.[23]

88.     GCP engineers and technicians, using a NOVO-SHADE reflectometer, measured
the reflectivity of AUSSIE SKIN® 560, batch number 20181007, at around 63.2%.[24]

89.     Because of the irregular shape of the inorganic particles on the surface of the
adhesive, the whiteness value can fluctuate slightly depending where on the surface the
reflectometer is used.  However, based upon my own observations of the AUSSIE SKIN®
products, there is not an area on the products' surface other than the selvedge strip that would
significantly deviate from small range of reflectivity values, accounting for the irregularly shaped
particles.

---

[23] Ex. 11 (GCP00069673); *see also* Ex. 21 (GCP00071963).
[24] Ex. 13 (GCP00069880); *see also* Ex. 21 (GCP00071963).

19

CONFIDENTIAL – ATTORNEYS' EYES ONLY

90.     It is my opinion that, for the reasons discussed above, the selvedge strip does not comprise a part of the outer exposed surface of AUSSIE SKIN® products as that term has been defined by the Court, because it is not intended to have concrete cast against it.  Rather, the selvedge strip is used to overlap and provide a waterproof seal with adjacent membranes; when that overlap is complete, the adhesive of the selvedge area of one membrane is covered by a correspondingly sized overlap of the adjacent membrane before any concrete is cast against it..

91.     I am also aware that AVM's CEO testified in this case that he measured the AUSSIE SKIN® products using a reflectometer when he was alerted to the filing of this lawsuit in 2018 and that the reflectivity of the products was "about 60%."[25]

> 6.     *1[e] wherein the substantially reflective inorganic particles have an average diameter of about 100 µm to about 600 µm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer,*

92.     Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the inorganic particles in AUSSIE SKIN® 550 and 560 have an average diameter of about 100 µm to about 600 µm and that their diameter is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer to which they are adhered.

93.     In forming my opinions with respect to the size of the inorganic particles, I relied in part upon the testing performed by GCP engineers and technicians.  GCP's engineers and technicians utilized a Mastersizer to measure the size of particles that were extracted from the product.

---

[25] Ex. 7 (Rudyan Dep. at 34-36).

20

CONFIDENTIAL – ATTORNEYS' EYES ONLY

94.     Using the above-described process, GCP's engineers and technicians determined the size of the particles adhered to the adhesive in the AUSSIE SKIN® 550 product, batch number 20161111, to have an average particle size of approximately 460 μm,[26] which is greater than the 381 μm measured average width of adhesive from that same batch.[27]

95.     Using the above-described process, GCP's engineers and technicians determined the size of the particles adhered to the adhesive in the AUSSIE SKIN® 560 product, batch number 20181007, to have an average size of approximately 600 μm,[28] which is greater than the 307 μm measured average width of adhesive from that same batch.[29]

96.     It is my opinion that said testing was performed accurately and in accordance with sound scientific principles.

> 7.      1[f] wherein the substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface,

97.     Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the inorganic particles in AUSSIE SKIN® 550 and 560 cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface.

98.     I have been advised that the Court construed "substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive to

---

[26] Ex. 22 (GCP00069672).
[27] Ex. 11 (GCP00069673).
[28] Ex. 23 (GCP00069883)
[29] Ex. 13 (GCP00069880); Ex. 23 (GCP00069883).

21

CONFIDENTIAL – ATTORNEYS' EYES ONLY

mean "70-100% of the surface area of the outer exposed surface of the pressure sensitive adhesive is coated with the particles, as measured by electron microscopy."

99.     In forming my opinions with respect to the coverage of the inorganic particles, I relied in part upon the testing performed by GCP engineers and technicians.  GCP's engineers and technicians utilized scanning electron microscopy ("SEM") to generate an x-ray back scatter image of the exposed surface of the adhesive, an approach described in the '879 patent:

> The percentage of particle-coated area can be measured using scanning electron microscopy to generate an X-ray back-scatter image of the carbon exposed at the membrane surface. The uncoated area of the membrane surface contains carbon in the exposed pressure sensitive adhesive not covered by inorganic particles. A small sample of coated membrane is mounted on a double-sided carbon adhesive stub. It is not coated with carbon so as not to interfere with the carbon signal from the sample. The carbon signal from the sample is measured using scanning electron microscopy with a low accelerating voltage of 8 kv, to minimize background signal, and a 400 msec dwell. An X-ray map of the back-scatter image is collected and EDAX software is used to calculated percent coverage.

'879 patent, column 6, lines 5-18.

100.     I observed an SEM test as described above being performed during my visit to GCP's Cambridge facility on May 6, 2021.

101.     It is my opinion that said SEM tests were performed accurately and in accordance with sound scientific principles, and consistent with the description in the '879 patent.

102.     Using the x-ray analysis, particle coverage in both AUSSIE SKIN® 550 and 560 was well above 90%.[30]  The AUSSIE SKIN® 550 product, batch number 20161111, had particle

---

[30] Ex. 24 (GCP00069657-69671); Ex. 25 (GCP00069727-69735).

22

CONFIDENTIAL – ATTORNEYS' EYES ONLY

coverage of 98.13%.[31]  The AUSSIE SKIN® 560 product, batch number 20181007, had particle

coverage of 97.5%.[32]

103.    I have been advised that the Court defined "substantially reflective surface" as "the

outer exposed layer of the pressure sensitive adhesive, 70-100% covered by substantially reflective

inorganic particles, so as to exhibit a whiteness value of greater than 55% as measured by

reflectometry."

104.    As described above in paragraphs 84-91, using reflectometry to measure AUSSIE

SKIN® 550 and 560 products for their whiteness/reflectivity values results in a value above 55%,

no matter where the reflectometer is used on the surface of the AUSSIE SKIN® product, again

excepting the selvedge strip.

>    8.    *1[g] wherein the waterproofing membrane does not include a removable
>    release sheet.*

105.    Based upon my review of the AUSSIE SKIN® 550 and 560 products and my

knowledge and experience in the commercial waterproofing industry it is my opinion that neither

of the AUSSIE SKIN® 550 and 560 products have a removable release sheet.

106.    I have been informed that the Court has defined "removable release sheet" as "a

film or paper that covers the outer exposed adhesive layer in whole or in large part to prevent that

layer from adhering to the carrier sheet of the membrane when the membrane is rolled up."[33]

107.    The AUSSIE SKIN® products include only a thin strip of material coverage the

selvedge portions of the product.  The selvedge portions of the product does not have inorganic

particles embedded therein.  The selvedge portion of the AUSSIE SKIN® products are used to

---

[31] Ex. 24 (GCP00069657-69671); *see also* Ex. 26 (GCP00069571-69578).
[32] Ex. 25 (GCP00069727-69735).
[33] Dkt. 101.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

overlap one sheet of product with an adjacent product to create a waterproofing seal. In other words, no concrete is intended to be cast against the selvedge portion of the AUSSIE SKIN® products.

108.    The inorganic particles adhered to the adhesive on the AUSSIE SKIN® products act to prevent the adhesive from sticking to the back of the HDPE carrier sheet when the products are rolled up.

109.    Because there are no particles on the selvedge strip area, AVM uses a liner to prevent that small portion from sticking when the product is rolled up.

> **B.    Claim 2** (*The waterproofing membrane of claim 1 wherein the substantially reflective inorganic particles comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.*)

110.    Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the substantially reflective inorganic particles in the AUSSIE SKIN® 550 and 560 products comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.

111.    As described above, in forming my opinions with respect to the composition of the particles, I relied upon the testing performed by GCP engineers and technicians. Using x-ray diffraction, it was determined that the particles in the AUSSIE SKIN® 550 products were made of hydrated white cement.[34]

---

[34] Ex. 18 (GCP00069825-69848); Ex. 19 (GCP00069601-69606); Ex. 20 (GCP00069579-69583).

24

CONFIDENTIAL – ATTORNEYS' EYES ONLY

112.   Documents produced by AVM state that the "First PO of Aussie Skin with White Cement based particles" was "PO 3694, Dated 12/29/2017."[35]

   **C.   Claim 3** (*The waterproofing membrane of claim 2 wherein the pressure sensitive adhesive has an average thickness in the range of 125 μm to 375 μm.*)

113.   Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550 and 560 products have a pressure sensitive adhesive with an average thickness in the range of 125 μm to 375 μm.

114.   As described in Paragraph 73 of this Report,  the pressure sensitive adhesive layer of the tested AUSSIE SKIN® 560 product, batch number 20181007, is approximately 307 μm.[36]

115.   The thickness of adhesive layer in the AUSSIE SKIN® 550 product is literally outside of the disclosed range, but it is substantially the same as the disclosed range.

116.   The '879 patent requires that the diameter of the inorganic particles is equal to or greater than the thickness of the pressure sensitive adhesive.  This is so the particles are not covered by or completely submerged in the pressure sensitive adhesive, and the particles protrude above the pressure sensitive adhesive and are able to provide protection to the pressure sensitive adhesive.

117.   As long as the thickness of the adhesive is less than the diameter of the particles, that the adhesive thickness is a few microns more than the literal range given is insubstantial.

118.   As noted above, using a micrometer, the thickness of the adhesive in the AUSSIE SKIN® 550 product, batch number 20161111, measured 15 mils, or 381 μm.[37]

---

[35] Ex. 16 (AVMI90100029127).
[36] Ex. 13 (GCP00069880)
[37] Ex. 11 (GCP00069673).

25

CONFIDENTIAL – ATTORNEYS' EYES ONLY

119.   As noted above, the results of the solvent testing method demonstrates that the pressure sensitive adhesive layer of AUSSIE SKIN® 550 is between approximately 383 μm[38] and 394.4 μm,[39] with batch 20161111 measuring approximately 386.97 μm.[40]

120.   As noted above, the size of the particles adhered to the adhesive in the AUSSIE SKIN® 550 product, batch number 20161111, have an average size of approximately 460 μm,[41] which is greater than the approximately 381-386.97 μm measured average width of adhesive from that same batch.[42]

121.   Therefore, the adhesive layer measuring approximately 381-386.97 μm performs the same function as an adhesive layer with an average thickness in the range of 125 μm to 375 μm in the substantially the same way, because the 381-386.97 μm thick adhesive layer is still below the average diameter of the inorganic particles, the average value of which are around 460 μm.

122.   Because adhesive that is between approximately 381-386.97 μm thick is smaller than the average diameter of the inorganic particles, the particles are able to protrude above the pressure sensitive adhesive layer and mitigate damage to the pressure sensitive adhesive.

   **D.**   **Claim 4** (*The waterproofing membrane of claim 3 wherein the substantially reflective particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive.*)

123.   Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550 and

---

[38] Ex. 23 (GCP00069883).
[39] Ex. 13 (GCP00069880); Ex. 14 (GCP00071228).
[40] Ex. 12 (GCP00070103); Ex. 21 (GCP00071963).
[41] Ex. 22 (GCP00069672);
[42] Ex. 11 (GCP00069673); Ex. 12 (GCP00070103); Ex. 21 (GCP00071963).

26

CONFIDENTIAL – ATTORNEYS' EYES ONLY

560 products have substantially reflective particles covering approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive.

124.    As described above, using an SEM, it was determined that the particle coverage in both AUSSIE SKIN® 550 and 560 was well above 90%.[43]   The AUSSIE SKIN® 550 product, batch number 20161111, had particle coverage of 98.13%.[44]   The AUSSIE SKIN® 560 product, batch number 20181007, had particle coverage of 97.5%.[45]

>    **E.    Claim 5** (*The waterproofing membrane of claim 3 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive.*)

125.    Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550 and 560 products have substantially reflective particles covering approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive.

126.    As described above, using an SEM, it was determined that the particle coverage in both AUSSIE SKIN® 550 and 560 was well above 90%.[46]   The AUSSIE SKIN® 550 product, batch number 20161111, had particle coverage of 98.13%.[47]   The AUSSIE SKIN® 560 product, batch number 20181007, had particle coverage of 97.5%.[48]

---

[43] Ex. 24 (GCP00069657-69671); Ex. 25 (GCP00069727-69735).
[44] Ex. 24 (GCP00069657-69671); *see also* Ex. 26 (GCP00069571-69578).
[45] Ex. 25 (GCP00069727-69735).
[46] Ex. 24 (GCP00069657-69671); Ex. 25 (GCP00069727-69735).
[47] Ex. 24 (GCP00069657-69671); *see also* Ex. 26 (GCP00069571-69578).
[48] Ex. 25 (GCP00069727-69735).

27

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**F.**   **Claim 7** (*The waterproofing membrane according to claim 1 wherein the reflective surface of the membrane exhibits a whiteness value greater than 55%.*)

127.   Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550 and 560 products have a reflective surface exhibiting a whiteness value of greater than 55%.

128.   GCP engineers and technicians measured the reflectivity of AUSSIE SKIN® 550, batch number 20161111, at around 62.9%.[49]

129.   GCP engineers and technicians measured the reflectivity of AUSSIE SKIN® 560, batch number 20181007, at around 63.2%.[50]

**G.**   **Claim 8** (*The waterproofing membrane according to claim 1 wherein the reflective surface of the membrane exhibits a whiteness value greater than 65%.*)

130.   Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550 and 560 products have a reflective surface exhibiting a whiteness value that is insubstantially different than a value greater than 65%.

131.   GCP engineers and technicians measured the reflectivity of AUSSIE SKIN® 550, batch number 20161111, at around 62.9%.[51]

132.   GCP engineers and technicians measured the reflectivity of AUSSIE SKIN® 560, batch number 20181007, at around 63.2%.[52]

---

[49] Ex. 11 (GCP00069673); *see also* Ex. 21 (GCP00071963).
[50] Ex. 13 (GCP00069880); *see also* Ex. 21 (GCP00071963).
[51] Ex. 11 (GCP00069673); *see also* Ex. 21 (GCP00071963).
[52] Ex. 13 (GCP00069880); *see also* Ex. 21 (GCP00071963).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

133.     The reflectivity/whiteness values of the AUSSIE SKIN® 550 and 560 products are literally outside of the claimed value, but they are insubstantially different than the claimed value and are likely within manufacturing tolerances.

134.     Claim 8 requires that the reflectivity/whiteness value be greater than 65%.  This reflectivity value is to ensure that the reflective particles forming the reflective surface mitigate damage to the adhesive from solar radiation and heat.

135.     It is my opinion that the measured values of 62.9% and 63.2% reflectivity are insubstantially different than the claimed greater than 65% value.

136.     As described above, the irregular shape of the inorganic particles can affect the exact reflectivity/whiteness value measurements within a small margin of error.  Because the irregular shapes of the inorganic particles redirect light away from the reflectometer, the resulting measured values could only be artificially lower than the actual reflectivity value.  In other words, an irregularly shaped inorganic particle that directs light away from the reflectometer's received will be interpreted as being absorbed into the target surface rather than reflected.

137.     Additionally, the reflective surfaces of the AUSSIE SKIN® 550 and 560 products, at 62.9% and 63.2%, perform the same function as a reflective surface measuring greater than 65% in the substantially the same way, because the reflective surfaces measuring 62.9% and 63.2% reflectivity reflect solar radiation and heat away from the adhesive in the products to mitigate damage from same.

   **H.     Claim 10** (*The waterproofing membrane of claim 1 wherein the substantially reflective inorganic particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive, and provide a reflective surface that exhibits a whiteness value greater than 65%.*)

138.     Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests

29

CONFIDENTIAL – ATTORNEYS' EYES ONLY

performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550 and 560 products have substantially reflective inorganic particles covering approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive and a reflective surface that exhibits a whiteness value insubstantially different than a value greater than 65%.

139.    The coverage limitation is addressed in paragraphs 123-26, and the greater than 65% reflectivity limitation is addressed in paragraphs 130-37.

I.    **Claim 11** (*The waterproofing membrane according to claim 1 wherein the carrier sheet has a thickness of about 0.05 to 2.0 mm.*)

140.    Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, my review of the tests performed by GCP's engineers and technicians, and documents produced by AVM, it is my opinion that the AUSSIE SKIN® 550 and 560 products have a carrier sheet with a thickness of about 0.05 to 2.0 mm.

141.    According to documents produced by AVM, constituting the City of Los Angeles Department of Building and Safety Research Report, the thickness of the HDPE carrier sheet in the AUSSIE SKIN® 550 product is 1.2 mm, and the thickness of the HDPE carrier sheet in the AUSSIE SKIN® 560 product is 2.0 mm.[53]

142.    AVM describes the AUSSIE SKIN® 560 membrane in its technical data sheet as comprising a "2.0 mm thick Waterproofing, Methane and Shot Crete Approved Heavy Duty, Easy to Install, Puncture Resistant HDPE Sheet Membrane[.]"[54]

143.    Because the total thickness of the membranes are each at or below 2.0 mm, the carrier sheet alone is below the maximum thickness described in claim 11.

---

[53] Ex. 5 (AVMI90100028731-28733).
[54] Ex. 2 (AVMI90100000151-210).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

144.    It is my understanding that AVM has admitted that "AUSSIE SKIN® 550 includes an HDPE-based plastic material which extends from edge to edge of the membrane and has a thickness of about 0.05 to 2.0 mm[.]"[55]

145.    It is my understanding that the AUSSIE SKIN® 560 product provides a thicker membrane than the 550 version in order to function as a methane barrier.[56]

146.    At his deposition, AVM's Paul Miller stated that the thickness of AUSSIE SKIN® 550's HDPE sheet is 50 µm (0.05 mm) and the thickness of AUSSIE SKIN® 560's HDPE sheet is 80 µm (0.08 mm).[57]

147.    In forming my opinions with respect to the thickness of the carrier sheet in the AUSSIE SKIN® 550 and 560 products, I also relied upon the testing performed by GCP engineers and technicians.  In order to determine the thickness of the HDPE carrier sheet of the AUSSIE SKIN® 550 and 560 products, GCP's engineers used a micrometer.  I observed said tests being demonstrated during my visit to GCP's Cambridge facility on May 6, 2021.

148.    The results of the micrometer measurement show that the thickness of the HDPE carrier sheet in the AUSSIE SKIN® 550 product, batch number 20161111, is approximately 0.90 mm.[58]

149.    The results of the micrometer measurement show that the thickness of the HDPE carrier sheet in the AUSSIE SKIN® 560 product, batch number 20181007, is approximately 1.648 mm.[59]

---

[55] Ex. 9 (RFA ResponseNo. 213).
[56] *Compare* Ex. 1 (AVMI90100000069-150), *and* Ex. 2 (AVMI90100000151-210); Ex. 5 (AVMI901000028731-28733) ("Aussie Skin 558/560/565 may also be used as a gas/methane barrier where required."); Ex. 6 (Caserta Dep. at 15).
[57] Ex. 8 (Miller Dep. at 22).
[58] Ex. 12 (GCP00070103).
[59] Ex. 27 (GCP00069744).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**J.    Claim 12** (*The waterproofing membrane according to claim 11 wherein the carrier sheet comprises a polymer film or a polymer coated fabric.*)

150.    Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, and documents produced by AVM, it is my opinion that the AUSSIE SKIN® 550 and 560 products have a carrier sheet comprising a polymer film or a polymer coated fabric.

151.    According to documents produced by AVM and testimony by AVM employees, the AUSSIE SKIN® 550 and 560 products have a carrier sheet made of HDPE.[60]

152.    According to the '879 patent, the preferred carrier sheet "comprises a thermoplastic film of high density polyethylene (HDPE)."[61]

153.    HDPE is a thermoplastic polymer.

**K.    Claim 13** (*The waterproofing membrane according to claim 11 wherein the carrier sheet comprises polyethylene, polypropylene, ethylene-propylene copolymers, ethylene-olefin copolymers, ethylene-vinyl acetate copolymers, polyvinyl acetate, polyethyl acrylate, polytetrafluoroethylene, polyvinylidene fluoride, polyethylene terephthalate, polyvinyl chloride, polyamides or a combination of two or more of these materials.*)

154.    Based upon my review of the AUSSIE SKIN® 550 and 560 products and documents produced by AVM, it is my opinion that the AUSSIE SKIN® 550 and 560 products have a carrier sheet comprising polyethylene, polypropylene, ethylene-propylene copolymers, ethylene-olefin copolymers, ethylene-vinyl acetate copolymers, polyvinyl acetate, polyethyl acrylate, polytetrafluoroethylene, polyvinylidene fluoride, polyethylene terephthalate, polyvinyl chloride, polyamides or a combination of two or more of these materials.

---

[60] AVMI90100028731-28733; Ex. 1 (AVMI90100000069-150); Ex. 2 (AVMI90100000151-210); Ex. 9 (RFA Response No. 10); Ex. 7 (Rudyan Dep. at 13); Ex. 8 (Miller Dep. at 22, 52, 55-56, 60-61); Ex. 6 (Caserta Dep. at 13).
[61] '879 patent, col. 4, ll. 54-56.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

155.     According to documents produced by AVM and testimony by AVM employees, the AUSSIE SKIN® 550 and 560 products have a carrier sheet made of HDPE.[62]

156.     According to documents produced by AVM, the AUSSIE SKIN® 550 and 560 products have a carrier sheet comprising "HDPE Resin" and "EVA Resin."[63] "EVA" is ethylene-vinyl acetate.

**L.**     **Claim 15** (*A method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane.*)

157.     Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, my review of the tests performed by GCP's engineers and technicians, and documents produced by AVM, it is my opinion that AVM instructs the public to install the AUSSIE SKIN® 550 and 560 products by applying the membrane "either horizontally to smoothly prepared concrete substrates and/or compacted earth or crushed stone substrates. . . . . Concrete is then cast directly against the adhesive side of the membrane."[64]

158.     As described above, it is my opinion that the AUSSIE SKIN® 550 and 560 products have all of the limitations of claim 1 of the '879 patent. *See supra* ¶¶ 42-109.

159.     It is my understanding that the only way described in AVM's product literature to use to AUSSIE SKIN® products is by applying the membrane to a substrate and casting concrete such that it contacts the substantially reflective particles of the membrane.

---

[62] Ex. 5 (AVMI90100028731-28733); Ex. 9 (RFA Response No. 10); Ex. 7 (Rudyan Dep. at 13); Ex. 8 (Miller Dep. at 22, 52, 55-56, 60-61); Ex. 6 (Caserta Dep. at 13).
[63] Ex. 1 (AVMI90100000069-150); Ex. 2 (AVMI90100000151-210).
[64] Ex. 1 (AVMI90100000069-150); Ex. 2 (AVMI90100000151-210).

33

CONFIDENTIAL – ATTORNEYS' EYES ONLY

160.    AVM provides instructions on installing AUSSIE SKIN® 550 to its customers that includes "[p]lac[ing] the membrane HDPE film side to the substrate with the granulated surface facing up" and "[i]nspect[ing] finished waterproofing installation and repair any damaged material prior to concrete placement."[65]

**M.    Claim 16** (*The method of claim 15 wherein the substantially reflective inorganic particles of the waterproofing membrane comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.*)

161.    Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, my review of the tests performed by GCP's engineers and technicians, and documents produced by AVM, it is my opinion that AVM provides the method of claim 15 wherein the substantially reflective inorganic particles of the waterproofing membrane comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.

162.    As described above, it is my opinion that the AUSSIE SKIN® 550 and 560 products have all of the limitations of claim 1 of the '879 patent. *See supra* ¶¶ 42-109.

163.    As described above, it is my opinion that AVM provides the method described in claim 15.

164.    As described above, the substantially reflective inorganic particles of the waterproofing membrane comprise hydrated white cement.

---

[65] Ex. 28 (AVMI90100020646-20653).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**N.     Claim 17** (*The method of claim 16 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide a reflective surface that exhibits a whiteness value greater than 65%.*)

165.    Based upon my review of the AUSSIE SKIN® 550 and 560 products, my knowledge and experience in the commercial waterproofing industry, my review of the tests performed by GCP's engineers and technicians, and documents produced by AVM, it is my opinion that AVM provides the method of claim 16 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide a reflective surface that exhibits a whiteness value insubstantially different than a value greater than 65%.

166.    As described above, it is my opinion that AVM provides the method described in claim 16.

167.    As described (*see supra* ¶¶ 123-26, 130-39), the substantially reflective particles in AUSSIE SKIN® 550 and 560 products cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive and the reflectivity of those particles/the reflective surface is insubstantially different than a value greater than 65%.

**XIV.   THE AUSSIE SKIN® 550G AND 560G PRODUCTS HAVE ALL THE FEATURES DESCRIBED IN THE ASSERTED CLAIMS**

168.    My opinions in this section of the Report reflect my understanding of the documents reviewed as noted in Appendix B as well as my examination of AUSSIE SKIN® products as described below.

169.    It is my understanding that AVM has intended the AUSSIE SKIN® 550G and 560G products to be substantially the same as the AUSSIE SKIN® 550 and 560 products in all relevant

35

respects except for the "granular layer" of the products.[66] I hereby incorporate the above analyses

regarding the AUSSIE SKIN® 550 and 560 products by reference.   Below I discuss any

differences between the non-"G" and "G" AUSSIE SKIN® products to the extent relevant to the

claims of the '879 patent.

> **A.    Claim 1**
>
> > *1.    1[Pre]  A waterproofing membrane [comprising]*

170.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my

knowledge and experience in the commercial waterproofing industry, and documents produced in

this action by AVM, it is my opinion that the AUSSIE SKIN® 550G and 560G products are

waterproofing membranes.

171.    I am aware that AVM has admitted that AUSSIE SKIN® 550G and 560G "are

membranes that bond to post-cast concrete."[67]

172.    A Laboratory Test Report performed by PRI Construction Materials Technologies

LLC for Amir Rudyan at AVM describes the AUSSIE SKIN® 550G produced as a "waterproofing

membrane."[68]

173.    For the same reasons as described above in paragraphs 42-46 of this Report, the

AUSSIE SKIN® 550G and 560G products are waterproofing membranes.

> > *2.    1[a]  a flexible carrier sheet with two opposed surfaces,*

174.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my

knowledge and experience in the commercial waterproofing industry, and documents AVM has

---

[66] Ex. 7 (Rudyan Dep. at 85); Ex. 8 (Miller Dep. at 29-30).
[67] Ex. 9 (RFA Response No. 9).
[68] Ex. 29 (AVMI90100000238-245).

36

produced in this action, it is my opinion that the AUSSIE SKIN® 550G and 560G products comprise a flexible carrier sheet with two opposed surfaces.

175.    The technical data sheets for the AUSSIE SKIN® 550G and 560G products describe the products as containing "HDPE sheet[s]."[69]

176.    I am aware that AVM has admitted that the AUSSIE SKIN® 550G and 560G products "include an HDPE-based plastic material which extends from edge to edge of the membrane[.]"[70]

177.    For the same reasons as described above in paragraphs 47-56 of this Report, the HDPE-based material in the AUSSIE SKIN® 550G and 560G products include a flexible carrier sheet with two opposed surfaces.

        3.     *1[b]  an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet [such that]*

178.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and documents produced by AVM in this action, it is my opinion that the AUSSIE SKIN® 550G and 560G products have an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet.

179.    For the same reasons as described above in paragraphs 57 – 66 of this Report, the AUSSIE SKIN® 550G and 560G products include an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet.

        4.     *1[c] the pressure sensitive adhesive has an average thickness in the range of 75 μm to 500 μm and has an outer exposed surface[, and]*

---

[69] Ex. 3 (AVMI90100010015-10136); Ex. 4 (AVMI90100011060-61).
[70] Ex. 9 (RFA Response No. 10).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

180.    Based upon my review of the AUSSIE SKIN® 550 and 560 products, my

knowledge and experience in the commercial waterproofing industry, and my review of the tests

performed by GCP's engineers and technicians, it is my opinion that the pressure sensitive

adhesive on the AUSSIE SKIN® 550 and 560 products has an average thickness in the range of

75 μm to 500 μm.

181.    The results of solvent testing demonstrates that the pressure sensitive adhesive layer

of AUSSIE SKIN® 550G, batch number 20200525, measured 211.24-252.90 μm.[71]

182.    The results of solvent testing demonstrates that the pressure sensitive adhesive layer

of AUSSIE SKIN® 550G, batch number 20200815, measured 244.28-272.24 μm.[72]

183.    For the same reasons as described above in paragraphs 67 – 77 of this Report), the

AUSSIE SKIN® 550G and 560G products include a pressure sensitive adhesive layer that has an

average thickness in the range of 75 μm to 500 μm.

> 5.    1[d] substantially reflective inorganic particles adhered directly to the
> outer exposed surface of the pressure sensitive adhesive,

184.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my

knowledge and experience in the commercial waterproofing industry, and my review of the tests

performed by GCP's engineers and technicians, it is my opinion that substantially reflective

inorganic particles are adhered directly to the outer exposed surface of the pressure sensitive

adhesive in the AUSSIE SKIN® 550G and 560G products.

185.    Based upon my review of various AUSSIE SKIN® products, it is my opinion that

there are particles adhered to the outer exposed surface of the adhesive.  Touching the outer

---

[71] Ex. 30 (GCP00069641); Ex. 31 (GCP00069894).
[72] Ex. 32 (GCP00072685).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

exposed surface of the AUSSIE SKIN® products indicates the feel of small, rough particles adhered to the adhesive.

186.   I further understand that AVM has admitted that both AUSSIE SKIN® 550G and 560G contain "inorganic particles adhered to the surface of the adhesive oppose the surface bonded to the HDPE-based plastic material[.]"[73]

187.   GCP engineers and technicians measured the reflectivity of AUSSIE SKIN® 550G, batch number 20200525, at around 63.3%.[74]

188.   AVM provided GCP with samples of its AUSSIE SKIN® 550G product, batch number 20200815, and the reflectivity was measured at around 50.3% reflectivity.[75]

> 6.    *1[e] wherein the substantially reflective inorganic particles have an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer,*

189.   Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the inorganic particles in AUSSIE SKIN® 550G and 560G have an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer.

190.   Using a Mastersizer, GCP's engineers and technicians determined the size of the particles adhered to the adhesive in the AUSSIE SKIN® 550G product, batch number 20200525,

---

[73] Ex. 9 (RFA Responses Nos. 19, 25); *see also* Ex. 8 (Miller Dep. at 27-28); Ex. 16 (AVMI90100029127); Ex. 17 (AVMI90100006158).
[74] Ex. 33 (GCP00069624); Ex. 21 (GCP00071963); Ex. 11 (GCP00069673); Ex. 30 (GCP00069641); Ex. 34 (GCP00069707); Ex. 35 (GCP00069720).
[75] Ex. 36 (GCP00072685).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

to have an average size of approximately 427 μm,[76] which is greater than the 211.24-252.90 μm

measured average width of adhesive from that same batch.[77]

> 7.     1[ff] wherein the substantially reflective particles cover approximately 70%
> to 100% of the outer exposed surface of the pressure sensitive adhesive so
> as to provide the membrane with a substantially reflective surface,

191.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my

knowledge and experience in the commercial waterproofing industry, and my review of the tests

performed by GCP's engineers and technicians, it is my opinion that the inorganic particles in

AUSSIE SKIN® 550G and 560G cover approximately 70% to 100% of the outer exposed surface

of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective

surface.

192.    Using an SEM, the particle coverage for AUSSIE SKIN® 550G, batch number

20200525, was found to be approximately 98.84%.[78]

193.    *See supra* ¶¶ 184-88 – reflectivity of G products.

> 8.     1[g] wherein the waterproofing membrane does not include a removable
> release sheet.

194.    Based upon my review of the AUSSIE SKIN® 550G and 560G products and my

knowledge and experience in the commercial waterproofing industry it is my opinion that neither

of the AUSSIE SKIN® 550G and 560G products have a removable release sheet.

195.    I have been informed that the Court has defined "removable release sheet" as "a

film or paper that covers the outer exposed adhesive layer in whole or in large part to prevent that

layer from adhering to the carrier sheet of the membrane when the membrane is rolled up."[79]

---

[76] Ex. 30 (GCP00069641).
[77] Ex. 30 (GCP00069641); Ex. 31 (GCP00069894).
[78] Ex. 30 (GCP00069641); Ex. 24 (GCP00069657-69671 at GCP00069660).
[79] Dkt 101.

40

CONFIDENTIAL – ATTORNEYS' EYES ONLY

196.    *See supra* ¶ 106.

B.    **Claim 2** (*The waterproofing membrane of claim 1 wherein the substantially reflective inorganic particles comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.*)

197.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the substantially reflective inorganic particles in the AUSSIE SKIN® 550G and 560G products comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.

198.    As described above, in forming my opinions with respect to the composition of the particles, I relied upon the testing performed by GCP engineers and technicians. Using x-ray diffraction, it was determined that the particles in the AUSSIE SKIN® 550 products were made of hydrated white cement.[80]

199.    Based upon my visual comparison of AUSSIE SKIN® products, it is my opinion that AUSSIE SKIN® "G" products comprise ground white particles.[81]

200.    I further understand that AVM describes the color of its AUSSIE SKIN® 550G and 560G products as "white" in its Safety Data Sheet.[82]

---

[80] Ex. 18 (GCP00069825-69848); Ex. 19 (GCP00069601-69606); Ex. 20 (GCP00069579-69583).
[81] Ex. 37 (GCP00069640).
[82] Ex. 3 (AVMI090100010015-10136 at AVMI90100010041).

41

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**C.      Claim 3** (*The waterproofing membrane of claim 2 wherein the pressure sensitive adhesive has an average thickness in the range of 125 μm to 375 μm.*)

201.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550G and 560G products have a pressure sensitive adhesive with an average thickness in the range of 125 μm to 375 μm.

202.    The results of solvent testing demonstrates that the pressure sensitive adhesive layer of AUSSIE SKIN® 550G, batch number 20200525, measured approximately 211.24-252.90 μm.[83]

**D.      Claim 4** (*The waterproofing membrane of claim 3 wherein the substantially reflective particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive.*)

203.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550G and 560G products have substantially reflective particles covering approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive.

204.    Using an SEM, the particle coverage for AUSSIE SKIN® 550G, batch number 20200525, was found to be approximately 98.84%.[84]

**E.      Claim 5** (*The waterproofing membrane of claim 3 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive.*)

205.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests

---

[83] Ex. 30 (GCP00069641); Ex. 31 (GCP00069894).
[84] Ex. 30 (GCP00069641); Ex. 24 (GCP00069657-69671 at GCP00069660).

42

CONFIDENTIAL – ATTORNEYS' EYES ONLY

performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550G

and 560G products have substantially reflective particles covering approximately 90% to 100% of

the outer exposed surface of the pressure sensitive adhesive.

206.    Using an SEM, the particle coverage for AUSSIE SKIN® 550G, batch number

20200525, was found to be approximately 98.84%.[85]

      **F.**    **Claim 7** (*The waterproofing membrane according to claim 1 wherein the reflective*
           *surface of the membrane exhibits a whiteness value greater than 55%.*)

207.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my

knowledge and experience in the commercial waterproofing industry, and my review of the tests

performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550G

and 560G products have a reflective surface exhibiting a whiteness value of greater than 55%.

208.    GCP engineers and technicians measured the reflectivity of AUSSIE SKIN® 550G,

batch number 20200525, at around 63.3%.[86]

209.    AVM provided GCP with samples of its AUSSIE SKIN® 550G product, batch

number 20200815, and the reflectivity was measured at around 50.3% reflectivity.[87]

      **G.**    **Claim 8** (*The waterproofing membrane according to claim 1 wherein the reflective*
           *surface of the membrane exhibits a whiteness value greater than 65%.*)

210.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my

knowledge and experience in the commercial waterproofing industry, and my review of the tests

performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550G

---

[85] Ex. 30 (GCP00069641); Ex. 24 (GCP00069657-69671 at GCP00069660).
[86] Ex. 33 (GCP00069624); Ex. 21 (GCP00071963); Ex. 11 (GCP00069673); Ex. 30
(GCP00069641); Ex. 34 (GCP00069707); Ex. 35 (GCP00069720).
[87] Ex. 36 (GCP00072676).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

and 560G products have a reflective surface exhibiting a whiteness value insubstantially different than a value greater than 65%.

211.    GCP engineers and technicians measured the reflectivity of AUSSIE SKIN® 550G, batch number 20200525, at around 63.3%.[88]

212.    The reflectivity/whiteness values of the AUSSIE SKIN® 550G and 560G products are literally outside of the claimed value, but they are insubstantially different than the claimed value.

213.    It is my opinion that the measured values of 62.0% and 63.3% reflectivity are insubstantially different than the claimed greater than 65% value.

214.    As described above, the irregular shape of the inorganic particles can affect the exact reflectivity/whiteness value measurements within a small margin of error.  Because the irregular shapes of the inorganic particles redirect light away from the reflectometer, the resulting measured values could only be artificially lower than the actual reflectivity value.  In other words, an irregularly shaped inorganic particle that directs light away from the reflectometer's received will be interpreted as being absorbed into the target surface rather than reflected.

215.    Additionally, the reflective surfaces of the AUSSIE SKIN® 550G and 560G products, at 62.0% and 63.3%, perform the same function as a reflective surface measuring greater than 65% in the substantially the same way, because the reflective surfaces measuring 62.0% and 63.3% reflectivity reflect solar radiation and heat away from the adhesive in the products.

---

[88] Ex. 33 (GCP00069624); Ex. 21 (GCP00071963); Ex. 11 (GCP00069673); Ex. 30 (GCP00069641); Ex. 34 (GCP00069707); Ex. 35 (GCP00069720).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**H.** **Claim 10** (*The waterproofing membrane of claim 1 wherein the substantially reflective inorganic particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive, and provide a reflective surface that exhibits a whiteness value greater than 65%.*)

216. Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and my review of the tests performed by GCP's engineers and technicians, it is my opinion that the AUSSIE SKIN® 550G and 560G products have substantially reflective inorganic particles covering approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive and a reflective surface that exhibits a whiteness value insubstantially different than a value greater than 65%.

217. The coverage limitation is addressed in paragraphs 203-06, and the greater than 65% reflectivity is addressed in paragraphs 210-15.

**I.** **Claim 11** (*The waterproofing membrane according to claim 1 wherein the carrier sheet has a thickness of about 0.05 to 2.0 mm.*)

218. Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, my review of the tests performed by GCP's engineers and technicians, and documents produced and admissions by AVM, it is my opinion that the AUSSIE SKIN® 550G and 560G products have a carrier sheet with a thickness of about 0.05 to 2.0 mm.

219. AVM admits that the AUSSIE SKIN® 550G product "includes an HDPE-based plastic material which extends from edge to edge of the membrane and has a thickness of about 0.05 to 2.0 mm[.]"[89]

220. The results of the micrometer measurement show that the thickness of the HDPE carrier sheet in the AUSSIE SKIN® 550G product, batch number 20200525, is approximately 0.95

---

[89] Ex. 9 (RFA Response No. 214).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

mm.[90]AVM describes the AUSSIE SKIN® 560G membrane in its technical data sheet as comprising a "2.0 mm thick Waterproofing, Methane and Shot Crete Approved Heavy Duty, Easy to Install, Puncture Resistant HDPE Sheet Membrane[.]"[91]

221.    Because the total thickness of the membrane is at or below 2.0 mm, the carrier sheet alone is below the maximum thickness described in claim 11.

222.    It is my understanding that the AUSSIE SKIN® 560G product provides a thicker membrane than the 550G product in order to function as a methane barrier.[92]

223.    According to documents produced by AVM, constituting the City of Los Angeles Department of Building and Safety Research Report, the thickness of the HDPE carrier sheet in the AUSSIE SKIN® 550G product is 1.2 mm, and the thickness of the HDPE carrier sheet in the AUSSIE SKIN® 560G product is 2.0 mm.[93]

**J.**      **Claim 12** (*The waterproofing membrane according to claim 11 wherein the carrier sheet comprises a polymer film or a polymer coated fabric.*)

224.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and documents produced and admissions made by AVM, it is my opinion that the AUSSIE SKIN® 550G and 560G products have a carrier sheet comprising a polymer film or a polymer coated fabric.

---

[90] Ex. 15 (GCP00069907); Ex. 12 (GCP00070103).
[91] Ex. 38 (AVMI90100030968-30969).
[92] *Compare* Ex. 39 (AVMI90100006163-64), *and* Ex. 38 (AVMI90100030968-30969), *with* Ex. 5 (AVMI901000028731-28733) ("Aussie Skin 558/560/565 may also be used as a gas/methane barrier where required."); Ex. 6 (Caserta Dep. at 15).
[93] Ex. 40 (AVMI90100011063-11065).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

225.    According to documents produced by AVM and testimony by AVM employees, the AUSSIE SKIN® 550G and 560G products have a carrier sheet made of HDPE.[94]

226.    For the same reasons as described above in paragraphs 150 -153 of this Report), the HDPE sheet in the AUSSIE SKIN® 550G and 560G products comprises a polymer film or a polymer coated fabric.

**K.    Claim 13** (*The waterproofing membrane according to claim 11 wherein the carrier sheet comprises polyethylene, polypropylene, ethylene-propylene copolymers, ethylene-olefin copolymers, ethylene-vinyl acetate copolymers, polyvinyl acetate, polyethyl acrylate, polytetrafluoroethylene, polyvinylidene fluoride, polyethylene terephthalate, polyvinyl chloride, polyamides or a combination of two or more of these materials.*)

227.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, and documents produced by AVM, it is my opinion that the AUSSIE SKIN® 550G and 560G products have a carrier sheet comprising polyethylene, polypropylene, ethylene-propylene copolymers, ethylene-olefin copolymers, ethylene-vinyl acetate copolymers, polyvinyl acetate, polyethyl acrylate, polytetrafluoroethylene, polyvinylidene fluoride, polyethylene terephthalate, polyvinyl chloride, polyamides or a combination of two or more of these materials.

228.    According to documents produced by AVM and testimony by AVM employees, the AUSSIE SKIN® 550G and 560G products have a carrier sheet made of HDPE.[95]

---

[94] Ex. 5 (AVMI90100028731-28733); Ex. 39 (AVMI90100006163-64); Ex. 38 (AVMI90100030968-30969); Ex. 9 (RFA Response No. 10); Ex. 7 (Rudyan Dep. at 13); Ex. 8 (Miller Dep. at 22, 52, 55-56, 60-61); Ex. 6 (Caserta Dep. at 13).
[95] Ex. 5 (AVMI90100028731-28733); Ex. 9 (RFA Response No. 10); Ex. 7 (Rudyan Dep. at 13); Ex. 8 (Miller Dep. at 22, 52, 55-56, 60-61); Ex. 6 (Caserta Dep. at 13).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

229.   According to documents produced by AVM, the AUSSIE SKIN® 550G products have a carrier sheet comprising "HDPE Resin" and "EVA Resin."[96]  "EVA" is ethylene-vinyl acetate.

230.   For the same reasons as described above in paragraphs 154 – 156 of this Report, the HDPE sheet in the AUSSIE SKIN® 550G and 560G products comprises polyethylene, polypropylene, ethylene-propylene copolymers, ethylene-olefin copolymers, ethylene-vinyl acetate copolymers, polyvinyl acetate, polyethyl acrylate, polytetrafluoroethylene, polyvinylidene fluoride, polyethylene terephthalate, polyvinyl chloride, polyamides or a combination of two or more of these materials.

**L.    Claim 15** (*A method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane.*)

231.   Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, my review of the tests performed by GCP's engineers and technicians, and documents produced by AVM, it is my opinion that AVM provides a method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane.

232.   As described above, it is my opinion that the AUSSIE SKIN® 550G and 560G products have all of the limitations of claim 1 of the '879 patent.  *See supra* ¶¶ 170-96.

233.   AVM instructs the public to install the AUSSIE SKIN® 550G and 560G products by applying the membrane "horizontally to smoothly prepared concrete substrates and/or

---

[96] Ex. 39 (AVMI90100006163-64).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

compacted earth or crushed stone substrates. . . . . Concrete is then cast directly against the adhesive side of the membrane."[97]

234.    AVM provides instructions on installing AUSSIE SKIN® 550G to its customers that includes "[p]lac[ing] the membrane HDPE film side to the substrate with the granulated surface facing up" and "[i]nspect[ing] finished waterproofing installation and repair any damaged material prior to concrete placement."[98]

> **M.     Claim 16** (*The method of claim 15 wherein the substantially reflective inorganic particles of the waterproofing membrane comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.*)

235.    Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, my review of the tests performed by GCP's engineers and technicians, and documents produced by AVM, it is my opinion that AVM provides the method of claim 15 wherein the substantially reflective inorganic particles of the waterproofing membrane comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.

236.    As described above, it is my opinion that the AUSSIE SKIN® 550G and 560G products have all of the limitations of claim 1 of the '879 patent. *See supra* ¶¶ 170-96.

237.    As described above, it is my opinion that AVM provides the method described in claim 15.

238.    As described above, I understand that the substantially reflective inorganic particles of the waterproofing membrane comprise hydrated white cement.

---

[97] Ex. 1 (AVMI90100000069-150); Ex. 2 (AVMI90100000151-210).
[98] Ex. 41 (AVMI90100010973-10981).

49

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**N.**   **Claim 17** (*The method of claim 16 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide a reflective surface that exhibits a whiteness value greater than 65%.*)

239.   Based upon my review of the AUSSIE SKIN® 550G and 560G products, my knowledge and experience in the commercial waterproofing industry, my review of the tests performed by GCP's engineers and technicians, and documents produced by AVM, it is my opinion that AVM provides the method of claim 16 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide a reflective surface that exhibits a whiteness value insubstantially different than a value greater than 65%.

240.   As described above, it is my opinion that AVM provides the method described in claim 16.

241.   As described (*see supra* ¶¶ 203-04, 210-17), the substantially reflective particles in AUSSIE SKIN® 550G and 560G products cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive and the reflectivity of those particles/the reflective surface is insubstantially different than a value greater than 65%.

**XV.   NON-INFRINGING ALTERNATIVES AND BENEFITS OF THE PATENT**

242.   As part of the remedy determination, I understand that the patentee must identify the absence of acceptable non-infringing alternatives in the market at the time of infringement.   In the discussion below, I identify example alternatives to the infringing products and the  product the patentee sold. I discuss the technical details of each available system below.  While there were multiple systems to choose from, the technical benefits of HDPE fully-adhesive pre-applied membranes for use in blind-side applications are recognized in the industry, and would not ultimately be substitutable with other non-infringing alternatives for many customers.

50

CONFIDENTIAL – ATTORNEYS' EYES ONLY

243.     The claims of the '879 patent confers benefits to a waterproofing membrane system.

For example, a waterproofing membrane product that contains the elements of claim 1 would (a)

adhesively bond to concrete, (b) have increased reflectivity, and (c) function without a release liner

as a result of having a mineral layer.  These claimed features are important factors that a purchaser

would consider when choosing a waterproofing membrane system, including the Accused

Products.  Below, I discuss the benefits of adhesively bonded products, and increased reflectivity,

and the mineral layer.

### A.     Types of Waterproofing Bonds

#### 1.     *Adhesive Bond Products*



#### 2.     *PVC Products*

51

CONFIDENTIAL – ATTORNEYS' EYES ONLY

245.     Polyvinyl chloride (PVC) waterproofing membranes are single-ply thermoplastic membranes.[103]  In sub-grade applications most applications are loose-laid, where there is no bond between the waterproofing membrane and the structure.    Joints between sheets of PVC waterproofing membranes are welded together, causing higher costs and more difficult installation than HDPE products.[104]  However, PVC products typically have no bond to concrete and poor performance on lateral water migration between the structure and the waterproofing membrane, should a breach in the membrane occur.   Sika's Sikaplan product is an example of a PVC membrane.[105]

### 3.     Bentonite Products

246.     Bentonite (a type of clay) products "encapsulate bentonite between layers of woven and nonwoven polypropylene" and are "intended to swell when hydrated," relying on the principle that waterproofing can be "obtained by maintaining permanent compression between the soil retention system and the concrete foundation."[106]   Bentonite products have a high ease of installation, though, as they are installed by loose-laying horizontal sheets under a slab on grade and hung vertically on the support of excavation on vertical structures.   Bentonite products have

---

[103] Based on a discussion with Greg Austin, I understand that the simplest PVC products are just sheets of plastic without any specific mechanism to bond to concrete.  However, there may be more sophisticated PVC products with alternative bonding technologies.

[104] "What Are Waterproofing Membranes Made Of?" Master Builders Solutions article dated December 17, 2018. (https://www.watertightconcrete.master-builders-solutions.com/latest-news/what-are-waterproofing-membranes-made-of, viewed on August 11, 2021.)

[105] Sikaplan Pre/Post Applied Loose-Laid Membrane. (https://usa.sika.com/en/construction/below-grade-waterproofing/pre-post-applied-loose-laid-membranes.html, viewed on September 16, 2021.)

[106] Below-Grade Blindside Waterproofing Membrane Systems by Justin Hensell and Paul Buccellato, dated May/June 2011, p. 8. (Downloaded from https://silo.tips/download/blindside-waterproofing-is-a on May 3, 2021.)

CONFIDENTIAL – ATTORNEYS' EYES ONLY

no bond to concrete and typically have poor performance on lateral water migration as compared to adhered membranes

247.    A disadvantage of Bentonite products in blindside waterproofing applications is that when the support of excavation  structural integrity is eroded over time for any of a number of reasons, it can reduce the pressure required to ensure watertightness, and the watertight integrity will be threatened.



108

### 4.    Mechanical Bond Products

248.    Mechanical bond products contain a layer of polyester fleece or nonwoven fabric laminated to a modified asphalt on other types of membranes and are intended to mechanically bond to the cast concrete. As the concrete hardens, "the bristles of the fleece attach to the

_____

108 Clay-Tite Bentonite Clay Waterproofing. (https://www.wrmeadows.com/clay-tite-bentonite-waterproofing-membrane/, viewed on August 12, 2021.)

CONFIDENTIAL – ATTORNEYS' EYES ONLY

concrete."[109]  Mechanical bond products include certain products offered by Mapei,[110] ███████

██████████████████

## B.    Types of Carrier Sheets in Waterproofing Membranes

249.    High Density Polyethylene (HDPE) is used as a carrier sheet to prevent tearing and to create an impermeable layer in waterproof membranes.  HDPE has good resistance to many chemicals.  HDPE also mitigates the movement of methane gas into structures.  HDPE is also flexible, which can ease installation.  Examples of products with a HDPE carrier sheet include the Preprufe membranes manufactured by GCP and AVM's Aussie Skin membranes.

250.    Thermoplastic – polyolefin (TPO) is a flexible membrane.  At least one product the Mira-Ply line manufactured by Carlisle utilizes a TPO membrane with a butyl adhesive that competes with adhered membranes.

251.    Polyvinyl chloride (PVC) membranes are also thermoplastic waterproofing membranes, which are typically loose-laid, particularly in blindside applications.  The sheets are welded, typically with hot air.   The welding provides seam strength at the overlaps.  Since the membrane is loose-laid they are venerable to the migration of water between the structure and the membrane should a breach on the membrane occur.  An example of a PVC membranes is Sika's Sikaplan.

## C.    Application of Waterproofing Membranes

---

[109] GCP Website, "Pre-applied Waterproofing: Understanding concrete bonding methods." (https://gcpat.com/en/about/news/blog/pre-applied-waterproofing-understanding-concrete-bonding-methods, viewed on May 3, 2021.)

[110] Mapei's Mapeproof membranes combine bentonite and mechanical bond systems.  (Mapei Mapeproof HW (https://www.mapei.com/us/en-us/products-and-solutions/products/detail/mapeproof--hw, viewed on September 16, 2021.))

███████████████████████████████████████

54

CONFIDENTIAL – ATTORNEYS' EYES ONLY

252.    Pre-applied waterproofing membranes are membranes that are applied prior to the concrete pour, and are also called blindside products because they are installed before the foundation and foundation wall.  Blind-side waterproofing membranes are applied to the soil support and then concrete is poured against the membrane  These products include the Preprufe membranes manufactured by GCP and AVM's Aussie Skin membranes.

253.    Post-applied waterproofing membranes are membranes that applied after the concrete is poured and have sufficiently cured.

254.    HDPE bonded blindside waterproofing membranes are products that have simple peel and stick applications for overlapping seams.  The overlapping seams are typically adhesive, making the adhesive-bonded simple to install.  This feature reduces labor costs for installation, and is preferred by customers.  These products include the Preprufe membranes  manufactured by GCP and AVM's Aussie Skin membranes.

**D.      AVM Did Not Have A Readily Available And Commercially Acceptable Non-Infringing Alternative To Replace The Accused Products at the Time of Infringement**

255.    Potential non-infringing alternatives would sacrifice many of the benefits of the '879 Patent and would likely result in inferior performance.  AVM has admitted that it markets the Accused Products as a direct replacement or "equal" for GCP's Preprufe products and that AVM specifically targets jobs specified for Preprufe (an HDPE adhesive bond product for blind-side applications).  As compared to the other waterproofing membranes available, the technology on an adhered blindside membrane is superior.

256.    To begin, I understand that AVM tried to introduce a dark gray non-infringing alternative into the market, which failed.  According to Mr. Miller, AVM sold some Aussie Skin 550 G that was a dark gray color that went to Texas and Colorado.  I further understand that the

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Colorado job site experienced issues with the dark gray product "expanding and contracting" and

decided to switch to GCP's Preprufe rather than accepting replacement Aussie Skin 550.   As the

'879 patent explains:

> [R]eflective inorganic particles protect the waterproofing membrane
> from sunlight exposure and, thus, provide a good bond to concrete.
> These particles keep the membrane cooler and block damaging UV
> exposure, thus minimizing the rate of degradation of the pressure
> sensitive adhesive. Membranes without substantially reflective
> particles will suffer degradation of the pressure sensitive adhesive
> by heat and UV radiation and will not bond well to concrete after
> such exposure.

257.     The patent claims a waterproofing membrane without a release sheet: this is a key

feature that is not available with most non-infringing alternatives.  A release sheet has higher

installation and labor costs, as the patent explains:

> [T]ypical commercial waterproofing membranes include a
> removable release sheet that is used to prevent the adhesive portion
> of the membrane from adhering to the carrier sheet or other portion
> of the membrane when the membrane is rolled up. This release sheet
> must be removed from the membrane prior to or during installation
> and disposed in the trash, thus creating environmental waste.

258.     Non-infringing alternatives that include release sheets do not confer the benefits of

the '879 patent.  Products with release sheets include Preprufe 300R manufactured by GCP and

Voltex Manufactured by CETCO.

259.     Finally, I understand that GCP's Preprufe products were no longer patent-protected

as of 2015.  Copycats of Preprufe have entered the market, but most products utilize a release

sheet, which would eliminate one of the benefits of the Patent-in-Suit.

260.     According to Mr. Miller, AVM prefers the mineral layer found on its Aussie Skin

products to the smooth face of the Preprufe-like products because it "provides a better

CONFIDENTIAL – ATTORNEYS' EYES ONLY

robustness[.]"[112]  Mr. Miller further testified that when AVM speaks to an applicator, "the mineral layer is a big advantage" for the reasons noted below.[113]

> Q.      And how is the mineral layer an advantage?
>
> A.      So it really just boils down to the robustness.  So the acrylic layer of Preprufe can get hard to describe, but if you were to drag something over the top of Preprufe, it can catch on that acrylic layer, and then dig into it and rip it apart, whereas the mineral layer acts more like a ball bearing.  So as you drag it, its gives it a chance to roll.  In addition the mineral layer provides some fire protection, which is a big advantage.  Depending on the project. … for those projects with deeper concrete slabs, sometimes that's a big advantage.

## XVI.   RESERVATION OF RIGHTS

261.    I reserve the right to modify or supplement the opinions, analysis, and conclusions set forth in this report based on any rulings made by the Court or based on any additional discovery performed by the parties.  I am also aware that AVM may be submitting expert reports concerning various issues.  I reserve the right to testify in response to subjects set forth in any of those reports.  In addition, I may testify in response to evidence put forward by AVM at trial.

**WISS, JANNEY, ELSTNER ASSOCIATES, INC.**

Douglas R. Stieve, AIA, RRC
Senior Principal

Dated:  September 22, 2021

---

[112] Ex. 8 (Miller Dep. at 180).
[113] Ex. 8 (Miller Dep. at 75 - 76.  *See also* Ex. 8 (Miller Dep. at 55 ("the mineral layer provides some nice advantages").

CONFIDENTIAL – ATTORNEYS' EYES ONLY

# APPENDIX A

# WJE

**CURRICULUM VITAE**

Douglas R. Stieve | Senior Principal

---

**DOUGLAS R. STIEVE, RA, AIA, RRC**
**SENIOR PRINCIPAL, WISS, JANNEY, ELSTNER ASSOCIATES, INC.**

## Experience

Mr. Douglas Stieve is a building envelope consultant with a specialization in roof and waterproofing consulting as well as masonry construction. Since joining WJE in 1991, he has provided professional services for over eight hundred buildings and other structures. Mr. Stieve has experience with many types of materials including low- and steep-slope roofing as well as plaza deck, vegetative roof, and subgrade waterproofing systems. He also has experience with masonry, glazed curtain walls, natural stone, and Exterior Insulation and Finish Systems (EIFS).

Mr. Stieve has managed the design and construction period services for several multimillion-dollar repair and rehabilitation projects as well as provided consulting services to architects, contractors, and owners for new buildings. His work includes some of the largest and most complicated waterproofing projects in the New York metropolitan area.

Projects that Mr. Stieve has been involved with have won awards at the national, state, and local levels from organizations including the American Institute of Architects, *Engineering News Record*, and the National Trust for Historic Preservation. He has also authored several articles and technical papers and has lectured throughout the United States on the subjects of roofing, waterproofing, and masonry construction.

## Education

Mr. Stieve holds a Bachelor of Architecture from the University of Oklahoma.

## Qualifications

Mr. Stieve is a registered architect in the states of Connecticut, Delaware, Florida, Massachusetts, New Jersey, New York, and Pennsylvania. Mr. Stieve is also a Green Roof Professional, Registered Roof Consultant, and holds a National Council of Architectural Registration Boards certificate.

## Civic and Professional Associations

Mr. Stieve is a member of the American Institute of Architects

Mr. Stieve is a member of ASTM International.

Mr. Stieve is a member of the Deep Foundations Institute.

Mr. Stieve is a member of Green Roofs for Healthy Cities.

Mr. Stieve is a member of the New York City Department of Buildings - Construction Requirements and Materials Committee

Mr. Stieve is a member of IIBEC

WJE  **CURRICULUM VITAE**
Douglas R. Stieve | Senior Principal

## Publications

Stieve, Douglas R.; Torres, Jesse, *Redundancy in Subgrade Waterproofing*, Durability + Design, 2017.

Stieve, Douglas R., *The Hidden Details of Blindside Waterproofing*, Interface Magazine, 2017.

Rzeznik, Michael J.; Stieve, Douglas R., *Fire Resistance of Exterior Cladding Materials*, Interface Magazine, September 2017, p.10-20.

Stieve, Douglas R., *TA-008-2015 Commentary Regarding Self-Adhesive, Modified-Bitumen Roofing Products and Systems*, RCI Web Site, 2015.

Stieve, Douglas R., *RCI TAC Position Statement on Waterbased Adhesives*, RCI Web Site, 2013.

Stieve, Douglas R., *Building Envelope Peer Reviews- Tips and Techniques*, Interface (RCI), September 2012, p. 13-20.

Cook, Richard L; Stieve, Douglas R., *Keep an Eye on the Roof*, College Planning & Management, March 2011, p. 42-46.

Cook, Richard L; Stieve, Douglas R., *Proactive Maintenance, School Planning & Management*, March 2011, p. 41-45.

Stieve, Douglas R.; Torres, Jesse, *Waterproofing Challenges in New and Existing Construction*, Applicator (SWRI), v. 32 n. 2, Summer 2010, p. 26-30.

Stieve, Douglas R., *Waterproofing Design and Detailing for Green Roofs*, Greening Rooftops for Sustainable Communities National Convention, 2009.

Stieve, Douglas R., *Fluid-applied Flashings for Bituminous Roof Systems*, RCI Inc. National Convention, 2008.

Stieve, Douglas R., *Masonry Wall Flashings*, Interface (RCI), v. 15, n. 7, August 2007, p. 5-10.

Stieve, Douglas R., *Repair and Restoration of Historic and Contemporary Brick Masonry* - RCI Inc. National Convention, 2006.

Stieve, Douglas R.; De Leon, Alicia E. Diaz; Drerup, Michael J., *Assessing the Apparent Watertight Integrity of Building Facades*, ASTM STP 1444, 2004, p. 316-323.

Normandin, Kyle C.; Shotwell, L. Brad; Stieve, Douglas R., *Cleaning Atmospheric Pollutants and Contaminants from Masonry Surfaces Modern and Traditional Methods*, North American Masonry Conference, 9th, June 2003, p. 621-632.

Bresler, Michael L.; Stieve, Douglas R., *Roofing: Repair, Recover, or Replace, Building Operating Management*, v. 49 n. 4, 2002, p. 46-54.

Stieve, Douglas R., *Splice Joints in Metal Flashings*, Masonry Construction, v. 15 n. 4, 2002, p. 34-36.

Beasley, Kimball J.; Stieve, Douglas R., *Assessing Building Wall System Failures, Forensic Engineering: Investigation of Failures*, London, (Neale, ed.), Thomas Telford, 2001, p. 212-219.

Stieve, Douglas R., *Flashing Brick-Veneer Walls*, Fine Homebuilding, n. 142, October/November, 2001, p. 62-67.

Stieve, Douglas R., *Failures- Masonry Mortar Selection*, Construction Specifier, v. 51 n. 6, June 1998, p. 104.

# WJE

## Presentations

*Addressing the Apparent Watertight Integrity of Building Facades*

*Ask the Structure - Common Causes of Construction Defects*

*Below-grade and Plaza Waterproofing*

*Below Grade Waterproofing System Types and Usage*

*Building Envelope Peer Reviews - Tips and Techniques*

*Building Science of Fire Protection for Exterior Cladding Systems*

*Design Issues and Considerations for Improving Sustainable Roof Design*

*Exterior Restoration of The Custom House*

*Evaluation of New and Existing Decks for Plaza and Green Roof Waterproofing Systems*

*Fluid-Applied Flashings for Bituminous Roof Systems*

*FM 1-49 and FM 1-52: Perimeter Flashings and In-situ Testing*

*Green Roof Maintenance: The Green Art*

*Historic Masonry Repair and Restoration*

*Hot-applied, Rubberized-asphalt Waterproofing*

*Innovations in the Planning, Design, and Testing of Green Roof Systems*

*Low-Slope Roofing and Waterproofing 101*

*Masonry Water Testing Basics*

*Planning and Selection of Waterproofing Membranes for Green Roofs*

*Professional Consulting Today - History, Roles, and Practice*

*Repair and Restoration of Deteriorated Terra Cotta*

*Restoration and Repair of Historic and Contemporary Brick Masonry*

*Roofing Adhesives*

*Roofing and Waterproofing*

*Subgrade and Plaza Deck Waterproofing - Considerations for Waterproofing the Built Environment*

*Subgrade Waterproofing Failures - Tips and Techniques for Successful Repairs*

*Top Ten Problems Observed in New Masonry Construction*

*Water Infiltration Through Building Facades*

*Water-Resistive Barriers - Tying It All Together*

**WJE**

<span style="color:orange">**CURRICULUM VITAE**</span>

Douglas R. Stieve | Senior Principal

---

## Professional services during trial, litigation, or deposition requiring testimony

**The Metropolitan Downtown Columbia Parcel C**
Columbia, MD
Mediation, 2020

**Miami-Dade South District Wastewater Treatment Plant**
Homestead, FL
Deposition, 2019

**No. 7 Line Extension Site J**
New York, NY
Deposition, 2017

**Walker Art Center**
Minneapolis, MN
Arbitration, 2017

**The Carlyle Garage**
New York, NY
Trial, 2016

**Rohrick Cadillac**
Pittsburgh, PA
Arbitration, 2016

**The Carlyle Garage**
New York, NY
Deposition, 2014

**Sachem East High School**
Farmingville, NY
Mediation, 2010

**South Ferry Structural Box**
New York, NY
Dispute Resolution Board Hearing (arbitration), 2008

**444, 448, 450 West 56th Street**
New York, NY
Litigation, 2007

**201 East 25th Street**
New York, NY
Arbitration, 2004

# APPENDIX B

GCP00002498-GCP00000536
GCP00018177-GCP00018191
GCP00051272-GCP00051283
GCP00069570-GCP00069578
GCP00069579-GCP00069583
GCP00069594-GCP00069596
GCP00069599
GCP00069600
GCP00069601-GCP00069606
GCP00069607
GCP00069608
GCP00069609
GCP00069610
GCP00069611
GCP00069612-GCP00069613
GCP00069614-GCP00069618
GCP00069619
GCP00069620
GCP00069621
GCP00069622
GCP00069623
GCP00069624
GCP00069625
GCP00069626
GCP00069627
GCP00069628
GCP00069629
GCP00069630
GCP00069631
GCP00069632
GCP00069634
GCP00069635
GCP00069636
GCP00069637
GCP00069639
GCP00069640
GCP00069641
GCP00069642
GCP00069643
GCP00069644
GCP00069645
GCP00069646
GCP00069647
GCP00069648
GCP00069649
GCP00069650

GCP00069652
GCP00069655
GCP00069656
GCP00069657-GCP00069671
GCP00069672
GCP00069673
GCP00069674
GCP00069675
GCP00069676
GCP00069677
GCP00069678
GCP00069679
GCP00069680
GCP00069681
GCP00069682
GCP00069683
GCP00069684
GCP00069685
GCP00069686
GCP00069687
GCP00069688
GCP00069689
GCP00069691-GCP00069705
GCP00069706
GCP00069707
GCP00069708
GCP00069709
GCP00069710
GCP00069711
GCP00069712
GCP00069713
GCP00069714
GCP00069715
GCP00069716
GCP00069717
GCP00069718
GCP00069719
GCP00069720
GCP00069721
GCP00069722
GCP00069723
GCP00069726
GCP00069727-GCP00069735
GCP00069736
GCP00069737
GCP00069738

GCP00069739
GCP00069740
GCP00069741
GCP00069742
GCP00069743
GCP00069744
GCP00069745
GCP00069746
GCP00069747
GCP00069748
GCP00069749
GCP00069750
GCP00069751
GCP00069752
GCP00069753
GCP00069756
GCP00069757
GCP00069758
GCP00069759
GCP00069760
GCP00069761-
GCP00069762
GCP00069763
GCP00069764
GCP00069770
GCP00069772
GCP00069773
GCP00069774
GCP00069775
GCP00069776
GCP00069777
GCP00069778
GCP00069779
GCP00069780-GCP00069788
GCP00069789
GCP00069790
GCP00069791
GCP00069792
GCP00069793
GCP00069794
GCP00069795
GCP00069796
GCP00069797
GCP00069798
GCP00069799
GCP00069800

GCP00069801
GCP00069802
GCP00069803
GCP00069804
GCP00069805
GCP00069806
GCP00069809
GCP00069810
GCP00069811
GCP00069812
GCP00069813
GCP00069814
GCP00069815
GCP00069816
GCP00069817
GCP00069823
GCP00069825-GCP00069848
GCP00069849-GCP00069853
GCP00069854-GCP00069862
GCP00069863-GCP00069864
GCP00069866-GCP00069868
GCP00069869
GCP00069870-GCP00069873
GCP00069874
GCP00069880
GCP00069881
GCP00069882
GCP00069883
GCP00069884-GCP00069888
GCP00069889-GCP00069893
GCP00069894
GCP00069895-GCP00069903
GCP00069907
GCP00070103
GCP00070104-GCP00070105
GCP00070107-GCP00070108
GCP00071228
GCP00071963
AVMI90100000069-AVMI90100000150
AVMI90100000151-AVMI90100000210
AVMI90100000238-AVMI90100000245
AVMI90100000466-AVMI90100000468
AVMI90100000904-AVMI90100000913
AVMI90100001167-AVMI90100001176
AVMI90100006158
AVMI90100006163

AVMI90100006270-AVMI90100006271
AVMI90100006272-AVMI90100006274
AVMI90100010015-AVMI90100010136
AVMI90100010973-AVMI90100010981
AVMI90100011060-AVMI90100011061
AVMI90100011063-AVMI90100011065
AVMI90100011283-AVMI90100011364
AVMI90100020646-AVMI90100020653
AVMI90100028731-AVMI90100028733
AVMI90100029127
AVMI90100029251-AVMI90100029291
AVMI90100029497-AVMI90100029537
AVMI90100030968

U.S. Patent No. 8,713,879
AVM's Responses to GCP's First Requests
for Admissions
AVM's Responses to GCP's First Set of
Interrogatories
AVM's Responses to GCP's Second Set of
Interrogatories
Transcript of April 22, 2021 Deposition of
Paul Miller
Transcript of April 29, 2021 Deposition of
Vince Caserta
Transcript of April 30, 2021 Deposition of
Amir Rudyan
Transcript of April 23, 2021 Deposition of
Greg Austin
GCP's Final Infringement Contentions
Dkt. 101 [Claim Construction Opinion]

The materials cited in my Report.

Exhibit 102

# EXHIBIT 13

**PRIVILEGED & CONFIDENTIAL; PREPARED FOR LITIGATION**

| Product name | Location | Reflective idex used for cement | Dv (50%) (um) | Date when measument was done |
|---|---|---|---|---|
| AVM 550-Sample 1 | Random | 1.77 | 476 | 2/4/2019 |
| AVM 550-Sample 2 | Random | 1.77 | 538 | 2/4/2019 |
| AVM 550-Sample 3 | Random | 1.77 | 606 | 10/25/2019 |
| AVM 550 -Sample 1 | Random | 1.68 | 477 | 2/4/2019 |
| AVM 550-Sample 2 | Random | 1.68 | 538 | 2/4/2019 |
| AVM 550-Sample 3 | Random | 1.68 | 614 | 10/25/2019 |
| | | Average | 543 | |
| | | | | |
| AVM 560-Sample 3 | Lap side | 1.77 | 549 | 10/22/2019 |
| AVM 560-Sample 5 | Non lap side | 1.77 | 673 | 10/22/2019 |
| AVM 560-Sample 1 | Random | 1.68 | 627 | 9/23/2019 |
| AVM 560-Sample 2 | Random | 1.68 | 559 | 9/23/2019 |
| AVM 560-Sample 3 | Lap side | 1.68 | 550 | 10/22/2019 |
| AVM 560-Sample 4 | Lap side | 1.68 | 589 | 10/25/2019 |
| AVM 560-Sample 5 | Non lap side | 1.68 | 656 | 10/22/2019 |
| AVM 560-Sample 6 | Non lap side | 1.68 | 633 | 10/25/2019 |
| | | Average | 602 | |

| Product Name | Location | Refractive Index used for Cement | Dx (10) (µm) | Dx (50) (µm) | Dx (90) (µm) | D [4,3] (µm) | D [3,2] (µm) | Span (90,10) | Result Below (99.9) µm (%) | Result Below (32) µm (%) | Result Below (45) µm (%) | Specific Surface Area (m²/kg) | Date When Measurment was done |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AVM 560 -Sample 1 | Random | 1.68 | 370 | 627 | 1030 | 667 | 543 | 1.057 | 0.88 | 0 | 0 | 3.51 | 9/23/2019 |
| AVM 560 -Sample 2 | Random | 1.68 | 297 | 559 | 965 | 599 | 461 | 1.196 | 1.21 | 0 | 0.04 | 4.128 | 9/23/2019 |
| AVM 560 -Sample 3 | Lap Side | 1.68 | 289 | 550 | 972 | 596 | 453 | 1.244 | 1.26 | 0 | 0.06 | 4.206 | 10/22/2019 |
| AVM 560 -Sample 4 | Lap Side | 1.68 | 312 | 589 | 1030 | 634 | 483 | 1.224 | 1.18 | 0 | 0.01 | 3.941 | 10/25/2019 |
| AVM 560 -Sample 5 | Non Lap Side | 1.68 | 416 | 656 | 1030 | 691 | 584 | 0.932 | 0.69 | 0 | 0 | 3.259 | 10/22/2019 |
| AVM 560 -Sample 6 | Non Lap Side | 1.68 | 370 | 633 | 1040 | 672 | 541 | 1.061 | 0.97 | 0 | 0 | 3.522 | 10/25/2019 |



| Property | Aussie Skin 550 | | | Aussie Skin 550 | Aussie Skin 560 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Xia/Huhe | Nasin | Wiercinski | Xia -2019 | Xia -2019 | |
| flexible carrier sheet | 30 mil sheet of HDPE/EVA blend | | 35 mils | | 1.648 mm (64.9 mils) | |
| pressure sensitive adhesive | yl blend PSA (preliminary FTIR analysis) | | | | | |
| Reflectivity | | | 62.2 | | 63.2 | |
| Adhesive thickness (microns) | 381 | 200-250 SEM | 419 by weight | 394.4 | 306.5 | Solvent Method |
| Selvedge adhesive thickness (microns) | | | | | 463 | |
| Average particle diameter (microns), PSD | | no | no | 614 | 602 | Dv(50%) |
| Average particle diameter (microns) | | 800 +/-300 SEM | 628 | | | |
| Particle chemistry | Mullite and Cristobalite | Feldspar, olivine spinel | | | hydrated white cement based material | XRD |
| Percent particle coverage % | | 76 | 75 | | 90% | 500 Point, point counts |
| release sheet | none | none | none | | | |

Exhibit 110

# EXPERT REPORT OF ROBERT WIERCINSKI

GCP APPLIED TECHNOLOGIES, INC.

v.

AVM INDUSTRIES, INC.

CASE NO. 2:19-CV-07475

U.S. DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

CONFIDENTIAL - ATTORNEYS' EYES ONLY

TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................2

II.     QUALIFICATIONS ..............................................................................................2

III.    MATERIALS CONSIDERED ..............................................................................4

IV.     SUMMARY OF OPINIONS .................................................................................4

V.      UNDERSTANDING OF LEGAL PRINCIPLES...................................................5

VI.     LEVEL OF ORDINARY SKILL IN THE ART ...................................................7

VII.    THE COURT'S CLAIM CONSTRUCTION.........................................................8

VIII.   ACCUSED G PRODUCTS HAVING WHITENESS VALUES BETWEEN 45%
        AND 55% EXHBIT A WHITNESS VALUE EQUIVALENT TO "GREATER
        THAN 55%" ..........................................................................................................9

IX.     MISCELLANEOUS ...........................................................................................13

CONFIDENTIAL - ATTORNEYS' EYES ONLY

## I.      INTRODUCTION

1.      I, Robert Wiercinski, have been retained by Baker & Hostetler LLP on behalf of GCP Applied Technologies, Inc. ("GCP") as an expert in the field of waterproofing membranes, and more particularly in the waterproofing membranes that bond to concrete cast against it (i.e., pre-applied membranes/post-cast concrete).

2.      I understand that GCP is alleging that AVM Industries, Inc. ("AVM") infringed U.S. Patent No. 8,713,879, entitled "Waterproofing Membrane" ("the '879 Patent"), in a lawsuit brought in the United States District Court for the Central District of California.  I have been retained to provide my opinion on how a waterproofing membrane with an outer exposed layer that exhibits a whiteness value of greater than 55% is insubstantially different from a waterproofing membrane that exhibits a whiteness value of between 45% and 55%.

3.      I am being compensated for my time in this matter at a rate of $100 per hour plus expenses for research and preparing my report and testifying at a deposition and trial.  This compensation is not contingent upon my opinion or performance, the outcome of this proceeding, or any other issues involved in or related to this proceeding.

4.      I have not given any expert testimony at trial or by deposition in the past four years. I was deposed as a witness in this case on April 20, 2021.

5.      I understand that this report will be used in the lawsuit, and I am prepared to testify about its contents in a deposition, hearing, or trial.

## II.      QUALIFICATIONS

6.      In 1973, I graduated from Michigan Technological University in Houghton, Michigan. In 1978, I received my Ph.D. in Polymer Chemistry from The University of Connecticut in Storrs, Connecticut. The general topic of my Ph.D. dissertation was polymeric liquid crystals.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

A liquid crystal is a compound that exhibits orientation in the liquid phase whereas ordinary liquids are isotropic, *i.e.*, disordered. The ability to achieve liquid crystalline properties for a polymer was demonstrated by synthesizing and characterizing polymers that have repeat units that are very much like small molecule liquid crystals.

7.     In 1978, I begin my career as a development chemist at General Electric Co. in Pittsfield, Massachusetts. There, I primarily worked on developing polycarbonate/PET (polyethylene terephthalate) blends. I also developed a one component, epoxy liquid injection molding compound to produce large parts.

8.     In 1981, I began working at W.R. Grace & Co., which eventually became GCP Applied Technologies, in Cambridge Massachusetts. Except for four years spent on other projects, I worked exclusively on the development of waterproofing products for W.R. Grace/GCP Applied Technologies during my 37-year career there. Three of those four years not spent on waterproofing products were spent on a tissue engineering project and a little over a year was spent on a high barrier PET compound for carbonated beverage applications. During my time at W.R. Grace/GCP, I held six different positions: Research Associate, Senior Research Associate, Technical Supervisor, Research Manager, Principal Scientist, and R&D Fellow. All of my positions were technical positions, and my role as Technical Supervisor and Research Manager were managerial in nature where I managed small research and development groups. The other four were spent as a front-line scientist. However, even in the managerial positions, I handled significant activities on my own.

9.     While at W.R. Grace/GCP, I developed a comprehensive portfolio of waterproofing products for the building envelope industry, including the company's and the waterproofing industry's flagship pre-applied waterproofing membrane (PREPRUFE®), roofing underlayments

CONFIDENTIAL - ATTORNEYS' EYES ONLY

(Grace Ice & Water Shield®), post applied waterproofing membranes (BITUTHENE®), air barriers (PERM-A-BARRIER®), flashing tapes, sealants, and primers. In doing so, I performed cost-reduction, raw material replacement, and technical analysis. I collaborated with customers, marketing, sales, manufacturing, technical service, engineering, quality control, logistics, environmental health and safety, and human resources. I mentored numerous R&D professionals. I am also listed as an inventor on 33 U.S. patents.

10.     To keep up to date with current developments in the waterproofing membrane industry, I regularly review patent literature, journal articles, and competitive product literature.

11.     My current curriculum vitae is attached as Appendix A.

## III.    MATERIALS CONSIDERED

12.     In reaching the opinions expressed in this report, I have reviewed, among other materials, the '879 Patent, and testing documents produced by GCP engineers and technicians. These materials are referenced in the body of this report, but include at least: GCP00069624; GCP00071963; GCP00069673; GCP00069641; GCP00069707; GCP00069720; Aussie Skin 550G 20200815 April 2021.  I would also note that because of my background, and my involvement with the '879 Patent, I am familiar with other materials involved in this case and may discuss them if asked, for example, the exhibits to my deposition of April 20, 2021 and the information discussed in that deposition.

## IV.    SUMMARY OF OPINIONS

13.     As part of my engagement, I have been asked to opine on whether a waterproofing membrane having a reflective surface that exhibits a whiteness value of 55% is insubstantially different to waterproofing membrane having a reflective surface that exhibits a whiteness value of between 45% and 55% in the context of infringement under the doctrine of equivalents of certain

claims of the '879 patent by the AUSSIE SKIN® 550G and 560G products ("the Accused G Products").

14.     As I will explain in more detail below, it is my considered opinion that a waterproofing membrane having a reflective surface that exhibits a whiteness value of 55% is insubstantially different to a waterproofing membrane having a reflective surface that exhibits a whiteness value of between 45% and 55%.

15.     If asked to do so, I may also testify about general background of waterproofing membrane technology and industry, and the '879 patent in particular.

## V.     UNDERSTANDING OF LEGAL PRINCIPLES

16.     I am not a legal expert and offer no legal opinions.  I have been informed by counsel, however, of the various legal standards that apply to the pertinent technical issues, and I have applied those standards in arriving at the conclusions expressed in this report.  I understand that a determination of patent infringement involves two steps.  First, the Court construes the claims.  Then, the construed claims are compared to the allegedly infringing device or process to determine whether the device or process infringes.

17.     I understand that a United States patent has "claims" which are supposed to provide the scope of the invention.  These are generally in a numbered list at the end of the issued patent. The claims are made up of "limitations" which are supposed to provide the "metes and bounds" of the invention (and can also be referred to as "elements").  I understand that there can be "independent" and "dependent" claims, and that a dependent claim incorporates all the limitations of the claim from which it depends.

18.     I understand that some of the asserted claims are "independent" and some are "dependent."  I understand that dependent claims include all of the requirements of a particular

5

independent claim, plus additional requirements of their own. As a result, if an independent claim is not infringed, its dependent claims are also not infringed. On the other hand, if an independent claim has been infringed, it is still necessary to separately decide whether any dependent claims have also been infringed.

19.     I understand that a proper infringement analysis requires two steps.  First, the claim language must be interpreted by the Court.[1]  I have reviewed the Court's claim constructions applicable to the '879 patent, and will use them to interpret the asserted claims.

20.     The second step of a patent infringement analysis is to compare the claim language (as interpreted by the Court) to the accused product or process.

21.     I understand that an asserted claim of a patent may be directly infringed either "literally" or under the "doctrine of equivalents."

22.     I further understand that even if literal infringement does not exist, there may still be infringement under the "doctrine of equivalents."  More specifically, I understand that even if a claim limitation is not literally present or performed by an accused device, such limitation may be found present under the doctrine of equivalents.  I understand that to find infringement under the doctrine of equivalents, any differences between the claimed invention and the accused product or method must be insubstantial to a person of ordinary skill in the art.  I also understand that one way of demonstrating that a difference is insubstantial is to show, on a limitation-by-limitation basis, that the accused product performs substantially the same function in substantially the same way to reach the same result as each limitation of the asserted claim.  However, I further understand that the doctrine of equivalents cannot be used to eliminate a claim limitation, and that each element contained in a patent claim is deemed material in defining the scope and limits of the

---

[1] *See* Opinion Construing Claims of Patent in Suit, August 4, 2021 (Dkt. 101).

CONFIDENTIAL - ATTORNEYS' EYES ONLY

patented invention.

## VI.    LEVEL OF ORDINARY SKILL IN THE ART

23.    I have been instructed that my analysis and opinions expressed in this report should be rendered based on the perspective of a person of ordinary skill in the art at the time of the invention ("POSITA").

24.    I have been further instructed that a POSITA is a hypothetical person presumed to have known about the relevant art at the time of the invention of the patent in question.

25.    I have also been told that the "time of the invention" here is February 8, 2010, the date that the PCT application, to which the '879 Patent claims priority, was filed in accordance with the Patent Cooperation Treaty.

26.    I have been told that in determining the level of ordinary skill in the art, I am to consider various factors, including: (a) the type of problems encountered in the art or field of invention; (b) prior art solutions to those problems; (c) the rapidity with which innovations are made; (d) sophistication of the technology; and (e) the educational level of active workers in the field.

27.    In my opinion, the relevant "art" or "field" of the claimed invention of the '879 Patent is waterproofing membranes, and in particular waterproofing membranes that bond to concrete case against it (i.e., post-cast concrete).  As described above, I have extensive experience in this field.

28.    It is my opinion that the hypothetical POSITA at the time of the invention of the '879 patent would have had at least seven to ten years of experience with building materials, especially those designed to repel water or prevent water ingress and damage, specifically in commercial waterproofing applications.

7

## VII.    THE COURT'S CLAIM CONSTRUCTION

29.    I understand the Court provided its construction of various terms of the asserted claims of the '879 patent.  I apply these claim constructions in my analysis.  The following table summarizes the claim terms, relevant claims, construction, and citations to the Court decision.[2]

| Claim term | Construction | Citation |
|---|---|---|
| "membrane" | "a thin pliable sheet of material forming a barrier or lining" | CC at 4 |
| "flexible carrier sheet" | "a thin film, extrusion coating, or fabric that is the mechanical backbone of the membrane" | CC at 5 |
| "waterproofing pressure sensitive adhesive" | no construction; plain and ordinary meaning | CC at 6-7 |
| "outer exposed surface" | "the surface of the layer of the adhesive opposite the surface that is bonded to the carrier sheet and is accessible to have concrete cast directly against it" | CC at 8-9 |
| "substantially reflective inorganic particles" | "inorganic particles that, when covering 70-100% of the surface of a layer of pressure sensitive adhesive, impart a minimum whiteness value to the surface as measured by reflectometry"[3] | CC at 9 |
| "substantially reflective" | "the outer exposed layer of the pressure sensitive adhesive, 70-100% covered by substantially reflective inorganic particles, so as to exhibit a whiteness value of greater than 55% as measured by reflectometry" | CC at 10-14 |
| "substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive" | "70-100% of the surface area of the outer exposed surface of the pressure sensitive adhesive is coated with the particles, as measured by electron microscopy" | CC at 15-17 |
| "removable release sheet" | "a film or paper that covers the outer exposed adhesive layer in whole or in large part to prevent that layer from adhering to the carrier sheet of the membrane when the membrane is rolled up" | CC at 18-22 |

---

[2] "CC" means the Opinion Construing Claims of Patent in Suit, August 4, 2021 (Dkt. 101).
[3] This Construction was stipulated to by the parties. The Court utilized this Construction in considering terms "substantially reflective surface" and "substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive." CC at 9.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

## VIII.   ACCUSED G PRODUCTS HAVING WHITENESS VALUES BETWEEN 45% AND 55% EXHBIT A WHITNESS VALUE EQUIVALENT TO "GREATER THAN 55%"

30.     Below I present my analysis that leads me to conclude that the Accused G Products have an outer exposed layer of the pressure sensitive adhesive that exhibit a whiteness value equivalent to "greater than 55%" as measured by reflectometry under the doctrine of equivalents.

31.     The '879 Patent has a total of seventeen claims, and they are listed beginning at column 9, line 45 and continue to column 10, line 65 of the '879 Patent.

32.     I understand that GCP is asserting, among other claims, Claim 1 in its lawsuit against AVM.  Claim 1 of the '879 Patent reads:

> 1.   *A waterproofing membrane comprising a flexible carrier sheet with two opposed surfaces, an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet such that the pressure sensitive adhesive has an average thickness in the range of 7 5 µm to 500 µm and has an outer exposed surface, and substantially reflec-tive inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive, wherein the sub-stantially reflective inorganic particles have an average diam-eter of about 100 µm to about 600 µm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer, wherein the substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface, and wherein the waterproofing membrane does not include a removable release sheet.*

33.     I understand that the Court construed the phrase "substantially reflective" in Claim 1 of the '879 Patent as follows: "the outer exposed layer of the pressure sensitive adhesive, 70-100% covered by substantially reflective inorganic particles, so as to exhibit a whiteness value of greater than 55% as measured by reflectometry."

34.     I have been asked to consider AUSSIE SKIN® 550G and 560G products with reflectivity/whiteness values below 55%, specifically, between 45% and 55% whiteness.

35.     My understanding is that certain AUSSIE SKIN® 550G and 560G products appear

CONFIDENTIAL - ATTORNEYS' EYES ONLY

to have reflectivity/whiteness values that are below 55%.  In my opinion, such products that have a reflectivity/whiteness value in the range of 45%-55% are insubstantially different from those at 55%.

36.    I relied upon testing performed by GCP's in-house engineers and technicians on AVM products as identified in this report in forming my below opinions.

37.    As disclosed in the '879 Patent, the reflectivity of a surface can be measured using a NOVO-SHADE reflectometer.

38.    In order to determine reflectivity/whiteness value of the AUSSIE SKIN® 550G and 560G products, GCP's engineers used a NOVO-SHADE reflectometer to measure the whiteness/reflectivity value of the products.

39.    GCP engineers and technicians measured the reflectivity of AUSSIE SKIN® 550G, batch number 20200525, at around 63.3%.[4]

40.    AVM provided GCP with samples of its AUSSIE SKIN® 550G product, batch number 20200815, and measured the reflectivity using a NOVO-SHADE reflectometer at around 50.3% reflectivity.[5]

41.    Based on the Court's claim construction, Claim 1 requires a reflectivity/whiteness value that is greater than 55%.  The reflectivity/whiteness value is to ensure that the reflective particles forming the reflective surface protect the adhesive against solar radiation and heat.

42.    A reflectivity/whiteness value of approximately 50.3% is insubstantially different than a limitation requiring "greater than 55%."

---

[4] GCP00069673.
[5] "Aussie Skin 550G 20200815 April 2021"

CONFIDENTIAL - ATTORNEYS' EYES ONLY

43.     Furthermore, a reflectivity/whiteness value of between 45-55% is insubstantially different than the requirement provided by the Court of "greater than 55%." I would note that the phrase "greater than 55%" would include even 55.1%.

44.     The reflective particles/surfaces of the AUSSIE SKIN® 550G and 560G products, at approximately 50.3%, or 45-55% more generally, perform the same function as a reflective particles/surface measuring greater than 55% in the substantially the same way, because the reflective particles/surfaces measuring 50.3%, or 45-55%, reflectivity reflect solar radiation and heat away from the adhesive in the same way or at the same level as a surface measuring a reflectivity greater than 55%.

45.     In my opinion, similar performance regarding waterproofing integrity is expected for a pre-applied waterproofing membrane, as taught by the '879 Patent, with a reflectivity of 45% to 55% versus a membrane with a reflectivity greater than 55% (e.g., 56% percent).  An explanation follows and includes a description of the membrane, a description of membrane installation, the relationship between bond strength and waterproofing integrity, the dependence of bond strength on pressure sensitive adhesive degradation, factors affecting pressure sensitive adhesive degradation, and a rationale for similar performance expected for membrane with a reflectivity of 45% to 55% versus a membrane with a reflectivity greater than 55%

46.     The three key elements of a pre-applied membrane as taught by the '879 Patent are a carrier sheet, a pressure sensitive adhesive layer, and a reflective particulate layer.

47.     Installation of a waterproofed structure having a pre-applied waterproofing membrane includes three key steps.  First the membrane is installed with the particulate layer facing outward.  Next reinforcing steel (e.g., rods, bars, or mesh) is installed. Finally, concrete is cast against the particulate surface and it encapsulates the reinforcing steel. Once the concrete is

CONFIDENTIAL - ATTORNEYS' EYES ONLY

cured, a bond is formed between the concrete and the membrane, where a strong bond is synonymous with good waterproofing integrity.

48.     A key factor that may have a detrimental effect on the pre-applied waterproofing membrane's bond to concrete is the level of pressure sensitive adhesive degradation caused by heat and sunlight exposure prior to casting concrete. The reflective particulate on the top surface of the membrane provides for protection from degradation of the pressure sensitive adhesive from these elements (i.e., heat and sunlight exposure). Sunlight exposure to the particulate surface results in a heating of the membrane.  However, the higher the reflectivity/whiteness value of the particulate layer, the lower the membrane temperature.  Thus, higher reflectivity provides for lower membrane temperature and slower pressure sensitive adhesive degradation than for a membrane with lower reflectivity.  That is, a high reflectivity results in a lower membrane temperature, less pressure sensitive adhesive degradation, and a better bond to concrete as compared to the same results for a waterproofing membrane having lower reflectivity. This is evidenced by Example 2 in the '879 Patent,[6] which shows greater peel adhesion (less adhesive degradation) for waterproofing membranes having a particulate layer with a greater reflectivity while keeping all else equal.

49.     The rationale for expecting similar performance/bond strength/waterproofing integrity for a membrane with a reflectivity of 45% to 55% versus that for membrane with a reflectivity of, e.g., 56% is that the maximum difference in reflectivity, 11%, would result in only minor differences in exposure temperature/pressure sensitive adhesive degradation rate/bond to concrete/waterproofing integrity.

50.     A reflective surface of no less than 45% reflectivity provides the same function as

---

[6] Col. 8, lines 55-64.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

a membrane with a greater than 55% reflectivity surface, in that it reflects light and UV radiation and protects the adhesive from degradation at a similar level due to UV and heat buildup.

51.     A reflective surface of no less than 45% reflectivity provides protection to the adhesive in the same way as a reflective surface of greater than 55%, by providing a reflective surface that reflects UV and light so as to avoid the adhesive being exposed to the full force of UV and solar radiation (including light/heat) from the sun.

52.     A reflective surface of no less than 45% achieves the same result as a reflective surface measuring greater than 55% reflectivity, in that they both prevent adhesive degradation at a similar level by reflecting away UV and solar radiation.

53.     A difference of no more than 11% reflectivity will result in an adhesive that is substantially protected from UV and solar radiation during the time between when the membrane is positioned/installed and when concrete is cast against it.

54.     Therefore, a waterproofing membrane with an outer exposed layer of the pressure sensitive adhesive that exhibits a whiteness value of greater than 55% is insubstantially different from a waterproofing membrane that exhibits a whiteness value of no less than 45%, and does so in the same way as a reflective surface of greater than 55% reflectivity, in the same way, and to achieve the same result.  Therefore, it is my opinion that AUSSIE SKIN® 550G and 560G products with reflectivity/whiteness values between 45% and 55% whiteness are the equivalent of those that literally meet the Court's defined value of greater than 55% (e.g., 56%).

## IX.     MISCELLANEOUS

55.     I reserve the right to modify or supplement the opinions, analysis, and conclusions set forth in this report based on any rulings made by the Court or based on any additional discovery performed by the parties.  I am also aware that AVM may submit expert reports concerning various

CONFIDENTIAL - ATTORNEYS' EYES ONLY

aspects of patent invalidity and infringement. I reserve the right to testify in response to subjects set forth in such reports. In addition, I may testify in response to evidence put forward by AVM at trial. At trial, I may use demonstrative exhibits to explain opinions that I have set forth in my report.

56.    All of the statements made in this expert report are based upon my own personal knowledge and opinion. If asked to do so, I can and will testify competently about the contents of this expert report at any hearing or trial held in this lawsuit.


Robert Wiercinski                                           9/22/2021
                                                                  Date

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# APPENDIX A

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Except for a few years spent on other projects I've done nothing but work on the development of waterproofing products for W.R. Grace/GCP applied technologies for my 37-year career there**

## Education

| 1974-09 - 1978-05 | **Ph.D.: Polymer Chemistry** |
| | *The University of Connecticut - Storrs, CT* |

| 1969-09 - 1973-06 | **Bachelor of Science: Chemistry** |
| | *Michigan Technological University - Houghton, MI* |

## Dissertation topic

polymeric liquid crystals
A liquid crystal is a compound that exhibits orientation in the liquid phase whereas ordinary liquids are isotropic i.e. disordered. The ability to achieve liquid crystalline properties for a polymer was demonstrated by synthesizing and characterizing polymers that have repeat units that are very much like small molecule liquid crystals

## Work History

| 1981-11 - 2019-07 | **R&D Fellow** |
| | *GCP Applied Technologies Inc. (formerly W. R. Grace & Co.), Cambridge, MA* |

- Held six positions including four as a front-line scientist and two as an R&D manager. Managed small R&D groups
- Developed a comprehensive portfolio of waterproofing products for the building envelope including the company's and the waterproofing industry's flagship pre-applied waterproofing membrane (PREPRUFE®), roofing underlayments (Grace Ice & Water Shield®), post applied waterproofing membranes (BITUTHENE®) , air barriers (PERM-A-BARRIER®), flashing tapes, sealants, and primers
- Performed cost-reduction, raw material replacement, and technical service
- Collaborated with customers, marketing, sales, manufacturing, technical service, engineering, quality control, logistics, environmental health and safety, and human resources
- Mentored numerous R&D professionals
- 33 US patents

| 1978-09 - 1981-11 | **Development Chemist** |
| | *General Electric Co, Pittsfield, MA* |

- Developed a one component, epoxy liquid injection molding compound to produce large parts
- Developed polycarbonate/PET blends

**Positions held within W.R. Grace and Company and GCP applied technologies.**
The third and fourth positions were managerial positions and the others were technical positions. However even in managerial positions, I performed significant technical activities on my own:
- Research Associate
- Senior Research Associate
- Technical Supervisor
- Research Manager

CONFIDENTIAL - ATTORNEYS' EYES ONLY

- Principal Scientist
- R&D Fellow

**Work on Waterproofing Membranes**

Except for 4 years spent on other projects (three years on a tissue engineering project and 1+ years on a high barrier PET compound for carbonated beverage applications) I've done nothing but work on the development of waterproofing products for W.R. Grace/GCP applied technologies for my 37-year career there.

**Outline of Progression of Projects at W.R. Grace/GCP**

- Grace Roofing Membrane GRM which was an exposed modified bitumen peel and stick membrane for low slope roofing
- formulated a modified bitumen pressure sensitive adhesive comprising a sulfonated EPDM polymer
- formulated butyl adhesives to be used in exposed low slope roofing membranes
- formulated block copolymer modified bitumen adhesives for  Bituthene which is a membrane for waterproofing concrete for below grade and deck structural concrete applications
- contributed to the development of the first-generation Preprufe membrane.
- developed a one component aqueous emulsion based liquid applied air barrier coating, Perm a Barrier VPL
- developed a water-based primers and solvent-based primers for structural waterproofing applications
- developed a unique two component liquid applied waterproofing membrane. It's referred to as phase inversion technology. One component is an aqueous emulsion of a polymer. Second component comprises an oil that is compatible with the polymer and blended with a superabsorbent polymer. When the two components are mixed and spray applied transformation of the two component liquid into a one component solid occurs instantaneously.
- involved in the development of various aspects of ice and water shield roofing underlayment. Key contributions involve the formulation of various modified bitumen pressure sensitive adhesives as well as developments to enhance the dimensional stability/lay flat characteristics of Ice and Water Shield.
- principal investigator for the development of PV 100
- Principal investigator for the second generation Preprufe membranes i.e. Preprufe Plus. A family of 8 different product concepts was developed including the one that was commercialized
- Developed a silane terminated polyether based air barrier coating, Perm a Barrier VPL 50.
- Various raw material replacement and cost reduction projects over the entire career

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 111

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GCP APPLIED TECHNOLOGIES INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>AVM INDUSTRIES, INC., a California corporation,<br><br>    Defendant. | Case No.: 2:19-cv-07475-MWF-RAO<br><br>**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY** |

## REBUTTAL EXPERT REPORT
## OF ROBERT WIERCINSKI ON VALIDITY

HIGHLY CONFIDENTIAL –ATTORNEYS' EYES ONLY

## I.     INTRODUCTION

1.      I, Robert Wiercinski, have been retained by Baker & Hostetler LLP on behalf of GCP Applied Technologies, Inc. ("GCP") to consider and respond to the opinions in the expert report of Philip D. Dregger regarding the validity of certain claims in U.S. Patent No. 8,713,879 ("the '879 patent"), dated September 22, 2021 (the "Dregger Report").

2.      I submitted an initial expert report dated September 22, 2021, regarding how a waterproofing membrane with an outer exposed layer that exhibits a whiteness value of greater than 55% is insubstantially different from a waterproofing membrane that exhibits a whiteness value of between about 45% and 55% ("Wiercinski Opening Report").  My CV is attached to the Wiercinski Opening Report as Appendix A.  My professional background, qualifications, and compensation are in the Wiercinski Opening Report.

3.      I have considered the Dregger Report and the exhibits and appendices to that report. I have attached a list of the materials I reviewed in formulating the opinions in this Report as Appendix B, and I reference some of those materials in the body of this Rebuttal Report.

4.      I am prepared to testify in a deposition or in court with respect to any of the opinions in this Rebuttal Report.

5.      In this Report, I address various statements from the Dregger Report.  My failure to mention a statement in the Dregger Report does not mean that I agree with it.

6.      This Rebuttal Report cites portions of the asserted prior art, but the citations are not exhaustive.  If I am asked to explain the opinions in this Rebuttal Report, I may rely on other portions of the asserted prior art and my professional experience and knowledge of the art to explain my opinions.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## II.      RELEVANT LEGAL STANDARDS

### A.      Presumption of Validity

7.      I understand that each claim of an issued patent is entitled to a statutory presumption of validity and the party challenging a patent's validity, in this case AVM, must present clear and convincing evidence to overcome that presumption of validity.  I understand the presumption does not change for prior art references the Patent and Trademark Office cited during prosecution of the application that issued as a patent, but such references may have less weight in determining the validity of patent claims.

8.      I understand that each claim of a patent shall presumed valid independently of the validity of other claims and that dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.

### B.      Prior Art

9.      I understand that prior art for the claims in a patent include certain documents and things that predate the invention date of those claims, which is either the filing date of the application that became that patent, or the filing date of another patent application that is properly related to the patent.

10.      I understand that, other than some exceptions not relevant in this case, prior art for the claims of the patent-in-suit includes patents filed before or printed publications made publicly available before the claims' invention date, products or processes in public use or on sale before the claims' invention date, or other information available to the public before the claims' invention date.

11.      I am aware that a person of ordinary skill in the art at the time of the invention ("POSA") has knowledge of all prior art in the field of the inventor's endeavor and of prior art solutions for a common problem.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C.    Anticipation

12.    I understand that a patent claim is anticipated by prior art when a single prior art reference has or discloses each limitation of the claim, arranged as in the claim, and enables one of ordinary skill in the art to make and use the claimed invention.

### D.    Inherency

13.    I understand that a single prior art reference may anticipate without explicitly disclosing a limitation of the claimed invention if such limitation is necessarily present, or inherent, in the disclosure of that reference.

14.    I understand that to be inherent, the limitation that is alleged to have been inherent must necessarily have existed in the prior art reference; the fact that the limitation is likely to have existed is not sufficient.  I have been told that inherency is not established when the reference does not unavoidably or inevitably include the limitation in question.

15.    I understand that evidence outside of the prior art reference itself can be used to show that limitations not expressly disclosed in the reference are inherent in it.  I have been told that, for anticipation, the extrinsic evidence cannot supply a missing claim limitation.

### E.    Obviousness

16.    I understand that a patent claim is obvious if the differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.

17.    I understand that a prior art reference must be analogous to the claimed invention to be prior art for purposes of obviousness.  I have been told that prior art is analogous if it is from the same field of endeavor or if it is reasonably pertinent to the particular problem the inventor is trying to solve.  I have been told that a prior art reference is only reasonably pertinent when it

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

logically would have commended itself to an inventor's attention in considering his or her problem.

18.     I understand that this determination requires a comparison of the claimed invention with the asserted prior art references, and that one must avoid combining pieces of prior art with the benefit of hindsight.

19.     I understand that, because it is improper to use hindsight in deciding whether a claim is obvious, the obviousness determination requires considerations made before the claimed invention, and the claimed invention cannot serve as a roadmap for selecting or combining prior art references.

20.     I understand that the following factors should guide the determination of obviousness: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of skill in the art; and (4) any objective evidence of nonobviousness.

21.     I understand that the objective evidence of nonobviousness, sometimes called "secondary considerations," include:

> (a) whether there was a long felt, but unmet, need for the claimed invention;
>
> (b) any commercial success of products or processes practicing the claimed invention;
>
> (c) whether others attempted, but failed, to make the claimed invention;
>
> (d) whether the claimed invention achieved any unexpected results;
>
> (e) praise of the invention by others skilled in the art;
>
> (f) taking of licenses under the patent by others; and
>
> (g) copying of the invention.

22.     I understand that there must be a relationship or nexus between secondary considerations and the claimed invention.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

23.     I understand that a finding of obviousness cannot be based on conclusory statements but must be the result of articulated reasoning with some rational underpinning.

24.     I understand that obviousness is not established simply because all of the limitations of a patent claim can be found in the prior art.  Rather, there must be a reason a person of ordinary skill would have thought to combine the limitations to achieve the claimed invention.  I have been told that the skilled artisan must have had motivation to combine the references and also had a reasonable expectation of success in combining the references that would have yielded the claimed invention.  I further understand there is no obviousness unless a properly motivated combination of prior art elements would have something that is within the patent claim.

25.     I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results. I have been told that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

## II.     THE ASSERTED PATENT

26.     The '879 patent was filed on May 10, 2013, and is a continuation of application No. 13/577,460, filed as application No. PCT/CN2010/000166, on February 8, 2010.  I have been told that February 8, 2010 is the effective filing date for the claims of the '879 patent.

27.     I have been informed that GCP has asserted claims 1-5, 7-8, 10-13, and 15-17 of the '879 patent (the "Asserted Claims") against AVM in this action.  The Asserted Claims read as follows:

1[pre]  A waterproofing membrane comprising

    1[a]     a flexible carrier sheet with two opposed surfaces,

    1[b]     an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet such that

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1[c]    the pressure sensitive adhesive has an average thickness in the range of 75 μm to 500 μm and has an outer exposed surface, and

1[d]    substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive,

1[e]    wherein the substantially reflective inorganic particles have an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer,

1[f]    wherein the substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface,

1[g]    wherein the waterproofing membrane does not include a removable release sheet.

2.  The waterproofing membrane of claim 1 wherein the substantially reflective inorganic particles comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.

3.  The waterproofing membrane of claim 2 wherein the pressure sensitive adhesive has an average thickness in the range of 125 μm to 375 μm.

4.  The waterproofing membrane of claim 3 wherein the substantially reflective particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive.

5.  The waterproofing membrane of claim 3 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive.

7.  The waterproofing membrane according to claim 1 wherein the reflective surface of the membrane exhibits a whiteness value greater than 55%.

8.  The waterproofing membrane according to claim 1 wherein the reflective surface of the membrane exhibits a whiteness value greater than 65%.

10.  The waterproofing membrane of claim 1 wherein the substantially reflective inorganic particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive, and provide a reflective surface that exhibits a whiteness value greater than 65%.

11.  The waterproofing membrane according to claim 1 wherein the carrier sheet has a thickness of about 0.05 to 2.0 mm.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

12.   The waterproofing membrane according to claim 11 wherein the carrier sheet comprises a polymer film or a polymer coated fabric.

13.   The waterproofing membrane according to claim 11 wherein the carrier sheet comprises polyethylene, polypropylene, ethylene-propylene copolymers, ethylene-olefin copolymers, ethylene-vinyl acetate copolymers, polyvinyl acetate, polyethyl acrylate, polytetrafluoroethylene, polyvinylidene fluoride, polyethylene terephthalate, polyvinyl chloride, polyamides or a combination of two or more of these materials.

15.   A method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane.

16.   The method of claim 15 wherein the substantially reflective inorganic particles of the waterproofing membrane comprise ground white cement, ground hydrated white cement, ground partially-hydrated white cement or a mixture of two or more of these.

17.   The method of claim 16 wherein the substantially reflective particles cover approximately 90% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide a reflective surface that exhibits a whiteness value greater than 65%.

## III.   LEVEL OF ORDINARY SKILL IN THE ART

28.      I have set forth my understanding of the qualifications of POSA in paragraphs 23-28 of the Wiercinski Opening Report, which I use in this Report as well.

29.      In Section V of the Dregger Report, on page 3, Mr. Dregger provides his opinion that a POSA "would be an individual with a bachelor's in civil engineering, structural engineering, construction engineering, architectural engineering, an engineering project management degree, or closely related field, and at least three years or more of post-education work experience in the roofing and/or waterproofing field.  Alternatively, a POSITA may be a non-degreed individual having 6 years of experience, or more, in the roofing and/or waterproofing industry either through field-work, manufacturing, sales or as a contractor."

30.      Mr. Dregger's opinion of a POSA is significantly broader than mine and I believe his opinion is flawed.  Although I do not disagree that certain technical degrees can in theory substitute for some years of experience in the waterproofing field, I disagree that a bachelor's

8

degree in civil engineering, structural engineering, construction engineering, architectural engineering, an engineering project management degree, or a closely related field and three years of experience is sufficient experience for a POSA. Similarly, I disagree that six years of experience on its own was sufficient experience for a POSA at the time of the invention. I further disagree that six years of experience in roofing or waterproofing industry sales would provide the necessary technical understanding to qualify a person as a POSA at the time of the invention. Although I disagree with Mr. Dregger on these points, I note that if I were required to apply Mr. Dregger's definition of a POSA, it would not change my opinions on the topics that I have addressed.

## IV.    CLAIM CONSTRUCTION

31.    I set forth the Court's claim construction in Section VII of the Wiercinski Opening Report, and I apply those constructions throughout this Report.

## V.    THE ASSERTED CLAIMS OF THE '879 PATENT ARE NOT INVALID AS ANTICIPATED

32.    I have evaluated whether both references that Mr. Dregger asserts anticipate the asserted claims of the '879 patent, and I found that they do not because they do not, individually, disclose every one of the limitations of those claims.

33.    At the outset, Mr. Dregger only asserts the invalidity of claims 1 and 15 of the '879 patent. As noted above, I have been informed that the validity of a claim is not affected by the invalidity of a claim from which it depends. Therefore, my understanding is that Mr. Dregger has not provided any opinions as to anticipation of claims 2-5, 7-8, 10-13, and 16-17.

34.    Further, Mr. Dregger fails to cite to specific portions of the prior art documents to which he refers. *See, e.g.*, Dregger Report at 8 ("While Serwin describes its composites in connection with a preferred embodiment arranged on steel plates, it also expressly discloses that in alternate embodiments the plate may be a polymer-plate, a plastic, or a semi-flexible surface

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

with corresponding effects in tension."). This has made review of his report and of the cited references unnecessarily difficult, and in fact makes it nearly impossible to understand how Mr. Dregger arrived at his opinions and upon what evidence or materials his opinions are based.

### A.     Overview of the Asserted References

####     1.     *U.S. Patent No. 7,776,432 to Serwin*

35.     U.S. Patent No. 7,776,432 to Serwin ("Serwin") discloses a sandwich plate-like construction of a steel plate and concrete layer. *See* Serwin at Abstract. The Background of Serwin explains that "sandwich-like constructions," wherein concrete is cast onto steel plates, does not allow for transfer of shear forces from the concrete to the steel. *Id.* at col. 1:10-19. Hence, the purpose of Serwin is to distribute shear forces more efficiently between the concrete and steel plate. In the past, this was facilitated by using studs or anchors. *Id.* at col. 1:20-25. However, this was labor intensive and, as concrete shrinks, cracks appear in the concrete surface, such that water and chlorides can enter and cause corrosion. *Id.* at col. 1:56-67. Therefore, it was required to have a coating on top of the concrete to hamper ingress of chlorides, water, and the like. *Id.* Serwin explains that these types of constructions are often found on bridges, ship decks, oil platforms, and similar constructions." *Id.* at col. 2:5-11.

36.     In the "Object of the Invention" section, Serwin purports to avoid disadvantages of prior art constructions by disclosing a "composite sandwich plate-like construction comprising a tension plate, a contact layer and a compression layer, said compression layer being an inorganic layer . . comprising ultra fine particles and a binder." *Id.* at col. 2:19-23. Serwin discloses that "ultra fine particles" in the inorganic layer, unlike stud construction, will create a very dense layer which will be substantially tighter against the ingression of chlorides, $CO_2$ and water." *See id.* at col. 2:28-38; *see also id.* at cols. 3:29-4:15.

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



### 2. *U.S. Patent No. 6,933,007 to Fensel*

37.     U.S. Patent No. 6,933,007 to Fensel ("Fensel") "relates to roofing and/or siding

materials and a method of making such materials having improved reflectivity, and more

particularly to a granular material and method of applying the granular material to the surface of

the, roofing and/or siding materials resulting in improved the roofing and/or siding reflectivity."

Fensel at col. 2:57-62.  The method disclosed in Fensel "is applicable to all types of roofing and/or

siding materials including, but not limited to, shingles, cap sheet roll roofing, modified bitumen,

foam roofing, built-up roofing (BUR), metal roofing and/or siding, plastic roofing and/siding, and

wood roofing and/or siding."  *Id.* at col 2:62-67.

38.     As shown in Fensel's Fig. 3, the "roofing and/or siding system 20 includes a top

layer of bituminous composition 22, a reinforcement material 24, a bottom layer of bituminous

composition 25, and granules 26."  *Id.* at col. 21:51-54; *see also id.* at Fig. 3:

## FIG. 3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



FIG. 3

**B.    Mr. Dregger's Discussion of Anticipation of Claims 1 and 15 of the '879 Patent**

39.    The Dregger Report asserts that Serwin and Fensel anticipate claim 1 of the '879 patent, and that Serwin also anticipates claim 15 of the '879 patent.  Dregger Report at 7, 11, 14. I disagree.  Neither reference discloses all the limitations of claims 1 or 15 of the '879 patent, explicitly or inherently.

*1.    Serwin Does Not Anticipate Claim 1 of the '879 Patent*

40.    In my opinion, Serwin does not disclose each limitation of claim 1 of the '879 patent, and so it does not anticipate that claim.

41.    As noted above, in conducting my review of the Dregger Report, I found that Mr. Dregger's lack of citations to the material on which he was relying or discussing, for example specific column and lines numbers in Serwin, made it nearly impossible to understand the basis for Mr. Dregger's comments and opinions.  My analysis below is based on my best understanding of the comments and opinions being advanced by Mr. Dregger with respect to claim 1.

a)    Serwin Does Not Disclose a "Waterproofing Membrane" (1[pre]).

42.    Mr. Dregger discusses the general limitations of membranes and flexible carrier sheets without separately identifying which of his opinions applies which specific limitation. Notwithstanding this confusing shortcoming, Mr. Dregger fails to show that Serwin discloses a waterproofing membrane as required by the preamble of claim 1.

43.    As construed by the Court, a membrane is "a thin pliable sheet of material forming

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a barrier or lining."

44.     Mr. Dregger opines that Serwin discloses "waterproofing membranes/composites" without reference to the Court's claim construction or the language of claim 1.  Dregger Report at 7.  I am not sure what is meant by "composites," but nothing in claim 1 of the '879 patent covers a structural composite instead of a membrane.

45.     Mr. Dregger admits that the preferred embodiment in Serwin has components arranged on steel plates," but also notes that Serwin "expressly discloses that in alternate embodiments the plate may be a polymer-plate, a plastic, or a semi-flexible surface with corresponding effects in tension."  Dregger Report at 7-8.  Mr. Dregger then opines that the "term 'semi-flexible' inherently possesses some degree of flexibility, such that, in the broadest reading and understanding thereof, an item that is 'semi-flexible' is inherently a flexible item."  *Id.* at 8.  I disagree with Mr. Dregger's opinion.  The Court construed the term membrane to mean "a thin pliable sheet of material forming a barrier or lining."  At best, as Mr. Dregger acknowledges, Serwin discloses materials that are "semi-flexible," not materials that are thin and pliable.  Indeed, in context, the examples in Serwin (steel, aluminum, carbon board, wood, timber, concrete, plastic) demonstrate that the disclosed materials are decidedly not both thin and pliable.  Serwin at col. 6:12-17.

> b)     Serwin Fails to Disclose a Flexible Carrier Sheet (1[a]).

46.     Mr. Dregger discusses the general limitations of membranes and flexible carrier sheets without separately identifying which of his opinions applies which specific limitation.  Notwithstanding this confusing shortcoming, Mr. Dregger fails to demonstrate that Serwin discloses the claimed "flexible carrier sheet."

47.     As construed by the Court, a flexible carrier sheet is "a thin film, extrusion coating,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

or fabric that is the mechanical backbone of the membrane."

48.   Mr. Dregger does not opine that any material disclosed in Serwin constitutes a "thin film, extrusion coating, or fabric that is the mechanical backbone" of what he analogizes to a membrane.  The whole of Mr. Dregger's analysis appears to be that certain materials disclosed in Serwin as "semi-flexible" and "inherently ... flexible" satisfy the "*flexible* carrier sheet" limitation. First, I disagree with Mr. Dregger's opinion to the extent that it ignores the Court's construction of the term "flexible carrier sheet."  Second, I disagree with Mr. Dregger's opinion that any of the materials disclosed in Serwin can act as the claimed "flexible carrier sheet" for the same reasons as stated above with regard to the term "membrane" and the Serwin materials not being "thin" and "pliable."  Third, I disagree with Mr. Dregger's deduction that something that is "semi-flexible" is inherently flexible.  Mr. Dregger does not describe what is meant by "semi-flexible," but finding that "semi-flexible" is no different than "flexible" ignores the modifier "semi."

> c)   Serwin Fails to Disclose an Approximately Uniform Layer of Waterproofing Pressure Sensitive Adhesive in the range of 75 μm to 500 μm (1[b] and 1[c]).

49.   Mr. Dregger fails to demonstrate that Serwin discloses the claimed approximately uniform layer of waterproofing pressure sensitive adhesive in the range of 75 μm to 500 μm.

50.   The Court advised the parties to use the plain and ordinary meaning of the term "waterproofing pressure sensitive adhesive" as understood by a POSA at the time of the invention.

51.   Mr. Dregger first opines that Serwin discloses a waterproofing pressure sensitive adhesive by stating with reference to Serwin's Fig. 2 that Serwin discloses a contact layer that "may be an epoxy, polyurethane, acrylic based material, or any material that provides the necessary adhesion between the layers."  Dregger Report at 8.  Mr. Dregger then notes that "at least dependent claim 14 of the '879 patent teaches that the claimed waterproofing pressure sensitive adhesive may be an acrylic based adhesive."  *Id.*  Although the '879 patent discloses that acrylic

14
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

based adhesives can be suitable pressure sensitive adhesives, *see* '879 patent at col. 5:14-16, I disagree that Serwin discloses a suitable waterproofing pressure sensitive adhesive as understood by a POSA at the time of the invention.  The term acrylic encompasses a very large number of different types of polymers and acrylic *pressure sensitive* adhesives are very small fraction of these.    The term acrylic includes acrylic fiber, superabsorbent polymer (SAP), super glue/cyanoacrylate adhesives, two component structural acrylic adhesives, acrylic glass (also called plexiglass), and rheology modifiers, and film formers.  Thus, Serwin's general referral to an acrylic based adhesive does not necessarily disclose an adhesive that is both waterproofing and pressure sensitive as required by claim 1 of the '879 patent.  Further, one would never select a pressure sensitive adhesive for use as the adhesive in the contact layer of Serwin because the compositions in Serwin are tailored to exhibit high shear strength.  By contrast use of a pressure sensitive adhesive (as disclosed in the '879 patent) would provide for low shear strength but high peel strength, as taught in examples of the '879 patent.  This explains why an epoxy was chosen as the preferred material for the adhesive of the contact layer in Serwin, because it provides for high shear strength.  Additionally, like epoxies, two-component acrylic structural adhesives would also provide for high shear strength and would be appropriate adhesives for the sandwich platelike structures of Serwin.

52.    Mr. Dregger also opines that Serwin discloses a claimed average thickness of the pressure sensitive adhesive layer of 75μm to 500 μm because its contact layer is "between 0.2 mm and 5 mm (i.e., 200 μm to 5,000 μm)[.]"  Dregger Report at 8.  I disagree that Serwin discloses claiming an average thickness or the claimed range.  As for claiming an average thickness, Serwin discloses a contact layer with an absolute thickness range of between 0.2 mm and 5 mm.  *See* Serwin at col. 4:52-58.  There is no mention of any average thickness.  Second, the range disclosed

15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in Serwin does not disclose the full range of pressure sensitive adhesive thickness in claim 1 of the '879 patent.  In fact, the range of adhesive thickness disclosed in Serwin is much larger than that claimed in the '879 patent, and Serwin provides no reason to limit the thickness of the adhesive to an average thickness of between 75 μm to 500 μm.  The reason for so limiting the range of the adhesive thickness is that, in the context of the '879 patent, the diameter of the inorganic particles must be approximately equal to or greater than the adhesive thickness, and particles over 600 μm would provide for difficulty with treating detail areas during membrane application, and would further result in a heavy membrane.

> d)      Serwin Fails to Disclose an Outer Exposed Surface (1[c] and 1[d]).

53.     Mr. Dregger fails to demonstrate that Serwin discloses the claimed "outer exposed surface."

54.     The Court construed "outer exposed surface" to mean "the surface of the layer of the adhesive opposite the surface that is bonded to the carrier sheet and is accessible to have concrete cast directly against it."

55.     Mr. Dregger does not address the Court's construction of "outer exposed surface." Instead, Mr. Dregger refers generally to Fig. 2 of Serwin and states that "Fig. 2 of Serwin below shows its contact layer 5 having an outer exposed surface, as is claimed in the asserted patent." Dregger Report at 8.  Mr. Dregger's conclusory opinion fails to explain how Serwin discloses the claimed outer exposed surface, which requires, among other things, that the waterproofing pressure sensitive adhesive layer have a surface "accessible to have concrete cast against it."  There is no explanation by Mr. Dregger that Serwin has any outer exposed surface of an adhesive layer available to have concrete cast against it.

> e)      Serwin Fails to Disclose Substantially Reflective Inorganic Particles Adhered Directly to the Outer Exposed Surface of the Pressure Sensitive Adhesive (1[e]).

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

56.     Mr. Dregger fails to demonstrate that Serwin discloses the claimed "substantially reflective inorganic particles" or that the inorganic particles are "adhered directly to the outer exposed surface of the pressure sensitive adhesive."

57.     For the same reason as discussed above (*see supra* at ¶¶ 53-55), Serwin fails to disclose the claimed "outer exposed surface."  Mr. Dregger merely restates that Serwin's Fig. 2 discloses the claimed "outer exposed surface" without explanation.   Dregger Report at 8. Therefore, Serwin fails to disclose substantially reflective inorganic particles directly adhered to the outer exposed surface of a pressure sensitive adhesive.

58.     Mr. Dregger does not opine that Serwin explicitly discloses the use of substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive.  Instead, Mr. Dregger opines that Serwin discloses inorganic particles adhered directly to an adhesive and that Serwin inherently discloses the substantial reflectivity of those particles.  I disagree.

59.     Mr. Dregger writes, without citation to any specific section of Serwin, that Serwin discloses "an inorganic layer of rock particles[,]" and "that these rock particles may be bauxite, quartz, granite, korund, or similar type of strong aggregates."  Dregger Report at 8.  Mr. Dregger then notes, again without citation, that "[i]t is well known in the art that at least quartz and granite exist in a variety of colors, including white."  *Id.*  Mr. Dregger then cites two publications: the Marceau publication for the proposition "that inorganic particle aggregates that are light in color have high solar reflectance (e.g., granite, quartz) and may have a high solar reflectance of 64%" (*id.*); and the Moresova publication for the proposition "that the whiteness degree of white cement may have a reflection coefficient minimum of 68 %, 75 %, or even 80 %."  *Id.* at 8-9.  Mr. Dregger then opines that, "[s]ince Serwin broadly teaches that its inorganic layer of rock particles 7 may

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

be granite or quartz, without limitation to any color, it is inclusive of light-colored (e.g., white) granite and quartz" and accordingly "it is necessarily present in Serwin that the rock particles 7 may be inorganic particles of granite or quartz, which in accordance with Marceau inherently have high solar reflectance." *Id.* at 9.

60.     I disagree with Mr. Dregger's opinion that Serwin inherently discloses substantially reflective inorganic particles.  In order to be inherent, a disclosure must necessarily have existed in the prior art reference.  Serwin discloses the use of certain types of rock ("bauxite, quarts [sic], granite, korund or similar type of strong aggregates" (Serwin at col. 4:60-61)), but according to Mr. Dregger, only two of those, quartz and granite, "exist in a variety of colors, including white." Dregger Report at 8.  In order for substantially reflective inorganic particles to be inherently disclosed in Serwin, the substantial reflectivity of the particles must necessarily have existed in the reference.  In Serwin, the only way in which the rock particles would have been reflective, according to Mr. Dregger, is if two out of at least four types of rock were selected, and only then if white versions of those rocks were used, notwithstanding that the purpose of the rock in Serwin was to increase the strength of the product against shear forces (*see* Serwin at col. 13:48-55), and the use of "white" versions of any rock particles was never mentioned.  Therefore, the reflective property of white quartz or granite was not disclosed, explicitly or inherently, in Serwin.

61.     Mr. Dregger appears to confirm this conclusion, explaining that "it is ***necessarily*** present in Serwin that the rock particles 7 ***may*** be inorganic particles of granite or quartz, which in accordance with Marceau inherently have high solar reflectance" if white.  Dregger Report at 9. It is my understanding that the use of the conditional "may" in Mr. Dregger's statement negates inherency.  Serwin does not require the use of rock particles that are necessarily reflective, and therefore it does not inherently disclose substantially reflective inorganic particles.  I also note that

18

Serwin's structural composite would see no benefit from having substantially reflective inorganic particles and there is therefore nothing in Serwin that would have led one of skill in the art to select a reflective species of particle from among Serwin's broad disclosure.  As an example of something being inherently disclosed, if Serwin only provided the use of white cement and no other particle option as the layer of particles, this could constitute an inherent disclosure.  As it is, with so many options, and only some of them being reflective some of the time, it is not an inherent disclosure.

> f)      Serwin Fails to Disclose Substantially Reflective Inorganic Particles Having an Average Diameter of About 100 μm to About 600 μm That is Approximately Equal to Or Greater Than the Average Thickness of the Pressure Sensitive Adhesive (1[e]).

62.     Mr. Dregger fails to demonstrate that Serwin discloses the claimed "substantially reflective inorganic particles hav[ing] an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer."

63.     Mr. Dregger opines that Serwin discloses this limitation because "Serwin discloses that the reflective inorganic rock particles 7 have a size between 0.5 mm to 8 mm (i.e., 500 μm to 8,000 μm), which is equal to or greater than the average thickness of the pressure sensitive adhesive ranging from 0.2 mm to 5 mm (i.e., 200 μm – 5,000 μm), as recited in the asserted claims." Dregger Report at 9.

64.     I disagree with Mr. Dregger's opinion that this limitation is disclosed in Serwin. First, nothing in Serwin discloses the measurement of the particles' "average" diameter.  Instead, Serwin discloses use of particles that fall into the disclosed range.  *See* Serwin at col. 4:58-61 (describing the rock particle layer as comprising particles between 0.5 mm to 8 mm).

65.     Second, Serwin does not disclose the particle size range claimed in claim 1 of the '879 patent (100 μm to 600 μm).  *See* Dregger Report at 9 (Serwin discloses particles having a size

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

between 500 μm to 8,000 μm).

66.     Third, Serwin discloses two size ranges, one for the contact layer (200 μm to 5,000 μm) and one for the rock particles (500 μm to 8,000 μm), but does not disclose the relationship between the thickness of the adhesive layer and the diameter of the inorganic particles.  In the '879 patent, it was important that the diameter of the inorganic particles be equal to or greater than the thickness of the pressure sensitive adhesive so that the particles were not covered or completely submerged in the adhesive layer.  Mr. Dregger does not point to any relationship between the particles and the adhesive layer in Serwin.  Therefore, it is possible in Serwin that the adhesive layer was thicker than the diameter of the rock particles, and thus Serwin fails to disclose the claimed size/thickness relationship between the pressure sensitive adhesive layer and substantially reflective inorganic particles in claim 1 of the '879 patent.

> g)      Serwin Fails to Disclose the Substantially Reflective Particles Covering Approximately 70% to 100% of the Outer Exposed Surface of the Pressure Sensitive Adhesive so as to Provide the Membrane with a Substantially Reflective Surface (1[f]).

67.     Mr. Dregger fails to demonstrate that Serwin discloses the claimed "substantially reflective particles cover[ing] approximately 70% to 100% of the outer exposed surface of the pressure sensitive so as to provide the membrane with a substantially reflective surface."

68.     Mr. Dregger states, without supporting citations, that "Serwin teaches that approximately the entire surface of its contact adhesive layer 5 is covered with the reflective inorganic rock particles 7 by way of applying a surplus amount thereof to the entire surface of adhesive layer 5."  Dregger Report at 9.  Based on this, Mr. Dregger opines that Serwin discloses the "substantially reflective particles cover[ing] approximately 70% to 100% of the outer exposed surface of the pressure sensitive" limitation.  I disagree.  By Mr. Dregger's own admission, Serwin at best discloses a nearly 100% coverage of the adhesive layer by the inorganic particles.

20

69.     Serwin fails to disclose a substantially reflective surface.  The Court construed "substantially reflective surface" to mean "the outer exposed layer of the pressure sensitive adhesive, 70-100% covered by substantially reflective inorganic particles, so as to exhibit a whiteness value of greater than 55% as measured by reflectometry."  Mr. Dregger asserts that because "most all of its adhesive surface is covered with the reflective inorganic rock particles (i.e., nearly 100% of the surface is covered), it is inherent that the resultant membrane would have a substantially reflective surface."  Dregger Report at 9.

70.     Aside from the failure to disclose substantially reflective inorganic particles (*see supra* at ¶¶ 56-61) doing this "covering," Mr. Dregger also fails to explain where Serwin discloses the claimed "substantially reflective surface" and its minimum of 55% reflectivity.  Mr. Dregger relies on two publications to demonstrate that, as of 2006/2007, a POSA "would have known that 'cool' roofing, particularly those white in color, were highly reflective and labeled by the Cool Roofing Rating Council (CRRC) as having an initial solar reflectance of at least 0.70 (70%)."  Mr. Dregger fails to explain why "'cool' roofing" that is white in color supports his opinion that Serwin inherently discloses a substantially reflective surface.  Mr. Dregger fails to state how the 2007 California Energy Code supports his statement that the CRRC labeled "cool" roofing, "particularly those white in color," "as having an initial solar reflectance of at least 0.70 (70%)."  In fact, the cited portion of the 2007 California Energy Code merely states that it is a mandatory requirement for something designated as a "cool roof" to in some circumstances be tested as having a minimum initial solar reflectance of 0.70[.]"  *See* 2007 California Energy Code at pg. 31, Section (i)(1). Immediately after that is an exception that states that certain "low-rise residential buildings" can use concrete tile and clay tile having "a minimum initial solar reflectance of 0.40[.]"  *Id.*  As discussed above, Serwin at best discloses rock particles that may in some circumstances be white.

21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*See supra* at ¶¶ 56-61.  There is thus no inherent disclosure in Serwin of any certain reflectivity value.

2.     *Serwin Does Not Anticipate Claim 15 of the '879 Patent*

71.     In my opinion, Serwin does not teach each limitation of claim 15 of the '879 patent, and so it does not anticipate that claim.

72.     As noted above, in conducting my review of the Dregger Report, I found that Mr. Dregger's lack of citations to the material on which he was relying or discussing, for example specific column and lines numbers in Serwin, made it nearly impossible to understand the basis for Mr. Dregger's comments and opinions.  My analysis below is based on my best understanding of the comments and opinions being advanced by Mr. Dregger with respect to claim 15.

a)     Serwin Fails to Disclose the Waterproofing Membrane of Claim 1.

73.     Mr. Dregger states that, "[f]or the reasons discussed above, it is my opinion that Serwin discloses all limitations recited in claim 1" and further "discloses all of the limitations of claim 15 of the '879 Patent, either expressly or inherently, such that Serwin also anticipates independent claim 15."  Dregger Report at 10.  For the same reasons discussed above, I disagree. *See supra* at ¶¶ 40-70.

74.     Notwithstanding the incorporation of his preceding opinions, Mr. Dregger appears to restate his opinions regarding the limitations of claim 1 albeit in a somewhat more succinct manner.  This recitation of his opinions exemplifies their flaws.  For example, Mr. Dregger states that "[a] POSITA, as defined above, would recognize Serwin's composites as being composed of a plate (carrier sheet) having two opposed surfaces[.]"  Dregger Report at 10.  Here, Mr. Dregger admits that Serwin does not disclose any membrane, but rather a "composite."  Mr. Dregger further admits that Serwin discloses a "plate," which he concludes is the claimed "carrier sheet." *Id.*  Here, again, Mr. Dregger ignores the Court's construction of "flexible carrier sheet" entirely and only

22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

concludes that something "which may have some degree of flexibility" is "flexible." *Id.*

75.     Mr. Dregger concludes his analysis of claim 15 of the '879 patent by reciting why it is his opinion that Serwin is a "relevant prior art reference." *Id.* at 11.  It is not clear what Mr. Dregger means when he says Serwin is "relevant prior art."  It seems possible Mr. Dregger is using the phrase "relevant prior art" to indicate his opinion as to "analogous prior art."  This entire section is in any event, according to Mr. Dregger's own understanding of the law regarding "analogous prior art," irrelevant in an anticipation analysis.  *See id.* at 7 ("Still further, my understanding is the question of whether a reference is analogous art is ***not*** relevant to whether that reference anticipates, and that such a reference, even if directed to a different problem than the one addressed by the inventor or from a different field of endeavor than that of the claimed invention, may still be anticipatory if it explicitly or inherently discloses every limitation recited in the claims.").

76.     That said, I disagree with Mr. Dregger that Serwin is "relevant prior art."  Mr. Dregger states that "[t]he '879 [patent][1] identified problems associated with known waterproofing membranes including:  poor adhesion of the membrane to concrete; degradation of the adhesive layer due to exposure to sunlight/UV; issues associated with blocking (sticking) of the membrane layers to one another when rolled; and issues with use of removable release sheets." *Id.* at 11.  Mr. Dregger then states that "Serwin is a relevant prior art reference that identifies and addresses these issues, including for instance, strengthening weak bonds between a structure, membrane, and/or concrete[,] ... preventing unwanted ingression of water into the membrane[,] ... avoid damage to layers of the membrane from external environmental exposures[,] ... and improving the overall workability and use of the membrane disclosed therein." *Id.*  Notably, none of the issues Mr.

---

[1]      Mr. Dregger often refers to the '879 patent as the '879 "application." *See, e.g.*, Dregger Report at 5, 11, 14-16, 18-19, 22, 25.  To dispel any confusion, the '879 patent is an issued United States patent.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dregger asserts are resolved in Serwin are the same as the issues identified in the '879 patent.  For

example, the product disclosed in Serwin could not be "rolled" and so Serwin has no reason to

address issues with blocking (sticking).  As for the only issue in Serwin that is remotely similar to

a problem identified in the '879 patent—"avoid[ing] damage to layers of the membrane from

external environmental exposures"—it is explicit in the cited portion of Serwin that the "external

environmental exposures" are "harsh environments where [the plate-like constructions] may be

exposed to dynamic forces which can exaggerate the crack formation and thereby lower the

strength of the sandwich construction as well as the expected life span of such a construction."

Serwin at col. 2:5-9.  These environmental conditions (harsh dynamic forces) are explicitly not the

sunlight/UV environmental conditions referred to by Mr. Dregger as a problem identified in the

prior art by the '879 patent.

> b)  Serwin Fails to Disclose a Method of Waterproofing a Concrete
> Structure Comprising Applying to a Substate the Waterproofing
> Membrane of Claim 1, and Casting Concrete Such That It Contacts
> the Substantially Reflective Particles of the Membrane.

77.     Mr. Dregger fails to show that Serwin discloses a method of waterproofing a

concrete structure comprising applying to a substrate the waterproofing membrane of claim 1 and

casting concrete such that it contacts the substantially reflective particles of the membrane.

78.     Mr. Dregger never opines that the structure disclosed in Serwin discloses a method

of waterproofing a concrete structure, especially not by casting the concrete on the pre-applied

waterproofing membrane.  The structures of Serwin are not shown to be "applied" (having first

been fully formed) to a substrate and then have concrete cast against them.  Mr. Dregger only states

that "Serwin discloses that its waterproof membrane/composite composed of the plate, adhesive

contact layer, and reflective inorganic rock particles embedded in the adhesive layer, maybe be

further processed by casting an inorganic material comprising a binder, fine and coarse aggregate

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

onto the surface (i.e., by casting a concrete product) and allowing the construction to cure." Dregger Report at 10. But this is how the composite structure of Serwin is made in the first place; it says nothing about using that structure as a waterproofing membrane in a method for waterproofing a concrete structure. In fact, the inorganic layer of rock particles in Serwin provides protection against ingress from water so as to protect the "tension plate" (Serwin at col. 15:26-27), the "tension plate" apparently being the steel plate Mr. Dregger opines comprises the "flexible carrier sheet" of claim 1 of the '879 patent. However, in claim 1 of the '879 patent, the "flexible carrier sheet" is what protects the concrete structures from water ingress. *See, e.g.*, '879 patent at col. 4:41-42 ("The carrier sheet 16 provides mechanical strength and waterproofing integrity for the membrane."). The "plate" being protected from water ingress in Serwin is not a "concrete structure." In other words, the adhesive and particle layers of the composite disclosed in Serwin protect the plate from water ingress, whereas in the '879 patent the particles protect the adhesive layer and the adhesive layer and flexible carrier sheet act to prevent water ingress into a concrete structure.

79.     Mr. Dregger's opinion that Serwin discloses the "casting concrete such that it contacts the substantially reflective particles of the membrane" limitation is inaccurate, or at least misleading. Serwin discloses "a method for making a construction composite as stated above," in which one step requires, when the contact layer (adhesive) "is still wet, rock particles having a size between 0.5 mm to 8 mm, preferably 1 mm to 6 mm and in that said rock particles are chosen from bauxite, quartz, granite, korund or similar strong aggregates, are distributed on the contact layer surface, an inorganic material comprising a binder, fine and coarse aggregate is cast on the surface on the contact layer, optionally wet-in-wet, and the construction is allowed to cure." Serwin at cols. 5:57-6:3. In that described method, the rock particles that are being cast against the contact

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

layer are the same rock particles that Mr. Dregger asserts comprise the "substantially reflective inorganic particles" in claim 1 of the '879 patent, *not* the post-cast concrete being applied against the substantially reflective inorganic particles once the claimed membrane is in place.  In other words, Mr. Dregger appears to equate a method of creating the product claimed in Serwin with a method of using a product (the claimed membrane in the '879 patent).  Serwin does not disclose a method for waterproofing a concrete structure that involves casting concrete against the substantially reflective inorganic particles of a waterproofing membrane.

3.    *Fensel Does Not Anticipate Claim 1 of the '879 Patent*

80.    In my opinion, Fensel does not teach each limitation of claim 1 of the '879 patent, and so it does not anticipate that claim.

81.    As noted above, in conducting my review of the Dregger Report, I found that Mr. Dregger's lack of citations to the material on which he was relying or discussing, for example specific column and lines numbers in Fensel, made it nearly impossible to understand the basis for Mr. Dregger's comments and opinions.  My analysis below is based on my best understanding of the comments and opinions being advanced by Mr. Dregger with respect to claim 1.

a)    Fensel Does Not Disclose a "Waterproofing Membrane" (1[pre]).

82.    Mr. Dregger discusses the general limitations of membranes and flexible carrier sheets without separately identifying which of his opinions applies to which specific limitation. Notwithstanding this confusing shortcoming, Mr. Dregger fails to show that Fensel discloses a waterproofing membrane as required by the preamble of claim 1.

83.    As construed by the Court, a membrane is "a thin pliable sheet of material forming a barrier or lining."

84.    Mr. Dregger opines that Fensel discloses the claimed membrane without referring

26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to the Court's construction of membrane and therefore without referring to the requirement that the claimed membrane be "a thin pliable sheet[.]" *See* Dregger Report at 11-12.

85.     Fensel discloses a roofing and/or siding system that "includes a base substrate 112 such as, but not limited to, a sheet of plastic, metal or wood." Fensel at col. 26:4-11.  "The base[] substrate is typically a rigid or semi-rigid structure." *Id.* at col. 26:11-12; *see also* Dregger Report at 12.  Mr. Dregger opines that, because the base substrate of Fensel can be plastic and semi-rigid, "the semi-rigid base substrate must also have a certain amount of flexibility, thereby making a semi-flexible base (carrier sheet)."  Dregger Report at 12.  And, for the same reasons as discussed with respect to Serwin, "a semi-flexible structure is one that has a certain degree of flexibility, making it a flexible structure." *Id.*  For the same reasons as I discussed above with respect to Serwin, I disagree that something that is semi-flexible can be described as flexible. *See supra* at ¶¶ 42-45.  Notwithstanding that, Mr. Dregger does not explain his understanding of what is meant by "semi-rigid" nor does he point to anything in Fensel that requires that the base substrate be thin and pliable, as required by the Court's construction.

> b)     Fensel Does Not Disclose a Flexible Carrier Sheet (1[a]).

86.     Mr. Dregger discusses the general limitations of membranes and flexible carrier sheets without separately identifying which of his opinions applies which specific limitation. Notwithstanding this confusing shortcoming, Mr. Dregger fails to demonstrate that Fensel discloses the claimed "flexible carrier sheet."

87.     As construed by the Court, a flexible carrier sheet is "a thin film, extrusion coating, or fabric that is the mechanical backbone of the membrane."

88.     Mr. Dregger does not opine that any material disclosed in Fensel constitutes a "thin film, extrusion coating, or fabric that is the mechanical backbone of the membrane."  The whole

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of Mr. Dregger's analysis appears to be, as described above with respect to "waterproofing membrane," that Fensel discloses the claimed "flexible carrier sheet" because it discloses "semi-rigid" base substrates, including plastic.  *See supra* at ¶¶ 46-48.  First, I disagree with Mr. Dregger's opinion to the extent that it ignores the Court's construction of the term "flexible carrier sheet."  Second, I disagree with Mr. Dregger's opinion that any of the materials disclosed in Fensel can act as the claimed "flexible carrier sheet" for the same reasons as stated above with regard to the term "membrane" and the Fensel materials not being "thin" and "pliable."  Third, I disagree with Mr. Dregger's logical deduction that something that is "semi-rigid" is inherently flexible. Mr. Dregger does not describe what is meant by "semi-rigid," but finding that "semi-rigid" is the same as "semi-flexible," and that both terms are no different than "flexible," ignores the difference between the terms "rigid" and "flexible" and the modifier "semi."

89.    Mr. Dregger ends his analysis by noting that it is his opinion that "Fensel teaches a base carrier sheet having a degree of flexibility, making it a flexible base carrier sheet."  Dregger Report at 12.  Notwithstanding the shortcomings described above, I am not sure what Mr. Dregger means when he says that Fensel discloses a "flexible base carrier sheet," or whether it is his opinion that a "flexible base carrier sheet" is the same or different than the claimed "flexible carrier sheet."

> c)    Fensel Does Not Disclose an Approximately Uniform Layer of Waterproofing Pressure Sensitive Adhesive in the range of 75 μm to 500 μm (1[b] and 1[c]).

90.    Mr. Dregger fails to demonstrate that Fensel discloses the claimed approximately uniform layer of waterproofing pressure sensitive adhesive in the range of 75 μm to 500 μm.

91.    The Court advised the parties to use the plain and ordinary meaning of the term "waterproofing pressure sensitive adhesive" as understood by a POSA at the time of the invention.

92.    Mr. Dregger states that Fensel discloses "an adhesive bituminous composition layer" but also that the adhesive can be "formed by any type of adhesive desirable" and that the

28

adhesive "may be a polymer adhesive." Dregger Report at 12. Mr. Dregger concludes that Fensel thus discloses the claimed "waterproofing pressure sensitive layer." *Id.* I disagree. First, the '879 patent teaches away from the use of bitumen adhesives. *See, e.g.*, '879 patent at col. 5:44-45. Second, although Fensel discloses generally that polymer adhesives can be used and/or any other type of adhesive, this does not support Mr. Dregger's conclusion that "Fensel inherently discloses a [waterproofing] pressure sensitive adhesive[.]" Dregger Report at 12-13.

93.     There are many types of polymer adhesives that are not "pressure sensitive adhesives." Pressure sensitive adhesives are adhesives that are tacky and require the application of pressure in order to form a bond to a substrate. One category of adhesives is hot melt adhesives. In order to form a bond to a substrate a hot melt adhesive must be heated to a temperature at which it is liquid. Once cooled it becomes a solid again. Hot melt adhesives are formulated with polymers including ethylene vinyl acetate, low density polyethylene, amorphous polyolefins, polyamides, thermoplastic polyurethanes TPU and styrene block copolymers. Another category of polymeric adhesives is reactive multi-component adhesives. These may be structural (i.e. high strength) or nonstructural (i.e. low strength). Generally, these materials are liquid at room temperature and as applied but then cure to a solid. Well known reactive multicomponent polymeric adhesives include polyurethanes and epoxies. Anaerobic adhesives form another category. These are liquid in the presence of oxygen in cure to a solid in the absence of oxygen. Fensel's general disclosure of "polymer adhesives" does not necessarily result in the disclosure of "pressure sensitive adhesives" as required by claim 1 of the '879 patent.

94.     Further, the purpose of the adhesive in claim 1 of the '879 patent is to both provide an adhesive to hold the inorganic particles in place and to bond to the concrete cast against the adhesive and inorganic particles. *See* '879 patent at cols. 3:40-47, 6:19-27. In contrast, the purpose

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of the adhesive layer in Fensel is to secure the "granules 116, 118" to the "base substrate." Fensel at col. 26:20-22. Therefore, there is no need for the adhesive in Fensel to be a waterproofing pressure sensitive adhesive as that term would be understood by a POSA. There is no need for an adhesive that would bond to concrete cast against it. It has been my experience that roofing membranes comprising a granular surface are intended to be exposed to the elements for their service life, whereas the waterproofing membranes of the '879 patent are only exposed to the elements prior to the casting of concrete against the pressure sensitive adhesive. A POSA would not select a pressure sensitive adhesive for this type of roofing membrane exposed to the elements for its service life, particularly for a shingle on a sloped roof, because of the low strength of the pressure sensitive adhesive at elevated temperatures because, for example, the adhesive may flow and/or poorly support foot traffic

95.     Mr. Dregger also opines that the adhesive layer in Fensel "is applied to the top of one surface of the base substrate 112 as an approximately uniform layer in a thickness selected to meet the desired end use." Dregger Report at 12. But these are Mr. Dregger's words, not the words of Fensel. I found no mention in Fensel of "uniform layer" to describe the adhesive layer. I therefore disagree that Fensel discloses an adhesive layer that is "approximately uniform." Mr. Dregger fails to cite any portion of Fensel that discloses the "approximately uniform" limitation for the adhesive layer.

96.     Mr. Dregger further opines that Fensel "inherently discloses a pressure sensitive adhesive in a thickness in the range of 75 μm to 500 μm" as claimed in the '879 patent because Fensel "teach[es] use of any adhesive having any desired thickness suitable for the desired end use[.]" Dregger Report at 12-13. I again disagree. By its plain language, Fensel's disclosure of "any desired thickness" for "any" end use of the adhesive does not disclose the specific claimed

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

thickness of 75 μm to 500 μm.  Fensel's broad disclosure of any thickness for the adhesive is too vague to inherently disclose the claimed range.

97.     I also disagree with Mr. Dregger's opinion on anticipation of claim 1 of the '879 patent based on Fensel because Mr. Dregger uses more than one reference to argue that the limitations of claim 1 are met.  Mr. Dregger argues that because "the '879 patent discloses a list of various polymer and copolymer pressure sensitive adhesives" and "[i]n view thereof, in combination with Fensel teaching use of any adhesive having any desired thickness suitable for the desired end use may be applied to one surface of the base carrier sheet, it is [his] opinion that Fensel inherently discloses a pressure sensitive adhesive in a thickness of 75 μm to 500 μm[.]" Dregger Report at 12-13.  Mr. Dregger does not explain why a combination of two references, including those disclosed in the specification of the '879 patent, is appropriate in an anticipation analysis.  Further, Mr. Dregger does not explain how either the '879 patent or Fensel demonstrates any inherent disclosure of any pressure sensitive adhesive in Fensel.

d)     Fensel Does Not Disclose a Pressure Sensitive Adhesive Layer with an Outer Exposed Surface (1[c]).

98.     Mr. Dregger fails to demonstrate that Fensel discloses a pressure sensitive adhesive layer with an outer exposed surface.

99.     I do not see a reference to the "outer exposed surface" limitation anywhere in Mr. Dregger's discussion of Fensel's supposed pressure sensitive adhesive layer.  *See* Dregger Report at 11-12. I also do not see any reference to the Court's construction of the phrase "outer exposed surface," which was construed to mean "the surface of the layer of the adhesive opposite the surface that is bonded to the carrier sheet and is accessible to have concrete cast against it."  There is no reference in Fensel to casting concrete against the adhesive of the finished Fensel product.

e)     Fensel Does Not Disclose Substantially Reflective Inorganic Particles Adhered Directly to the Outer Exposed Surface of the

31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Pressure Sensitive Adhesive (1[d]).

100.     Mr. Dregger fails to demonstrate that Fensel discloses substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive.

101.     For the reasons discussed above, I disagree that Fensel discloses a pressure sensitive adhesive or an outer exposed surface of same.  *See supra* at ¶¶ 90-99.

102.     Mr. Dregger opines that Fensel "discloses inorganic particles 26/28 and 116/118 adhered directly to the adhesive layer with some granules being fully or partially embedded in the adhesive layer" and the granules "being composed of a highly reflective material that reflects most, if not all, of the sunlight that contacts the granules[.]"  Dregger Report at 13.  I disagree that Mr. Dregger has shown that Fensel discloses "inorganic particles."  In Fensel, reference to 26, 28, 116, and 118 are actually to different size "granules" that are used to reflect sunlight.  *See, e.g.*, Fensel at col. 22:12-19.  There is no mention that the "granules" are "inorganic."  For example, at least the disclosed aluminum oxalate would be characterized as organometallic (*id.* at col. 29:9-12), and the particles disclosed as being "polymers" could be either organic or inorganic (*id.* at col. 28:64-65).

> f)     Fensel Does Not Disclose Substantially Reflective Inorganic Particles Having an Average Diameter of About 100 µm to about 600 µm That is Approximately Equal to or Greater Than the Average Thickness of the Pressure Sensitive Adhesive Layer (1[e]).

103.     Mr. Dregger fails to demonstrate that Fensel discloses substantially reflective inorganic particles having an average diameter of about 100 µm to about 600 µm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer.

104.     As to the size of the particles, Mr. Dregger opines that Fensel "inherently teaches highly reflective inorganic particles having an average diameter of about 100 µm to about 600

32

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

µm." Dregger Report at 13.  Mr. Dregger posits that Fensel describes its granules as having "any size to meet the desired end use, including varying shapes and sizes." *Id.*  Mr. Dregger further notes that Fig. 4 "shows that the highly reflective granules 116, 118 have a thickness that is approximately equal to or greater than the thickness of the adhesive layer, as in claim 1." *Id.*  I disagree with Mr. Dregger's assessment.  First, I understand that figures in a patent are not read to be to scale unless explicitly stated.  Additionally, although Fig. 4 appears to show some granules 116 that are at least close to the same thickness as the adhesive, other granules 118 are smaller.



FIG. 4

At a minimum, this demonstrates that the average size of all the granules is going to be much lower than the average size of just granules 116.  Further, Mr. Dregger leaves out that Fensel itself describes the granules 116, 118 as being demonstrative only:  "As illustrated in FIG 4, granules 116 are substantially spherical and have the same size.  In practice, the granules have a variety of different shapes and not all of the granules are the same size."  Fensel at col. 26:26-32.  Aside from his flawed reliance on Fig. 4, the only other disclosure that could be construed as relating to the size of particles is that "some granules being fully or partially embedded in the adhesive layer." Dregger Report at 13.  That a granule could be fully embedded in the adhesive layer means that the diameter of said granule is less than the adhesive thickness, and thus Fensel fails to disclose particles having an average thickness approximately equal to or greater than the thickness of the adhesive.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

105. Mr. Dregger also points to nothing in Fensel that describes the actual objective size of the granules. Instead, Mr. Dregger says that "in view of Bartlett '615 (cited during prosecution of the '879 patent) teaching adhesive thickness of 127 μm to 2032 μm in combination with the granules 116, 118 of Fensel as shown as equal to or greater than the adhesive layer thickness in Fig. 4, it is my opinion that Fensel inherently teaches high reflective inorganic particles having an average of about 100 μm to about 600 μm." Dregger Report at 13. Mr. Dregger using the term "in view of" appears to be an attempt to use the additional reference, Bartlett '615, to meet a claim limitation. For anticipation, use of another reference to meet a claim limitation is inappropriate. To the extent Mr. Dregger posits that Bartlett '615 is used merely to demonstrate an inherent disclosure in Fensel, it is unclear how he reaches that conclusion. That Bartlett '615 teaches a range of adhesive thicknesses says nothing about what the specific thickness of the adhesive layer in Fensel must be, and further says nothing about the size of the granules in Fensel in relation to the thickness of the adhesive.

g) Fensel Does Not Disclose Substantially Reflective Particles Covering Approximately 70% to 100% of the Outer Exposed Surface of the Pressure Sensitive Adhesive (1[f]).

106. Mr. Dregger fails to demonstrate that Fensel discloses substantially reflective particles covering approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive.

107. Mr. Dregger explains that the granules in Fensel "are disclosed as covering most, if not all, of the upper surface of adhesive layer 114, with about 95% or more, or the adhesive layer covered with the highly reflective inorganic particles" and thus it is his "opinion that Fensel discloses the claimed limitation of the reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive." Dregger Report at 13. Mr. Dregger's states that Fensel discloses an approximately 95% to 100% coverage of the adhesive layer by the

34

granules.  Mr. Dregger provides no other explanation for his understanding of the phrase "most, if not all."

4.      *Fensel Does Not Anticipate Claim 15 of the '879 Patent*

108.    In my opinion, Fensel does not teach each limitation of claim 15 of the '879 patent, and so it does not anticipate that claim.

109.    Mr. Dregger provides no opinions regarding Fensel as an anticipating reference to claim 15 of the '879 patent.  *See* Dregger Report at 14.  Instead, Mr. Dregger broadly asserts that Fensel "discloses all of the limitations set forth in independent claim 1, expressly or inherently, thereby invalidating the '879 patent by anticipation."  Mr. Dregger does not opine that Fensel discloses the limitations of claim 15, specifically "[a] method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane."

## VI.    THE ASSERTED CLAIMS OF THE '879 PATENT ARE NOT INVALID AS OBVIOUS

110.    I have evaluated whether each of the references Mr. Dregger asserts in combination render obvious the asserted claims of the '879 patent and I found that they do not.

111.    As noted above with respect to anticipation, Mr. Dregger only discusses the elements found in claims 1 and 15 of the '879 patent.  Therefore, Mr. Dregger has not provided any opinions as to claims 2-5, 7-8, 10-13, and 16-17.

112.    Further, Mr. Dregger fails to cite to specific portions of the documents to which he refers.  *See, e.g.*, Dregger Report at 14 ("Serwin and Fensel are relevant prior art references as both are directed to waterproofing membranes and address similar problems in the art that the '879 patent aimed at overcoming.").  This has made review of his report and of the cited references unnecessarily difficult, and in fact makes it nearly impossible to understand how Mr. Dregger

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

arrived at his opinions and upon what evidence or materials his opinions are based.

### A.   Overview of the Additional Asserted References

#### 1.   *U.S. Patent No. 4,218,260 to Metzler*

113.   U.S. Patent No. 4,218,260 to Metzler ("Metzler") discloses reflective concrete bodies intended to increase road safety. Metzler at col. 1:8-12. "The reflective concrete body according to the invention is characterized in that it consists at least partly of reflecting concrete, the latter containing portland cement, a hard filler, a pigment and crystal glass balls E, whereby the refractive index of the filler is substantially the same as that of the crystal glass balls, the particle size of the filler being smaller than that of the crystal glass balls and the crystal glass balls being approximately half exposed in the surface of the layer of reflecting concrete." *Id*. at col. 2:6-13. "The reflective concrete should contain preferably (a) white portland cement, (b) a hard white filler, in particular quartz powder, (c) a white pigment, in particular titanium dioxide (rutile), and (d) colourless glass balls, since this gives the best reflective effect. But one can also use coloured portland cement, a coloured filler, a coloured pigment and coloured glass balls." *Id*. at col. 2:14-20. "The concrete body can, for example, have a base A of normal grey concrete which is at least partly covered with a layer of reflective concrete, generally being 8 to 10 mm thick.

114.   The filler is preferably quartz powder with the trigonal trapezohedral crystal structure of β-quartz, with a particle size of up to 0.5 mm, especially up to 0.2 mm, and with a refractive index of at least 1.2, in particular 1.55. The crystal glass balls have preferably a diameter of 0.2 to 0.6 mm, in particular 0.3 mm, and a refractive index of at least 1.55, in particular 1.55. If one uses the preferred pigment, namely titanium dioxide (rutile), an additional lightening of the white portland cement is achieved. Titanium dioxide is shown to have a reflex reflective value of 15% higher than that of e.g. magnesium oxide at an observation angle of 20 degrees, used in a test

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of reflex reflectors. This value is due to the fact that the mirror reflection component is higher in titanium dioxide than in magnesium oxide." *Id*. at col. 2:21-40.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

2.     *U.S. Patent No. 6,500,520 to Wiercinski*

115.    U.S. Patent No. 6,500,520 to Wiercinski ("Wiercinski '520") "employs particles that react with hydratable cementitious compositions such as concrete or mortar and/or that accelerate the hydration reaction of such compositions.  The particles may comprise, for example, set accelerators, strength enhancing agents, pozzolans and/or pozzolanic materials."  Wiercinski '520 at col. 2:13-20.  "As shown in FIG. 1, an exemplary waterproofing system **10** of the present invention comprises a pressure-sensitive waterproofing adhesive layer **12** and a discrete, separate layer of granulated particulate or pozzolanic material **14** that is contiguous with at least one major surface of the adhesive layer **14**.  The waterproofing adhesive layer **12** may be formed by coating the adhesive onto a substrate surface (not shown) such as a foundation wall, a deck, a below-grade structure, a roof deck, or other building and civil engineering structures.  Alternatively, the waterproofing adhesive layer **12** may be provided as a pre-formed layer that is attached to a carrier support sheet **16** (e.g., similar to FIG. 1 but without carrier support layer **16**)."  *Id*. at col. 4:42-54.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for  obviousness.

3.     *WO 2009/009659 to Wiercisnki*

116.    International Patent Publication WO 2009/009659 to Wiercinski ("Wiercinski '659") discloses "a skid-resistant roofing underlayment that, in its most basic form, includes three layers - a flexible substrate layer, an adhesive layer and a release liner layer.  The flexible substrate

37

comprises a woven polyolefin mesh that includes a first plurality of polyolefin tapes extending in a major direction interwoven with a second plurality of polyolefin tapes extending in a cross direction.  The adhesive layer includes a modified bitumen pressure sensitive adhesive with a sufficient cohesive strength to prevent exudation of the adhesive through the flexible substrate at elevated temperatures."  Wiercinski '659 at Abstract.  "The third layer includes a release liner removably affixed to the adhesive layer.  The release liner permits the underlayment to be stored in a roll, while enabling the user to easily unroll it during application.  The release liner is removed just prior to application of the underlayment to a roof surface.  The roofing underlayment is adapted to be applied to a roof surface such that the MD [major direction] (or length) of the flexible substrate is perpendicular to the slope of the roof after application."  *Id*. at ¶ [0012].  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

### 4. *U.S. Patent No. 3,937,640 to Tajima*

117.    U.S. Patent No. 3,937,640 to Tajima et al. ("Tajima '640") "relates to a self-adhesive type multilayer laminated bituminous roofing membrane which may be simply and easily applied in the built-up system roofing or waterproofing work on the tops of buildings, floors and walls of basements, surrounding walls of underpasses and subways, tunnels, bridges, reservoirs, canals and the like.  "As shown in FIGS. 1A, 1B, 1C and 1D, the base sheet 6 of the laminated roofing membrane 26, is coated on all or part of both or one face thereof with bitumen 8, and all or part of said bitumen coated layer is laminated with compound bitumen 20 that is denatured bitumen prepared particularly to impart high tackiness at ambient temperature thereto by blending natural or synthetic rubber and/or natural or synthetic resins." *Id*. at col. 6:1-8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

> 5.     *U.S. Patent No. 7,968,171 to Seth*

118.    U.S. Patent No. to 7,968,171 Seth ("Seth '171") "relates to reverse tanking waterproofing membranes which bond to freshly poured concrete, and more particularly to membranes having three-dimensional contours for creating unified moisture barriers in and around detail areas and other surface irregularities."  Seth '171 at col. 1:6-10.  "An exemplary waterproofing membrane of the invention, having a three-dimensional contour surrounded entirely or partially by a flat collar portion, can be positioned over tiebacks or other surface irregularities, and seamed with conventional reverse tanking membranes to provide a continuous waterproofing barrier.  Preferably, such shaped membranes are used in combination with correspondingly shaped molded support structures to prevent the membranes from collapsing under the weight of post cast concrete (i.e., concrete which is cast against them after they are installed)."  Seth '171 at col. 2:42-52.  "As another example, a waterproofing membrane having a three-dimensional shape, such as a circular- or conical-shaped sleeve, surrounded by a contiguous flat collar portion, may be

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

employed for waterproofing around penetrations such as pipes and pile caps.

119.     Three-dimensional shaped waterproofing membranes, having shapes such as domes, cones, cylinders, pyramids, or other three-dimensional forms, will save several steps otherwise needed for providing a continuous barrier at penetration joints.  Such membranes may have at least one or both major faces coated with one or more conventional waterproofing adhesive layers (e.g., rubberized asphalt, synthetic polymeric adhesives, clay-based adhesives, etc.) which are operative to bond with fresh concrete." *Id*. at col. 2:63-3:8.  "As shown in FIG. 3, an exemplary 'shaped' waterproofing membrane 10 and optional exemplary supporting structure 30 can be used to provide a continuous waterproofing barrier over a tieback 40 or other surface detail on the construction surface before concrete is post cast against it." *Id*. at col. 4:4-8.  "As illustrated in the magnified view (enlarged circle) in FIG. 3, the waterproofing membrane 10 comprises at least one carrier support sheet 12 having first and second major opposing faces, and, attached to a first major face thereof, at least one continuous pressure-sensitive waterproofing adhesive layer 14 operative to bond with post cast concrete or mortar."  *Id*. at col. 4:9-15.  "Optionally, but preferably, a protective layer 16, such as an elastomer coating, a particulate layer, or a mixture thereof (e.g., particles mixed into the elastomer) or arrangement thereof (e.g., discrete particle layer on top of or partially embedded into an elastomer layer) operates to protect the adhesive layer 14 from dirt and debris." *Id*. at col. 4:16-21.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**Fig. 3**

6.      *U.S. Patent Publication 2007/0044397 to Wiercinski*

120.    U.S. Patent Application Publication 2007/0044397 to Wiercinski ("Wiercinski '397 Patent Publication") "relates to skid-resistant surfaces especially when wet, and in particular to skid-resistant trafficable surfaces such as roofs and floors as well as skid resistant packaging for lumber and the like."  Wiercinski '397 Patent Publication at [0001].  "One embodiment of the invention is the provision of a skid-resistant surface comprising a substrate coated with a skid resistant layer.  The substrate is preferably a pedestrian trafficable surface such as a roofing or flooring surface.  The skid or slip-resistant layer is preferably a pressure sensitive adhesive or a highly filled textured binder."  *Id.* at [0010].  "Another embodiment of the invention is a lightweight roofing underlayment having excellent skid or slip-resistance to foot traffic under dry, wet and/or dusty conditions on a sloped surface, and is both readily rollable and unrollable as a

41

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

coherent unit.  The present invention overcomes problems associated with the prior art.  The underlayment is preferably a multi-layered sheet material that includes a support layer composed of a film or fabric or both, and a skid or slip resistant layer on one or both faces of the support layer.  The skid or slip resistant layer is preferably a pressure sensitive adhesive or a highly filled textured binder.  The resulting sheet-like underlayment is sufficiently flexible to allow it to be formed into rolls and readily installed by unrolling over a support structure such as a roof deck.

121.  It also provides a sloped walking surface having a high coefficient of friction and excellent skid resistance even when wet and/or dusty, and even at high roof pitches such as those between about 4:12 and 12:12." *Id*. at [0011].  Referring to Fig. 1, "the support layer is comprised of (i) a non-woven or woven fabric layer **11**, and (ii) a synthetic organic polymer film **12** attached to one surface of the fabric **11**.  On the surface of the synthetic organic polymer film **12** is a skid-resistance layer **13**, which is a pressure sensitive adhesive or a highly filled textured binder.  It is this skid-resistance layer **13** that provides the walking surface for the roof applicator, and is ultimately covered by the primary roof covering or overlayment such as shingles or tiles." *Id*. at [0051].



**Figure 1**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The Dregger Report does not disclose why or how this reference would be used in any particular
combination as the basis for obviousness.

### 7.     *U.S. Patent Publication 2007/0218251 to Jacobs*

122.    U.S. Patent Application Publication 2007/0218251 to Jacobs ("Jacobs '251 Patent
Publication") "relates generally to infrared light reflecting construction surfaces and infrared light
reflecting mixtures used to create such construction surfaces."  Jacobs '251 Patent Publication at
[0009].  "In one embodiment, the invention pertains to an infrared light reflecting mixture that
includes about 99.95 to about 70 weight percent inorganic granules having a mean size that is
between about 0.1 and about 5 millimeters and about 0.05 to about 30 weight percent polymeric
multilayer infrared light reflecting film particles having a mean size that is between about 50
micrometers to about 5 millimeters." *Id*. at [0010].  "In another embodiment, the invention pertains
to a roofing shingle that includes a substrate, a number of granules that are secured to the substrate,
and a number of multilayer infrared light reflecting film particles that are secured relative to the
substrate."  *Id*. at [0011].  "FIG. 2 is a diagrammatic cross-section of a roofing shingle **200**.
Roofing shingle **200** includes a substrate **202**, which as discussed above may be a felt or fiberglass
substrate.  An asphalt layer **204** is disposed on substrate **202**.  A granule layer **206** is disposed on
asphalt layer **204**.  As discussed above, granule layer **206** may include both conventional and cool,
infrared light reflecting granules.  A film layer **208** is disposed over granule layer **206**.  Film
layer **208** may include a multilayer infrared light reflecting film such as those discussed herein."
*Id*. at [0078].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



*Fig. 2*

The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

        8.     *U.S. Patent No. 7,442,270 to Bartek*

123.    U.S. Patent No. 7,442,270 to Bartek ("Bartek '270") "relates to asphalt-based waterproof roofing membranes used in multi-ply asphalt-based commercial roofing systems and, in particular, to a prefabricated asphalt-based waterproof roofing membrane for use in a multi-ply asphalt-based commercial roofing system, e.g. a cap sheet that forms the exposed layer of a multi-ply built-up roofing system, that is manufactured at a factory to have a highly reflective upper surface to meet EPA Energy Star requirements." Bartek '270 at col. 1:9-18. The prefabricated asphalt-based waterproof roofing membrane **10** includes: a reinforcing substrate **20**; asphalt with which the reinforcing substrate **20** is saturated and which forms top and bottom layers **22** and **24** encapsulating the reinforcing substrate; and a top thermoplastic sheet layer **26** with a highly reflective top surface **28** that is coextensive with or substantially coextensive with the top major surface **12** of the prefabricated asphalt-based waterproof roofing membrane **10** and may be used to form the lateral tab **19**. Preferably, the prefabricated asphalt-based waterproof roofing membrane **10** has a polymer primer layer **30**, which is impermeable to the oils and other components of the asphalt. The impermeable polymer primer layer **30** is located between the highly reflective thermoplastic elastomeric sheet layer **26** and the top surface of the

44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

top asphalt layer **22** to prevent the exuding of oils and other components from the asphalt into the highly reflective thermoplastic elastomeric sheet layer **26** and to thereby prevent the oils and other components of the asphalt from staining and otherwise discoloring or adversely affecting the highly reflective top surface **28** of the thermoplastic elastomeric sheet layer **26**.  In addition, the prefabricated asphalt-based waterproof roofing membrane **10** normally includes a bottom surface layer **32** formed of conventional mineral surfacing materials, such as but not limited to such as mica, talc, sand, etc.  *Id*. at col. 5:61-6:18.



The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

         9.     *U.S. Patent No. 7,238,408 to Aschenbeck*

124.    U.S. Patent No. 7,238,408 to Aschenbeck ("Aschenbeck '270") "relates generally to asphalt-based roofing materials [such as roofing shingles], and more particularly to asphalt-based roofing materials having coatings which are engineered to vary in composition through the thickness of the roofing materials.  The invention also relates to processes for coating the roofing materials."  Aschenbeck '270 at col. 1:18-23 (alteration added); *see also id*. at col. 1:27-29.  "As shown in FIG. 1, a roofing material **10** according to the invention includes a mat **12** saturated and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

coated with an asphalt-based coating **14**.  The coating includes a top portion **14**A covering the top of the mat, a mat portion **14**B saturating the mat, and a bottom portion **14**C covering the bottom of the mat.  As used herein, "top" means the side facing upward or away from the roof when the roofing material is installed on a roof, and "bottom" means the side facing downward or toward the roof.  The roofing material usually includes a layer of roofing granules **16** (not drawn to scale) embedded in the top portion of the coating." *Id*. at col. 5:25-35.



The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

          10.     *U.S. Patent Publication 2006/0110996 to Getlichermann*

      125.   U.S.   Patent   Application   Publication   2006/0110996   to   Getlichermann ("Getlichermann '996 Patent Publication") "relates to a waterproofing membrane comprising a structure incorporating a fibre layer and wherein to one side of said structure a bituminous mass is applied and another side of said structure is covered on its surface with a substance comprising a mineral or organic filler and an acrylic polymer."  Getlichermann '996 Patent Publication at [0002].  "A waterproofing membrane according to the present invention is therefor characterised [sic] in that said substance comprises between 15% and 25% by dry weight of said acrylic polymer and mixed therewith between 4% and 22% by dry weight of titanium dioxide.  The mixture of the

46

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

acrylic polymer and the titanium dioxide causes the titanium dioxide, which is an appropriate

reflective substance, to be integrated in the polymer matrix which is applied to the surface of the

structure and penetrates partially therein before the bituminous mass is applied.  In such a manner,

the titanium dioxide and the UV resistant acrylic polymer are anchored in the structure and can

not be easily removed for example by the rain.  The mixture of the acrylic polymer and the titanium

dioxide in the indicated proportion causes a surprising synergism, which leads to a highly reflective

membrane although the rather small amount of used titanium dioxide.  The aqueous mixture of the

acrylic polymer and the titanium dioxide, which is applied during coating of the structure, enables

to form a coating which is uniformly applicable by impregnation or induction to the structure, thus

causing a structural bound between mixture and structure." *Id*. at [0006].  The Dregger Report does

not disclose why or how this reference would be used in any particular combination as the basis

for obviousness.

           11.    *U.S. Patent No. 5,496,615 to Bartlett*

       126.    U.S. Patent No. 5,496,615 to Bartlett ("Bartlett '615") discloses a waterproofing

membrane useful for blind-side (or pre-applied) applications, which comprises a carrier layer, a

first pressure-sensitive adhesive layer adhered on said carrier first major face,  a protective coating

layer coated onto said first adhesive layer; said first pressure-sensitive adhesive and protective

coating layers being operative to bond with a cementitious material cast against the membrane and

allowed to cure.  Bartlett '615 at col. 2:47-67.  Bartlett '615 also discloses a layer of finely divided

particulate material adhered onto said protective coating layer as a separate layer, said particulate

layer being operative to permit a cementitious material to be cast against said first adhesive layer

and said protective coating layer and bonded thereto when allowed to cured.  *Id.*; *see also id.* at

col. 7:56-58.  The Dregger Report does not disclose why or how this reference would be used in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

any particular combination as the basis for obviousness.

12.    *Journal Publication by "Marceau"*

127.    Medgar L Marceau and Martha G. Vangeem, *Solar Reflectance Values of Concrete*, Vol. 30 No. 8 Concrete International 52 (2008) ("Marceau") discusses how "[i]ntrinsic material properties can minimize the heat island effect." Marceau at 52. "Surface and air temperatures in urban and suburban areas tend to be higher than those in adjacent rural areas. This phenomenon, commonly known as the heat island effect, is the result of many factors, but the solar energy absorbed by the surfaces of pavement and buildings plays a major role. Because the heat island effect leads to increased demand for air conditioning and amplified levels of air pollution in cities, current and pending environmental rating systems for buildings encourage the use of construction materials that efficiently reflect solar radiation and emit heat via radiant energy." *Id.* "[T]he solar reflectance of the concrete generally increased with increasing solar reflectance of the supplementary cementitious material. The solar reflectances of the ordinary cements (other than the white cement) ranged from 0.36 to 0.47. The solar reflectances of the fly ashes encompassed those of the cements and ranged from 0.28 to 0.55. The solar reflectances of the slag cements ranged from 0.71 to 0.75, exceeding that of both the ordinary cements and fly ashes. Accordingly, the slag cement concretes generally had the highest solar reflectances. The white cement had the highest solar reflectance at 0.87. The average effect of replacing 45% of the cement in a mixture with slag cement was to increase (lighten) the solar reflectance of the concrete by 0.07. The average effect of replacing 25% of the cement in a mixture with dark gray fly ash was to decrease (darken) the solar reflectance by 0.02. *Id*. at 57. The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

48

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

13.   *Journal Publication by "Hollis"*

128.   *A Description of Some Oregon Rocks and Minerals*, by Hollis M Dole, Second revision, 1986, by Lawrence L. Brown, Oregon Department of Geology and Mineral Industries (Reprinted August 2006) ("Hollis"), describes "some of the more common rocks and minerals found in [Oregon]." Hollis at 1.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

14.   *Journal Publication by "Moresová"*

129.   *White Cement – Properties, Manufacture, Prosects*, by Karteřina Moresová and František Škvára, Technická5, 166 28 Prague 6, Czech Republic (submitted Jan. 6, 2000, accepted Mar. 12, 2001) ("Moresová") "summarize[s] . . . aspects concerning white cement . . . ." Moresová at 158.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

15.   *Journal Publication by "Whiting"*

130.   *Synthesis of Current and Projected Concrete Highway Technology*, by David Whiting et al., Strategic High Research Program, National Research Council, Washington DC (1993) ("Whiting") "summarizes the results of an extensive search and review of available literature in the field of concrete materials, construction practices, and major application areas as applied to highway construction technology.   The synthesis covers current and projected developments in materials systems, including cements, aggregates, admixtures, fibers, and sealers. General topic areas in the fields of concrete production and highway construction covered by this synthesis include mix proportioning, batching and transport, placement, finishing, and curing." Whiting at 1.  "The synthesis includes information on specific applications areas in the highway industry.  These applications focus Oil repair and reconstruction and include full-depth repairs,

49
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

slab replacement, partial-depth repairs, overlays, and recycling.  Quality control of concrete, including traditional approaches as well as new test methods and quality assurance schemes, is also discussed in detail." *Id*.  "The appendix describes the history of and new developments in concrete pavement construction on the European continent. *Id*.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

16.   *Preprufe® 300R/160R Technical Datasheet 2002*

131.   The "Preprufe® 300R & 160R Technical Datasheet, 2002" is a technical data sheet for the Preprufe® 300R & 160R products, published in 2002.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

17.   *Preprufe® 300R/160R Technical Datasheet 2007*

132.   The "Preprufe® 300R & 160R Technical Datasheet, 2007" is a technical data sheet for the Preprufe® 300R & 160R products, published in 2007.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

18.   *Preprufe® 300R/160R Technical Datasheet 2008*

133.   The "Preprufe® 160R Technical Datasheet, 2008" is a technical data sheet for Preprufe® 160R, published in 2008.  The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

19.   *Preprufe® 300R/160R Waterproofing Membrane Products*

134.   Preprufe® 300R/160R waterproofing membrane products ("Preprufe® 300R/160R Tested Products") have a carrier sheet and a layer of a pressure sensitive adhesive over the carrier

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

sheet, and a protective coating over the pressure sensitive adhesive, the protective coating comprising inorganic particles encapsulated by the polymer contained in the protective coating. The Dregger Report does not disclose why or how this reference would be used in any particular combination as the basis for obviousness.

**B.    Mr. Dregger's Discussion of Obviousness of Claims 1 and 15 of the '879 Patent**

135.    The Dregger Report sets forth three sections asserting broad grounds for obviousness of claims 1 and 15 of the '879 patent:  (1) Serwin and/or Fensel in combination with Metzler and Wiercinski '520; (2) Serwin, Fensel, Metzler, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, Wiercinski '659, Seth '171, Wiercinski '397 Patent Publication, Tajima '640, and Getlichermann '996 Patent Publication, Jacobs '251 Patent Publication, Bartek '270, Aschenbeck '408, and the Whitling Publication, alone or in combinations thereof; and (3) Bartlett '615 in view of Seth '171, Wiercinski '397 Patent Publication, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, and Wiercinski '659, in various combinations thereof.  Dregger Report at 14, 18, 25.

136.    By my calculation, Mr. Dregger provides at least a trillion combinations of references.  *See* Dregger Report at 18 (listing 16 references and noting that the combinations can be each reference "alone or in combinations thereof").  Except as specifically noted, the Dregger Report does not identify any specific examples of the vast majority, over 99.99999999%, of possible combinations.  I reserve all rights to respond to further specific combinations should Mr. Dregger limit the number of asserted combinations in the future.  I further reserve all rights to supplement this report  or testifying at trial by discussing further what any particular reference discloses and what it does not if Mr. Dregger is allowed to supplement his report or testify at trial

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

regarding specific combinations of references that his report does not currently discuss .

1.    *Serwin and/or Fensel in Combination with Metzler and Wiercinski '520 Do Not Render Claims 1 or 15 of the '879 Patent Obvious*

137.    It is my opinion that neither Serwin nor Fensel in combination with Metzler and Wiercinski '520 would have made claims 1 or 15 of the '879 patent obvious to a POSA.

a)    Serwin, Fensel, and Metzler Are Not Analogous Prior Art.

138.    I disagree that Serwin, Fensel, or Metzler are "relevant prior art." Mr. Dregger asserts that "Serwin and Fensel are relevant prior art references as both are directed to waterproofing membranes and address similar problems in the art that the '879 patent is aimed at overcoming." Dregger Report at 14. I disagree.

139.    As explained above, *see supra* at ¶ 75, I am not sure what Mr. Dregger means when he simply posits that a reference is "relevant prior art." It is possible that Mr. Dregger instead means to reference the concept of "analogous prior art" and my analysis below assumes that possibility as true. To the extent Mr. Dregger has some other understanding of the meaning of "relevant prior art," then his conclusions are irrelevant .

140.    As explained above, *see supra* at ¶ 76, it is my opinion that Serwin is not analogous prior art. Serwin discloses a sandwich plate-like construction of a steel plate and concrete layer. *See* Serwin at Abstract. The background of Serwin explains that "sandwich-like constructions," wherein concrete is cast onto steel plates, does not allow for transfer of shear forces from the concrete to the steel. *Id.* at col. 1:10-19. Hence, the purpose of Serwin is to distribute shear forces more efficiently between the concrete and steel plate. In the past, this was facilitated by using studs or anchors. *Id.* at col. 1:20-25. However, this was labor intensive and, as concrete shrinks, cracks appear in the concrete surface, such that water and chlorides can enter and cause corrosion. *Id.* at col. 1:56-67. Therefore, it was required to have a coating on top of the concrete to hamper

52

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ingress of chlorides, water, and the like.  *Id.*  Serwin explains that these types of constructions are often found on bridges, ship decks, oil platforms, and similar constructions."  *Id.* at col. 2:5-11.

141.    Mr. Dregger provides no explanation as to why a POSA would consider looking to a reference like Serwin when faced with the problem of the waste associated with a release sheet that is normally used to protect the waterproofing pressure sensitive adhesive from foot traffic and sunlight until concrete is ready to be cast upon the membrane (post-cast concrete), and prevents blocking when the membrane is rolled up (such as during shipping).  Serwin is not a "waterproofing membrane" as Mr. Dregger opines because it is not "thin" or "pliable," nor is its purpose to prevent water ingress into a concrete structure or to bond with post-cast concrete.

142.    Additionally, I disagree with Mr. Dregger's opinion that Serwin discloses the range of adhesive thickness in claim 1 of the '879 patent and that a POSA would look to Serwin to solve the problems identified in the '879 patent.  Serwin discloses an adhesive between 200 μm and 5,000 μm.  Dregger Report at 16.  Although it is true that peel strength increases, up to a limit, with increasing pressure sensitive thickness, particles sized to provide for the no blocking/no release sheet features of claim 1 of the '879 in a membrane with an adhesive above 500 μm would result in difficulty with treating detail areas during membrane application, and would further result in a heavy membrane.  For at least that reason, the broad disclosed range of Serwin does not make the considerably narrower range of adhesive thickness in a water-proofing membrane of the '879 patent obvious.  A POSA would not look at the much thicker adhesive disclosed in Serwin as a solution to the problems identified in the '879 patent.

143.    Further, Mr. Dregger gives no opinion as to whether Serwin is in the same field of endeavor as the '879 patent.  For the avoidance of doubt, I disagree that Serwin is in the same field of endeavor as the '879 patent.  For many of the same reasons as discussed above, Sewin is not in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the same field of endeavor because it is not a waterproofing membrane, is not used in pre-applied applications using post-cast concrete, and is not used to waterproof cement structures.

144.    It is my opinion that Fensel is not analogous prior art.  Fensel "relates to roofing and/or siding materials and a method of making such materials having improved reflectivity, and more particularly to a granular material and method of applying the granular material to the surface of the, roofing and/or siding materials resulting in improved the roofing and/or siding reflectivity." Fensel at col. 2:57-62.  The method disclosed in Fensel "is applicable to all types of roofing and/or siding materials including, but not limited to, shingles, cap sheet roll roofing, modified bitumen, foam roofing, built-up roofing (BUR), metal roofing and/or siding, plastic roofing and/siding, and wood roofing and/or siding."  *Id.* at col 2:62-67.  Mr. Dregger provides no cogent explanation for why a POSA would  consider Fensel as analogous to water-proofing membranes for post-cast concrete structures or the problems they are specifically engineered to overcome.   In his anticipation section, Mr. Dregger explains that it is his opinion that Fensel is relevant prior art because (1) the '879 patent references roofing products cited as prior art; and (2) "Fensel teaches its waterproof materials may be secured to the ground, which would include the ground inside an excavation and a pre-applied application.  As for roofing products being cited in the '879 patent, I agree that a roofing membrane is a waterproofing membrane that in some circumstances could be relevant .  However, as Fensel discloses, the "substrate" that Mr. Dregger equates to the claimed "flexible carrier sheet" includes "semi-rigid" materials such as plastic, wood, or metal.  Fensel at col. 26:9-12.  This is not a "membrane" as defined by the Court.  Further, nothing in Fensel discloses application of the roofing and/or siding system to a concrete structure, or for use in a waterproofing system for post-cast concrete.  The roofing and/or siding materials of Fensel are operable to protect the substrate to which they are applied from the elements.  By stark contrast

the waterproofing membrane of the '879 patent is intended to waterproof concrete that is cast against (i.e., applied to the membrane). Fensel does not teach pre-applied membranes (i.e. post-cast concrete). Thus, there is no need for or reference to a pressure sensitive adhesive in Fensel because the adhesive in Fensel is to secure the particles in place, not to further adhere to something cast against the adhesive and particles. *See, e.g.*, Fensel at col. 26:20-22.

145.    Mr. Dregger provides no cogent explanation for why Metzler is analogous prior art. Metzler discloses a road surface having a top layer of reflex reflective concrete in slab or cylindrical form made of a mixture of white Portland cement, particulate white quartz filler, material, colorless crystal balls and titanium dioxide pigment. Metzler at Abstract. The diameter of the glass balls are from 0.2 to 0.6 mm and constitute from 50 to 70% of the concrete mixture but are arranged within the top layer of concrete in successive layers with those balls closest to the impact surface of the top layer being half exposed to intercept light from car headlamps. *Id.* The purpose of the reflective surface in Metzler is to address problems with road safety and for a way to permanently light up roadways at night via a vehicle's headlamps. *Id.* at cols. 1:11-15, 2:1-3.

146.    Mr. Dregger asserts that Metzler "is relevant prior art as it relates to a reflective concrete body and, like that the of the '879 patent, it is aimed at increasing the surface reflectivity thereof." Dregger Report at 18. Contrary to Mr. Dregger's statement, the '879 patent does *not* relate to a reflective concrete body. The '879 patent describes waterproofing membranes for use in pre-applied application, with a specifically sized layer of pressure sensitive adhesive to bond to post-cast concrete and specifically sized reflective inorganic particles adhered to the adhesive to prevent blocking when rolled and to protect the adhesive from sunlight and foot traffic between the time the membrane is applied and when concrete is cast against it. *See* '879 patent at cols. 3:40-47, 6:19-27. There is no requirement in the '879 patent that any "concrete body" must be

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reflective.  Additionally, Metzler seeks to have a reflective surface to provide reflective markings in a roadway to make it safer for cars to drive at night, not to protect the concrete road structure from sunlight.  *See* Metzler at col. 2:1-3, 51-53.

        b)    Mr. Dregger Provides No Substantive Opinions as to Any Motivation to Combine Serwin and/or Fensel with Metzler and Wiercinski '520

147.    Mr. Dregger provides no substantive analysis of any motivation to combine based at the time of the invention and instead relies on clear hindsight bias to pick and choose limitations from various references to arrive at the claimed invention.

148.    Mr. Dregger posits that each of the four references "is at least aimed at protecting the underlying layers of the respective membranes and the substrates they are attached to (e.g., by preventing such layers from being exposed to detrimental environmental conditions)."  Dregger Report at 15-16.  Mr. Dregger also states that Serwin, Metzler, and Wiercinski '520 "all disclose top layers of their respective membranes that enhance adhesion of concrete cast against such membranes.  *Id.* at 17.  These statements are inaccurate.

149.    First, as discussed above, neither Serwin nor Fensel disclose a "membrane."  *See supra* at ¶¶ 42-45, 82-85.

150.    Second, Mr. Dregger never points to the disclosure of a membrane in Metzler. Instead, Mr. Dregger just concludes that Metzler discloses a membrane.  *See, e.g.*, Dregger Report at 15 (discussing Metzler but not identifying or even using the term "membrane"); *id.* at 15-16 (concluding that all four references have their own "respective membranes"); *id.* at 16 ("Both Metzler and Wiercinski '520 teach membranes have top layers....").

151.    Third, Serwin, Fensel, and Metzler do not disclose a construct upon which concrete is cast, and so none disclose a construct, such as the water-proofing membranes of the '879 patent, that serves to enhance any adhesion of concrete cast against it.  *See supra* at ¶¶ 42-45, 82-85, 150-

56

51.

152.    Fourth, the asserted references are all directed to different problems from those identified in the '879 patent.  Mr. Dregger assert that Serwin "teaches membranes having layers that both prevent water ingress into underlying layer(s) and enhance adhesion to concrete cast against it.". *Id.* at 16.  As described above, the membrane of the '879 patent prevents water ingress into concrete structures by providing a waterproofing layer between the substrate and the post-cast concrete.  *See supra* at ¶ 78.  The purpose of the membrane of the '879 patent is not to protect the other layers of membrane from water ingress, unlike Serwin.  Also, Serwin does not disclose a product onto which concrete is cast against it in a post-cast concrete application.  The referenced "casting" in Serwin is the act of adding particles on top of the adhesive layer during the manufacture of the Serwin product .  *See supra* at ¶ 79.  Fensel discloses a waterproofing construct that protects the underlying structure, but does not disclose providing a waterproofing layer between the underlying structure (Fensel discloses a roofing or siding material for a structure), and any material being cast against the outside.  Rather, Fensel is not designed to have a surface that is designed to reflect sunlight as well as be resistant to foot traffic for a short term, and thereafter have concrete cast against and adhere to it and does not describe a situation in which a material is cast against the reflective surface.

153.    Mr. Dregger asserts that both Metzler and Wiercinski '520 "teach membranes having top layers that have increased surface reflectivity to both protect the underlying membrane layers as well as enhance adhesion of the membrane to concrete or cementitious material cast against it." Dregger Report at 16.  This is inaccurate.  Metzler discloses a reflective surface to provide a roadway with built-in durable reflectors that reflect vehicle lamps at night that illuminate the roadway, not to protect anything from sunlight.  Metzler at col. 2:1-3.  Further, there is no

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

disclosure in Metzler of providing a reflective surface upon which "concrete or a cementitious material cast against it[,]" let alone enhancing adhesion of the membrane to that concrete or cementitious material.  Dregger Report at 16.

154.    As for Wiercinski '520, Mr. Dregger's statement that the reference used a reflective top surface to protect the underlying membrane layers is incorrect.  Mr. Dregger points to nothing in Wiercinski '520 that refers to a reflective surface or of the problem of protecting underlying layers from sunlight.  *See, e.g.*, Dregger Report at 16-17 (referencing alleged disclosure of "substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive" and noting that Wiercinski '520 discloses "inorganic particulates coated on the adhesive"); *see also id.* at 18 ("Since these prior art references teach highly reflective inorganic particles that both protect underlying membrane layers and enhance adhesion to cast concrete, a POSITA at the time of the invention would have found it obvious to combine such references to render a membrane as disclosed in claims 1 and 15 of the '879 patent.").  In fact, Wiercinski '520 discloses use of particles "that react with hydratable cementitious compositions such as concrete or mortar and/or that accelerate the hydration reaction of such compositions." Wiercinski '520 at col. 2:15-19.  And at least fly ash and blast furnace slag are dark in color.  *See id.* at col. 2:30-33.

155.    Other than his flawed analysis with respect to the problems addressed by Serwin, Fensel, Metzler, and Wiercinski '520, Mr. Dregger does not provide any opinions as to any other facts relevant to an obviousness analysis or a motivation to combine the references.  For example, Mr. Dregger merely describes his view that all of the elements of a patent claim are found across these  prior art references but provides no reason that a POSA would have thought to combine the elements to create the claimed invention.  Mr. Dregger also fails to provide any opinion or analysis

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

as to why a POSA would have had a reasonable expectation of success that the combination of references would have yielded the claimed invention with its properties. Instead, Mr. Dregger just restates what I understand to be that law. *See* Dregger Report at 16 ("With the known problems in the prior art, a POSITA would have been able to identify solutions to such problems in the prior art discussed herein and below, and combine these references in various combinations thereof, with reasonable certainty and success in achieving the claimed invention of the '879 patent."). He does not apply that law to the references.

156.   Mr. Dregger also relies on hindsight bias to arrive at his conclusion that a POSA would have been motivated to combine Serwin and/or Fensel with Metzler and Wiercinski '520 to arrive at the claimed invention. The best example in Mr. Dregger's Report is his statement: "The motivation to combine is based in part on the fact that a POSITA would recognize Serwin, Fensel, Metzler, and Wiercinski '520, alone or in various combinations thereof, disclose all limitations set forth in claims 1 and 15 of the '879 patent." Dregger Report at 16. Based on this statement, Mr. Dregger clearly uses claim 1 and 15 of the '879 patent as a roadmap in picking and choosing disclosures from references with no regard for any potential hindsight bias or explanation as to why a POSA would look to those specific references in arriving at the claimed invention.

157.   Mr. Dregger also fails to specifically address differences between the prior art and the invention claimed in the '879 patent. For example, there is no analysis of differences between a reference like Serwin and the claims of the '879 patent. Instead, Mr. Dregger's focus is solely on the alleged similarities. As described above, there are substantial differences between the asserted prior art references and the claims of the '879 patent, including that Serwin, Fensel, and Metzler do not disclose waterproofing membranes for use in pre-applied concrete waterproofing applications, *see supra* at ¶¶ 53-55, 98-99, 152-53, and Wiercinski '520 does not discuss

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reflectivity or the protection of the pressure sensitive waterproofing adhesive layer but is rather directed to increasing the bond strength between the adhesive and the post-cast concrete. Wiercinski '520 at Abstract.  Wiercinski '520 also does not teach average particle size greater than the adhesive thickness.

158.    Mr. Dregger also does not explain why a POSA would look to references like Serwin and Fensel instead of the art described by the '879 patent itself in its Background section or the 24 patent documents cited during prosecution of the '879 patent, many of which specifically concern waterproofing membranes.  Mr. Dregger's reliance on non-analogous art demonstrates again that he is focusing on the disclosure of specific limitations and not on why a POSA would look to any specific references, would be motivated to combine those references, and would reasonably expect to be successful in combining the references to arrive at the claimed invention.

>        c)        The Combinations of Serwin and/or Fensel with Metzler and Wiercinski '520 Do Not Render Claims 1 or 15 of the '879 Patent Obvious

159.    Mr. Dregger provides shortand paraphrased, but unsupported, statements about where each limitation in claims 1 and 15 is supposedly found in the prior art references.  *See* Dregger Report at 16-17.  Mr. Dregger's opinions are deficient and fail to provide the substance of his opinions.

160.    There are several limitations found in claims 1 and 15 of the '879 patent that are not disclosed by any of the asserted prior art references and therefore Mr. Dregger has failed to provide any basis for a finding of obviousness of claims 1 and 15. No combination of these references, even if properly motivated, would result in something within the claims of the 879 patent.

161.    There are no entries under any limitation that purport to be disclosed by Metzler, and so the report fails to include  Metzler in Mr. Dregger's proposed combination of references

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and fails to explain where that reference fits in his analysis.  *See id.*

162.    As discussed above with respect to anticipation, I disagree the Serwin discloses limitations (a), (b), (c), (d), (e), (f), and (h).[2]  *See supra* at ¶¶ 40-79.

163.    As discussed above with respect to anticipation, I disagree that Fensel discloses limitations (a), (b), (c), (d), (e), (f), and (h).  *See supra* at ¶¶ 80-109.

164.    It is also my opinion that Wiercinski '520 fails to disclose limitations (b), (c), (d), (e), and (f).  Further, Wiercinski '520 was considered by the patent examiner during prosecution of the claims of the '879 patent.  *See* '879 patent at pg. 2 ("References Cited").

165.    Mr. Dregger asserts that Wiercinski '520 discloses a pressure sensitive adhesive having a thickness "in the range of 75 μm to 500 μm, but fails to identify where."  Dregger Report at 15; *see id.* at 16 (at entry (c)).  As Mr. Dregger acknowledges, Wiercinski '520 discloses a waterproofing pressure sensitive adhesive layer that has a thickness range between 2 and 75 mils, and more preferably 5-60 mils.  Wiercinski '520 at col. 4:55-58.  This equates to between 50.8 μm and 1905 μm, or more preferably from 127 μm and 1524 μm.  This range is far outside of that claimed in the '879 patent.

166.    Mr. Dregger fails to identify in Wiercinski '520 where there is a disclosure of "substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive."  Dregger Report at 15-16; *see also id.* at 16-17 (at entry (d)).  Mr. Dregger asserts that Wiercinski '520 discloses "inorganic particles" (Wiercinski '520 at col. 2:13-35) that can be "coated or embedded in the waterproofing adhesive[.] (*id.* at col. 5:66-67; *see also id.* at col. 2:51-56 ("the particles being preferably embedded in the adhesive and partially exposed

---

[2]    Mr. Dregger lists the limitations of claims 1 and 15 using lower case letters.  *See* Dregger Report at 16-17.  I refer to those designations for the remainder of my report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and thus operative to bind with calcium hydroxide or other alkaline solution from a hydratable cementitious composition that is cast against the particle-coated adhesive layer"). But Mr. Dregger points to nothing in Wiercinski '520 that describes the inorganic particles as substantially reflective. *See* Dregger Report at 16 ("Both Metzler and Wiercinski '520 teach membranes having top layers that have increased surface reflectivity to both protect the underlying membrane layers as well as enhance adhesion of the membrane to concrete or a cementitious material cast against it."). At least two of the disclosed particles in Wiercinski '520, blast furnace slag and fly ash, are dark in color. Wiercinski '520 at col. 2:30-33.

167. Mr. Dregger fails to identify in Wiercinski '520 where there is a disclosure of the claimed "substantially reflective inorganic particles have an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer." *See* Dregger Report at 15; *see also id.* at 17 (at entry (e)). As Mr. Dregger acknowledges, Wiercinski '520 discloses the use of much smaller particles than those used in the '879 patent. Wiercinski '520 at col. 5:45-48 (disclosing use of aluminum oxide trihydrate particles having an average particle size of 5 to 100 microns); *see* Dregger Report at 15, 17 (describing the particles in Wiercinski '520 as between 5 and 100 microns).

168. Mr. Dregger also fails to point to any disclosure in Wiercinski '520 that suggests using particles approximately equal to or greater than the adhesive thickness. Mr. Dregger summarily opines that, because "the outer measures of" the particle size and adhesive thickness ranges in Wiercinski '520 overlap, "it would have been obvious to a POSITA that by adhering 100 micron (3.9 mils) sized inorganic particulates to a pressure-sensitive adhesive having an average thickness of 50.8 μm across such layer, results in inorganic particulates having average diameter that is greater than the average thickness of the pressure sensitive adhesive, as recited in claim 1."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dregger Report at 15.  However, Mr. Dregger provides no supporting analysis for why a POSA would look to the admittedly outer measures of the disclosures of particle sizes and adhesive thicknesses in Wiercinski '520 to solve a problem not identified in Wiercinski '520 (e.g., degradation of the adhesive layer by sunlight) through the use of a solution  (reflective particles) that is also not disclosed in Wiercinski '520.  To the extent Mr. Dregger believes other prior art references would teach the use of the outer measures of Wiercinski '520's particles and adhesive to arrive at the claimed invention, he does not say that in his Report.

169.    Mr. Dregger fails to identify in Wiercinski '520 where there is a disclosure of "the substantially reflective inorganic particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface."  *See* Dregger Report at 15; *see also id.* at 17 (at entry (f)).  The only support upon which Mr. Dregger relies is that Fig. 1 of Wiercinski '520 "shows up to 100% of the surface covered [with inorganic particulates]."  *Id.* at 15, 17.  As discussed above, I have been told that unless otherwise noted, figures in patents are not to be read as being to scale.  *See supra* at ¶ 104. Aside from a not-to-scale figure in the reference, Mr. Dregger points to nothing in Wiercinski '520 disclosing the claimed particle coverage.

170.    It is my opinion that Mr. Dregger has failed to demonstrate that the three discussed references, Serwin, Fensel, and Wiercinski '520, disclose among them all of the limitations of claims 1 and 15 of the '879 patent, alone or in combination with one another.  It is also my opinion that Mr. Dregger has at least failed to explain why Serwin and Fensel are analogous art, why a POSA would look to Serwin, Fensel, or Wiercinski '520 to solve the problem using release sheets to protect the adhesive layer in a waterproofing membrane from sunlight and foot traffic, and to prevent blocking of the membrane when rolled up, why a POSA would be motivated to combine

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Serwin and/or Fensel and Wiercinski '520 references, and why a POSA would have had an expectation of success in arriving at the claimed invention.

> 2.   *Serwin, Fensel, Metzler, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, Wiercinski '659, Seth '171, Wiercinski '397 Patent Publication, Tajima '640, and Getlichermann '996 Patent Publication, Jacobs '251 Patent Publication, Bartek '270, Aschenbeck '408, and the Whitling Publication, Alone or In Combinations Thereof, Do Not Render Claims 1 or 15 of the '879 Patent Obvious*

171.   It is my opinion that Serwin, Fensel, Metzler, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, Wiercinski '659, Seth '171, Wiercinski '397 Patent Publication, Tajima '640, and Getlichermann '996 Patent Publication, Jacobs '251 Patent Publication, Bartek '270, Aschenbeck '408, and the Whitling Publication, alone or in combinations thereof, would not have made claims 1 or 15 of the '879 patent obvious to a POSA.

172.   At the outset, it is difficult to respond to Mr. Dregger's arguments regarding the combination of one or more of 16 identified prior art references because of the sheer number of combinations possible.  By my calculation, there are over a trillion possible combinations of at least two of 16 different references.  *See* Dregger Report at 18 (listing 16 references and noting that the combinations can be each reference "alone or in combinations thereof").  It is impossible to respond to each and every possible combination in this Report.  I reserve all rights to respond to specific combinations should Mr. Dregger limit the number of asserted combinations in the future.  I further reserve all rights to supplement this report  or testifying at trial by discussing further what any particular reference discloses and what it does not if Mr. Dregger is allowed to supplement his report or testify at trial regarding specific combinations of references that his report does not currently  discuss

173.   I also found it difficult to respond to Mr. Dregger's arguments in that the title of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the Section E, which lists 16 references and says that each alone or in combinations thereof renders claims 1 and 15 of the '879 patent obvious, is different from the proceeding paragraph, which purports to opine that "it would have been obvious to a POSITA, at the time prior to the '879 [patent], to combine one or more of Serwin, Fensel, Metzler, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Seth '171, Wiercinski '397 Pat. Pub., Tajima '640, ***and*** Getlichermann '996 Pat. Pub., Jacobs '251 Pat. Pub., Bartek '270, Aschenbeck '408, ***and*** the Whiting publication, alone or in any combinations thereof, ***in view of*** the Wiercinski Deposition Testimony, Wiercinski '659 and/or the Preprufe® 300R/160R Tested Products.  Dregger Report at 18 (emphasis added).  It is unclear, for example, what purpose the "and"s after Tajima '640 and Aschenbeck '408 serve, or why only 13 of the references serve as primary references and only three are used "in view of" those prior 13 references.  Additionally, the following page of the Dregger Report appears to revert to the 16-reference combination found in the heading of Section E (*id.* at 19) rather than the possibly narrower set of 13 plus three found on page 18.

174.    Also, Mr. Dregger's arguments from one section to another are inconsistent.  For example, in Section D of his Report, Mr. Dregger identifies Wiercinski '520 as disclosing a "method or waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane."  Dregger Report at 17 (at entry (h)).  Notwithstanding that Wiercinski '520 is also included in the list of 16 references in Section E of his Report, Mr. Dregger does not list Wiercinski '520 as disclosing a "method or waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane."  *Id.* at 22 (at entry (h)).

175.    Also, I disagree with Mr. Dregger's opinion  that  the 12 references other than

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Serwin, Fensel, Metzler, and Wiercinski '520 "further render the asserted claims of the '879 patent obvious[.]"  Dregger Report at 18.  As discussed above, it is my opinion that Mr. Dregger has failed to demonstrate why claims 1 and 15 of the '879 patent are rendered obvious by the combination of Serwin and/or Fensel with Metzler and Wiercinski '520.  *See supra* at ¶¶ 137-70. Therefore, to the extent Mr. Dregger is relying on the Serwin and/or Fensel with Metzler and Wiercinski '520 combinations to disclose the limitations of claim 1 and 15 of the '879 patent as a starting point, I find that his opinion is erroneous and that citation to other references to "further render the asserted claims" obvious is irrelevant.  In any event, the report fails to explain how any of the other references supplements the above-discussed failures in disclosure of Serwin, Fensel, Metzler, and Wiercinski '520 in any properly motivated and meaningful way.

> a)   Mr. Dregger Does Not Provide Any Opinions as to Why the Asserted Prior Art References are Analogous Art

176.   Mr. Dregger does not provide his opinion as to why the 16 references he cites are analogous such that a POSA would consider them in an obviousness analysis.  Instead, Mr. Dregger says generally that "a POSITA would recognize that all of these references are relevant prior art as each is directed to waterproofing membranes in the construction field, and address one or more problems identified in the '879 patent and provide solutions thereto."  Dregger Report at 19.  He then provides his view as to the problems identified in the '879 patent and merely notes that it is his opinion that a POSA would look to " various waterproofing membrane patents/publications, as well as waterproofing membrane products sold prior to the critical date of the '879 [patent] that disclose and/or teach methods and materials for" solving the problems identified in the '879 patent.  *Id.*  Mr. Dregger does not recite any portions of any of the 16 references to support this conclusion.  I reserve the right to respond to Mr. Dregger should he attempt to provide any reasoning or justification for why any of the cited references are analogous

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

art for purposes of an invalidity analysis.

        b)    Mr. Dregger Provides No Substantive Opinions as to Any Motivation to Combine the 16 References

177.    Mr. Dregger provides no substantive analysis of any motivation to combine the 16 identified references at the time of the invention and instead relies on clear hindsight bias to pick and choose limitations from various references to arrive at the claimed invention.

178.    Mr. Dregger provides only conclusory opinions that there was any motivation to combine the 16 references.  Mr. Dregger posits that "a POSITA would have had motivation to combine [each of the 16] references based on the fact that a POSITA would recognize that all of these references are relevant prior art as each is directed to waterproofing membranes in the construction field, and address one or more of the problems identified in the '879 patent and provide solutions thereto."  Dregger Report at 19.  Mr. Dregger further posits that a POSA "would have been motivated to combine the [16] references discussed herein to render the invention of the '879 patent [sic]" "based on the fact that a POSITA would recognize" that each of the 16 references, "alone or in any combination thereof, disclose all limitations set forth in claims 1 and 15 of the '879 patent in various combinations as set forth below."  Mr. Dregger finishes Section E by stating:

> It is my opinion that a POSITA would have recognized that the references discussed in this section are each aimed at overcoming one or more problems identified in the '879 patent.  A POSITA would have had motivation to combine these references to arrive at the claimed invention of the '879 patent as waterproofing membranes were continually being improved upon to include layers that protected the adhesive layer as well as provide stronger bonds to concrete cast against it.  This is evidenced at least by the number of GCP patents referred to and discussed herein, which when combined, disclose the claimed '879 invention rendering the asserted claims thereof as obvious.  These references show a POSITA would have recognized that there is a reasonable probability of success that providing a membrane with inorganic reflective particles adhered to, and embedded in, a pressure-

67

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> sensitive adhesive in an amount that covers nearly all of the adhesive layer would significantly increase the reflectivity of the membrane's surface.

Dregger Report at 24.  There is nothing in the above cited text other than a conclusion about motivation to combine.  There are no statements specific to any of the references on which the alleged motivation is based and nothing that shows where any of them provides a solution to any of the problems identified in the '879 patent.  In fact, similar to the report's failure in Section D, the report here bases motivation only on the assertion that  each of the references discloses some limitation or part of some limitation from claims 1 and 15 of the '879 patent.  This, however, provides no explanation as to why a POSA would have combined those references other than that all of the limitations of claims 1 and 15 are disclosed somewhere across all those references.  This is not an opinion as to motivation to combine, but rather the use of hindsight and the claims of the '879 patent themselves as a roadmap to arrive at the claimed invention using an assortment of cherry-picked sections of a large number of prior art references with no discernable motivation to combine them.  Further, Mr. Dregger does not even attempt to explain why a POSA would combine one or more of 16 references with any expectation of success at arriving at the claimed invention.

179.    Contrary to Mr. Dregger's sweeping statement that each of the 16 prior art references are "each aimed at overcoming one or more problems identified in the '879 patent[,]" it is clear that many of those references have nothing to do with the problems identified in the '879 patent.  Further, many of the reference have nothing to do with "provid[ing] stronger bonds to concrete cast against [them]."  Dregger Report at 24.  For example, Aschenbeck '270 provides for an enhanced reflective roofing shingle to "reduce the amount of solar radiation penetrating the roof of a building, thereby lowering the air conditioning costs of the building."  Aschenbeck '270 at col. 7:45-50.  This is not the same problem identified by the '879 patent, and there is no reference

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in Aschenbeck '270 of providing a reflective surface to protect the adhesive layer, the adhesive in Aschenbeck '270 intending to be exposed to solar radiation for an extended period of time (i.e., it is on the roof of a building) versus the relatively limited time the membrane disclosed in the '879 patent is exposed to sunlight between it being applied and concrete being cast against it.

180.    Mr. Dregger also states that "a POSITA would have had reason and/or motivation to combine [the Wiercinski '397 Patent Publication and Seth '171] as they provide one or more predictable solutions or established functions directed to related problems as identified in such references and in the '879 patent."   Dregger Report at 24.   Mr. Dregger then states that "[t]he benefit would be in providing a waterproofing membrane having a highly reflective surface that would not require a removable release sheet and enhanced adhesion of such a membrane to post cast concrete."   *Id.*   But the report does not explain how these references would be combined to result in a water-proofing membrane within the '879 patent claims.

181.    As for the Wiercinski '397 Patent Publication, Mr. Dregger writes that a "POSITA would also have recognized that in embedding such inorganic reflective particles into the adhesive layer, so as to substantially cover the adhesive layer, would provide a 'textured' surface of the membrane, which as taught in GCP's Wiercinski '397 Pat. Pub. contributes to the performance of the underlayments" and "enhances resistance to blocking[.]"   Dregger Report at 24.   Mr. Dregger then notes that "if blocking is eliminated[,]" "such a membrane would not need or have a removable release sheet."   *Id.*   I agree that a membrane not susceptible to blocking may not need a release sheet to prevent blocking.   To be clear, however, a membrane that has eliminated blocking, such as, for example, by having dark particles adhered directly to the outer exposed surface of the pressure sensitive adhesive, would still require something to prevent degradation of the pressure sensitive adhesive by sunlight/UV exposure in the time between when the membrane

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

is placed on a substrate and concrete is cast against it.  *See* '879 patent at col. 6:19-27; *see also id.*
at cols. 8:25-44.  I disagree with Mr. Dregger to the extent he opines that the Wiercinski '397
Patent Publication discloses "inorganic reflective particles" because Mr. Dregger has failed to
point to any disclosure of same.  *See* Dregger Report at 20-21 (failing to cite Wiercinski '397 for
limitation (d)).

182.    As for Seth '171, Mr. Dregger acknowledges that it discloses a membrane with a
release sheet.  Dregger Report at 24.  The distinction, Mr. Dregger writes, is that the release sheet
of Seth '171 is used only for an "intermediate product," and it must be "removed and discarded
prior to molding the final three-dimensional waterproofing product."  *Id.*  Mr. Dregger fails to
explain that Seth '171 concerns methods for making membranes with three-dimensional contours
using thermoforming that are useful for waterproofing detail areas, and the release sheet is only
removed "just before the membrane laminate 12/14/16 is thermoformed to provide the shaped
waterproofing membrane 10."  Seth '171 at Abstract & col. 5:1-6.

183.    Mr. Dregger's entire report is set up such that a large number of prior art references
are paraphrased to show that some limitations of claims 1 and 15 of the '879 patent are disclosed,
but there is never any explanation as to why a POSA would use a certain reference for one
limitation and another reference for a second limitation, and a third reference for another limitation,
et cetera, or why the POSA would have an expectation of success in arriving at the invention
claimed in claims 1 and 15 of the '879 patent.  As a basic example, Seth '171 discloses an adhesive
thickness with an average range that overlaps slightly with claim 1 of the '879 patent (Seth '171
discloses an average thickness between 250 μm to 3,810 μm; claim 1 of the '879 patent requires
an average thickness between 75 μm and 500 μm), and a "discrete particle layer on top of or
partially embedded into an adhesive layer for protecting such adhesive layer[,]" *id.*, but no mention

70

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of the size of the particles, no mention if the particles are reflective, no mention of a

"approximately uniform" adhesive layer, and Seth '171 requires a release sheet. *See id.* at 22

(noting that Seth '171 "[d]iscloses using a release sheet"). Assuming use of Seth '171 as the

primary reference (though it is entirely unclear what or if there any primary reference(s) in Section

E of Mr. Dregger's Report), there is no analysis of why a POSA would seek to combine Seth '171

specifically with any of the references disclosing the missing limitations of claims 1 and 15 of the

'879 patent or why a POSA would have had a reasonable expectation in combining the references

to arrive at the claimed invention.

<blockquote>
c)      The Combinations of the 16 Asserted Reference Do Not Render
        Claims 1 or 15 of the '879 Patent Obvious
</blockquote>

184.    Mr. Dregger does not cite to specific passages of the references to support his

paraphrasing of their supposed teachings. *See* Dregger Report at 20-24. Mr. Dregger's opinions

are deficient and fail to provide the substance of his opinions with sufficient detail.

185.    Further, Mr. Dregger fails to apply the Court's claim constructions to the terms or

phrases that have been construed when alleging that said term or phrase is found in the prior art,

rendering his opinions unreliable and untethered to the specific case for which his report is being

provided. For example, in the subsection regarding the limitation "a flexible carrier sheet with

two opposed surfaces," Mr. Dregger fails to note that the Court construed "flexible carrier sheet"

as "a thin film, extrusion coating, or fabric that is the mechanical backbone of the membrane." *See*

Dregger Report at 20. Thus, his paraphrased and unsupported statements about what each of the

prior art references allegedly discloses is untethered from the Court's constructions or the '879

patent. For example, when Mr. Dregger says that a reference discloses something "flexible," *see,*

*e.g.*, *id.* at 20 (alleging that Tajima '640 discloses a "multi-layer laminate [that] includes a base

sheet that is flexible (e.g., film, non-woven, etc.)[,]" he fails to explain how that reference discloses

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the claimed "flexible carrier sheet" as defined by the Court.  Instead, Mr. Dregger focuses on the term "flexible" in the limitation and his unsupported assertion that the same term is found in the prior art reference, even though the Court has provided a construction of that term/phrase that may differ from how the term/phase is used in the prior art.

186.    Mr. Dregger lists the limitations of claims 1 and 15 of the '879 patent across pages 20 through 22 of his report with short, paraphrased, and unsupported statements about what is supposedly found in the prior art references.  Mr. Dregger's statements are thus wholly deficient and do not allow for a meaningful and substantive response.  In addition, I disagree with a number of Mr. Dregger's statements.

187.    For example, regarding limitation (a), Mr. Dregger asserts that the limitation "a flexible carrier sheet with two opposed surfaces" is met by six references.  The first, "Wiercinski Dep. Testimony," is not prior art.  Mr. Dregger also writes that Wiercinski '659 discloses a "flexible substrate having a first and second major surfaces [sic][.]"  Dregger Report at 20.  Mr. Dregger fails to explain why or how any flexible substrate in Wiercinski '659 satisfies the "flexible carrier sheet" limitation as construed by the Court.

188.    As another example, regarding limitation (b), the only references that Mr. Dregger states have the claimed "approximately uniform layer of pressure-sensitive waterproofing adhesive on one surface of the carrier sheet" are the Preprufe® 300R/160R Tested Products.  Dregger Report at 20.  But Mr. Dregger never explains how he arrived at the conclusion that the Tested Products have an approximately uniform layer of pressure sensitive adhesive.  The only statement regarding the uniformity of the adhesive layer in the Tested Products in the Dregger Report is:  "Based on my review and analysis of the Preprufe® 300R/160R waterproofing membrane products I tested, it is my opinion and understanding that these Preprufe® 300R/160R membrane products, which I

72

have been told by Mr. Paul Miller look like the original Preprufe® 300R/160R products sold or made available prior to Feb 8, 2009, include a carrier sheet with an approximately uniform layer of pressure-sensitive waterproofing adhesive on such carrier sheet." Dregger Report at 22-23. There is no explanation as to how Mr. Dregger arrived at his conclusion or why his understanding is that the adhesive layer in the Preprufe® 300R/160R Tested Products is "approximately uniform." The only testing performed on the Tested Products appears to have been a measurement of their whiteness value using a reflectometer. *Id.* at 18-19.

189.    As another example, regarding limitation (c), Mr. Dregger cites the Wiercinski deposition transcript, which is not itself prior art, to say that the "original Preprufe 300R and Preprufe 160R have approximately 15 mils of pressure-sensitive adhesive (381 microns)[.]" Dregger Report at 20.  However, no actual Preprufe® 300R/160R membranes are cited in this section as prior art.

190.    As another example, regarding limitation (d), Mr. Dregger refers to the Preprufe® Technical Datasheet and Tested Products as disclosing some reflectivity value.  Dregger Report at 20.  However, Mr. Dregger does not opine that Preprufe® discloses "substantially reflective inorganic particles" or that any inorganic particles are "adhered directly to the outer exposed surface of the pressure sensitive adhesive." *Id.*; *see also id.* at 23.

191.    As another example, also regarding limitation (d), Mr. Dregger cites Jacobs '251 Patent Publication as "disclos[ing] cool granules such as inorganic materials (e.g., titanium dioxide which yields a white appearance) [that] are reflective[.]" Dregger Report at 20.  This paraphrased excerpt from the Jacobs '251 Patent Publication is very misleading.  The Jacobs '251 Patent Publication discloses the use of granules in addition to "a number of light reflecting film particles." Jacobs '251 Patent Publication at [0011]; *see also id.* at [0010], [0012].  Jacobs '251 discloses the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

use of either "conventional" granules or "cool granules," "cool granules" meaning "colored granules that reflect significant amounts of infrared light." *Id.* at [0024]. "Some shingles employing only cool granules may achieve Total Solar Reflectance (TSR) values as high as 25 or even 30 percent." *Id.* "Any suitable material may be used for the granules[, and i]n some cases, the granules may be formed from any one of wide class of rocks, minerals or recycled materials." *Id.* at [0027]. This includes "basalt, diabase, gabbro, argillite, rhyolite, dacite, latite, adesite, greenstone, granite, silica sand, slate, nepheline syenite, quartz, or slag (recycled material)." *Id.* Further, the "cool granules may be formed of an inorganic material (sch as those described above) bearing one or more coatings or layers of one or more infrared light reflecting pigments." *Id.* at [0028]. "A suitable pigment includes titanium dioxide, which yields a white appearance." *Id.* But the Jacobs '251 Patent Publication "granules" attached to the adhesive are disclosed as being "colored" and only able to provide up to 30% solar reflectance. Jacobs does disclose the use of titanium dioxide, but not as the disclosed granule as Mr. Dregger posits, but rather as a pigment to be applied to a granule to give it light reflecting properties.

192. The particles of the Jacobs '251 Patent Publication may be a mixture of multilayer infrared light reflecting film (organic polymer) particles and inorganic particles. A shingle of Jacobs '251 that comprises a pressure sensitive adhesive would have a structure like that in Fig. 1 with a coating layer, on top of the granular layer 106, that comprises multilayer infrared light reflecting film particles embedded in the pressure sensitive adhesive. This would be a four-layer structure. The multilayer infrared light reflecting film particles would be embedded in the pressure sensitive adhesive by virtue of the manner in which the coating is applied. As a result, the multilayer infrared light reflecting film particles cannot provide protection for the exposed surface of the pressure sensitive adhesive. This is in contrast with the membrane of '897 patent where the

74

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

particulate covers and protects the pressure sensitive adhesive.



A coating comprising the film particles may also, presumably, be applied to a polyethylene sheet resulting in a layer of particles embedded in the pressure sensitive adhesive. As a result, the multilayer infrared light reflecting film particles cannot provide protection for the exposed surface of the pressure sensitive adhesive. Contrast this with the membrane of '879 patent where the particulate covers and protects the pressure sensitive adhesive.

193.     As another example, also regarding limitation (d), Mr. Dregger posits that Getlichermann '996 Patent Publication discloses "titanium dioxide, an appropriate reflective substance, on structure surface, white colour of the substance obtained by the presence of $TiO_2$ provides excellent anti-reflective properties to the coating." Dregger Report at 20-21. There are a number of issues with Mr. Dregger's paraphrasing of Getlichermann. The titanium dioxide in the reference is mixed with an acrylic polymer, and that mixture is applied to the surface of the structure and penetrates partially therein before the bituminous mass is applied." Getlichermann '996 Patent Publication at [0006]. Thus, the titanium dioxide is not itself adhered directly to the outer exposed surface of any pressure sensitive adhesive. Mr. Dregger impliedly acknowledges this when he first refers to titanium dioxide as the reflective substance but then contradicts himself and says the "white colour of the *substance*" is obtained by $TiO_2$, which is titanium dioxide. It appears that Mr. Dregger cited Getlichermann '996 Patent Publication merely to indicate that something white can be reflective, and not as a reference that discloses any of the limitations found in the claims of the '879 patent.

75

194.    As another example, also regarding limitation (d), Mr. Dregger cites Seth '171 as disclosing a "discrete particle layer on top of or partially embedded into an adhesive layer for protecting such adhesive layer[.]" Dregger Report at 20.  Later, Mr. Dregger alleges that Seth '171 discloses "[h]ighly reflective inorganic particles/materials on or embedded into an adhesive layer[.]"  *Id.* at 23.  Not only are Mr. Dregger's comments contradictory, or at the very least incomplete, but also they provide no supporting citation to the reference, including whether or where said reference discloses substantially reflective particles.

195.    As an example, regarding limitation (e), Mr. Dregger identifies two references that purportedly disclose inorganic particles having size ranges overlapping with those disclosed in claims 1 and 15 of the '879 patent.  Dregger Report at 21.  The first, the Wiercinski '397 Patent Publication, does not state whether the particles are "substantially reflective" or whether they are adhered directly to the outer exposed surface of the pressure sensitive adhesive (*id.*), and therefore do not meet the claim limitation.  Mr. Dregger also points to nothing in the Wiercinski '397 Patent Publication that discloses that the particles are "approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer" as required by claim 1 of the '879 patent.  *See* Dregger Report at 21 (noting only that the average particle size is greater than the average thickness of the pressure sensitive adhesive layer).  The second, Jacobs '251, is cited by Mr. Dregger as supporting the limitation requiring substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive, but for the reasons discussed above, I disagree that Jacobs '251 discloses that limitation.  *See supra* at ¶¶ 191-92.  In addition, Mr. Dregger does not point to any support in Jacobs '251 for any disclosed adhesive thickness (*see* Dregger Report at 20-21), and thus Mr. Dregger is unable to point to anything in Jacobs '251 that discloses that the size of the inorganic particles is "approximately equal to or greater than the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

average thickness of the pressure sensitive adhesive layer."

196.    Regarding limitation (f), Mr. Dregger includes a multitude of references that he describes as disclosing one or more parts of the limitation ("the substantially reflective particles cover approximately 70 to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface"), but it is unclear based on his paraphrasing and lack of citations as to what exactly he believes each reference discloses.  For example, Mr. Dregger refers to the Getlichermann '996 Patent Publication and states that it provides a "membrane having top coating layer containing titanium dioxide that provides the membrane with high reflectance" and "high whiteness[.]"  Dregger Report at 21.  In addition to the fact that the titanium dioxide in Getlichermann '996 is not the "particles" of that reference (*see supra* at ¶ 193), Mr. Dregger does not mention the percent surface area coverage of the titanium dioxide, including whether that coverage is between 70% and 100%.

197.    Mr. Dregger also refers to Wiercinski '659 for the first time dealing with the claimed reflective particles and their substantial reflectivity (*see* Dregger Report at 20-21 (failing to cite Wiercinski '659 in limitations (d), or (e))), and paraphrases that Wiercinski '659 discloses "white woven polyolefin layer having high reflectance entirely covering adhesive layer to provide the membrane with a reflective to highly reflective surface[.]"  *Id.* at 21.  Not only does Mr. Dregger not point to any substantially reflective particles, but he also only points to a "woven polyolefin layer" that he claims has "high reflectance" that provides a "reflective to highly reflective surface[.]"  *Id.*  As disclosed in Wiercinski '659, however, the "woven polyolefin mesh" flexible substrate that is also described by Mr. Dregger as constituting the "flexible carrier sheet" limitation.  *See* Wiercinski '659 at [0020]; Dregger Report at 20 (at (a)).  Mr. Dregger fails to explain how the flexible substrate comprising a woven polyolefin mesh of Wiercinski '659 can be

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

both the "mechanical backbone of the membrane" and also the "substantially reflective particles adhered directly to the outer exposed surface of the pressure sensitive adhesive."  Further, Mr. Dregger fails to explain that Wiercinski '659 only discloses a minimum reflectivity of the woven polyolefin mesh of at least 20%, and more preferably at least 30%.  Wiercinski '659 at [0010], [0046].

198.    Mr. Dregger also refers to the Wiercinski '397 Patent Publication in relation to limitation (f).  In addition to the that the Wiercinski '397 Patent Publication does not disclose "substantially reflective inorganic particles," *see* Dregger Report at 20-21 (failing to cite Wiercinski '397 for limitation (d)), Mr. Dregger also erroneously claims that the disclosed particles "cover[] at least about 95% of the adhesive layer[.]"  Dregger Report at 21.  As disclosed in the Wiercinski '397 Patent Publication, the 95% value cited by Mr. Dregger refers to the substantial coverage of the **particles** by the **binder**, the preferred binder including pressure sensitive adhesives.  Wiercinski '397 Patent Publication at [0043] ("[T]he filler particles ... are preferably substantially coated with binder[.]" & "The filler particles must be substantially coated with binder as a result of the preferred manufacturing process."); *see also id.* at [0039] ("Preferred binders include[] pressure sensitive adhesives[.]").

199.    Also in regard to (f), Mr. Dregger refers for the first time to Bartek '270 and Aschenbeck '408.  Dregger Report at 21.  Neither reference was cited in regard to the prior limitations.  I read that omission as indicating Mr. Dregger's view that neither discloses substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive and have an average diameter of about 100 μm to 600 μm, which is approximately equal to or greater than the average thickness of the pressure sensitive adhesive. This is confirmed based on Mr. Dregger's paraphrasing of what each reference discloses.  For

78

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Bartek '270, Mr. Dregger writes that it discloses a "top layer of inorganic particles (granules, talc, sand, etc.) on a highly reflective thermoplastic elastomeric sheet layer having a measured Initial Solar Reflectance greater than or equal to 65%[.]"  *Id.*  The particles in Bartek '270 identified by Mr. Dregger are traditional top surfacing materials for roofing applications (Bartek '270 at col. 8:27-30), which Bartek '270 specifically explains in the preferred embodiment are not adhered to the top surface of the highly reflective thermoplastic elastomeric sheet layer because the "presence of such a layer of traditional top surfacing materials could reduce the reflectivity of the top surface 28, 128 of the highly reflective thermoplastic elastomeric sheet layer 26, 126 and thus, the major surface 12, 112 of the prefabricated asphalt-based waterproof roofing membrane 10, 110."  *Id.* at col. 8:31-39.  Mr. Dregger also fails to cite any portion of Bartek '270 as disclosing any percent surface coverage area by the identified particles.

200.    As to Aschenbeck '270, this reference discloses that "roofing material usually includes a layer of roofing granules 26 embedded in the top surface layer 24T." Aschenbeck '408 at col. 7:12-13.  The patent then further explains that a preferred embodiment includes a highly reflective coating, which would increase the reflectivity of the surface of the shingle, which could "reduce the amount of solar radiation penetrating the roof of a building, thereby lowering the air conditioning costs of the building."  *Id.* at col. 7:43-50.  Further, "a highly reflective coating would allow the use of less opaque (or fewer) granules."  *Id.* at col. 7:50-51.  As shown in Fig. 2, "the reflectivity is increased by using an asphalt-based coating having a high reflectivity in at least the top surface layer[,]" which "can be produced by incorporating metal flakes into the coating."  *Id.* at col. 7:51-58.  Thus, not only does Aschenbeck '408 teach the use of metal flakes in an asphalt coating to increase reflectivity, but it also actively teaches away from the use of inorganic granules as a provider of reflectivity.  Further, Mr. Dregger fails to cite to any portion of Aschenbeck '270

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that discloses a percentage surface area coverage of any particles.

201.     As for the Jacobs '251 Patent Publication, I disagree that it discloses the claimed substantially reflective inorganic particles.  *See supra* at ¶¶ 191-92.  As disclosed in the Jacobs '251 Patent Publication, using only "cool granules" results in a  maximum of 30% solar reflectance.  Jacobs '251 Patent Publication at [0024].

202.     As for the Whiting publication in relation to limitation (f), Mr. Dregger only writes that Whiting discloses that "white-pigmented materials with high reflectivity minimize temperature gain from solar radiation."  Dregger Report at 21.  I am not sure what this statement adds to the analysis of whether the limitation "substantially reflective particles cover[ing] approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface" was found in the prior art.  Based on Mr. Dregger's description of the Whiting publication's disclosure, it is my opinion that Whiting does not disclose limitation (f).

203.     As for Seth '171, Mr. Dregger does not cite the reference for the limitations relating to substantially reflective inorganic particles or the size of the particles.  *See* Dregger Report at 20-21.  And in regard to limitation (f), Mr. Dregger only writes that Seth '171 has an "inorganic particle layer roll pressed onto and embedding in[] the waterproofing adhesive layer."  *Id.* at 21.  This says nothing about any reflective particles, any percent of surface area coverage by any reflective particles, and nothing about providing a reflective surface.

204.     As an example, regarding limitation (g), Mr. Dregger identifies Seth '171 as disclosing the limitation "the waterproofing membrane does not include a removable release sheet."  Dregger Report at 21-22.  However, as Mr. Dregger himself explains, Seth '171 "[d]iscloses using a release sheet to form an intermediate waterproofing membrane[.]"  *Id.* at 22.

80

205.    Regarding limitation (h), which is claim 15, Mr. Dregger identifies Seth '171 as disclosing "waterproofing systems intended to bond with fresh cementitious compositions that are cast against them and allowed to harden, provides strong bond with post cast concrete." *Id.* at 22. This statement says nothing about the limitations of claim 15, which recites "A method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane." Mr. Dregger's statement says nothing about applying the "waterproofing systems" of Seth '171 to a substrate or casting concrete such that it contacts the substantially reflective particles of the membrane.

206.    Following the (a) through (h) subsections paraphrasing the alleged prior art disclosures, Mr. Dregger then restates the same in paragraph form (along with a paragraph reciting yet again his short, declaratory opinions as to the disclosures in Serwin, Fensel, Metzler, and/or Wiercinski). *Compare* Dregger Report at 20-22, *with id.* at 22-24. Therefore, for the same exemplar reasons given above, I disagree with Mr. Dregger's statements on pages 22-24 of his Report as they pertain to any disclosures found in the asserted prior art references.

> 3.    *The Combination of Bartlett '615 in View of Seth '171, Wiercinski '397 Patent Publication, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Deposition Testimony, and Wiercinski '659, in Various Combination Thereof, Do Not Render Claims 1 or 15 of the '879 Patent Obvious*

207.    It is my opinion that Bartlett '615 in view of Seth '171, Wiercinski '397 Patent Publication, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, Wiercinski '659, in various combinations thereof, would not have rendered claims 1 or 15 of the '879 patent obvious to a POSA.

208.    Mr. Dregger points to the prosecution history of the claims of the '879 patent, noting that the examiner asserted that Bartlett '615 "disclosed the basic structure for the

81

waterproofing membrane except for expressly disclosing that the particles have an average diameter approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer." Dregger Report at 25. Mr. Dregger then opines that the applicant argued against certain of the examiner's findings as to whether certain limitations were disclosed. *Id.* Mr. Dregger then states that in view of the further prior art references "disclosed herein, a significant amount of which is owned by GCP and/or its predecessor, a POSITA at the time of the invention would have been fully aware that prior art existed in the field, and which addressed the problems of the '879 patent." *Id.* There are a number of issues with Mr. Dregger's statements.

209. First, I understand a POSA is presumed to have knowledge of all prior art in the field of the inventor's endeavor and of prior art solutions for a common problem. Therefore, it is irrelevant that the cited prior art is owned by GCP and/or its predecessor.

210. Second, all of the references cited in Section F of Mr. Dregger's report, aside from Bartlett '615, were discussed in Section E of Mr. Dregger's report. And as I discussed in response to Section E, at a minimum, none of the references cited disclose: (1) an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet (Dregger Report at 20 (at (b))); (2) the pressure sensitive adhesive has an average thickness in the range of 75 μm to 500 μm and has an outer exposed surface (*id.* at 20 (at (c))); or (3) substantially reflective inorganic particles having an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer (*id.* at 21 (at (e))); (4) substantially reflective particles covering approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface (*id.* (at (f))); or (5) a method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

such that it contacts the substantially reflective particles of the membrane (*id.* at 22 (at (h))).

211.   In addition to not explaining how any of these references, or all of them, disclose all of the limitations of claims 1 and 15 of the '879 patent, Mr. Dregger provides no substantive opinion as to any motivation to combine any of the references, in any combination, to arrive at the claimed invention.  The sum total of Mr. Dregger's opinions as to motivation to combine is that "[s]ince the art discussed herein in this section is primarily GCP relevant prior art and not disclosed in the '879 patent, it is my opinion that a POSITA, in reviewing such prior art, would have had motivation to combine these references to derive the claimed invention of the '879 patent"; and "a POSITA would have had reason and/or motivation to combine the various GCP references disclosed herein, as they provide one or more predictable solutions or established functions directed to related problems as identified therein as well as in the '879 patent."  Dregger Report at 26.  These are not opinions, but rather recitations of the definition of "motivation to combine." There is no discussion about what each of the references discloses, the problems addressed by the reference, or how that problem is or is not related to any problems identified in the '879 patent. There is also no mention of why a POSA would have a reasonable expectation of success with respect to combining the disclosed references.

212.   Mr. Dregger finishes out Section F of his Report by describing the "but for" test for materiality, opining that a reference is "material 'if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.'"  Dregger Report at 25 (citing something but not including the reference it is citing).  Mr. Dregger then asserts that the applicant failed to inform the patent examiner of the Preprufe® 300R/160R Technical Datasheets, leading "the examiner to believe that there was no material prior art that disclosed a waterproofing membrane having a flexible carrier sheet, a layer of pressure sensitive adhesive over the carrier sheet, and a layer

containing reflective inorganic particles over the pressure sensitive adhesive, with a substantially reflective surface having a reflectivity greater than 55%." *Id.*

213.    There are a number of problems and internal inconsistencies with Mr. Dregger's analysis regarding the "but for" materiality of the Preprufe® 300R/160R Technical Datasheets. First, the Wiercinski '520 reference was before the patent examiner and Mr. Dregger opines that the Wiercinski '520 reference discloses every limitation of claims 1 and 15 of the '879 patent. *See* Dregger Report at 16-17 (citing Wiercinski '520 in every limitation section).  Second, Mr. Dregger never opines that the Preprufe® 300R/160R Technical Datasheets disclose at least the limitation that the particles have an average diameter approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer, which is one of the limitations the patent examiner noted was missing from Bartlett '615.  *Id.* at 21.

214.    Additionally, the Preprufe® 300R/160R Technical Datasheets are cumulative to Bartlett '615.  I understand that Preprufe® 330R/160R is a commercial embodiment of Bartlett '615.  Bartlett '615 was before the patent examiner.

215.    To the extent Mr. Dregger argues that the reflective surface of Preprufe® 300R/160R was "but for" material, Dregger Report at 26, I disagree for at least the reason that Mr. Dregger refers to Wiercinski '520 as having a "top layer[] hav[ing] increased surface reflectivity to both protect the underlying membrane layers as well as enhance adhesion of the membrane to concrete or a cementitious material cast against it."  Dregger Report at 16.  In my opinion, the examiner already believed that a reference she had before her had disclosed a membrane with substantially reflective particles on an outer exposed surface, but that the reference as a whole did not disclose a waterproofing membrane having all the structural properties, including no need for a release sheet, of the claimed membrane.  Nothing regarding the Preprufe® 300R/160R products

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

would have added to her understanding of the prior art or caused her not to allow the claims.

## VII.   OBJECTIVE EVIDENCE OF NONOBVIOUSNESS

216.    It is my opinion that claims 1 and 15 of the '879 patent would not have been obvious regardless of the objective evidence of nonobviousness, but that the objective evidence makes it even more clear and confirms my opinion as to nonobviousness.

217.    I have been asked to perform a nexus evaluation of the PV100—also marketed as Preprufe 100S— to the claims of the '879 patent.  The PV100 product is the embodiment of the invention as claimed in the '879 patent.  For example, PV100 is marketed as a "pre-applied waterproofing membrane is a multi-layer composite waterproofing material with superior performance, including a layer of high-performance PE film, self-adhesive polymer layer and a unique particulate layer."  Ex. 1 (GCP00000005).  The adhesive thickness of PV100 averages around 264 microns, while the average particle diameter is around 493-571 microns.  Ex. 2 (GCP00034923).  The average reflectivity is 60.8.  *Id.*

218.    I understand that copying of the claimed invention can constitute an objective evidence of nonobviousness that supports validity of a patent.  I understand that copying in light of the failure of others in their attempts to solve the problem the claimed invention solved is even greater evidence of nonobviousness.  I understand evidence of copying and AVM's failure to design around the claimed invention has been produced in this case, and this would weigh in favor of nonobviousness.

219.    I understand that industry praise of the claimed invention can constitute objective evidence of nonobviousness that supports validity of a patent.  I understand evidence of praise for the claimed features has been produced in this case, and this would weigh in favor of nonobviousness.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

220.    I understand that commercial success can constitute objective evidence of nonobviousness that supports validity of a patent.  I understand evidence of commercial success of the PV100 and Accused Products has been produced in this case, and this would weigh in favor of nonobviousness.

221.    I understand that copying can constitute objective evidence of nonobviousness that supports validity of a patent.  I understand evidence of copying has been produced in this case, and this would weigh in favor of nonobviousness.

## VIII.   MISCELLANEOUS

222.    I reserve the right to modify or supplement the opinions, analysis, and conclusions set forth in this report based on any rulings made by the Court or based on any additional discovery performed by the parties.  I am also aware that AVM may submit additional expert reports concerning various aspects of patent invalidity and infringement.  I reserve the right to testify in response to subjects set forth in such reports.  In addition, I may testify in response to evidence put forward by AVM at trial.  At trial, I may use demonstrative exhibits to explain opinions that I have set forth in my report.

223.    All of the statements made in this expert report are based upon my own personal knowledge and opinion.  If asked to do so, I can and will testify competently about the contents of this expert report at any hearing or trial held in this lawsuit.


_____          _____
Robert Wiercinski                                              Date

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

220.  I understand that commercial success can constitute objective evidence of nonobviousness that supports validity of a patent.  I understand evidence of commercial success of the PV100 and Accused Products has been produced in this case, and this would weigh in favor of nonobviousness.

221.  I understand that copying can constitute objective evidence of nonobviousness that supports validity of a patent.  I understand evidence of copying has been produced in this case, and this would weigh in favor of nonobviousness.

## VIII.  MISCELLANEOUS

222.  I reserve the right to modify or supplement the opinions, analysis, and conclusions set forth in this report based on any rulings made by the Court or based on any additional discovery performed by the parties.  I am also aware that AVM may submit additional expert reports concerning various aspects of patent invalidity and infringement.  I reserve the right to testify in response to subjects set forth in such reports.  In addition, I may testify in response to evidence put forward by AVM at trial.  At trial, I may use demonstrative exhibits to explain opinions that I have set forth in my report.

223.  All of the statements made in this expert report are based upon my own personal knowledge and opinion.  If asked to do so, I can and will testify competently about the contents of this expert report at any hearing or trial held in this lawsuit.


Robert Wiercinski

10/20/2021
Date

# APPENDIX A

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Except for a few years spent on other projects I've done nothing but work on the development of waterproofing products for W.R. Grace/GCP applied technologies for my 37-year career there**

**Education**

1974-09 - 1978-05 **Ph.D.: Polymer Chemistry**
*The University of Connecticut - Storrs, CT*

1969-09 - 1973-06 **Bachelor of Science: Chemistry**
*Michigan Technological University - Houghton, MI*

**Dissertation topic**
polymeric liquid crystals
A liquid crystal is a compound that exhibits orientation in the liquid phase whereas ordinary liquids are isotropic i.e. disordered. The ability to achieve liquid crystalline properties for a polymer was demonstrated by synthesizing and characterizing polymers that have repeat units that are very much like small molecule liquid crystals

**Work History**

1981-11 - 2019-07 **R&D Fellow**
*GCP Applied Technologies Inc. (formerly W. R. Grace & Co.), Cambridge, MA*

- Held six positions including four as a front-line scientist and two as an R&D manager. Managed small R&D groups
- Developed a comprehensive portfolio of waterproofing products for the building envelope including the company's and the waterproofing industry's flagship pre-applied waterproofing membrane (PREPRUFE®), roofing underlayments (Grace Ice & Water Shield®), post applied waterproofing membranes (BITUTHENE®) , air barriers (PERM-A-BARRIER®), flashing tapes, sealants, and primers
- Performed cost-reduction, raw material replacement, and technical service
- Collaborated with customers, marketing, sales, manufacturing, technical service, engineering, quality control, logistics, environmental health and safety, and human resources
- Mentored numerous R&D professionals
- 33 US patents

1978-09 - 1981-11 **Development Chemist**
*General Electric Co, Pittsfield, MA*

- Developed a one component, epoxy liquid injection molding compound to produce large parts
- Developed polycarbonate/PET blends

**Positions held within W.R. Grace and Company and GCP applied technologies.**
The third and fourth positions were managerial positions and the others were technical positions. However even in managerial positions, I performed significant technical activities on my own:
- Research Associate
- Senior Research Associate
- Technical Supervisor
- Research Manager

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Principal Scientist
- R&D Fellow

**Work on Waterproofing Membranes**

Except for 4 years spent on other projects (three years on a tissue engineering project and 1+ years on a high barrier PET compound for carbonated beverage applications) I've done nothing but work on the development of waterproofing products for W.R. Grace/GCP applied technologies for my 37-year career there.

**Outline of Progression of Projects at W.R. Grace/GCP**

- Grace Roofing Membrane GRM which was an exposed modified bitumen peel and stick membrane for low slope roofing
- formulated a modified bitumen pressure sensitive adhesive comprising a sulfonated EPDM polymer
- formulated butyl adhesives to be used in exposed low slope roofing membranes
- formulated block copolymer modified bitumen adhesives for  Bituthene which is a membrane for waterproofing concrete for below grade and deck structural concrete applications
- contributed to the development of the first-generation Preprufe membrane.
- developed a one component aqueous emulsion based liquid applied air barrier coating, Perm a Barrier VPL
- developed a water-based primers and solvent-based primers for structural waterproofing applications
- developed a unique two component liquid applied waterproofing membrane. It's referred to as phase inversion technology. One component is an aqueous emulsion of a polymer. Second component comprises an oil that is compatible with the polymer and blended with a superabsorbent polymer. When the two components are mixed and spray applied transformation of the two component liquid into a one component solid occurs instantaneously.
- involved in the development of various aspects of ice and water shield roofing underlayment. Key contributions involve the formulation of various modified bitumen pressure sensitive adhesives as well as developments to enhance the dimensional stability/lay flat characteristics of Ice and Water Shield.
- principal investigator for the development of PV 100
- Principal investigator for the second generation Preprufe membranes i.e. Preprufe plus. A family of 8 different product concepts was developed including the one that was commercialized
- Developed a silane terminated polyether based air barrier coating, Perm a Barrier VPL 50.
- Various raw material replacement and cost reduction projects over the entire career

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# APPENDIX B

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# List of Materials Considered

- Defendant's Expert Report and Disclosure of Philip Dregger and Appendices and Exhibits thereto

- U.S. Patent No. 8,713,879

- Prosecution History of U.S. Patent No. 8,713,879

- U.S. Patent No. 7,776,432

- U.S. Patent No. 6,933,007

- U.S. Patent No. 4,218,260

- U.S. Patent No. 6,500,520

- International Patent Publication WO 2009/009659

- U.S. Patent No. 3,937,640

- U.S. Patent No. 7,968,171

- U.S. Patent Publication 2007/0044397

- U.S. Patent Publication 2007/0218251

- U.S. Patent No. 7,442,270

- U.S. Patent No. 7,238,408

- U.S. Patent Publication 2006/0110996

- U.S. Patent No. 5,496,615

- Medgar L Marceau and Martha G. Vangeem, *Solar Reflectance Values of Concrete*, Vol. 30 No. 8 Concrete International 52 (2008) (excerpt)

- *A Description of Some Oregon Rocks and Minerals*, by Hollis M Dole, Second revision, 1986, by Lawrence L. Brown, Oregon Department of Geology and Mineral Industries (Reprinted August 2006)

- *White Cement – Properties, Manufacture, Prosects*, by Karteřina Moresová and František Škvára, Technická 5, 166 28 Prague 6, Czech Republic (submitted Jan. 6, 2000, accepted Mar. 12, 2001)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- *Synthesis of Current and Projected Concrete Highway Technology*, by David Whiting et al., Strategic High Research Program, National Research Council, Washington DC (1993)

- Preprufe® 300R/160R Technical Datasheet, dated 2002

- Preprufe® 300R/160R Technical Datasheet, dated 2007

- Preprufe® 160R Technical Datasheet, dated 2008

- Cool Roofs California Cool Roofs: A Snapshot of Installed Costs, by Phil Dregger, Western Roofing (Nov./Dec. 2006)

- 2007 California Energy Code, page 31

- Declaration of Paul Miller

- GCP00000005

- GCP00034923

- Transcript of April 20, 2021 Deposition of Robert A. Wiercinski

- All documents cited in this Report

- All documents cited or relied upon by Mr. Dregger in his report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 1

Case 3:21-cv-00118-SMR-RAO   Document 131-4   Filed 11/17/23   Page 4 of 8   Page ID #:1975



# PV™ 100

A unique multi-layer composite pre-applied waterproofing membrane that bonds integrally to poured concrete

## Product Description

PV™ 100 pre-applied waterproofing membrane is a multi-layer composite waterproofing material with superior performance, including a layer of high-performance PE film, self-adhesive polymer layer and a unique particulate layer.

PV 100 pre-applied waterproofing membrane can be applied on a smooth level concrete surface, qualified compacted sand-stone cushion, or used as the waterproof layer of vertical surfaces of temporary and adjacent structures. After pouring concrete directly on to the paved PV 100 preapplied waterproofing membrane, the poured concrete will bond fully and permanently with PV 100 pre-applied waterproofing membrane.

PV 100 pre-applied waterproofing membrane protects concrete foundation against aggressive ground contaminants and is suitable for water and vapour-proofing for all basement grades.

PV 100 pre-applied waterproofing membrane is supplied at a width of 1.0m. Pour concrete after the steel bars are tied up. Please contact your local GCP representative for application details.

## Product Advantages

- Forms permanent bond to concrete poured against it.
- Not affected by the displacement of the basal layer/ ground settlement beneath slabs
- Membrane is self-protecting. It can be trafficked immediately after application and does not require the use of protective layer
- Simple and quick to install, requiring no priming or fillets
- Unaffected by wet conditions
- Fully-adhered watertight laps and detailing
- Excellent bonding even under long-term water immersion

GCP00000005

Case 3:21-cv-01417-RAO   Document 131-4   Filed 11/17/21   Page 190 of 390   Page ID #:1976

Installation

Substrate Preparation

All Surfaces

It is essential to create a sound and solid substrate to eliminate movement during the concrete pour. Substrates must be regular and smooth with no gaps or voids greater than 12mm.

Hydroduct® drainage composites can provide the membrane with a good surface and facilitate underground structural drainage.

Horizontal Blinding

The substrate must be free of loose aggregate and sharp protrusions. Avoid curved or rounded substrates. The surface does not need to be dry, but standing water must be removed.

Vertical Sheet Piling

Use concrete, or 19mm thick plywood, insulation or other approved facing to sheet piling to provide support for the membrane. Board systems such as timber lagging must be close butted to provide support and not more than 12mm out of alignment.

GCP00000006

Case Document 3:11-cv-RAO  Document 131-4  Filed 11/17/2 Page 3 of 8 on Page ID #:1977



## Membrane Installation

When placing PV™ 100 pre-applied waterproofing membrane, overlap the bonding edge. Use a steel roller to press the bonding edge firmly to ensure complete bonding and to achieve continuity. PV 100 pre-applied waterproofing membrane can be applied at -4ºC and above. When installing PV 100 waterproofing membrane in cold or marginal weather, the bonding edge may be heated appropriately with hot air gun or similar devices to remove moisture in order to enhance bonding.

## PV 100 Waterproofing Membrane

Place the membrane PE film side to the substrate with particulate layer side up, facing the concrete pour. End laps should be staggered to avoid build up of layers. Accurately position succeeding sheets to overlap the previous sheet 75mm along the marked selvedge. Ensure the underside of the succeeding sheet is clean, dry and free from contamination before attempting to overlap. Ensure a continuous bond is achieved without creases and roll firmly with a heavy roller. Any initial tack will quickly disappear.

## Roll Ends and Cut Edges

Overlap all roll ends and cut edges by a minimum 75mm and ensure the area is clean and free from contamination, wiping with a damp cloth if necessary.

Remove all floating particulates from the surface of the PV 100 pre-applied waterproofing membrane by brush. Brush a thin layer of Contact Adhesive Primer to cover the particulates on overlap area. When primer dries, apply PV 100 Tape or Grace RA Double-sided Tape or Preprufe Tape by peeling off release paper and fix the adhesive side on substrate. Roll firmly to ensure complete adhesion without creases or voids. Peel off the other layer of release paper and apply another piece of PV 100 to the adhesive tape. Roll firmly to ensure complete adhesion.

## Application with Bituthene® Membrane and Joints

If PV 100 pre-applied waterproofing membrane is applied together with Bituthene membranes, or for areas such as construction joints, allow for another 300mm-wide overlap so as to protect PV 100 pre-applied waterproofing membrane from being contaminated. This 300mm-wide membrane can offer overlap with the follow-up waterproofing membrane that is installed.

## Pouring of Concrete

The concrete must be poured within 21 days of application of the membrane. During pouring, take care when vibrating concrete to avoid damaging the waterproofing materials.

## Formwork Removal

PV 100 pre-applied waterproofing membrane can be applied to removable formwork, such as slab perimeters, elevator and lift pits, etc. Once the concrete is poured the formwork must remain in place until the concrete has gained sufficient compressive strength to develop the surface bond. PV 100 pre-applied waterproofing membrane is not recommended for conventional twin-sided wall forming systems.

GCP00000007

Case 1:05-cv-00377-SLR-RAO   Document 131-4   Filed 11/17/2005   Page 192 of 390   Page ID #:1978

gcp applied technologies

As a guide, to reach the minimum compressive strength stated above, a structural concrete mix with an ultimate strength of 40N / mm2 will typically require a cure time of approximately six days at an average ambient temperature of ~4ºC, or two days at 21ºC. Please contact your local GCP representative for more details.

## Physical Properties

| PROPERTY | TYPICAL VALUE | TEST METHOD |
|---|---|---|
| Colour | White | |
| Thickness | 1.2 mm | ASTM D 3767 |
| Tensile Strength, Film | 27.6 Mpa | ASTM D 412 Modified |
| Elongation | 400% | ASTM D 412 Modified |
| Low Temperature Flexibility | ~25oC, Pass | ASTM D 1970 |
| Water Migration/Resistance to Hydrostatic Head | >60M | ASTM D 5385 Modified |
| Crack Cycling | Pass | ASTM D 836 / ASTM C 1305 Modified |
| Peel Adhesion to Concrete, No Treatment | 880 N/m | ASTM D 903 Modified |
| Dimension Stability | < 1% | ASTM D 1204 |
| Puncture Resistance | 800N | ASTM E 154 |

Details of foot of the wall foundation for drainage



GCP00000008

Details of wall foundation attached with temporary works



Pipe hole



Pile details

GCP00000009

Case 3:05-cv-04518-RAO   Document 131-4   Filed 11/17/20   Page 45 of 96   Page ID #:1980



Details of wall base detail



Details of wall foundation for replacement of earlier formwork stripping

GCP00000010

Case 1:01-cv-12257-PBS    Document 131-4    Filed 11/17/2010    Page 195 of 390    Page ID #:1981



| 1 | PVTM 100 Pre-Applied Waterproofing Membrane | 5 | Protection Board |
| 2 | PVTM 100 Tape, Preprufe® Tape | 6 | Hydroduct® Drainage Sheet |
| 3 | Self-Adhesive Water Membrane or Grace RA Double-Sided Tape with Contact Adhesive Primer | 7 | De Neef Swellseal Mastic |
| 4 | Bituthene® Liquid Membrane | 8 | Betec® M-5 Crystallisation |

The above drawings are typical examples and not details of the works. For details or assistance, please contact GCP Technical Services.

## Supply

| Thickness | 1.2mm |
| Roll size | 1.0m x 25m |
| Roll area | 25m² |
| Roll weight | 39 - 41kg |
| Edge/end laps | 75mm |

## Health and Safety

Refer to relevant Material Safety Data Sheet. Complete rolls should be handled by a minimum of two persons.

GCP00000011

Product Data Sheets 

## Storage

Dry conditions below +40°C. Store indoors or under cover on pallets. Do not double stack pallets.

## Technical Services

For assistance with working drawings for projects and additional technical advice, please contact GCP Applied technologies.

---

**th.gcpat.com | Thailand customer service: 66 2 030 9700**

Australia 1800 855 525 email: au.sbmsales@gcpat.com New Zealand +64 9 448 1146 China Mainland +86 21 3158 2888 Hong Kong +852 2675 7898 India +91 124 488 5900 Indonesia +62 21 893 4260 Japan +81 3 5226 0231 Korea +82 32 820 0800 Malaysia +60 3 9074 6133 Philippines +63 49 549 7373 Singapore +65 6265 3033 Thailand +66 2 709 4470 Vietnam +84 8 3710 6168

We hope the information here will be helpful. It is based on data and knowledge considered to be true and accurate, and is offered for consideration, investigation and verification by the user, but we do not warrant the results to be obtained. Please read all statements, recommendations, and suggestions in conjunction with our conditions of sale, which apply to all goods supplied by us. No statement, recommendation, or suggestion is intended for any use that would infringe any patent, copyright, or other third party right.

PV, Bituthene, Betec and Hydroduct are trademarks, which may be registered in the United States and/or other countries, of GCP Applied Technologies, Inc. This trademark list has been compiled using available published information as of the publication date and may not accurately reflect current trademark ownership or status.

© Copyright 2017 GCP Applied Technologies, Inc. All rights reserved.

GCP Applied Technologies Inc., 62 Whittemore Avenue, Cambridge, MA 02140, USA
This document is only current as of the last updated date stated below and is valid only for use in Thailand. It is important that you always refer to the currently available information at the URL below to provide the most current product information at the time of use. Additional literature such as Contractor Manuals, Technical Bulletins, Detail Drawings and detailing recommendations and other relevant documents are also available on www.th.gcpat.com. Information found on other websites must not be relied upon, as they may not be up-to-date or applicable to the conditions in your location and we do not accept any responsibility for their content. If there are any conflicts or if you need more information, please contact GCP Customer Service.

Last Updated: 2018-08-27
**th.gcpat.com/solutions/products/pv-100**

GCP00000012

# EXHIBIT 2

Document Produced in Native Format

Highly Confidential - Attorney's Eyes Only

GCP00034923

|                           | Canlon-Unknown | PV100 |
|---------------------------|----------------|-------|
| sample area in2           | 4              | 4     |
| membrane weight g         | 4.528          | 4.31  |
| Carrier weight g          | 2.09           | 1.83  |
| pan weight g              | 1.217          | 1.24  |
| pan + cement weight g     | 2.79           | 3.04  |
| cement weight g           | 1.573          | 1.8   |
| cement + carrier weight g | 3.663          | 3.63  |
| adhesive weight g         | 0.865          | 0.68  |
| adhesive density g/cc     | 1              | 1     |
| adhesive thickness microns| 335            | 264   |



| Record Number | Sample Name | Dx (10) (µm) | Dx (50) (µm) | Dx (90) (µm) |
|---|---|---|---|---|
| 12 | Average of 'PV100 Control' | 287 | 493 | 815 |
| 20 | Average of 'PV100 R1' | 383 | 571 | 842 |
| 24 | Average of Canlon | 323 | 543 | 873 |

| | New Canlon | PV100 | 1st Canlon | rainbow 1-17 | Keshun 1-17 | | | avg | std. dev. |
|---|---|---|---|---|---|---|---|---|---|
| | 56.7 | 61 | 55.7 | 59.2 | 52.8 | | | | |
| | 55.5 | 60.5 | 55.8 | 59.9 | 53.7 | | | avg | std. dev. |
| | 56.1 | 61.6 | 55.2 | 59.7 | 53.8 | | rainbow 1-17 | 59.8 | 0.53 |
| | 56 | 61.1 | 55 | 59.8 | 53.4 | | Keshun 1-17 | 53.5 | 0.4 |
| | 56 | 59.5 | 57 | 59.6 | 53.9 | | | | |
| | 54 | 60.6 | 56.6 | 60.8 | 53.4 | | | | |
| | 53.8 | 61.3 | 56.6 | | | | | | |
| | 56.7 | 61.1 | 56.5 | | | | | | |
| | 56.4 | 61.3 | 56.9 | | | | | | |
| | 56.2 | 60.2 | 57.5 | | | | | | |
| | 57.2 | | | | | | | | |
| avg | 55.87273 | 60.82 | 56.28 | 59.83333333 | 53.5 | | | | |
| | 56.7 | 61 | 55.7 | 59.2 | 52.8 | | | | |
| | 55.5 | 60.5 | 55.8 | 59.9 | 53.7 | | | | |
| | 56.1 | 61.6 | 55.2 | 59.7 | 53.8 | | | | |
| | 56 | 61.1 | 55 | 59.8 | 53.4 | | | | |
| | 56 | 59.5 | 57 | 59.6 | 53.9 | | | | |
| | 54 | 60.6 | 56.6 | 60.8 | 53.4 | | | | |
| | 53.8 | 61.3 | 56.6 | | | | | | |
| | 56.7 | 61.1 | 56.5 | | | | | | |
| | 56.4 | 61.3 | 56.9 | | | | | | |
| | 56.2 | 60.2 | 57.5 | | | | | | |
| | 57.2 | | | | | | | | |
| stdev | 1.0743 | 0.6268 | 0.8176 | 0.5317 | 0.4000 | | | | |

| Property | PV 100 Loose particulate | PV 100 | 1st Canlon Sample | Recent Canlon Sample | 4021-01 | 4021-02 | Target 8453405 | 8713879 |
|---|---|---|---|---|---|---|---|---|
| flexible carrier sheet | | | | | yes | yes | yes | yes |
| pressure sensitive adhesive | | | | | yes | yes | yes | yes |
| Reflectivity | | 60.8/.63 | 56.3/.82 | 55.9/1.07 | >65 | >55 | >65 | not mentioned |
| Adhesive thickness solvent method (microns) | | 264 | 335 | | <Average particle diameter | <Average particle diameter | <Average particle diameter | |
| Adhesive thickness (microns) | | | | | 75 to 500 | >75 | 75 to 500 | 75 to 500 |
| Selvedge adhesive thickness (microns) | | | | 254 | | | | |
| Average particle diameter (microns) | 493 | 571 | 543 | | > Adhesive thickness | > Adhesive thickness | > Adhesive thickness | > Adhesive thickness |
| Average particle diameter (microns) | | | | | 100 to 600 | 100 to 600 | 100 to 600 | 100 to 600 |
| Particle chemistry | | Nearly Identical – see attached report | | | Ground white cement | Ground white cement | reflective inorganic particles | reflective inorganic particles |
| Percent particle coverage % | | Not tested | 93 see report | | >/= 80 | >/= 70 | >/= 80 | >/= 70 |
| release sheet | | selvedge only | | selvedge only | none | none | none | none |

1. A waterproofing membrane consisting of a flexible carrier sheet with two opposed surfaces, an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet such that the pressure sensitive adhesive has an average thickness in the range of 75 µm to 500 µm and has an outer exposed surface, and substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive, wherein the substantially reflective inorganic particles have an average diameter of about 100 µm to about 600 µm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer, wherein the substantially reflective particles cover approximately 80% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface that exhibits a whiteness value greater than 65%, and wherein the waterproofing membrane does not include a removać  sāţ屮Ā   A1ā

v

1. A waterproofing membrane comprising a flexible carrier sheet with two opposed surfaces, an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet such that the pressure sensitive adhesive has an average thickness in the range of 75 µm to 500 µm and has an outer exposed surface, and substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive, wherein the substantially reflective inorganic particles have an average diameter of about 100 µm to about 600 µm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer, wherein the substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface, and wherein the waterproofing membrane does not include a removable release 871 sheet.

4021-02

1. A waterproofing membrane comprising a flexib
surfaces, an uniform layer of pressure sensitive wat
of the carrier sheet, said pressure sensitive adhesive
of at least 75 µm and an outer exposed surface,
membrane further comprises reflective inorganic pa
the outer exposed surface of the pressure sensitive

inorganic particles comprises ground white cement,

or greater than the average thickness of the pressure

a whiteness value that is greater than 55%, and wh

does not include a removable release sheet to pr

membrane from adhering to the carrier sheet or otl

the membrane is rolled up, said waterproofing mem

which is unrollable for installation, despite the abser

whereby the carrier sheet side of the unrolled meml

and the particle-containing layer of the pressure s

bond to concrete that is cast against it.

4021-01

1 A waterproofing membrane consisting of a

surfaces, an approximately uniform layer of a

adhesive on one surface of the carrier sheet s

adhesive has an average thickness in the ran

outer exposed surface, and substantially refle

directly to the outer exposed surface of the pr

substantially reflective inorganic particles co

an average diameter of 100 µm to600 µm tha

than the average thickness of the pressure se

substantially reflective particles cover 80% to

the pressure sensitive adhesive so as to provi

reflective surface that exhibits a whiteness v

the waterproofing membrane does not includ

ble carrier sheet with two opposed

erproofing adhesive on one surface

e layer having an average thickness

, and wherein said waterproofing

rticles adhered to 70% to 100% of

e adhesive, wherein the reflective

have an average diameter equal to

e sensitive adhesive layer and have

erein the waterproofing membrane

event the adhesive portion of the

er portion of the membrane when

brane being supplied in a roll form

nce of the removable release sheet,

brane can be applied to a substrate

ensitive adhesive can receive and


flexible carrier sheet with two opposed

a waterproofing pressure sensitive

uch that the pressure sensitive

ge of 75 μm to 500 μm and has an

ective inorganic particles adhered

ressure sensitive adhesive, wherein the

mprises a ground white cement, have

t is approximately equal to or greater

ensitive adhesive layer, wherein the

100% of the outer exposed surface of

ide the membrane with a substantially

alue greater than 65%, and wherein

e a removable release sheet.

| | |
|---|---|
| carrier + adhesive + release (mils) | 58 |
| carrier  (mils) | 46 |
| release (mils) | 2 |
| adhesive (mils) | 10 |
| adhesive (microns) | 254 |

Exhibit 112



Deposition of:

**Robert A. Wiercinski**

*April 20, 2021*

In the Matter of:

**GCP Applied Techs., Inc.v. AVM Industries, Inc.**

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3      - - - - - - - - - - - - - - - - - - - - x

4      GCP APPLIED TECHNOLOGIES, INC.

5           Plaintiff

6      vs.      Case No. 2:19-CV-07475-MWF-FFM

7      AVM INDUSTRIES, INC.

8           Defendant

9      - - - - - - - - - - - - - - - - - - - - x

10

11     HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12

13          ALL PARTICIPANTS APPEARING VIA ZOOM

14

15          DEPOSITION of ROBERT WIERCINSKI

16          Tuesday, April 20, 2021 - 9:06 a.m.

17

18

19

20     Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR

21

22

23

24

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
                                                    Page 2

 1     APPEARANCES:

 2

 3     Baker & Hostetler LLP

 4         Gary H. Levin, Esq.  (via Zoom)

 5         Jeffrey J. Lyons, Esq.  (via Zoom)

 6         Philip Wolf, Esq.  (via Zoom)

 7         2929 Arch Street

 8         Cira Centre, 12th Floor

 9         Philadelphia, Pennsylvania 19104-2891

10         215.564.8363

11         glevin@bakerlaw.com

12         jjlyons@bakerlaw.com

13       Counsel for plaintiff

14

15     DeLio Peterson & Curcio LLC

16         Peter W. Peterson, Esq.  (via Zoom)

17         700 State Street, Suite 402

18         New Haven, Connecticut 06511

19         203.787.0595

20         ppeterson@delpet.com

21         Counsel for defendant

22

23

24     Concierge:  Keith Shulman  (via Zoom)

25
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 3

1                     I N D E X

2

3     WITNESS:

4

5     ROBERT WIERCINSKI

6          Examination by Mr. Peterson 265    9

7          Examination by Mr. Levin 266      262

8

9                  E X H I B I T S

10    Exhibit 1   Second Amended Complaint        13

11    Exhibit 2   Notice of Deposition of         14

12                Robert A. Wiercinski

13    Exhibit 3   Notice of Deposition of GCP     14

14                Applied Technologies, Inc.

15    Exhibit 4   US Patent No. 8,713,879         22

16    Exhibit 5   US Patent No. 8,453,405         23

17    Exhibit 6   Brochure - Global Martech       51

18                PV 100

19    Exhibit 7   Adhesive chemistries            53

20                considered

21    Exhibit 8   Performance comparison          55

22    Exhibit 9   Brochure - Comparing of         55

23                pre-applied in CN

24    Exhibit 10  Email string, 10/13/09          58

25    Exhibit 11  Grace PV 100 Update             62

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 9

1            P R O C E E D I N G S

2

3              ROBERT WIERCINSKI, a witness

4    having been duly sworn, on oath deposes and

5    says as follows:

6

7                    EXAMINATION

8    BY MR. PETERSON:

9        Q    Mr. Wiercinski, would you please

10   state your name and address.

11       A    Robert A. Wiercinski, 29 Brooks

12   Road, Lincoln, Massachusetts 01773.

13       Q    Thank you.

14              And do you have a position at

15   GCP?

16       A    No.

17       Q    Are you retired from GCP?

18       A    Yes.

19       Q    Okay.

20              What was your last position at

21   GCP before retiring?

22       A    Oh, God.  Principal scientist --

23   no, excuse me.  No, no.  I think it was R&D

24   fellow.

25       Q    Okay.  Thank you.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 31

```
 1    somewhere between 85 percent and 90 percent.
 2         Q    Okay.
 3                   And what is the surface
 4    reflectivity of the PV100?
 5         A    It's probably in the low to mid
 6    60s, as measured as described in the
 7    specification in '879.
 8         Q    And you said that there was a
 9    selvage along the edge with adhesive for
10    lapping with an adjacent membrane; is that
11    correct?
12         A    Yes.
13         Q    Okay.
14                   And what's the adhesive
15    thickness on that selvage strip?
16         A    The same as underneath the
17    particles.  It should be 15 mils.
18         Q    Okay.
19                   And the PV100 has no release
20    sheet, correct?
21         A    Correct.
22         Q    Okay.
23                   Now, the surface reflectivity,
24    why is that provided?
25         A    The surface reflectivity is
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 32

1    provided because a highly reflective surface

2    will provide for a membrane that exhibits

3    better bond to concrete after weathering in

4    UV exposure versus a membrane that has a less

5    reflective or nonreflective surface.

6         Q    And why is that important?

7         A    Why is it important?

8         Q    Well, why does it provide that

9    better adhesion with the concrete?

10        A    Because a light-colored particle,

11   when -- a light-colored particle or a

12   reflective particle or a white particle when

13   exposed to solar radiation is going to get

14   heated to a lower temperature than a darker

15   or nonreflective particle.  And the

16   degradation of the adhesive or the rate of

17   degradation of the adhesive is going to be

18   proportional to the exposure temperature.

19                   So at higher exposure

20   temperatures for dark or nonreflective

21   particles, the rate of degradation is going

22   to be higher than the situation for the white

23   or the highly reflective particles.

24        Q    Now, do -- do customers prefer a

25   high reflectivity in a waterproofing

Page 33

1    membrane?

2         A    I would think so.

3         Q    Have any customers ever asked for

4    that?

5         A    That, I don't know.

6         Q    Now, you were involved in the

7    developing of the PV100 product, correct?

8         A    Correct.

9         Q    Okay.

10             Prior to developing the PV100

11   product, were you aware of any other

12   waterproofing membranes that had a highly

13   reflective surface?

14        A    Yes.

15        Q    Okay.

16             And what were those?

17        A    One of the earliest preapplied

18   membranes was one developed and manufactured

19   by W.R. Grace, which we still may sell,

20   although we may have transitioned to a later

21   version.

22             And that product line is

23   called Preprufe, and there were a number of

24   products in that line, including

25   Preprufe 300R and Preprufe 160R.

Page 34

1       Q      And what was the reflectively of

2       the surface of those Preprufe products?

3       A      Can't say that I ever measured

4       reflectivity of the surface of PV300 or

5       PV160.

6       Q      Okay.

7                      Did you measure reflectivity

8       of the surface of any other waterproofing

9       membranes that were around prior to PV100?

10      A      I don't recollect doing that.

11      Q      Okay.

12                     And what was the reason for

13      the reflectivity of the surface of the prior

14      Preprufe products?

15      A      The same purpose as for the

16      reflectivity requirement for the inorganic

17      particles of PV100, to retard degradation of

18      the membrane and provide for better bond to

19      concrete after weatherability and UV

20      exposure, as opposed to the situation for a

21      darker or nonreflective-surfaced membrane.

22      Q      Did -- did customers prefer that

23      high-reflectivity on the Preprufe product?

24      A      I would think that they would.

25      Q      Now, you said you used hydrated

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 35

1    white cement in PV100, correct?

2         A    Correct.

3         Q    Okay.

4              Did you have to select any

5    particular hydrated white cement to get to

6    that surface reflectivity that -- that you

7    have in the PV100?

8         A    I actually -- I actually don't

9    recollect selecting more than one white

10   cement.

11             Just to elaborate on that,

12   part of our organization is responsible for

13   developing products to -- as additives for

14   cement in concrete, and I asked one of the

15   experts in that area to give me a sample of

16   white cement and to make hydrated white

17   cement out of it.

18        Q    Did you ever come across any white

19   cement particles that had a lower

20   reflectivity than what you're using in the

21   PV100?

22        A    Not that I can recollect.

23        Q    Now, did you ever test gray cement

24   for the PV100 product?

25        A    Test -- which type of test?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 36

```
 1        Q    Well, I -- did you ever -- let's
 2   back up a little.
 3                  Did you ever consider using
 4   gray cement particles on the PV100 product?
 5        A    No.
 6        Q    And what is the difference between
 7   white cement and gray cement other than the
 8   color?
 9        A    Can you -- are you talking about
10   reflectivity or something else?
11        Q    Other than color and reflectivity,
12   any compositional differences?
13        A    Yes, there are compositional
14   differences between white cement and gray
15   cement.
16        Q    And generally what are those
17   differences?
18        A    One of the primary differences
19   is -- and this is in the specification, is
20   that the ferrite content of the white cement
21   is something -- is generally on the order of
22   something less than 1 percent.
23        Q    And what is the ferrite content on
24   gray cement?
25        A    Never measured it, but I would
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 37

1    assume that it's something -- actually, never

2    measured it.

3         Q    Do you know whether it's a higher

4    ferrite content that gives gray cement its

5    color?

6         A    Yes, I believe it is.

7         Q    Now, did you ever consider any

8    other inorganic particles other than hydrated

9    white cement to use for PV100?

10        A    Yes.

11        Q    And what were those?

12        A    I recollect making prototypes with

13   calcium carbonate and with white sand.

14        Q    And how did those work out?

15        A    In terms of initial bond to

16   concrete, they were similar.

17        Q    And is there a reason that you

18   didn't use either of these in place of the

19   hydrated white cement on the PV100 product?

20        A    Some of the development was done in

21   a Chinese laboratory under the direction of

22   May Ding, who is no longer with the

23   organization, and she had some results that

24   indicated that initial bond to concrete for

25   the hydrated cement particles was better than

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 38

1    for some other reflective particles that were

2    not hydrated white cement.

3                    And based on her results, we

4    had a preference for white cement.

5        Q    Okay.

6                    Did anyone measure the

7    reflectivity of the calcium carbonate or the

8    white sand particles that you tested?

9        A    I don't recollect doing that.

10       Q    Do you know if that reflectivity

11   would have been above 55 percent?

12       A    I would presume that it was just

13   from, you know, its appearance as being -- as

14   being pretty white.

15       Q    Okay.

16                   Now, did any other

17   waterproofing membranes prior to PV100 use

18   calcium carbonate inorganic particles on the

19   surface?

20       A    On the surface?

21       Q    Yes.

22       A    Are you talking -- are you

23   referring to commercially available

24   membranes?

25       Q    Yes.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 39

1      A     And when you say "on the surface,"

2    that implies that they are not encapsulated

3    in the top layer.

4      Q     Well, let me rephrase that.

5                  Were you aware of any other

6    publicly available waterproofing membranes

7    prior to PV100 that had calcium carbonate, an

8    adhesive layer, on the surface?

9      A     Not in what I would refer to as the

10    adhesive layer.

11     Q     Okay.

12                 How was the calcium carbonate

13    particles used on these other waterproofing

14    membranes?

15     A     Preprufe 300 and Preprufe --

16    Preprufe 300R and Preprufe 160R, which I

17    alluded to earlier, comprise three layers:

18    There is a carrier sheet, a

19    pressure-sensitive adhesive, and a protective

20    layer.  And the protective layer is a coating

21    that comprises calcium carbonate in an

22    acrylic polymer.

23     Q     Okay.

24                 And --

25     A     Such that -- such that the calcium

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 46

1    was done, but an approximate starting date.

2         Q    I see.

3                   Was testing started for PV100

4    in the United States before it started in

5    China?

6         A    Yes.

7         Q    Yes.

8                   Do you know when testing for

9    the PV100 product began in China?

10        A    It was after it was started in the

11   US, but I don't recollect the exact or the

12   approximate starting date for work in China.

13        Q    And where in China was that testing

14   done?

15        A    I believe at our Beijing lab.

16        Q    And was that under the direction of

17   Hongmei Ding?

18        A    Yes.

19        Q    Now, in the testing that you did in

20   the United States, did you ever make any

21   prototypes of the PV100 product?

22        A    Yes.

23        Q    Okay.

24                  And did you test those

25   prototypes?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 47

1      A     Personally?

2      Q     Yes.  Let's start with personally.

3      A     I would have been responsible at

4    least in the initial stages for the

5    preparation of lab-scale samples.  But most

6    of the testing would have -- although

7    certainly not all of it, but most of the

8    testing would have been done by one of my

9    technicians.

10     Q     And what size is the lab-scale

11   sample that you made?

12     A     There were various lab-scale

13   samples.  Some samples were -- were made with

14   a -- with a composition comprising a carrier

15   sheet and pressure-sensitive adhesive on top

16   of it that might have only been a couple of

17   inches wide where a particulate was embedded

18   on top of that.

19               Other samples may have been

20   something on the order of a foot square.  The

21   size of the sample required depending --

22   depended on the nature of the test that was

23   being done.

24     Q     Okay.

25               And how were those samples

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    tested?

2          A     What types of tests were done?

3          Q     Yes.

4          A     Probably the most important test

5    that was done was initial bond to concrete,

6    where a laboratory-made sample was put into a

7    form in a vertical position and concrete cast

8    against it.

9                The concrete was allowed to

10   cure for seven days, and then peel adhesion

11   at two inches per minute at a 90-degree angle

12   was measured and reported.

13         Q     Was all the testing done within the

14   confines of the Cambridge lab?

15         A     No.  As I say, there was certainly

16   some testing and development work done in

17   China as well.

18         Q     Okay.

19                But for the -- for the test

20   samples that you made in the Cambridge lab,

21   was all the testing on those samples done

22   within the lab itself?

23         A     I'm not positive that I never sent

24   any of my own laboratory-prepared samples to

25   China for testing, but certainly, you know, a

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 56

1        Q    Now, Mr. Wiercinski, the PV100

2    product is sold in China, correct?

3        A    Yes.

4        Q    Okay.

5                  Is it sold anywhere else?

6        A    I believe it is also sold in other

7    countries, but I'm not sure which ones.

8        Q    Okay.

9                  Other countries in Asia or

10    outside of Asia?  Are you aware?

11        A    I think it's sold in India, and it

12    may be sold in other Asian countries.  I

13    mean -- but I'm -- you know, I'm not sure.

14        Q    It's not sold here in the United

15    States, correct?

16        A    Not that I know of.

17        Q    Okay.

18                  And why is that?

19        A    I'm not sure.

20        Q    Did you ever ask anyone?

21        A    Did I ever ask anyone?  I don't

22    recollect.

23        Q    Do you recall any -- hearing any

24    discussion about whether the PV100 product

25    should be sold in the United States?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 57

1          A      Possibly.

2          Q      And what's your recollection?

3          A      My recollection was that it was not

4     sold in the United States.

5          Q      Do you recall hearing any reason

6     why?

7          A      Maybe.  I mean, I can -- I can

8     guess, but I don't know if I want to guess.

9                    MR. LEVIN:  You don't have to

10    guess.

11         Q      Okay.  Well, perhaps Mr. Austin

12    will be able to know the answer to that.

13                    Now, Mr. Wiercinski, since the

14    PV100 product was originally sold in China,

15    has it changed in any way?

16         A      Not that I know of.  My guess is

17    that they may have made improvements to the

18    quality of the membrane over the years versus

19    what they started out with, but as far as I

20    know, it's the -- it's the same composition.

21         Q      Let's go to the next document.

22    That's A205.  And I ask you if you can

23    identify that document.

24         A      Well, it's from me.

25         Q      Okay.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 82

1          Q     Let's say the first four pages is

2     A212.

3                         Can you identify those first

4     four pages?

5                         (The deponent read the

6     document.)

7          A     I mean, just based on the subject

8     matter, without reading through the whole

9     thing, they -- this email stream deals with

10    the performance of Dusty, which is a nickname

11    for PV100, and its patentability.

12         Q     Yes.

13                        And on the fourth page there

14    on patentability, at the bottom of the page,

15    it's part of the email from Ding, May to you

16    sent Saturday, October 31, 2009, 10:18 a.m.

17         A     Hold on.  Wait a minute.  That's on

18    page 3.

19         Q     Page 3, yes.

20         A     Okay.  Start over again, please.

21         Q     Yes.

22                        So on that email there, it's

23    on the lower half of that page, it's from May

24    Ding to you.

25                        It says in the next to the

Page 83

1    last paragraph:  "I remember based on our

2    last round discussion, if we cannot find

3    differences from white hydrated cement to

4    white cement, the chance to get patent

5    protection is low."

6                     Do you see that?

7         A    Yes, I do.

8         Q    Do you know what is meant by that

9    statement?

10                    (The deponent read the

11   document.)

12        A    It's odd that a comparison is being

13   made between white hydrated cement and white

14   cement.  I'm not sure what I was thinking

15   about.

16                    I mean, based on -- "I

17   remember based on our last round of

18   discussion, if we cannot find differences

19   from white hydrated cement to white cement,

20   the chance to get patent is low."

21                    It doesn't make sense.

22        Q    Okay.

23                    Then the next page there --

24        A    Wait a minute.  I'm just reading up

25   above.

HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

Page 84

```
 1        Q     Okay.

 2                   (The deponent read the

 3     document.)

 4        A     Go ahead.

 5        Q     Does reading the rest of that email

 6     make that sentence make any more sense to

 7     you?

 8        A     No.

 9        Q     Okay.

10                   Then the next page, page 4,

11     it's an email from you to May Ding, Friday,

12     October 30th.

13                   Do you see that?

14        A     Yes.

15        Q     In the second sentence there:

16     "Were you ever able to demonstrate that use

17     of white hydrated cement particulate offers

18     some performance enhancement versus other

19     particulates like sand?"

20                   Do you see that?

21        A     Yes, I do.

22        Q     Okay.

23                   Why did you bring that up with

24     May Ding?

25        A     I presume I would want to know if
```

Page 85

1    white hydrated cement was preferable to other

2    particulates.

3         Q    Other particulates like sand,

4    correct?

5         A    As long as they were re -- you

6    know, reflective, like sand -- like white

7    sand or calcium carbonate.

8         Q    Okay.

9              And does that sentence shed

10   any light on the -- on the next email that

11   we've just gone over:  "If we can't find

12   differences from white hydrated cement to

13   white cement the chance to get patent

14   protection is low"?

15        A    I mean, this one on the fourth page

16   seems to make more sense than the one on the

17   previous page since the '879 patent teaches

18   preferable particulates, including white

19   cement, partially white -- hydrated white

20   cement and hydrated white cement.

21        Q    Okay.

22              Thank you.  Then -- okay.

23   Before we mark this, I know we haven't marked

24   this as an exhibit yet, but let's -- can you

25   turn to the next page in your paper

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 102

1    embedded in the polymer coating.

2         Q    Okay.

3         A    Again, this is the fourth layer on

4    top.

5         Q    Now, the original Preprufe that you

6    said came out in the '90s, the 300R and 160R,

7    did that have a high-surface reflectivity?

8         A    Yes.

9         Q    And what did that measure as?

10        A    I -- I didn't measure it, but I

11   would venture that it had a high-surface

12   reflectivity.

13        Q    Meaning above 50 percent?

14        A    Yeah.  It would be --

15        Q    Or above 50, I should say, yeah.

16        A    It would be greater than

17   50 percent.

18        Q    Okay.

19             Did that product also have a

20   selvage along the edge?

21        A    The 300R and 160R?

22        Q    Yes.

23        A    Yes, yes.

24        Q    Okay.

25             And is that also in the

Page 107

1    out loud.  I'll let you read it.

2         A    Want me to read it out loud?

3         Q    If you wish.  You don't have to,

4    but I might -- let me ask you --

5                    Let me pose my question, and

6    then I'll help you read it.

7                    Does layer C describe the

8    third layer of the original Preprufe product?

9         A    Yes.

10                   MR. LEVIN:  I'll object --

11   hold on.

12                   Bob, you got to let me --

13                   THE DEPONENT:  Sorry.

14                   MR. LEVIN:  You have to pause.

15                   I'll object to the question as

16   calling for a legal conclusion if you're -- if

17   you're asking him to construe the claim.

18                   MR. PETERSON:  Okay.

19   BY MR. PETERSON:

20        Q    Well, let's just break it down,

21   then.

22                   The original Preprufe product

23   from the 1990s, that's what I'm referring to

24   here, does that have in the third layer a

25   protective coating?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 108

1         A    Yes.

2         Q    Okay.

3              And does that protective

4    coating comprise an acrylic or methacrylic

5    polymer or copolymer, an inorganic filler and

6    a white pigment?

7         A    Yes.

8         Q    Okay.

9              And is that portion of the

10   layer substantially free of surfactant?

11        A    In the -- in the earlier version?

12        Q    Yes.

13        A    Yes.

14        Q    Okay.

15             And does that third layer of

16   the original Preprufe -- does the protective

17   coating have a penetration less than or equal

18   to 20 dmm?

19             MR. LEVIN:  I have a

20   continuing objection to this line of

21   questioning to the extent it's asking for

22   claim construction.

23             MR. PETERSON:  Right.

24        Q    I'm not asking for claim

25   construction.  I'm asking whether the

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 109

1    physical properties of the original Preprufe

2    product had a -- the layer -- third layer of

3    protective coating had a penetration less

4    than or equal to 20 dmm.

5              THE DEPONENT:  Answer that?

6              MR. LEVIN:  Yes, you may.

7        A    Yes.

8        Q    Okay.

9              And in that original Preprufe

10   product, that third layer, protective

11   coating, did it have a reflectivity greater

12   than or equal to 55 percent as measured by a

13   reflectometer perpendicular to a surface

14   illuminated at a 45-degree angle?

15       A    Yes.

16       Q    Okay.

17             And in that original Preprufe

18   product, the third layer, the protective

19   coating, did the protective coating have a

20   pigment volume concentration in terms of

21   filler plus white pigment in a range of

22   30 percent to 80 percent?

23       A    Yes.

24       Q    And did the original Preprufe

25   product have a fourth layer comprising a

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 110

1    releasable material?

2         A     No.

3         Q     Okay.  Thank you.

4                    Now, let's go to the '879

5    patent.  That's back to document A4,

6    Exhibit 4.

7         A     Yeah, I got it.

8         Q     If you go to the columns 1, 2 and 3

9    of that patent.

10        A     Of '879, okay.

11        Q     '879, yes.

12        A     Okay.

13        Q     And I'm referring to the background

14   section of the invention, background of the

15   invention section there.

16                    Is the original Preprufe

17   product discussed there in any way?

18                    (The deponent read the

19   document.)

20        A     Answer the -- ask me that question

21   again, please.

22        Q     Is the Preprufe product, the

23   original one from the 1990s, is that

24   discussed in any way in the background

25   section of the invention in the '879 patent?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 111

1      A    I'd have to -- in order to give you
2    a very accurate answer to that, I would have
3    to go back and review these Bartlett patents
4    in detail.
5      Q    Okay.
6                What is the original Preprufe
7    product patented?
8      A    That is a difficult question to
9    answer.
10                Without -- yeah, that is a
11    difficult question to answer.  You thought --
12    you mean the product that we actually sold,
13    started selling in the mid-'90s, is it
14    covered by these two?
15      Q    Is -- well, let's -- let me back
16    up.
17                Is it covered by any patent,
18    any US Patent?
19      A    Can you show me -- in order -- in
20    order to answer that, can I -- can I see at
21    least the -- look at, like, the claim --
22                I'd like to review some of the
23    text, particularly claim 1, of -- of '848 and
24    '615, particularly the earlier one.
25      Q    Okay.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 112

1              You're talking about the '848

2      Bartlett patent?

3          A    Yes.

4          Q    And what other patent?

5          A    The '848 Bartlett.

6          Q    Oh, this is '615 Bartlett.

7          A    '615 Bartlett.

8          Q    Okay, yeah.  Let's see if we have

9      that anywhere here.

10             Yes.  Okay.  We're going to

11     have to open up another packet.  Can you open

12     the packet that's market A401 to 413?

13         A    I could offer --

14             THE DEPONENT:  Gary, are you

15     still there?

16             MR. LEVIN:  I am.

17         A    I can offer an explanation that

18     would shed some light on the question that

19     you're trying to get an answer to.

20         Q    Yes, please.  Please do.  Go ahead.

21         A    Okay.

22             What was actually

23     commercialized, the formulation that was --

24     the three-layer structure that was actually

25     commercialized for -- for -- for Preprufe 300

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 113

1    and Preprufe 160 is not the best mode, as

2    taught in those two Bartlett patents.

3                     That said, those two Bartlett

4    patents may cover it, but they certainly

5    don't teach the best mode.

6          Q    I see.  Okay.

7          A    I mean, for example, one of the

8    Bartlett patents teaches putting carbon black

9    in the protective coating and/or the

10   pressure-sensitive adhesive, making it pretty

11   damn nonreflective.

12         Q    Okay.

13         A    And if you were to look at the --

14   at the examples and look at maintenance of

15   bond to concrete after UV exposure, it's

16   pretty damn horrendous.

17         Q    I see.  Okay.  Okay.

18                    So what was commercialized in

19   Preprufe wasn't necessarily described as

20   the -- as the best mode in these two patents

21   to Bartlett, 5,316,848 and 5,496,615?

22         A    Yes, correct.

23         Q    And it might not have been

24   disclosed in any mode in those patents?

25         A    You know, in order to answer that,

Page 114

1    I'd have to give the entire -- both entire

2    patents a careful read.

3          Q    Okay.  Well, we'll -- we'll skip

4    that for now.

5                    Now, the original Preprufe

6    product was sold in the US, correct?

7          A    Yes.

8          Q    And for what uses was that sold?

9          A    Blindside waterproofing.

10         Q    Okay.

11         A    And, again, that means apply the

12   membrane first, cast concrete against the

13   surface that's operative to bond to concrete.

14         Q    So it was used in a manner very

15   similar to the PV100, correct?

16         A    Correct.

17         Q    Are you familiar with the Preprufe

18   Plus products that are on sale now in the US?

19         A    Yes.

20         Q    Okay.

21                    Do you know if that patent

22   number is marked on those products, patent

23   document A309, Exhibit 24, US Patent

24   No. 9,476,196?

25         A    Are you telling me that's on --

Page 183

1    conceiving the invention that we just -- as

2    we just went over with you?

3         A    As -- as -- you know, in a similar

4    response regarding May Ding, she contributed

5    to at least one of the claims in the

6    invention.  I'm not sure which one that was

7    or which ones those were.

8         Q    So in your mind, for the invention

9    as we just described it in claim 1, what did

10   you believe was new?

11        A    Versus what?

12        Q    Versus what was known in the prior

13   art.

14             MR. LEVIN:  Object to that.

15   I'll object to that question as vague.

16   That's an improper question.

17        Q    Okay.

18             Let's -- let me rephrase that.

19   Had you been aware of any waterproofing

20   membranes that had a waterproofing

21   pressure-sensitive adhesive on a carrier

22   sheet where the adhesive had a thickness in

23   the range of 75 microns to 500 microns?

24        A    Any previous membranes?

25        Q    Yes.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 184

1          A     Yes.

2          Q     Okay.

3                     And which were those?

4          A     I mean, both -- I mean,

5     Preprufe 300R, Preprufe 160R, Preprufe 300

6     Plus and Preprufe 160 Plus I believe all have

7     approximately 15 mils of pressure-sensitive

8     adhesive.  Multiply that by 25, and you get

9     microns.

10         Q     Okay.  I am going to try that.

11    Okay.

12                     So multiplying 15 mils times

13    25.4, I get 381 microns.

14         A     You knew it was 25.4, not 25.

15                     (Laughter.)

16         Q     Don't ask me to tell you what pi

17    is, though.

18                     MR. LEVIN:  To how many -- to

19    how many significant places?

20                     MR. PETERSON:  3.14156, et

21    cetera, et cetera.

22    BY MR. PETERSON:

23         Q     Yes.  Okay.

24                     So the prior Preprufe products

25    had pressure-sensitive adhesive layers with

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 185

1      about 381 micron thickness, give or take?

2           A    Yes.

3           Q    Okay.

4                     Now, did any prior art

5      waterproofing membranes have substantially

6      reflective inorganic particles adhere

7      directly to the pressure-sensitive adhesive?

8                     MR. LEVIN:  Objection.  Vague.

9           A    Well, not -- not any of the four

10     Preprufe membranes that I mentioned.  They

11     had reflective particles within the bulk of

12     the protective coating so that all of the

13     particles would be coated with the polymer.

14          Q    So -- so the particles were adhered

15     to the pressure-sensitive adhesive, but they

16     were, what, inside the adhesive layer?

17          A    No, no.  They're -- all of those

18     membranes comprise three layers, and two of

19     them -- an additional two:  Carrier sheet,

20     pressure-sensitive adhesive and protective

21     coating.

22                     All four of them have the

23     protective coating, and the protective

24     coating comprises the acrylic polymer and the

25     calcium carbonate.  And all of the particles

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 186

1     in the protective coating would be surrounded

2     by polymer.

3                    So none of the particles in

4     the protective coating would be in direct

5     contact with the pressure-sensitive adhesive.

6          Q     Would you describe them, though, as

7     substantially reflective inorganic particles?

8          A     Yes.

9          Q     And what was the typical range of

10    particle diameter in the waterproofing

11    membranes that were sold prior to this

12    invention?

13                    MR. LEVIN:  Objection.

14         A     Sorry.

15                    MR. LEVIN:  Objection.  Vague.

16    Lack of foundation.  I mean, it's -- you're

17    asking him about anything that might have

18    been out there.

19         Q     Well, anything to your knowledge.

20         A     I mean, I can answer for the same

21    four Preprufe membranes that we've been

22    talking about.

23                    And earlier, I indicated that

24    there was a calcium carbonate in the

25    protective coding that was a 325 mesh calcium

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 187

1    carbonate.

2                    And the particle size for that

3    was probably somewhere between -- an average

4    particle size between 10 and 25 microns.

5         Q    And for those Preprufe products,

6    the ones that were, let's say, starting with

7    the 1990s, did any of them have particles

8    covering 70 to 100 percent of the surface of

9    the membrane?

10        A    Well, the particles are -- surface

11   of the membrane.

12                    Well, the particles are not --

13   in the coating are not in direct contact

14   with -- with the pressure-sensitive adhesive.

15   So it's -- it's sort of a tough question to

16   answer.  I'm not even sure if it's possible

17   to answer that.

18        Q    Did you ever measure how much of

19   the surface of the membrane was covered by

20   the calcium carbonate particles?

21        A    No.  I wouldn't know how to.

22        Q    Now, going again to the '879

23   patent, let's turn again to columns 1, 2

24   and 3, the background of the invention

25   section.

Page 188

1        A      Just backing up that question,

2     there's probably another way to answer that

3     question, but it would take some thought on

4     my part.  There may be a mathematical way to

5     do it.

6        Q      Okay.

7                    So in -- turning to the

8     background section of the invention there,

9     there are a number of patents listed, and you

10    testified earlier that you thought that two

11    of them, the two Bartlett patents, the '848

12    Bartlett patent and the '615 Bartlett

13    patents, covered the Preprufe product.

14                    Do you recall that?

15       A      Well, we had a -- a discussion

16    about that, and what I had indicated is that

17    Preprufe 300 and Preprufe -- Preprufe 300R

18    and Preprufe 160R as sold are not the

19    preferred embodiments as described in those

20    inventions.

21       Q      Now, for the other patents that are

22    discussed in the background section of the

23    invention, do you know if they covered any

24    other commercial products on the market in

25    the United States?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 191

1    that the diameter of this particle is less

2    than the thickness of the adhesive layer?

3         A    It looks like this.  So the figure

4    is not a good representation of what's in

5    claim 1 or what's taught in this patent.

6         Q    Right.

7              Let's go to column 8 of the

8    patent, lines 42 through 44.

9         A    Okay.

10        Q    And looking at the sentence that

11   starts:  "The whiteness of the particles

12   can."

13              Do you see that?

14        A    Yes.

15        Q    Okay.

16              And particles there are the

17   cement particles that you were testing,

18   correct?

19        A    The white cement particles, yes.

20        Q    Right.  Okay.

21              And it goes on to say:  "The

22   whiteness of the particles as measured with a

23   Novo-Shade 45/0 Reflectometer was 70 for the

24   white particles and 25 for the gray

25   particles."

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 192

1              Do you see that?

2       A    Yes.

3       Q    Okay.

4              Were those typical

5    measurements for white and gray cement

6    particles?

7                   MR. LEVIN:  Objection.  Vague.

8                   You may answer.

9       A    I would say yes.

10      Q    Okay.

11             Now, did you have to specially

12   select white cement particles to get that

13   whiteness level of 70?

14      A    We talked a little bit about this

15   earlier, and I indicated that, you know, we

16   have divisions within the construction --

17   within W.R. Grace that dealt with cement and

18   concrete additives and cement.

19             And when I wanted a white

20   cement, I just went to one of the individuals

21   there and says, you know, can you give me

22   a -- a standard white cement and can you --

23   can you cast it to make hydrated white cement

24   and then mill it.

25             And at least for development,

Page 193

1     that's the -- that's the sole material that I

2     ever used, and that's what would have

3     measured as a -- as having a reflectivity or

4     a whiteness of 70.

5          Q    What about the gray cement

6     particles?  Did you have to specially select

7     gray cement particles to get that to the

8     value of 25?

9          A    As for the white cement, with the

10    gray cement, I go, can you -- can you take

11    gray Portland cement, mix it into a paste,

12    harden it and then mill it?

13               And that's -- that's what I

14    got.  I didn't -- I didn't select either one

15    of these.  It's -- it's what they had.

16         Q    Now, going back to the background

17    section of the patent, did you select the

18    patents that were listed there?

19         A    I certainly must have -- I

20    certainly must have selected some of them.

21    I'm not sure that I selected all of them.

22         Q    Mm-hmm.

23               Do you know if Ms. Ding

24    selected any of the patents that are listed

25    in the background section there?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 196

```
 1    didn't know if they had more than one
 2    product.
 3         Q    Okay.
 4              And did you get it as one
 5    sheet?
 6         A    I believe we got a roll.
 7         Q    A roll, okay.
 8              And what was the results of
 9    the tests that you conducted on that Canlon
10    roll?
11         A    I'd have to go -- I'd have to go
12    through some reports on the analysis of that
13    as well as, you know, some of my own data,
14    which I don't have in front of me.
15         Q    Okay.  Well, we might be getting to
16    that.
17              What about AVM products?  Did
18    you ever test an AVM product?
19         A    Yes.
20         Q    Okay.
21              And what products did you
22    test?
23         A    550.
24         Q    And when did you test this product?
25         A    I believe I tested -- tested one of
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 197

```
 1    them -- I did some testing sometime in 2017,
 2    and then, more recently, close to retirement,
 3    or maybe even directed some analysis after
 4    retirement.
 5         Q    Okay.
 6                   So that would have been in
 7    2019?
 8         A    Yeah.  I think.
 9         Q    And what do you recall from the
10    product you tested in 2017?  What do you
11    recall about the characteristics of the
12    product?
13         A    Actually, I don't -- I don't recall
14    a lot.  I mean, I have vague recollection of
15    what I tested for Canlon because in
16    preparation for this litigation I was told to
17    confine my --
18                   MR. LEVIN:  Don't -- Bob,
19    don't --
20                   THE DEPONENT:  Okay.
21                   MR. LEVIN:  You don't have
22    to -- you don't have to divulge anything that
23    you were told by any counsel representing
24    GCP.
25    BY MR. PETERSON:
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 198

```
 1        Q    Yeah.  I'm -- I'm just asking about
 2     the results of your test.
 3        A    Again, I don't recollect, because I
 4     have only recently familiarized myself with
 5     what was done with AVM membranes.
 6        Q    Okay.
 7              Do you recall whether the
 8     products were the same that you tested in
 9     2017 and 2019?
10        A    Were they both 550?
11        Q    Well, not necessarily whether they
12     were the same designation, but was the -- was
13     the product itself the same?
14              Did it have the same
15     characteristics in 2019 as it had in 2017?
16        A    I think the -- the product -- one
17     of the products in 2017 had a larger particle
18     size than one of the ones tested later.
19        Q    And what about the composition of
20     the particles?  Did you test that in 2017 and
21     2019?
22        A    The earlier -- the product that was
23     tested earlier I recollect had a -- the
24     particles were composed of what was called
25     mullite and cristobalite, whatever that was.
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 199

1     It's probably just some fancy word for sand,

2     but I'm not sure.

3                    The composition of the

4     products tested later on were found to be

5     hydrated white cement.

6          Q    And for the earlier product that

7     had what might have been sand, do you recall

8     what the particle size was?

9          A    I think the particle size was --

10    was somewhat above the upper limit of

11    claim 1.  It was like in the median 600s.

12         Q    Okay.

13                   So above 600 microns?

14         A    I believe so.

15         Q    And what about the product that you

16    tested in 2019 that had the hydrated white

17    cement?

18                   Do you recall what the

19    particle size was for that?

20         A    It was within the range.  I'm not

21    exactly -- I'm not exactly sure what the

22    number was.

23         Q    And going back to the Canlon

24    product that you tested, was that also within

25    the range of the limitations in claim 1 of

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 200

1    the '879 patent?

2         A    Don't remember.

3         Q    For the AVM product, the two

4    products that you tested, did you measure the

5    thickness of the adhesive?

6         A    At least for one of them, I did.

7         Q    Okay.

8              Which one was that, the 2017

9    or the 2019?

10        A    It was probably the more -- I

11   believe the more recent one.

12        Q    Okay.

13             And how did you measure the

14   adhesive thickness?

15        A    Okay.  I would unroll some

16   membrane, discard the first wrap, select a --

17   and then cut a strip of membrane across the

18   entire width, and then select a section from

19   the center of the roll, a section from one

20   edge of the roll, and a section from the

21   other edge of the roll, and then precisely

22   cut those sections so that the -- the area of

23   those samples could be very accurately

24   measured, okay?

25             The next thing that I would do

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 201

1    is to accurately weigh those three specimens

2    out to three or four decimal places.  That

3    would be followed by immersing each sample

4    individually into some toluene to dissolve

5    the pressure-sensitive adhesive, and that is

6    easily done with a single application of

7    toluene, and the particles would be filtered

8    off from that.

9               The -- the particles would be

10   filtered off from that completely into a -- a

11   glass container, and the carrier sheet would

12   get another few soaks in toluene.

13              After a few soaks in toluene,

14   the carrier sheet would be dried at room

15   temperature, then dried in an oven, then

16   cooled down.  Then this -- carrier sheet

17   strips would be weighed.

18              Then, back to the particles.

19   Those would be subjected to five washes with

20   toluene to completely remove the

21   pressure-sensitive adhesive, each time being

22   very careful to decant off just the toluene

23   with the pressure-sensitive adhesive

24   dissolved in it.

25              After five washes, the

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    particles were dried at room temperature,

2    followed by an oven dry, followed by cooling.

3    Once cooled, those particles would be

4    weighed.

5                So now you've got the weight

6    of the whole membrane.  You've got the weight

7    of the carrier sheet.  You've got the weight

8    of the particles.  The weight of

9    pressure-sensitive adhesive is calculated by

10   difference, knowing the area and estimating

11   the density at 1 gram per cc.

12        Q    And how did you determine the

13   density of the pressure-sensitive adhesive?

14        A    I assumed that it was very -- I did

15   not measure it.  I assumed that it was very

16   similar to the pressure-sensitive adhesive

17   that we use.

18        Q    Did anyone do any testing for

19   the -- to determine the composition of the

20   adhesive?

21        A    There was some limited testing, I

22   think, that was -- that was done under the

23   direction of Xia or May Ding, a -- a -- and

24   the -- there were limited results of the

25   analysis.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 203

1            But the indication was that it

2    comprised an SIS block copolymer as well as a

3    butyl adhesive.

4            And the analysis was done by

5    Fourier-transform infrared spectroscopy.

6        Q    So your measurement of the

7    thickness of the adhesive was then dependent

8    on your determination of the adhesive based

9    on the IR spectrographic results, correct?

10       A    What was that question again?

11       Q    So your determination of the

12   thickness of the adhesive was based on the

13   density assumption based on the composition

14   as determined by the infrared spectrometer,

15   correct?

16       A    I don't -- I don't know that I -- I

17   don't know that I needed to -- I don't know

18   that I -- that I assumed that both of those

19   compositions would have similar density.

20            But I was fairly -- fairly

21   confident that a density of 1 gram per cc is

22   going to be pretty damn close to what that

23   adhesive is.

24       Q    Had you tested the density of other

25   adhesives?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 204

1        A    Yes.

2        Q    And what was the range of densities

3    that you obtained for testing other

4    adhesives?

5        A    Somewhere between .95 and up.

6        Q    And --

7        A    But -- but below 1.

8        Q    Now, so the adhesive density --

9    strike that.

10            So the adhesive thickness that

11   you determined, then, was the thickness of

12   the adhesive before the particles were placed

13   on and in the adhesive, correct?

14       A    Well, it would have been, yes.

15       Q    Okay.

16            Did you try to determine the

17   thickness of the adhesive after the particles

18   were placed on or in the adhesive?

19       A    No, I'm confused.  I mean, we

20   determined the adhesive thickness for a

21   sample of membrane that already had particles

22   attached to the adhesive.

23       Q    Yes, right.

24            But isn't it true that if you

25   were to place particles in an adhesive, that

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    the thickness of the adhesive would increase

2    because of the displacement of the particles?

3         A    Yes, I believe that would happen to

4    some degree.

5         Q    And had -- did you determine that

6    for the AVM product samples that you tested?

7         A    No.  I mean, the thickness that I

8    was calculating would be the thickness of the

9    adhesive as it was coated onto the carrier

10   sheet prior to application of the inorganic

11   particles.

12        Q    So is -- is that also true for the

13   '879 patent that, when you refer to the

14   thickness of the adhesive layer, you're

15   referring to the thickness of the adhesive

16   layer before you place particles on or in it?

17        A    Correct.

18        Q    Now, for the AVM products that you

19   tested, did you measure the diameter of the

20   inorganic particles?

21        A    I had it measured by Analytical.

22        Q    Okay.

23             And how was that done?

24        A    It was done with a unit called a

25   Mastersizer 2000, which I believe uses light

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 237

1          Q    Oh, okay.  Yes.  Okay.  Then please

2    do open them.

3          A    Oh, boy.  Okay.

4          Q    Okay.

5                    Let's start with A508.

6          A    508.  Got it.

7          Q    And --

8                    MR. PETERSON:  Yeah.  Let's go

9    ahead and mark this as the next exhibit

10   number, 66.

11                   (Exhibit 66 marked for

12   identification.)

13   BY MR. PETERSON:

14         Q    Mr. Wiercinski, this is a document

15   we received from GCP, and I ask you if you

16   know what it is.

17         A    Well, seemingly, it's about White

18   Cement Concrete, but I've never seen this

19   particular document in my life.

20         Q    Okay.  Then that's enough said

21   about that document.

22                   The next document I'll have

23   you look at -- and I -- these are a number of

24   patents and other documents, and you may not

25   know anything about them, but we'll go

Page 238

1    through them and see if you're familiar with

2    them.

3                   So let's start with A -- the

4    A501 document, US Patent No. 7,776,432.

5                   MR. PETERSON:  And let's mark

6    that as Exhibit 67.

7                   (Exhibit 67 marked for

8    identification.)

9                   THE DEPONENT:  My recollection

10   is that this is something that was cited

11   during the prosecution of '879 or its

12   predecessor.

13                  Or it might have been -- I

14   mean, I've seen this before, but I don't

15   remember exactly when or where.

16                  It may be something that

17   was -- actually, I don't know if I can answer

18   that -- if I can say this, but that was cited

19   by another competitor.

20   BY MR. PETERSON:

21        Q    Okay.

22        A    I mean, I've -- I've seen this.

23        Q    Okay.

24        A    And I recollect responding to this.

25   I don't recollect if it was in response to an

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 239

```
 1     office action or in response to litigation in

 2     this case or litigation another case.

 3          Q     Okay.

 4                    MR. PETERSON:  Let's -- let's

 5     pull up document number A509.  And we'll give

 6     that the next exhibit number, Exhibit 68.

 7                    (Exhibit 68 marked for

 8     identification.)

 9                    THE DEPONENT:  This seems to

10     be the PCT version of the one I just saw.

11     BY MR. PETERSON:

12          Q     Yes, I'll represent that to you.

13                    So do you know if you've

14     previously seen the US version or the PCT

15     version?

16          A     Don't remember.

17          Q     Okay.

18                    And do you recall

19     approximately when?  Was it in the last few

20     years or ten years or more?

21          A     I think -- I think this was within

22     the last few years.

23                    MR. PETERSON:  Let's go to

24     document A502.  That's US Patent

25     No. 6,933,007.  And we'll mark that
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 240

1    Exhibit 69.

2                    (Exhibit 69 marked for

3    identification.)

4                    THE DEPONENT:  I have also

5    seen this patent, again, in regard to

6    prosecution.  But thinking a little bit more

7    about this, more likely cited in litigation

8    in another case.

9    BY MR. PETERSON:

10        Q    Okay.

11                  Would that have been ten years

12    ago or more or --

13        A    Probably within the last couple of

14    years.

15        Q    Okay.

16                  MR. PETERSON:  Then let's go

17    to A503.  That's US Patent No. 4,218,260.

18                  And go ahead and mark that

19    Exhibit 70.

20                  (Exhibit 70 marked for

21    identification.)

22                  THE DEPONENT:  I think -- I

23    think I've seen all -- this patent as well as

24    the previous two associated with litigation

25    in another case.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 241

1     BY MR. PETERSON:

2          Q    And, again, was that --

3          A    Within the last couple of years.

4          Q    Last couple of years?  Fine.

5               Let's go to document A504, one

6     of your patents, US 6,500,520.

7          A    Yes.

8               MR. PETERSON:  We'll call that

9     Exhibit 71.

10              (Exhibit 71 marked for

11    identification.)

12    BY MR. PETERSON:

13         Q    And you're, of course, familiar

14    with this patent, correct?

15         A    Correct.

16         Q    And is the drawing figure on the

17    front of this patent the same drawing figure

18    that's in the '879 patent?

19         A    Yeah, sure looks like it.

20         Q    Okay.

21              MR. PETERSON:  And let's look

22    at the next document, A505.  And we'll call

23    that Exhibit 72.

24              (Exhibit 72 marked for

25    identification.)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 242

1    BY MR. PETERSON:

2         Q    And I'll ask you if you've seen

3    this document before.

4         A    You know, I'm not sure.  I'm not

5    sure about this one.  I may have, but I'm not

6    sure.

7                    MR. PETERSON:  Then the next

8    document is A506, which we'll mark as

9    Exhibit 73.

10                   (Exhibit 73 marked for

11   identification.)

12                   THE DEPONENT:  Boy.

13   BY MR. PETERSON:

14        Q    And I'll ask you if you've seen

15   this document before.

16                   (The deponent read the

17   document.)

18        A    I don't recollect seeing this.

19                   MR. PETERSON:  Then let's go

20   to A507.

21                   THE DEPONENT:  Yup.

22                   MR. PETERSON:  We'll mark that

23   as 74.

24                   (Exhibit 74 marked for

25   identification.)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 268

1              C E R T I F I C A T E

2              I, Jill K. Ruggieri, Registered Merit

3      Reporter and Certified Realtime Reporter, do certify

4      that the deposition of ROBERT WIERCINSKI, in

5      the above-captioned matter, on April 20, 2021, was

6      stenographically recorded by me; that the witness

7      provided satisfactory evidence of identification, as

8      prescribed by Executive Order 455 (03-13) issued by

9      the Governor of the Commonwealth of Massachusetts,

10     before being sworn by me, a Notary Public in and for

11     the Commonwealth of Massachusetts; that the

12     transcript produced by me is a true record and

13     accurate record of the proceedings to the best of my

14     ability; that I am neither counsel for, related to,

15     nor employed by any of the parties to the above

16     action; and further that I am not a relative or

17     employee of any attorney or counsel employed by the

18     parties thereto, nor financially or otherwise

19     interested in the outcome of the action.

20

21     _____

22              Jill K. Ruggieri, RPR, RMR, FCRR, CRR

23

24     Transcript review was requested of the reporter.

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 269

1   Gary H. Levin, Esq

2   glevin@bakerlaw.com

3                     May 5, 2021

4   RE:   GCP Applied Techs., Inc. v. AVM Industries, Inc.

5         4/20/2021, Robert A. Wiercinski (#4543574)

6         The above-referenced transcript is available for

7   review.

8         Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-midatlantic@veritext.com

16

17   Return completed errata within 30 days from

18  receipt of testimony.

19    If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 270

1    GCP Applied Techs., Inc. v. AVM Industries, Inc.

2    Robert A. Wiercinski (#4543574)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Robert A. Wiercinski                         Date

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 271

1   GCP Applied Techs., Inc. v. AVM Industries, Inc.

2   Robert A. Wiercinski (#4543574)

3                 ACKNOWLEDGEMENT OF DEPONENT

4       I, Robert A. Wiercinski, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____    _____

12  Robert A. Wiercinski                         Date

13  *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20___.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 113

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 270

1    GCP Applied Techs., Inc. v. AVM Industries, Inc.

2    Robert A. Wiercinski (#4543574)

3              E R R A T A   S H E E T

4    PAGE 34  LINE 4-5  CHANGE change "PV300 or PV160" to "Preprufe 300R or Preprufe

5    160R"

     REASON Misspoke, see p. 33, lines 22-25.

6

7

8    PAGE 80  LINE 1-2  CHANGE change "Certainly Preprufe and Preprufe Plus were
     developed" to "Certainly certain versions of Preprufe and Preprufe Plus were designed"

9    REASON Clarification, not all versions of Preprufe or Preprufe Plus provide barriers to methane

10   leakage.

11

12   PAGE 109  LINE 15  CHANGE "Yes" should be changed to "No, as I indicated before, I do
     not recall that I specifically measured it.  However, I recall that in 1991 I measured the

13   reflectivity of an experimental product that was similar to the Preprufe product but was never
     sold, and its protective coating did have a reflectivity above 55 percent."

14   REASON Misspoke, see p. 102, lines 10-12 for reference.

15

16   PAGE 113  LINE 1-2  CHANGE replace "the best mode, as taught in" with "specifically
     shown in the examples of"

17

18   REASON Misspoke, clarification needed.

19

20   PAGE 113  LINE 4-5  CHANGE replace "may cover it, but they certainly don't teach the
     best mode." with "in other parts of their specifications disclose the use of titanium dioxide in the

21   protective coating, so they cover it."

22   REASON Misspoke, clarification needed.

23

24

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
                                            Page 270

 1     GCP Applied Techs., Inc. v. AVM Industries, Inc.

 2     Robert A. Wiercinski (#4543574)

 3                   E R R A T A   S H E E T
```

PAGE <u>113</u> LINE <u>22</u> CHANGE replace "Yes, correct." with "What was commercialized as Preprufe was not shown in the specific examples of those two Bartlett patents."

REASON <u>Misspoke, clarification needed.</u>

PAGE <u>114</u> LINE <u>2</u> CHANGE <u>after "careful read." add "Both patents teach all the compositions of the Preprufe products, including the actual materials in the protective coating of the Preprufe products."</u>

REASON <u>Clarification needed.</u>

PAGE <u>130</u> LINE <u>9</u> CHANGE <u>change "resis" to "resistance"</u>

REASON <u>Transcription error.</u>

PAGE <u>144</u> LINE <u>13</u> CHANGE <u>change "post-applied" to "preapplied."</u>

REASON <u>Misspoke, see p. 144, lines 15-16 for reference.</u>

PAGE <u>168</u> LINE <u>11</u> CHANGE <u>change "board" to "bored"</u>

REASON <u>Transcription error.</u>

```
      Robert A. Wiercinski          06/03/2021
      _____        _____
 24   Robert A. Wiercinski                    Date
```

HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

Page 271

1    GCP Applied Techs., Inc. v. AVM Industries, Inc.

2    Robert A. Wiercinski (#4543574)

3              ACKNOWLEDGEMENT OF DEPONENT

4       I, Robert A. Wiercinski, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   *Robert A. Wiercinski*              06/04/2021
     _____        _____

12   Robert A. Wiercinski                        Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20___.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

Exhibit 114

1  Douglas G. Muehlhauser (SBN 179495)
2  doug.muehlhauser@knobbe.com
   KNOBBE, MARTENS, OLSON & BEAR, LLP
3  2040 Main Street
   Fourteenth Floor
4  Irvine, CA 92614
5  Phone:      (949) 760-0404
   Facsimile:  (949) 760-9502
6
7  Peter W. Peterson (*pro hac vice*)
8  David R. Pegnataro (*pro hac vice*)
   delpet@delpet.com
9  DeLIO, PETERSON & CURCIO, LLC
   700 State Street, Suite 402
10 New Haven, Connecticut 06511
11 Phone:      (203) 787-0595
   Facsimile:  (203) 787-5818
12
13 Attorneys for Defendant
14 AVM INDUSTRIES, INC.

15            **IN THE UNITED STATES DISTRICT COURT**
16             **CENTRAL DISTRICT OF CALIFORNIA**
17

18 GCP APPLIED TECHNOLOGIES     ) Case No. 2:16-cv-07475-MWF-RAO
   INC.,                        )
19                              ) Hon. Michael W. Fitzgerald
              Plaintiff,        )
20                             )
                               ) **DEFENDANT'S EXPERT**
21       v.                    ) **REPORT AND DISCLOSURE OF**
                               ) **PHILIP DREGGER**
22 AVM INDUSTRIES, INC.,       )
                               )
23            Defendant.       )
                               )
24 ─────────────────────────────

25
26      **Contains Information Designated Confidential Attorneys Eyes Only**
                **Pursuant To Protective Order**
27

28

# Expert Report of Philip D. Dregger

## I.     SCOPE OF ASSIGNMENT

I have been retained by DeLio, Peterson & Curcio, LLC as an expert to provide my opinions regarding claims 1-8 and 10-17 of United States Patent No. 8,713,879 ("the '879 patent"), and, specifically, whether the asserted claims of the '879 patent meet the conditions of validity as required by U.S. patent law.

## II.     BACKGROUND QUALIFICATIONS

I have 30 years of experience in the roofing and waterproofing industry and am a registered Professional Engineer (PE) in several states, a Registered Roof Consultant (RRC), and Fellow of the International Institute of Building Enclosure Consultants (IIBEC, formerly RCI). I studied Civil Engineering at the University of Minnesota – Minneapolis, receiving a BS in Civil Engineering in 1976 and an MS in Civil Engineering in 1978. I am currently the Vice President, Senior Project Manager at Salas O'Brien, a roofing and waterproofing consulting company, having an address at 2339 Stanwell Circle, Suite A, Concord, CA 94520. My curriculum vitae is attached as Appendix A, which includes a list of my publications, presentations and lectures, special awards, and a list of special projects I have been involved with over the last 30 years. I have extensive experience working with waterproofing membranes including expertise in foundation work, including, building foundations, waterproofing membranes (above- and below-grade), concrete work, and geotechnical work. Specifically, I have served as the designer of record, or consulted to the designer of record, for several projects utilizing waterproofing membranes (above-grade plaza deck and below-grade applications), including blind-side applications. As a result of my career in the field, I have sat on the Board of Directors for various roofing waterproofing organizations, and am currently a fellow of the International Institute of Building Enclosure Consultants, the main governing body for the roofing and waterproofing industry. I have also consulted as an expert providing testimony (>50 depositions/arbitrations/trials) relating to roofing, waterproofing and building enclosure systems, including providing expert testimony for several patent infringement cases over the years. Attached as Appendix B is a list of cases in which I have provided trial or deposition testimony as an expert witness dating back to 1983.

## III.     COMPENSATION

I am being compensated for my time at a rate of $395 an hour for my time spent on this matter. My compensation does not depend in any way on the opinions that I provide or on the outcome of the case. I have not been given a maximum amount of time to spend on this matter, nor have I imposed a maximum amount of time upon myself. Instead, I will spend as much time as I believe, in my professional capacity, is required to complete the scope of the assignment.

## IV.     MATERIALS REVIEWED AND CONSIDERED

In forming my opinions set forth in this report, I have reviewed, among other things: the '879 patent; the prosecution history of the '879 patent along with the references cited therein; Plaintiff's Second Amended Complaint for Patent Infringement; Plaintiff GCP's Final

Infringement Contentions and supporting documents; Defendant's Final Invalidity Contentions and supporting documents; the Court's Claim Construction Order; the deposition transcript of Mr. Robert Wiercinski, other materials referenced herein, U.S. 7,634,877 to "Wiercinski '877" which I understand to be evidence of the ordinary skill in the art at the time of the invention, and patents and articles that to the best of my understanding have been established as prior art for this case, along with prosecution histories of select reviewed prior art, including:

1. US 7,776,432 to "Serwin"
2. US 6,933,007 to "Fensel"
3. US 4,218,260 to "Metzler"
4. US 6,500,520 to "Wiercinski '520"
5. WO 2009/009659 to "Wiercinski '659"
6. U.S. 3,937,640 to "Tajima '640"
7. U.S. 7,968,171 to "Seth '171"
8. U.S. Pat. Pub. 20070044397 to "Wiercinski '397 Pat. Pub."
9. U.S. Pat. Pub. 20070218251 to "Jacobs '251 Pat. Pub."
10. U.S. 7,442,270 to "Bartek '270"
11. U.S. 7,238,408 to "Aschenbeck '270"
12. U.S. Pat. Pub. 20060110996 to "Getlichermann '996 Pat. Pub."
13. U.S. 5,496,615 to "Bartlett '615"
14. Journal publication by "Marceau"
15. Journal publication by "Hollis"
16. Journal publication by "Moresová"
17. Journal publication by "Whiting"
18. Preprufe® 300R & 160R Technical Datasheet, 2002
19. Preprufe® 300R & 160R Technical Datasheet, 2007
20. Preprufe® 160R Technical Datasheet, 2008
21. "Cool Roofs California Cool Roofs: A Snapshot of Installed Costs" by Phil Dregger, WESTERN ROOFING – NOVEMBER/DECEMBER 2006, pgs. 16-22
22. "2007 California Energy Code" publication, pg. 31.
23. Preprufe® 160R and Preprufe® 360R waterproofing membrane products ("Preprufe® 300R/160R Tested Products")
24.  Declaration of Paul Miller (see, Appendix C)

## V.    <u>LEGAL STANDARDS</u>

In rendering my opinions, I have utilized the following standards, which I understand are an accurate summary of relevant United States patent law.

I understand that a patent is presumed to be valid and the burden of establishing invalidity of a patent or any claim shall rest on the party asserting invalidity. Invalidity defenses must be proved by clear and convincing evidence. I understand that clear and convincing evidence is evidence indicating that the thing to be proved is highly probable or reasonably certain.

A patent falling under the first to invent rules may be anticipated if, more than one year before the patent application filing date, the invention was patented or described in a printed

publication, or was in public use or on sale in the United States. A patent may be anticipated if the claimed invention was described in a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent. In order to anticipate, the prior art reference must describe the applicant's claimed invention sufficiently to have placed a Person of Ordinary Skill in the Art (hereinafter, "POSITA") in possession of the invention.

In order to anticipate, the prior art reference must also enable one of ordinary skill in the art to make the invention without undue experimentation. To establish anticipation each and every limitation must be found either expressly or inherently in a single prior art reference. A claim limitation is "inherent" if it is "necessarily present" in the prior art invention.

A patent may be obvious, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to a POSITA to which said subject matter pertains.  The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. When a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious. It can be important to identify a reason that would have prompted a POSITA to combine the elements in the way the claimed new invention does.

A POSITA applicable to the patent-in-suit would be an individual with a bachelor's in civil engineering, structural engineering, construction engineering, architectural engineering, an engineering project management degree, or closely related field, and at least three years or more of post-education work experience in the roofing and/or waterproofing field. Alternatively, a POSITA may be a non-degreed individual having 6 years of experience, or more, in the roofing and/or waterproofing industry either through field-work, manufacturing, sales or as a contractor.

Although the level of work experiences and my numerous years of expertise in the field are greater than that required for a perspective in this case, I am familiar with the perspective of the POSITA from my past experiences and my continuing lecturing and consultancy work.

In reaching my opinions below, I have kept in mind the instruction that my opinions should reflect not my own perspective as an experienced expert in the field, but rather, they should reflect my opinion on how a POSITA at the time the patent application was filed would have understood the patent claims, patent specification, and the prosecution history.

## VI.    TECHNICAL BACKGROUND

The patent in suit generally relates to waterproofing membranes for pre-applied (or "blind-side") waterproofing for concrete structures.  These types of membranes typically include a carrier sheet and a pressure sensitive adhesive layer on at least one surface of the carrier sheet. In pre-applied (or "blind-side") waterproofing, the carrier sheet side of the membrane is attached to a substrate with the adhesive layer facing outwards to bond with "post-cast" concrete. Known waterproofing membranes prior to the '879 Patent often included a release sheet covering and protecting the adhesive layer, particularly those membranes that were rolled up. In particular, the release sheet was used to prevent the adhesive portion of the membrane from adhering to the carrier sheet or other portion of the membrane when the membrane is in a rolled-up state.  However, these types of membranes often require unrolling the membrane prior to installation, sometimes with the adhesive side facing downward requiring the installer to flip over these heavy membranes. They also require the installer to remove the release sheet from the adhesive layer prior to or during installation at the job site, which was then discarded.

The '879 Patent discloses that the claimed invention addresses this problem by incorporating inorganic particles adhered to the pressure sensitive adhesive layer. These inorganic particles protrude above the adhesive layer to provide a surface of exposed inorganic particles that will not adhere to the carrier surface when the membrane is rolled up, thereby eliminating the need for a release sheet. The inorganic particles disclosed in the '879 Patent inherently have a degree of reflectivity, which when protruding out of the adhesive layer surface provide the membrane with a reflective surface. Various known inorganic particles are suitable for use in the '879 Patent, whereby select ones of such inorganic particles are known to be highly reflective, and as such, provide a highly reflective exposed surface of the membrane.  It is known that membranes having highly reflective surfaces will reflect solar energy, thereby keeping their underlying adhesive layer cooler and preventing degradation thereof by heat and/or sunlight.

## VII.   PATENT AT ISSUE

The asserted '879 patent is entitled "Waterproofing Membrane". The '879 patent was filed May 10, 2013, and issued May 6, 2014 to inventors Robert Wiercinski, Hongmel Ding, and Xia Cao. I have been informed by attorneys for AVM that the '879 patent is a continuation of U.S. Ser. No. 13/577,460 filed on August 7, 2012, which is a 371 of PCT/CN2010/000166 filed on February 8, 2010, and as such, is entitled to the priority date of February 8, 2010.  It is also my understanding that the '879 patent is owned by GCP, which I understand is the successor in interest of W.R. Grace and Co.

Based on my review, it is my opinion that the '879 patent is aimed at providing solutions to a number of problems associated with known waterproofing membranes used in the construction field.  In arriving at the invention of the '879 patent, it discloses that "[s]heet-like waterproofing membrane laminates are well-known for application to concrete and other substrates. These laminates typically comprise a carrier sheet and a pressure sensitive adhesive layer (and optionally other layers)."  (Col. 1, ll. 25 – 28.)

The '879 patent refers to problems with both post-applied and pre-applied (or "blind-side") waterproofing membranes (see, e.g., column 1, lines 28-46).  Based on my knowledge in the field, post-applied waterproofing membranes are applied to preformed, cured concrete structures (e.g., a building foundation) that typically do not require downstream concrete casting. In post-applied waterproofing applications, a structural (final) concrete construction is formed and allowed to cure (e.g., concrete foundation, walls, etc.), and then a waterproofing membrane is applied to such cured concrete construction.

In pre-applied applications, a pre-applied (or "blind side") waterproofing membrane is applied to a substrate, followed by casting concrete (or shotcrete) against the membrane's exposed adhesive side which may have particulates on a top surface thereof. Typical substrates for pre-applied applications include compacted soil, gravel, lagging, walls, floors, a temporary slab (i.e., a mud or waste slab), a concrete slab (vertical or horizontal), tiebacks, etc., all of which are installed "before" the primary (i.e., the structural) final concrete construction is poured or cast. The '879 patent also teaches that in pre-applied waterproofing, the carrier sheet side of the membrane is affixed to the substrate and the adhesive layer, which may have an optional coating thereon, faces the cavity in which the concrete is to be poured/cast against such adhesive layer.

The background section of the '879 patent discloses then known prior art waterproofing membranes for both pre-applied and post-applied waterproofing. For instance, the '879 patent refers to pre-applied (or "blind-side") waterproofing membranes including, for example, U.S. Pat.

-4-

No. 4,994,328 (Cogliano), U.S. Pat. No. 5,316,848 (Bartlett), and U.S. Pat. No. 5,496,615 (Bartlett), as well as discusses the problems associated with these known pre-applied waterproofing membranes.  It also refers to post-applied waterproofing membranes (i.e., applied to a cured final concrete construction), such as the waterproofing membranes in U.S. Pat. No. 5,271,781 (Anno) which teaches a waterproof sheet applied to the surface of a formed (final) concrete construction, thereby waterproofing such concrete construction. The '879 patent discloses that problems of known waterproofing membranes at a time prior to the '879 application included problems associated with adhesion of the membrane to post cast concrete, degradation of the adhesive layer due to exposure to sunlight/UV, issues associated with blocking (sticking) of the membrane layers to one another when rolled, and issues with use of removable release sheets.

In addressing the above problems, the '879 patent discloses a waterproofing membrane that it asserts to have improved adhesion to post cast concrete (See, e.g., Col. 5 ll. 48-52; Col. 6 ll. 19-27); protects the underlying layers of the membrane from exposure to outdoor elements (See, e.g., Col. 6 ll. 19-21); minimizes the rate of degradation of the pressure sensitive adhesive by keeping it cooler and blocking UV (See, e.g., Col. 6 ll. 21-24); prevents 'blocking' (sticking) of membrane layers to one another, as well as eliminates the need for a removable release sheet (See, e.g., Col. 1 ll. 47-54, Col. 8 ll. 8-13).  The '879 patent discloses that all of these problems are overcome through use of substantially reflective inorganic particles of a particular diameter size, including various forms of white cement (See, e.g., Col. 6 ll. 19-41).

Since the '879 patent broadly teaches known waterproofing membranes in its background section that include both pre-applied and post-applied waterproofing membranes, and looks to these prior art patents for solutions and reference in deriving the invention of the '879 patent, it is my opinion that a POSITA at a time prior to filing the '879 patent would turn to additional like-references that broadly teach waterproofing membranes, in both pre-applied and post-applied applications, for solutions to the above discussed problems of the then known waterproofing membranes. These like-references would disclose and/or teach methods and materials that provide strong bonds between a waterproofing membrane and concrete cast against its surface, protect one or more layers of the waterproofing membrane from detrimental environmental conditions (e.g., protect the adhesive layer from exposure to sunlight/UV), eliminate blocking, as well as eliminate the need for use of a removable release sheet.

In overcoming the above problems, the '879 patent describes waterproofing membranes having a flexible carrier sheet, a pressure sensitive adhesive, and inorganic reflective particles adhered to the pressure sensitive adhesive. The inorganic particles have an average diameter equal to or greater than the average thickness of the adhesive layer, such that the inorganic particles protrude above and protect the adhesive layer while providing the membrane with a surface that will not adhere to the carrier surface when the membrane is rolled up, eliminating the need for a release sheet. The inorganic reflective particles cover at least approximately 70% of the outer exposed surface of the adhesive layer to provide a substantially reflective surface on the membrane, exhibiting a whiteness value greater than 55%. This substantially reflective surface provided by the inorganic reflective particles protects the pressure sensitive adhesive layer from degradation by sunlight and facilitates bonding of post-cast concrete thereto.  The '879 patent also includes claims directed to use of such membranes including casting concrete against the reflective particles of the membrane.

The '879 patent has 17 claims. I have been advised that the plaintiff has identified at least independent claims 1 and 15 as the asserted claims in this case. These claims read as follows:

1.  A waterproofing **membrane** comprising:
   a **flexible carrier sheet** with two opposed surfaces,
   an approximately uniform layer of a **waterproofing pressure sensitive adhesive** on one surface of the carrier sheet such that the pressure sensitive adhesive has an average thickness in the range of 75 µm to 500 µm and has an **outer exposed surface**, and **substantially reflective inorganic particles** adhered directly to the outer exposed surface of the pressure sensitive adhesive,
wherein the substantially reflective inorganic particles have an average diameter of about 100 µm (3.9 mils) to about 600 µm (24 mils) that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer,
wherein the **substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive** so as to provide the membrane with a **substantially reflective surface**, and
wherein the waterproofing membrane does not include a **removable release sheet**.

15.  A method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane.

I understand that the court construed the following phrases in independent claim 1 of the '879 patent. I have considered these constructions in my analysis:

| Phrase | Court's Construction |
|---|---|
| **"membrane"** | "a thin pliable sheet of material forming a barrier or lining." |
| **"flexible carrier sheet"** | "a thin film, extrusion coating, or fabric that is the mechanical backbone of the membrane." |
| **"waterproofing pressure sensitive adhesive"** | plain and ordinary meaning |
| **"outer exposed surface"** | "the surface of the layer of the adhesive opposite the surface that is bonded to the carrier sheet and is accessible to have concrete cast directly against it." |
| **"substantially reflective inorganic particles"** | "inorganic particles that, when covering 70-100% of the surface of a layer of pressure sensitive adhesive, impart a minimum whiteness value to the surface as measured by reflectometry." |
| **"substantially reflective surface"** | "the outer exposed layer of the pressure sensitive adhesive, 70-100% covered by substantially reflective inorganic particles, so as |

| | to exhibit a whiteness value of greater than 55% as measured by reflectometry." |
|---|---|
| **"substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive"** | "70-100% of the surface area of the outer exposed surface of the pressure sensitive adhesive is coated with the particles, as measured by electron microscopy" |
| **"removable release sheet"** | "a film or paper that covers the outer exposed adhesive layer in whole or in large part to prevent that layer from adhering to the carrier sheet of the membrane when the membrane is rolled up." |

## VIII.   STATEMENT AND BASIS FOR MY OPINIONS

### A.  Summary of Opinions

Having considered the asserted patent, the prior art, the law as it was explained to me, and the other materials referenced in this report, it is my opinion claims 1 and 15 of the '879 patent are invalid due to anticipation and/or obviousness based on the various prior art references, alone or in any combination, discussed herein below.

### B.  Anticipation by Serwin

I have been informed by attorneys for AVM that in order to render a claim invalid as anticipated, a single prior art reference must expressly or inherently disclose each claim limitation. It is also my understanding that a prior art reference may anticipate an article or apparatus patent claim if it describes an article or apparatus that falls within the limitations of the claim, even if the article or apparatus is intended to be used for a purpose different from that of the claimed invention. Still further, my understanding is the question of whether a reference is analogous art is not relevant to whether that reference anticipates, and that such a reference, even if directed to a different problem than the one addressed by the inventor or from a different field of endeavor than that of the claimed invention, may still be anticipatory if it explicitly or inherently discloses every limitation recited in the claims. (See, Appendix D.)

Serwin is relevant prior art as it is directed to sandwich-like composite structures having dense and compact configurations that "effectively hamper the ingression of water".  That is, Serwin teaches composite constructions (i.e., membranes) suitable for use as a waterproofing membrane. It is also my opinion, that based on the prior art disclosed in the '879 patent covering both pre-applied and post-applied waterproofing membranes and the problems addressed by the '879 patent, Serwin is relevant prior art as a 'like-reference' teaching methods and materials for improving adhesion of a waterproofing membrane to concrete poured/cast against it.

Based on my review, Serwin discloses waterproofing membranes/composites including a plate, a contact layer, and an inorganic layer, whereby the inorganic layer is so dense and compact that it will "effectively hamper the ingression of water" hence, resulting in a waterproofing

membrane/composite. While Serwin describes its composites in connection with a preferred embodiment arranged on steel plates, it also expressly discloses that in alternate embodiments the plate may be a polymer-plate, a plastic, or a semi-flexible surface with corresponding effects in tension. As for Serwin's plate comprising a polymer-plate or a plastic, the '879 patent discloses that at a time prior to the filing of the '879 patent application, membranes having a flexible carrier sheet were well known  (See, e.g., background section of '879 patent, and admitted prior art Wiercinski '520 at Col. 5, ll. 13-17). Also, in connection with Serwin teaching that its plate may be a semi-flexible surface, the term 'semi-flexible' inherently possesses some degree of flexibility, such that, in the broadest reading and understanding thereof, an item that is 'semi-flexible' is inherently a flexible item.  Based on the foregoing, it is my opinion that Serwin teaches that its plate may be flexible.

Serwin also discloses that its contact layer 5 resides on one surface of its plate. Referring to Fig. 2 of Serwin (replicated below), this contact layer is depicted as an approximately uniform contact layer 5 with rock particles 7 embedded therein. Serwin discloses that the contact layer 5 may be an epoxy, polyurethane, acrylic based material, or any material that provides the necessary adhesion between the layers. At least dependent claim 14 of the '879 patent teaches that the claimed waterproofing pressure sensitive adhesive may be an acrylic based adhesive. As such, with the '879 patent teaching that its pressure sensitive adhesive may be an acrylic based adhesive, and Serwin teaches its contact layer may be an acrylic based material, it is my opinion that Serwin teaches the claimed limitation of 'waterproofing pressure sensitive adhesive'.  Further, the background section of the '879 patent teaches that it was known that waterproofing membranes had a pressure sensitive adhesive on a carrier sheet. The contact adhesive layer in Serwin is disclosed as having a thickness between 0.2 mm and 5 mm (i.e., 200 µm to 5,000 µm), which falls within the claimed limitation of the pressure sensitive adhesive in the '879 patent having an average thickness in the range of 75 µm to 500 µm.  Also, Fig. 2 of Serwin below shows its contact layer 5 having an outer exposed surface, as is claimed in the asserted patent.



## Fig. 2

As for the limitation of 'substantially reflective inorganic particles' in the '879 patent, Serwin discloses that an inorganic layer of rock particles 7 are adhered directly to the outer exposed surface of the contact layer 5 (i.e., the pressure sensitive adhesive). (See, Fig. 2 above.)  Serwin discloses that these rock particles may be bauxite, quartz, granite, korund or similar type of strong aggregates. It is well known in the art that at least quartz and granite exist in a variety of colors, including white.  I have reviewed the Marceau publication, and based on my review thereof, it is my opinion that inorganic particle aggregates that are light in color have high solar reflectance (e.g., granite, quartz) and may have a high solar reflectance of 64% (e.g., in the case of white cement, thereby imparting a whiteness value) as measured by solar spectrum reflectometer (SSR). (See, Marceau, pg. 52, 54, 56 and Figs. 1, 2 and 5.)

I have been informed by attorneys for AVM that a claim limitation is "inherent" if it is "necessarily present" in the prior art, and that extrinsic evidence may be used to establish such inherency. It is my opinion that the extrinsic evidence of Marceau teaches that light-colored (e.g.,

white) particulates, such as light-colored granite and quartz, have high solar reflectance as measured by reflectometry (i.e., SSR), with white cement having a high solar reflectance of 64% as measured by SSR. Further the Moresova publication discloses that the whiteness degree of white cement may have a reflection coefficient minimum of 68 %, 75 %, or even 80%.  Based on my experience in the field, it is my interpretation that measures of solar reflectance and whiteness are similar in that they both measure a degree of reflectivity, with whiteness generally having measures slightly higher than measures of solar reflectivity (in some instances up to about 10% higher, or more), as evidenced by the Marceau and Moresova publications in combination disclosing whiteness values higher than solar reflectance values.

Since Serwin broadly teaches that its inorganic layer of rock particles 7 may be granite or quartz, without limitation to any color, it is inclusive of light-colored (e.g., white) granite and quartz. Accordingly, it is necessarily present in Serwin that the rock particles 7 may be inorganic particles of granite or quartz, which in accordance with Marceau inherently have high solar reflectance. That is, Serwin teaches highly reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive, as recited in the asserted claims of the '879 patent.

Further, Serwin discloses that the reflective inorganic rock particles 7 have a size between 0.5 mm to 8 mm (i.e., 500 μm to 8,000 μm), which is equal to or greater than the average thickness of the pressure sensitive adhesive ranging from 0.2 mm to 5 mm (i.e., 200 μm – 5,000 μm), as recited in the asserted claims. Serwin teaches the claimed limitation of its reflective inorganic rock particles having an average diameter of 100-600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer of 75-500 μm.

Serwin teaches that approximately the entire surface of its contact adhesive layer 5 is covered with the reflective inorganic rock particles 7 by way of applying a surplus amount thereof to the entire surface of adhesive layer 5. By teaching 'approximately the entire surface' is covered by reflective inorganic rock particles, it is my opinion that Serwin teaches almost all (i.e., nearly 100%) of the outer exposed surface of the contact adhesive layer is covered by the reflective inorganic rock particles. The basis for my opinion is derived from the literal text in Serwin.

With Serwin disclosing that almost all of its adhesive surface is covered with the reflective inorganic rock particles (i.e., nearly 100% of the surface is covered), it is inherent that the resultant membrane would have a substantially reflective surface.  It is my opinion that Serwin teaches the '879 claim limitation of "substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive".  Additionally, in view of pages 17 and 22 of the "Cool Roofs California Cool Roofs: A Snapshot of Installed Costs" publication and page 31 of the "2007 California Energy Code", as of 2006/2007 a POSITA would have known that "cool" roofing, particularly those white in color, were highly reflective and labeled by the Cool Roof Rating Council (CRRC) as having an initial solar reflectance of at least 0.70 (70%). Serwin inherently discloses a waterproofing membrane having a substantially reflective surface.

Based on my review of Serwin, I did not find that Serwin requires its waterproofing membrane/composite to have a removable release sheet. While Serwin does disclose a "curing membrane" or a "plastic sheet", they are indicated to be a "evaporation protective covering" applied over its inorganic material layer (i.e., the post-cast concrete layer).  Also, in my opinion and experience these layers are not equivalent to a removable release sheet. In my opinion, Serwin teaches that its waterproof membrane/composite do not have a removable release sheet, as claimed in independent claim 1 of the '879 Patent.

Based on my review and findings set forth herein, it is my opinion that Serwin discloses all of the limitations of claim 1 of the '879 Patent, either expressly or inherently, such that Serwin anticipates independent claim 1.

As for independent claim 15, it is directed to a method of waterproofing a concrete structure by applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane. For the reasons discussed above, it is my opinion that Serwin discloses all limitations recited in claim 1. As for the added limitation of casting concrete such that it contacts the substantially reflective particles of the membrane in independent claim 15, Serwin discloses that its waterproof membrane/composite composed of the plate, adhesive contact layer, and reflective inorganic rock particles embedded in the adhesive layer, may be further processed by casting an inorganic material comprising a binder, fine and coarse aggregate onto the surface (i.e., by casting a concrete product) and allowing the construction to cure. In view thereof, it is my opinion that Serwin discloses all of the limitations of claim 15 of the '879 Patent, either expressly or inherently, such that Serwin also anticipates independent claim 15.

In my opinion Serwin teaches waterproofing structures/membranes having waterproofing characteristics and features, whereby such composites are capable of waterproofing a substrate by applying the composite to such substrate (i.e., Serwin teaches waterproofing membranes). A POSITA, as defined above, would recognize Serwin's composites as being composed of a plate (carrier sheet) having two opposed surfaces, an approximately uniform layer of an adhesive contact layer on one surface of the plate, and reflective particles adhered directly to the outer exposed surface of the adhesive contact layer.

As for the carrier plate, a POSITA would have recognized that Serwin's plate/carrier sheet may be flexible as Serwin discloses that its plate may be a polymer-plate, a plastic, or a semi-flexible surface, all of which may have some degree of flexibility (i.e., they are 'flexible'). The '879 patent even teaches that membranes having flexible carrier sheets were well known in the art at the time of the invention, such that, a POSITA would have known that Serwin's plate/carrier sheet may be a flexible carrier sheet as claimed.

A POSITA would have also realized that the approximately uniform layer of adhesive contact layer of Serwin may include a waterproofing pressure sensitive adhesive as the '879 teaches that the claimed waterproofing pressure sensitive adhesive may be an acrylic based adhesive. Serwin teaches that its contact layer may be an acrylic based material (or any material that provides the necessary adhesion between the layers), such that, a POSITA would have recognized that Serwin's contact layer may be a waterproofing pressure sensitive adhesive as claimed in the asserted patent. The '879 patent also teaches that pressure sensitive adhesives were well known in the field of art.

As for the reflective particles, a POSITA would have recognized that Serwin discloses that its inorganic rock particles may be quartz or granite, which when light in color, are reflective inorganic particles. Looking to Marceau and/or Moresova, a POSITA would have been apprised that light-colored inorganic particles (e.g., granite, quartz, white cement) exhibit high solar reflectance and may have a high solar reflectance of 64% (e.g., in the case of white cement, thereby imparting a whiteness value) as measured by reflectometry. As such, a POSITA would have recognized that the rock particles of Serwin may be substantially or highly reflective inorganic particles that are adhered directly to the outer surface of the adhesive layer.

With Serwin teaching that approximately the entire surface of its adhesive layer is covered by the inorganic particles disclosed therein, in those waterproofing membrane/composite having

-10-

inorganic particles that are substantially or highly reflective (e.g., granite, quartz, white cement), a POSITA would have recognized that an adhesive layer that is almost entirely covered by such substantially/highly reflective inorganic materials would render a substantially reflective surface of the resultant membrane, as claimed.

For the reasons discussed above, in view of the background section of the '879 patent, a POSITA at the time of the '879 application already knew waterproofing membranes (for pre-applied and/or post-applied applications) may include a flexible carrier sheet, a pressure sensitive adhesive layer on the carrier sheet, and reflective inorganic particles on the adhesive layer. The '879 application identified problems associated with known waterproofing membranes including: poor adhesion of the membrane to concrete; degradation of the adhesive layer due to exposure to sunlight/UV; issues associated with blocking (sticking) of the membrane layers to one another when rolled; and issues with use of removable release sheets.

A POSITA addressing and looking for remedies to these problems would have looked to various waterproofing membrane and/or construction membrane published references that disclose and/or teach methods and materials for increasing adhesion of such membranes to concrete, protecting the underlying layers of the membrane (including the adhesive layer), and improving the overall workability and ease of use and installation of such membranes.

Serwin is a relevant prior art reference that identifies and addresses these issues including, for instance, strengthening weak bonds between a structure, membrane, and/or concrete (See, e.g., Col. 5 ll. 10-18),  preventing unwanted ingression of water into the membrane (See, e.g., Col. 1 ll. 61-67), avoid damage to layers of the membrane from external environmental exposures (See, e.g., Col. 2 ll. 5-7), and improving the overall workability and use of the membranes disclosed therein (See, e.g., Col. 3 ll. 49-57). In viewing Serwin, a POSITA would have recognized the teachings therein of providing a membrane construction comprising a flexible plate, a pressure sensitive adhesive contact layer, and a layer of reflective inorganic rock particles embedded in the adhesive contact layer, followed by providing a concrete material onto the reflective inorganic rock particles. In doing so, the inorganic rock particles would have been "half embedded in the [adhesive contact layer] and half embedded in the [concrete material] layer whereby an effective bond between the adhesive contact layer and cement is achieved" due to the embedded rock particles (Col. 5 ll. 10-18.)  Serwin teaches the membrane structure of the '879 patent. It also teaches a POSITA how to make such a membrane, without undue experimentation, by providing a pressure sensitive adhesive contact layer over a flexible plate, followed by half embedding highly reflective inorganic rock particles in the adhesive layer so that they cover nearly all the adhesive layer surface, which would provide the resultant membrane with a highly reflective surface that protects the underlying adhesive layer and bonds well to concrete cast against it.

In view of the foregoing, upon reviewing Serwin, a POSITA would have been placed in possession of the invention of the '879 patented, such that, Serwin anticipates asserted claims 1 and 15 and renders the '879 patent invalid.

### C. Anticipation by Fensel

It is my opinion that Fensel is relevant prior art as it discloses waterproof roofing and/or siding materials that may be secured to a roof, roof substrate, subroof, or "the side of a structure, the floor of a structure, a deck, a street, a sidewalk, a parking lot, a driveway, the ground, etc." (Fensel, Col. 21, ll. 43-51.)  The basis for my opinion is that the '879 patent includes roofing related patents cited as relevant prior art (see, e.g., U.S. Pat. Nos. 3,373,074; 8,104,245;

7,771,807), and the fact that Fensel teaches its waterproof materials may be secured to the ground, which would include the ground inside an excavation and a pre-applied application.

I have been informed by attorneys for AVM that a prior art reference may anticipate an article or apparatus patent claim if it describes an article or apparatus that falls within the limitations of the claim, even if the article or apparatus is not intended to be used for the exact purpose of the claimed invention.

Based on my review, it is my opinion that Fensel discloses composite membranes having a water-resistant layer rendering the disclosed membrane capable of waterproofing a structure. Fensel's membranes are composed of a base substrate (i.e., carrier sheet) having two opposing surfaces, an adhesive layer (i.e., pressure sensitive adhesive), and inorganic granules (i.e., substantially reflective inorganic particles) coated on the adhesive layer. Fensel discloses that its base substrate may be a sheet of plastic, and may be semi-rigid. In other words, it is my opinion that the semi-rigid base substrate must also have a certain amount of flexibility, thereby making it a semi-flexible base (carrier sheet). As discussed above in connection with Serwin, a semi-flexible structure is one that has a certain degree of flexibility, making it a flexible structure. Therefore, in my opinion Fensel teaches a base carrier sheet having a degree of flexibility, making it a flexible base carrier sheet.

In one embodiment of Fensel, referring to Fig. 3, the waterproofing membrane may be provided over substrate "R", which may be the ground (Col. 21 ll. 43-51). The waterproofing membrane includes a reinforcement material layer 24, an adhesive bituminous composition layer 22, and granules 26 adhered to the adhesive layer. An optional bottom layer of bituminous composition 25 is attached to the bottom of the reinforcement material layer 24. Fensel expressly discloses that the reinforcement material layer 24 may be between the top and bottom layers of bituminous layers 22, 25, however, "the bottom layer of bituminous composition can be eliminated" (Col. 22 ll. 2-8). In doing so, it is my opinion that when the substrate is the ground, the membrane comprising the reinforcement material layer 24, adhesive bituminous composition layer 22, and granules 26 adhered to the adhesive layer, is applied over such ground with the reinforcement material layer 24 making contact with the ground.

FIG. 3



In another embodiment, referring to Fig. 4 of Fensel, the adhesive layer 114 is applied to the top of one surface of the base substrate 112 as an approximately uniform layer in a thickness selected to meet the desired end use. It also discloses that the adhesive can be 'any type of adhesive desirable.' The '879 patent discloses waterproofing pressure sensitive adhesives were well known in the art for use in waterproofing membranes. Additionally, Fensel discloses that its adhesive layer 114 may be a polymer adhesive. The '879 patent discloses a list of various polymer and copolymer pressure sensitive adhesives. In view thereof, in combination with Fensel teaching use of any adhesive having any desired thickness suitable for the desired end use may be applied to one surface of the base carrier sheet, it is my opinion that Fensel inherently discloses a pressure

sensitive adhesive in a thickness range of 75 μm to 500 μm, as taught and claimed in claim 1 of the '879 Patent. Accordingly, in my opinion Fensel discloses these limitations.



FIG. 4

Fensel discloses inorganic granules 26/28 and 116/118 adhered directly to the adhesive layer with some granules being fully or partially embedded in the adhesive layer. The granules are disclosed as being composed of a highly reflective material that reflects most, if not all, of the sunlight that contacts the granules as shown by the arrows in Fig. 4 above. Claims of Fensel disclose that the highly reflective granules are non-coated granules having a generally white color. While Fensel discloses that the highly reflective granules may have any size to meet the desired end use, including varying shapes and sizes, Fig. 4 shows that the highly reflective granules 116, 118 have a thickness that is approximately equal to or greater than the thickness of the adhesive layer, as in claim 1. In view of Bartlett '615 (cited during prosecution of the '879 patent) teaching adhesive thickness of 127 μm to 2032 μm in combination with the granules 116, 118 of Fensel shown as equal to or greater than the adhesive layer thickness in Fig. 4, it is my opinion that Fensel inherently teaches highly reflective inorganic particles having an average diameter of about 100 μm to about 600 μm. That is, Fensel discloses the claimed limitation of substantially reflective inorganic particles adhered to the adhesive, and having an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer.

The highly reflective inorganic granules 116, 118 (which are preferably white in color) of Fensel are disclosed as covering most, if not all, of the upper surface of adhesive layer 114, with about 95%, or more, of the adhesive layer covered with the highly reflective inorganic particles. It is my opinion that Fensel discloses the claimed limitation of the reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive. Since the highly reflective inorganic granules cover almost all of the adhesive surface, it is inherent that Fensel's waterproofing membrane/composite has a highly reflective surface. In fact, Fensel expressly teaches that the highly reflective granules provide a structure surface with increased reflectivity ranging from over about 30 to about 99.9%, with many tighter reflectivity ranges therebetween (e.g., 35-99.9%, 50-99.9%, 55-95%, 65-95%, etc.). It is taught that this top layer of highly reflective inorganic particles greatly increases surface reflectivity of the composite to prevent most, if not all, of the sunlight directed toward the structure from contacting and/or being absorbed by the underlying layers (i.e., the adhesive and base carrier sheet). That is, Fensel's highly reflective surface provided by the highly reflective granules protects the underlying layers from sunlight, reduces surface temperature of the composite, and reduces the rate of degradation of the underlying adhesive layer. It is my opinion these disclosures of Fensel read on the limitations of claim 1.

As for the limitation of the waterproofing membrane not including a removable release sheet, Fensel does not disclose or require its membrane to have a removable release sheet. In view thereof, it is my opinion Fensel also discloses this claim limitation.

It is my opinion that a POSITA, would have looked to Fensel as relevant prior art. Again, the '879 patent teaches that at the time of filing the '879 application, waterproofing membranes (pre- and/or post-applied) having a flexible carrier sheet, a pressure sensitive adhesive layer on the carrier sheet, and reflective inorganic particles on the adhesive layer were known. Without undue experimentation, upon reviewing Fensel a POSITA would be able to make the invention of the '879 patent by adhering the highly reflective inorganic granules 116, 118 directly to the adhesive layer with some granules being fully or partially embedded in the adhesive layer, thereby being in possession of the invention. The thickness of the adhesive layer and size of the inorganic granules of Fensel inherently fall within the claimed range in claim 1.  In view of Fensel a POSITA would also know to cover most, if not all, of the upper surface of adhesive layer with the reflective inorganic granules to provide a highly reflective surface of the resultant membrane (i.e., surface reflectivity ranging from 30 to about 99.9%, …55-95%, 65-95%, etc.).  In making the membrane taught by Fensel, using the known materials taught by the '879 patent, the highly reflective surface of the membrane would prevent most, if not all, of the sunlight directed toward the membrane from contacting and/or being absorbed by the underlying adhesive layer. In doing so, such formed membrane with its highly reflective surface would prevent degradation of the adhesive layer due to exposure to sunlight/UV, which is one of the problems addressed by the '879 patent.

In view of the foregoing, a POSITA would recognize Fensel as relevant prior art that discloses all of the limitations set forth in independent claim 1, expressly or inherently, thereby invalidating the '879 patent by anticipation. In my opinion, Fensel renders all of the asserted claims of the '879 patent invalid.

## D. Obviousness Due to Serwin and/or Fensel in combination with Metzler and Wiercinski '520

As discussed above, it is my opinion that Serwin and Fensel, either expressly or inherently, disclose waterproofing membranes that include all of the limitations set forth in claim 1 of the '879 patent, and Serwin discloses all of the limitations of independent claim 1 and 15. While I have opined that various claimed features are inherent in Serwin and/or Fensel, rendering claims 1 and 15 of the '879 patent invalid, it is also my opinion that these features are further found in the relevant prior art references of Metzler and/or Wiercinski '520.

Serwin and Fensel are relevant prior art references as both are directed to waterproofing membranes and address similar problems in the art that the '879 patent is aimed at overcoming. Again, in the background section of the '879 patent it is disclosed that at a time well before the filing of the '879 application, waterproofing membranes (for pre-applied and/or post-applied applications) having a flexible carrier sheet, a pressure sensitive adhesive layer on the carrier sheet, and reflective inorganic particles on the adhesive layer were well known.

In addition to the above, based on a reviewing of Serwin, a POSITA would have recognized that Serwin further discloses highly reflective inorganic rock particles half embedded in the adhesive contact layer (which inherently may have been a pressure sensitive adhesive in view of the '879 background). A POSITA would have further recognized that Serwin teaches nearly the entire adhesive layer surface is covered by these highly reflective inorganic rock particles, such that, the membrane would be provided with a highly reflective surface protecting the underlying adhesive layer and enhancing bonding to concrete cast against it.

Further in addition to above, based on a review of Fensel at the time of the invention, a POSITA would have recognized that Fensel discloses highly reflective inorganic granules (average reflectivity of the granules ranges from about 35-99.9%) fully or partially embedded in the

adhesive layer, providing the membrane with a highly reflective surface to reduce temperature gain by reflecting sunlight. Fensel discloses that its inorganic granules may be white granules. The highly reflective inorganic granules cover about 95%, or more, of the adhesive layer in Fensel, so that the surface of the membrane has a highly reflective surface to protect the underlying layers from sunlight and reduce the rate of degradation of the underlying adhesive layer. It teaches high reflective surfaces of the resultant membrane having reflectivity ranging from 30 to about 99.9%, up to 55-95%, 65-95%, and more.

In my opinion Metzler is relevant prior art as it relates to a reflective concrete body and, like that of the '879 patent, it is aimed at increasing the surface reflectivity thereof. Metzler focuses on types of materials/particles that provide increased reflectivity, with the preferred reflective material/particles being white in color, particularly, white Portland cement and white quartz filler. It discloses that the reflective surface has a white coloring.  The preferred particles have a diameter of 200μm - 6,000μm (7.9-236 mils), and are 50% exposed outside the adhesive layer so that such exposed portion is anchored into concrete cast against it.

Wiercinski '520 is relevant prior art as it is directed to articles having pressure sensitive adhesive surfaces having inorganic particulate coatings. Wiercinski '520 is also relevant as it was a cited prior art reference in the '879 patent. Wiercinski '520 teaches that prior to the invention of the '879 patent, it was known that waterproofing membranes included a flexible carrier sheet (e.g., a cross-laminated high density polyethylene), with a pressure-sensitive adhesive on one side thereof, and an inorganic particulate coating on the adhesive that react with cast cementitious materials. Wiercinski '520 teaches that the adhesive layer is a pressure-sensitive waterproofing adhesive layer having a thickness of 2-75 mils (i.e., 50.8 μm to 1905 μm), and the inorganic particles have a size of 5 to 100 microns (0.2-3.9 mils). As such, based on the outer measures of these ranges, it would be obvious to a POSITA that by adhering 100 micron (3.9 mils) sized inorganic particulates to a pressure-sensitive adhesive having an average thickness of 50.8 μm across such layer, results in inorganic particulates having average diameter that is greater than the average thickness of the pressure sensitive adhesive layer, as recited in claim 1. As shown in Fig. 1 below, Wiercinski '520 discloses that its membrane may include a carrier support sheet 16 with a pressure sensitive waterproofing adhesive layer 12 on a surface thereof, and a separate contiguous layer of granulated particulate or pozzolanic material 14 adhered to the adhesive layer 12. The particles of Wiercinski '520 may be coated or embedded into the waterproofing adhesive layer. Figure 1 of Wiercinski '520 shows up to 100% of the surface covered. Wiercinski '520 does not require its waterproofing membranes/composites to have a removable release sheet.



*Fig. 1*

In my opinion it would have been obvious to a POSITA, at a time prior to the '879 application, to combine Serwin and/or Fensel with Metzler and Wiercinski '520, alone or in combination. All references are directed to composite membranes for use in pre- and post-applied applications. Based on the disclosures of these references, a POSITA would have reason to combine Serwin, Fensel, Metzler, and Wiercinski '520, as each reference is at least aimed at

protecting underlying layers of the respective membranes and substrates they are attached to (e.g., by preventing such layers from being exposed to detrimental environment conditions).   For instance, Serwin teaches membranes having layers that both prevent water ingress into underlying layer(s) and enhance adhesion to concrete cast against it. Fensel teaches membranes having a highly reflective top surface that reduces thermal gain due to sunlight/UV exposure, thereby protecting the underlying layers (i.e., the adhesive layer). Both Metzler and Wiercinski '520 teach membranes having top layers that have increased surface reflectivity to both protect the underlying membrane layers as well as enhance adhesion of the membrane to concrete or a cementitious material cast against it.

For the reasons discussed above, in view of the background section of the '879 patent, a POSITA at the time of the '879 application already knew waterproofing membranes (for pre-applied and/or post-applied applications) may include a flexible carrier sheet, a pressure sensitive adhesive layer on the carrier sheet, and reflective inorganic particles on the adhesive layer. The '879 application identified problems associated with known waterproofing membranes including: poor adhesion of the membrane to concrete; degradation of the adhesive layer due to exposure to sunlight/UV; issues associated with blocking (sticking) of the membrane layers to one another when rolled; and issues with use of removable release sheets.

The motivation to combine is based in part on the fact that a POSITA would recognize Serwin, Fensel, Metzler, and Wiercinski '520, alone or in various combinations thereof, disclose all limitations set forth in claims 1 and 15 of the '879 patent. With the known problems in the prior art, a POSITA would have been able to identify solutions to such problems in the prior art discussed herein and below, and combine these references in various combinations thereof, with reasonable certainty and success in achieving the claimed invention of the '879 patent. As for independent claims 1 and 15 of the '879 patent, a POSITA would recognize that the below references, in various combinations thereof, teach ***a waterproofing membrane and casting concrete against it, comprising***:

a. ***a flexible carrier sheet with two opposed surfaces:***
Wiercinski '520: waterproofing membranes including a flexible carrier sheet, Serwin: a semi-flexible plate; Fensel: base substrate having some degree of flexibility;

b. ***an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet:***
Wiercinski '520: a pressure-sensitive adhesive on a flexible carrier sheet, Serwin: acrylic based adhesives (i.e., pressure sensitive adhesives); Fensel: a polymer adhesive (i.e., pressure sensitive adhesive);

c. ***the pressure sensitive adhesive has an average thickness in the range of 75 μm to 500 μm and has an outer exposed surface:***
Wiercinski '520: thickness of 50.8 μm to 1905 μm, Serwin: thickness 200 μm to 5,000 μm; Fensel: any thickness (e.g., adhesive in a thickness range of 75 μm to 500 μm);

d. ***substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive:***
Fensel: inorganic granules of a highly reflective material that is fully or partially embedded in the adhesive layer, Wiercinski '520: inorganic particulates coated on the

-16-

adhesive, Serwin: inorganic quartz and/or granite rock particles (inherently highly reflective) on and embedded in the adhesive layer;

e.   *the substantially reflective inorganic particles have an average diameter of about 100 µm to about 600 µm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer:*
     Wiercinski '520: 5 to 100 microns (2-75 mils), Serwin: between 500 µm to 8,000 µm; Fensel: any diameter (e.g., about 100 µm to about 600 µm); --both of which are equal to or greater than the adhesive average thickness of 75 µm to 500 µm;

f.   *the substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface:*
     Fensel: highly reflective inorganic granules covering about 95%, or more, of the adhesive layer providing increased reflectivity ranging from over about 30 to about 99.9% to prevent most, if not all, of the sunlight directed toward the structure from contacting and/or being absorbed by the underlying layers, Wiercinski '520: Figure 1 shows up to 100% of the surface covered with inorganic particulates (e.g., pozzolans, pozzolanic type materials, aluminum oxide trihydrate), Serwin: entire surface of the adhesive layer is covered with reflective inorganic rock particles;

g.   *the waterproofing membrane does not include a removable release sheet:*
     the waterproofing membranes disclosed in each Wiercinski '520, Serwin, and Fensel do not include or require a removable release sheet; and

h.   *method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane:*
     Wiercinski '520: inorganic particulates react with hydratable cementitious materials cast against it to enhance adhesion thereof, Serwin: composite membrane/construction may be further processed by casting a cementitious composition against it.

The motivation to combine is based on the fact that a POSITA would recognize that waterproofing membranes were continually being improved upon to include layers that not only protected the underlying layering of the membrane itself or the substrate to which the membrane is attached, but also provide a stronger bond with concrete cast against it. In view of Wiercinski '520 it was known that waterproofing membranes included a flexible carrier sheet, a pressure-sensitive adhesive in a thickness of 50.8 µm to 1905 µm on the flexible carrier sheet, and inorganic particles having diameters of about 100 µm to about 600 µm adhered directly to the outer exposed surface of the pressure sensitive adhesive. Wiercinski '520 also discloses that the inorganic particles cover up to 100% of the exposed pressure sensitive adhesive surface.

Serwin, Metzler and Wiercinski '520 all disclose top layers of their respective membranes that enhance adhesion of concrete cast against such membranes. Wiercinski '520 discloses various inorganic particle materials, while Serwin and Metzler both disclose reflective inorganic particles that may be white or light-colored. All of the top protective inorganic particulate layers of Serwin, Metzler and Wiercinski '520 protect one or more underlayers of the membrane, such as, the

adhesive layer -in addition to providing enhanced adhesion to cast concrete.  Fensel and Serwin also disclose inorganic particles attached to the adhesive layer that protect underlying membrane layers.  Serwin's inorganic particles are inherently reflective inorganic particles, while Fensel expressly teaches highly reflective inorganic particles fully or partially embedded in the adhesive layer.

Since these prior art references teach highly reflective inorganic particles that both protect underlying membrane layers and enhance adhesion to cast concrete, a POSITA at the time of the invention would have found it obvious to combine such references to render a membrane as disclosed in claims 1 and 15 of the '879 patent.  These references show that there is a reasonable probability of success that providing a structure having inorganic reflective particles on a surface of a pressure-sensitive adhesive would increase the reflectivity of the surface of such structure. A POSITA would have had reason and/or motivation to combine these references as they provide one or more predictable solutions or established functions directed to related problems as identified in these prior art references as well as in the '879 patent. The benefit would be in providing a waterproofing membrane having a highly reflective surface that would not require a removable release sheet and enhance adhesion of such a membrane to post cast concrete.

Based on my review of these references, it is my opinion that Serwin, Fensel, Metzler, and Wiercinski '520, alone or in combinations thereof, disclose all limitations set forth in claims 1 and 15 of the '879 patent, thereby rendering the asserted claims of the '879 patent obvious. It is my opinion that independent claims 1 and 15, and all claims dependent thereon, are invalid as obvious over Serwin, Fensel, Wiercinski and/or Metzler, alone or in any combination thereof.

### E.  Obviousness Due to Serwin, Fensel, Metzler, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, Wiercinski '659, Seth '171, Wiercinski '397 Pat. Pub., Tajima '640, and Getlichermann '996 Pat. Pub., Jacobs '251 Pat. Pub., Bartek '270, Aschenbeck '408, and the Whiting publication, alone or in any combinations thereof.

As discussed in detail above, Serwin, Fensel, Metzler, and Wiercinski '520, alone or in combinations thereof, disclose all limitations set forth in claims 1 and 15 of the '879 patent rendering such claims obvious. The below discussed additional prior art references further render the asserted claims of the '879 patent obvious alone or in combination with Serwin, Fensel, Metzler, and/or Wiercinski '520.

In my opinion it would have been obvious to a POSITA, at a time prior to the '879 application, to combine one or more of Serwin, Fensel, Metzler, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Seth '171, Wiercinski '397 Pat. Pub., Tajima '640, and Getlichermann '996 Pat. Pub., Jacobs '251 Pat. Pub., Bartek '270, Aschenbeck '408, and the Whiting publication, alone or in any combinations thereof, in view of the Wiercinski Deposition Testimony, Wiercinski '659 and/or the Preprufe® 300R/160R Tested Products.

In connection with the Preprufe® 300R/160R Tested Products, on September 13, 2021, I reviewed and tested products labeled as Preprufe® 160R and Preprufe® 300R that were sent to AVM's warehouse.  Upon speaking with Paul Miller, Vice President of AVM Industries, Inc., ("AVM") he told and confirmed to me that the Preprufe® 160R and Preprufe® 300R products received by AVM looked the same as the original Preprufe® 160R and Preprufe® 300R products sold before February 8, 2009. Paul Miller also told and confirmed to me that the Preprufe® 160R and Preprufe® 300R products received by AVM appeared to have the same reflectivity and

whiteness as the original Preprufe® 160R and Preprufe® 300R products sold before February 8, 2009.

Also on September 13, 2021, I tested the Preprufe® 160R and Preprufe® 300R products received by AVM by measuring reflectivity of both products using a Novo-Shade Reflectometer outdoors in the shade.  The test parameters included measuring reflectivity at 5 (five) incremental feet locations along the length of the unrolled product, release sheet removed.  At each location, reflectivity readings were obtained at 5 (five) different spots across the sheet at each location. These readings were averaged to provide an average reflectivity reading for each 5-feet incremental location. The reflectivity for these 5-feet incremental locations were averaged to provide an overall average reflectivity reading of the membrane product.

I measured and calculated averaged reflectivity readings for the 5 different locations along the length of the PrePrufe 160R product as follows:  77.5, 77.5, 77.2, 76.9, 76.6; with an overall average reflectivity reading of the PrePrufe 160R product of 77.1.  I also measured and calculated averaged reflectivity readings for the 5 different locations along the length of the PrePrufe 300R product as follows: 80.3, 79.8, 80.1, 80, 80.3; with an overall average reflectivity reading of the PrePrufe 300R product of 80.1.  (See, Appendix E.)

In reviewing the above references, it is my opinion that a POSITA would have had motivation to combine such references based on the fact that a POSITA would recognize that all of these references are relevant prior art as each is directed to waterproofing membranes in the construction field, and address one or more of the problems identified in the '879 patent and provide solutions thereto.  These solutions include one or more of:  improving adhesion of the membrane to post cast concrete, preventing degradation of the adhesive layer due to exposure to sunlight/UV, eliminating blocking (sticking) of the membrane layers to one another when rolled, and improving the overall workability and ease of use and installation of such membranes. A POSITA addressing and looking for remedies to the problems identified in the '879 patent would have looked to various waterproofing membrane patents/publications, construction field related publications, as well as waterproofing membrane products sold prior to the critical date of the '879 application that disclose and/or teach methods and materials for increasing adhesion of waterproofing membranes to concrete, protecting the underlying layers of the membrane (including the adhesive layer), and improving the overall workability and ease of use and installation of such membranes.

It is my opinion that a POSITA would have recognized that all of the prior art references discussed herein are citable prior art references to the '879 patent disclosing solutions, products and/or methods to the problems identified in the '879 patent. A POSITA would have been motivated to combine the references discussed herein to render the invention of the '879 patent. My opinion is based on the fact that a POSITA would recognize Serwin, Fensel, Metzler, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, Wiercinski '659, Seth '171, Wiercinski '397 Pat. Pub., Tajima '640, and Getlichermann '996 Pat. Pub., Jacobs '251 Pat. Pub., Bartek '270, Aschenbeck '408, and the Whiting publication, alone or in any combination thereof, disclose all limitations set forth in claims 1 and 15 of the '879 patent in various combinations as set forth below.  A POSITA would have had reason and/or motivation to combine these references as they provide one or more predictable solutions or established functions directed to related problems as identified in these prior art references as well as in the '879 patent.

The reasoning and/or motivation come from the references discussed herein disclosing all of the limitations of the asserted claims of the '879 patent as set forth below. With respect to

-19-

independent claims 1 and 15 of the '879 patent, the below references in combination teach *a waterproofing membrane* (Preprufe® 300R/160R Technical Datasheets: discloses pre-applied waterproofing membranes, Preprufe® 300R/160R Tested Products: are waterproofing membranes, Wiercinski '659: pre-formed waterproofing membranes were known, Seth '171: teaches a membrane having a waterproofing adhesive layer, Wiercinski '397 Pat. Pub.: membrane adapted for exposure to wet conditions, Getlichermann, '996 Pat. Pub: discloses a waterproofing membrane, Tajima '640: multi-layer laminates suitable for use in waterproofing work) *and casting concrete against it, comprising*:

**a.** *a flexible carrier sheet with two opposed surfaces:*
Wiercinski Dep. Testimony: original Preprufe [300R/160R] product had a carrier sheet, Preprufe® 300R/160R Tested Products: include a carrier sheet, Wiercinski '659: flexible substrate having a first and second major surfaces, Seth '171: waterproofing membrane comprises a carrier support sheet having first and second major opposing faces, Wiercinski '397 Pat. Pub.: underlayment includes a support layer, Tajima '640: multi-layer laminate includes a base sheet that is flexible (e.g., film, non-woven, etc.);

**b.** *an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet:*
Wiercinski Dep. Testimony: original Preprufe product had a pressure-sensitive waterproofing adhesive; Preprufe® 300R/160R Tested Products: have an approximately uniform layer of pressure-sensitive waterproofing adhesive on carrier sheet, Seth '171: continuous pressure-sensitive waterproofing adhesive layer attached to carrier support sheet, Wiercinski '397 Pat. Pub.: a pressure sensitive adhesive on the support layer, Wiercinski '659: modified bitumen pressure sensitive adhesive affixed to flexible substrate, Jacobs '251 Pat. Pub.: pressure sensitive adhesive employed in securing light reflecting particles;

**c.** *the pressure sensitive adhesive has an average thickness in the range of 75 μm to 500 μm and has an outer exposed surface:*
Wiercinski Dep. Testimony:  original Preprufe 300R and Preprufe 160R have approximately 15 mils of pressure-sensitive adhesive (381 microns), Seth '171: adhesive layer may be 10-150 mils (250 microns to 3810 microns);

**d.** *substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive:*
Wiercinski Dep. Testimony: original Preprufe product third layer had reflectivity greater than or equal to 55 percent as measured by a reflectometer, Preprufe® 300R/160R Technical Datasheets: membranes are solar reflective to reduce temperature gain, Preprufe® 300R/160R Tested Products: PrePrufe 160R: 77.1% reflectance and PrePrufe 300R: 80.1% reflectance, Jacobs '251 Pat. Pub.: discloses cool granules such as inorganic materials (e.g., titanium dioxide which yields a white appearance) are reflective, Seth '171: discrete particle layer on top of or partially embedded into an adhesive layer for protecting such adhesive layer, Getlichermann, '996 Pat. Pub: titanium dioxide, an appropriate

reflective substance, on structure surface, white colour of the substance obtained by the presence of TiO$_2$ provides excellent anti-reflective properties to the coating;

**e.** ***the substantially reflective inorganic particles have an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer:***
Wiercinski '397 Pat. Pub.: inorganic particle size of 100 microns (3.9 mils) over pressure sensitive adhesive layer having thickness up to 10 microns (0.4 mils)  - inorganic particles are greater than the average thickness of the pressure sensitive adhesive layer, Jacobs '251 Pat. Pub.: inorganic granules having a mean size of 100 microns to 5,000 microns (3.9 - 197 mils);

**f.** ***the substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface:***
Wiercinski Dep. Testimony: original Preprufe 300R/160R products had a third layer comprising a white inorganic protective coating over the pressure-sensitive adhesive providing the membranes with a reflectivity greater than or equal to 55 percent as measured by a reflectometer, Preprufe® 300R/160R Technical Datasheets: outer exposed surface of membrane is white in color providing membrane with solar reflectance to reduce temperature gain, Preprufe® 300R/160R Tested Products: PrePrufe 160R: 77.1% reflectance and PrePrufe 300R: 80.1% reflectance, Getlichermann, '996 Pat. Pub: Membrane having top coating layer containing titanium dioxide that provides the membrane with high reflectance (85% visible light reflectance, 95% IR reflectance) and high whiteness (from 83.97 to 95.28), Wiercinski '659: white woven polyolefin layer having high reflectance entirely covering adhesive layer to provide the membrane with a reflective to highly reflective surface, the white woven polyolefin layer keeps the adhesive cooler to retard degradation when exposed to sunlight, Wiercinski '397 Pat. Pub.: textured particles covering at least about 95 percent of the adhesive layer and protruding from the surface of the adhesive layer (i.e., "textured"), Bartek '270: top layer of inorganic particles (granules, talc, sand, etc.) on a highly reflective thermoplastic elastomeric sheet layer having a measured Initial Solar Reflectance greater than or equal to 65%, Aschenbeck '408: layer of inorganic rock granules embedded in the top surface layer having a high reflectivity that is defined by a solar reflectance of at least 70% as measured by reflectometry, Jacobs '251 Pat. Pub.: light reflecting particulate layer containing about 99.95 to about 70 weight percent inorganic granules, reflection of solar energy is accomplished using white or light-colored roofs, Whiting publication: white-pigmented materials with high reflectivity minimize temperature gain from solar radiation, Seth '171:  discrete inorganic particle layer roll pressed onto and embedding int the waterproofing adhesive layer; and

**g.** ***the waterproofing membrane does not include a removable release sheet:***
Wiercinski '397 Pat. Pub.: discloses sheet-like underlayment having a textured coating of inorganic particles extending out of an adhesive layer whereby the texturing prevents "blocking" (sticking) when the underlayment is in a roll and provides for easy unrolling,

also discloses blocking was enhanced for membranes having the inorganic particles providing "texture" to the surface of the acrylic pressure sensitive adhesive; Seth '171: Discloses using a release sheet to form an intermediate waterproofing membrane having a carrier support sheet, waterproofing adhesive layer, protective polymer coating and a release sheet, and then removing and discarding the release sheet before making the final waterproofing laminate by molding (e.g., thermoforming) the membrane into a three-dimensional profile in the shape of domes that are capable of being stacked on top of each other for shipping/transport; and

h.  *method of waterproofing a concrete structure comprising applying to a substrate the waterproofing membrane of claim 1, and casting concrete such that it contacts the substantially reflective particles of the membrane:*
Seth '171: discloses waterproofing systems intended to bond with fresh cementitious compositions that are cast against them and allowed to harden, provides strong bond with post cast concrete.

Again, in view of the background section of the '879 patent, a POSITA at the time of the '879 application already knew waterproofing membranes (for pre-applied and/or post-applied applications) included a flexible carrier sheet, a pressure sensitive adhesive layer on the carrier sheet, and reflective inorganic particles on the adhesive layer. The '879 application identified problems associated with known waterproofing membranes including: poor adhesion of the membrane to concrete; degradation of the adhesive layer due to exposure to sunlight/UV; issues associated with blocking (sticking) of the membrane layers to one another when rolled; and issues with use of removable release sheets.

As discussed in detail in the previous section, Serwin, Fensel, Metzler and/or Wiercinski '520, alone or in combinations, disclose top layers of their respective membranes that enhance adhesion of concrete cast against such membranes. These top layers are disclosed (individually or in combination of these references) as having highly reflective inorganic particles (white or light in color) that are partially embedded in a layer of pressure-sensitive adhesive so that a part of the particles extend out of the adhesive layer. GCP's own prior art refences, Wiercinski '520, teaches a waterproofing membrane including a flexible carrier sheet, a pressure-sensitive adhesive may be in a thickness of 50.8 μm to 1905 μm on the flexible carrier sheet, and inorganic particles having diameters of about 100 μm to about 600 μm adhered directly to the outer exposed surface of the pressure sensitive adhesive. Wiercinski '520 also discloses that the inorganic particles cover up to 100% of the exposed pressure sensitive adhesive surface. Wiercinski '520, Fensel and Metzler teach membranes having top layers that have increased surface reflectivity to reduce thermal gain due to sunlight/UV exposure, thereby protecting underlying membrane layers and enhancing adhesion of the membrane to concrete cast against it.

Additional prior art references owned by GCP, and its predecessor, also disclose many limitations set forth in the asserted claims.  For instance, as discussed above, Wiercinski '659, Seth '171, and Wiercinski '397 Pat. Pub. all discloses a flexible carrier sheet with two opposed surfaces (See also, Tajima '640 for this limitation) having an approximately uniform layer of a waterproofing pressure sensitive adhesive on one surface of the carrier sheet.  In the deposition of the inventor of the '879 patent, Mr. Wiercinski also admits that the original Preprufe [300R/160R] product had a carrier sheet and a pressure-sensitive waterproofing adhesive.  Based on my review and analysis of the Preprufe® 300R/160R waterproofing membrane products I tested, it is my

opinion and understanding that these Preprufe® 300R/160R membrane products, which I have been told by Mr. Paul Miller look like the original Preprufe® 300R/160R products sold or made available prior to Feb 8, 2009, include a carrier sheet with an approximately uniform layer of pressure-sensitive waterproofing adhesive on such carrier sheet.

GCP's Seth '171 patent also discloses that the pressure sensitive adhesive has an average thickness in the range 10-150 mils (250 microns to 3810 microns), falling within the claimed range of 75 μm to 500 μm. Mr. Wiercinski also testified that the original Preprufe 300R and Preprufe 160R has a pressure-sensitive adhesive thickness of about 381 microns (15 mils).

As for the claimed limitation of 'substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive' and having 'an average diameter of about 100 μm to about 600 μm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer', Mr. Wiercinski testified that the original Preprufe® 300R and Preprufe® 160R had a reflective surface, and the Preprufe® 300R/160R Technical Datasheets describe these membranes as being solar reflective to reduce temperature gain. GCP's Wiercinski '520 patent teaches inorganic particles having diameters of about 100 μm to about 600 μm adhered to the pressure sensitive adhesive having a thickness of 50.8 μm to 1905 μm. That is, when the adhesive of Wiercinski '520 is 50.8 μm thick and the particles have a diameter of 100 μm, Wiercinski '520 teaches inorganic particles having an average diameter greater than the thickness of the adhesive, thereby falling within the '879 claim limitations. GCP's Wiercinski '397 Pat. Pub. also teaches inorganic particle sizes of 100 microns (3.9 mils) over a pressure sensitive adhesive layer having thickness up to 10 microns (0.39 mils). Highly reflective inorganic particles/materials on or embedded into an adhesive layer are further disclosed in GCP's Seth '171 patent, Jacobs '251 Pat. Pub. and Getlichermann, '996 Pat. Pub. It is also my understanding that the Preprufe® 300R/160R waterproofing membrane products I tested have substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive, as claimed.

GCP's Wiercinski '520 patent discloses that the inorganic particles cover up to 100% of the exposed pressure sensitive adhesive surface. Further, GCP's Wiercinski '659, Wiercinski '397 Pat. Pub., Preprufe® 300R/160R Technical Datasheets, and the Wiercinski Dep. Testimony, alone or in any combination, teach high reflective particles almost entirely covering the adhesive layer to provide the membrane with a reflective to highly reflective surface that keeps the adhesive cooler to retard degradation when exposed to sunlight. As discussed above, the Preprufe® 300R/160R waterproofing membrane products I tested resulted in reflectivity values of PrePrufe 160R: 77.1% reflectance and PrePrufe 300R: 80.1% reflectance.  In addition to these GCP references, Getlichermann, Bartek '270, Aschenbeck '408, Jacobs '251 Pat. Pub., and/or Seth '171 also teach high reflectivity inorganic particles/ rock granules covering the adhesive layer to provide a membrane surface having high reflectivity (e.g., Getlichermann: 85% visible light reflectance, 95% IR reflectance, and high whiteness (from 83.97 to 95.28); Bartek '270: Initial Solar Reflectance greater than or equal to 65; Aschenbeck '408: solar reflectance of at least 70% as measured by reflectometry).

Providing a waterproofing membrane not having a removable release sheet would also have been obvious to a POSITA in view of the references herein. The basis for my opinion is that GCP's Wiercinski '520 '397 Pat. Pub.: discloses a membrane having large inorganic particles extending out of an adhesive layer to provide texturing or a textured coating. It discloses that this textured coating of inorganic particles extending out of an adhesive layer prevents "blocking" (sticking) when the underlayment is in a roll and provides for easy unrolling, hence, eliminating

the need for a removable release sheet. GCP's Seth '171 patent also discloses final three-dimensional waterproofing products that do not have a removable release sheet, and are stackable upon each other without the need for a removable release sheet that must be removed prior to installation of such products.

As for independent claim 15 of the '879 patent, GCP's Seth '171 patent further discloses that the waterproofing membrane disclosed therein is intended to bond with fresh cement cast against it, as claimed.

It is my opinion that a POSITA would have recognized that the references discussed in this section are each aimed at overcoming one or more problems identified in the '879 patent. A POSITA would have had motivation to combine these references to arrive at the claimed invention of the '879 patent as waterproofing membranes were continually being improved upon to include layers that protected the adhesive layer as well as provide stronger bonds to concrete cast against it. This is evidenced at least by the number of GCP patents referred to and discussed herein, which when combined, disclose the claimed '879 invention rendering the asserted claims thereof as obvious. These references show a POSITA would have recognized that there is a reasonable probability of success that providing a membrane with inorganic reflective particles adhered to, and embedded in, a pressure-sensitive adhesive in an amount that covers nearly all of the adhesive layer would significantly increase the reflectivity of the membrane's surface.

A POSITA would also have recognized that in embedding such inorganic reflective particles into the adhesive layer, so as to substantially cover the adhesive layer, would provide a 'textured' surface of the membrane, which as taught in GCP's Wiercinski '397 Pat. Pub. contributes "to the performance of the underlayments. The dual texturing enhances resistance to "blocking" (the tendency of the front face of the underlayment to stick to its rear face when unrolled) by minimizing contact between opposite faces of the underlayment within a roll of underlayment." (Wiercinski '397 Pub., Para [0067], ll. 7-13.) It would be understood by a POSITA that if blocking is eliminated and the membrane front and rear faces did not stick together by layered (i.e., in a roll), such a membrane would not need or have a removable release sheet. Additionally, GCP's Seth '171 patent teaches a final three-dimensional waterproofing membrane/composite that does not have removable release sheet, whereby these structures can be layered (i.e., stacked) on top of each other without a removable release sheet.  While Seth'171 refers to a removable release sheet, it expressly teaches that the removable release sheet is merely used to form an intermediate product, and must be removed and discarded prior to molding the final three-dimensional waterproofing product. In view of the foregoing, it is my opinion that a POSITA would have had reason and/or motivation to combine these references as they provide one or more predictable solutions or established functions directed to related problems as identified in such references and in the '879 patent. The benefit would be in providing a waterproofing membrane having a highly reflective surface that would not require a removable release sheet and enhanced adhesion of such a membrane to post cast concrete.

Based on my review of these references, it is my opinion that Serwin, Fensel, Metzler, Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, Wiercinski '659, Seth '171, Wiercinski '397 Pat. Pub., Tajima '640, and Getlichermann '996 Pat. Pub., Jacobs '251 Pat. Pub., Bartek '270, Aschenbeck '408, and the Whiting publication, alone or in any combination thereof, disclose all limitations set forth in claims 1 and 15 of the '879 patent, rendering the asserted claims of the '879 patent obvious. It is my opinion that independent claims 1 and 15, and all claims dependent thereon, are invalid as obvious over the foregoing relevant prior art references, alone or in any combination thereof.

**F. Obviousness Due to Bartlett '615 in view of Seth '171, Wiercinski '397 Pat. Pub., Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, and Wiercinski '659, in various combinations thereof**

Upon my review of the prosecution history of the '879 patent, an Office Action dated 09/09/20013 issued rejecting the claims of the '879 application as being obvious over US Pat. No. 5,496,615 to Bartlett et al.. ("Bartlett '615"). The examiner stated that Bartlett '615 disclosed all of the claimed limitations of claim 1, including citing sand as the substantially reflective inorganic particles. The examiner stated that Barlett '615 disclosed the basic structure for the waterproofing membrane except for expressly disclosing that the particles have an average diameter approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer. It was the examiner's opinion that this claimed feature would have been obvious to a POSITA as determining optimum or working ranges involves only routine skill in the art, and are not patentable.

In its response, the applicant argued that Bartlett '615 does not disclose the particle coverage and particle size limitations of the '879 application, stating that the use of large particles (i.e., 100 μm to about 600 μm) covering 70% to 100% of the outer exposed adhesive surface substantially prevents blocking, thereby not requiring a release sheet to prevent the membrane from adhering to itself when rolled up. They argued that Bartlett '615 teaches smaller particle sizes, and it would not have been obvious to use large particles having a diameter equal to or greater than the adhesive thickness "in order to ensure that the particles logged *(sic.* lodged) within the pressure sensitive [adhesive] layer." Also, as its most important argument, the applicant argued that Bartlett '615 does not disclose use of inorganic particles that are substantially reflective that provide stronger bonds to post-cast concrete.

In viewing the prior art disclosed herein, a significant amount of which is owned by GCP and/or its predecessor, a POSITA at the time of the invention would have been fully aware that prior art existed in the field, and which addressed the problems of the '879 patent. These references disclose use of large particles (i.e., 100 μm to about 600 μm; or 3.9 – 24 mils) (see, e.g., Wiercinski '397 Pat. Pub.: inorganic particle size of 100 microns (3.9 mils) over pressure sensitive adhesive layer having thickness up to 10 microns (0.39 mils)  - inorganic particles are greater than the average thickness of the pressure sensitive adhesive layer) covering 70% to 100% of the outer exposed adhesive surface (see, e.g., Wiercinski '520: Figure 1 shows up to 100% of the surface covered with inorganic particulates; Wiercinski '397 Pat. Pub.: textured particles covering at least about 95 percent of the adhesive layer) to prevent blocking (see, e.g., Wiercinski '397 Pat. Pub.: textured particles covering at least about 95 percent of the adhesive layer and protruding from the surface of the adhesive layer (i.e., "textured") that eliminate blocking).

Also, in view of the deposition testimony from inventor Robert Wiercinski, the original Preprufe 300R/160R products had a third layer comprising a white inorganic protective coating over the pressure-sensitive adhesive that provided the membranes with a reflectivity greater than or equal to 55 percent as measured by a reflectometer.  The Preprufe® 300R/160R Technical Datasheets also disclose that the original Preprufe® 300R/160R products had an outer exposed surface of membrane white in color that provided the membrane with solar reflectance to reduce temperature gain. In fact, I attest that the Preprufe® 300R/160R Tested Products I measured had reflectance values of: PrePrufe 160R: 77.1% reflectance and PrePrufe 300R: 80.1% reflectance.

Again the GCP products of the prior art did not include or require a removable release sheet. Again, Wiercinski '397 Pat. Pub. discloses  a waterproofing membrane having inorganic particles extending out of its adhesive layer providing a textured surface that prevents "blocking" (sticking) when the membrane is rolled, hence, such membrane does not need, use or require a removable release sheet, as is recited in the assert claims of the '879 patent.

Since the prior art discussed herein in this section is primarily GCP relevant prior art not disclosed in the '879 patent, it is my opinion that a POSITA, in reviewing such prior art, would have had motivation to combine these references to derive at the claimed invention of the '879 patent for the reasons as discussed herein.

It is my opinion that a POSITA would have had reason and/or motivation to combine the various GCP references disclosed herein, as they provide one or more predictable solutions or established functions directed to related problems as identified therein as well as in the '879 patent. The benefit would be in providing a waterproofing membrane having a highly reflective surface that would not require a removable release sheet and enhanced adhesion of such a membrane to post cast concrete.

It is my opinion that Bartlett '615 in view of Seth '171, Wiercinski '397 Pat. Pub., Wiercinski '520, Preprufe® 300R/160R Technical Datasheets, Preprufe® 300R/160R Tested Products, Wiercinski Dep. Testimony, and/or Wiercinski '659, in various combinations thereof, render obvious the asserted claims of the '879 patent. For these reasons, the '879 patent is invalid in view of these references.

Additionally, I have been informed by attorneys for AVM that under the "but-for" test of materiality, a reference is material "if the PTO would not have allowed a claim had it been aware of the undisclosed prior art."  It is also my understanding that in its response to the office action, the applicant failed to inform the examiner of its prior art Preprufe® 300R/160R waterproofing membranes which had a highly reflective surface. Applicant also did not inform the examiner of its prior art PrePrufe® 300R/160R Technical Datasheets. This led the examiner to believe that there was no material prior art that disclosed a waterproofing membrane having a flexible carrier sheet, a layer of a pressure sensitive adhesive over the carrier sheet, and a layer containing reflective inorganic particles over the pressure sensitive adhesive, with a substantially reflective surface having a reflectivity greater than 55%.

The Preprufe® 160R and Preprufe® 300R membranes I reviewed and tested, which were confirmed to me by Paul Miller to look the same as the original Preprufe® 160R and Preprufe® 300R membranes sold before February 8, 2009, had measured reflectivity readings as follows: PrePrufe 160R membrane of 77.1% and PrePrufe 300R membrane of 80.1%. It is my opinion that GCP's Preprufe® 160R and Preprufe® 300R membranes, and its prior art PrePrufe® 300R/160R Technical Datasheets, are "but for" material to the patentability of the '879 Patent. Neither the PrePrufe® 300R/160R Technical Datasheets or the PrePrufe 160R and PrePrufe 300R membranes are cumulative prior art as the examiner did not consider these prior art references during prosecution of the '879 Patent. It is my opinion that "but-for" the applicant's misrepresentation and omission of its own prior art Preprufe® 160R and Preprufe® 300R waterproofing membranes and their properties, as well as the prior art PrePrufe® 300R/160R Technical Datasheets, the PTO would not have approved at least claims 1 and 7 of the '879 Patent, and issued the '879 Patent.

### G. Secondary Considerations

I am not aware of any secondary considerations of nonobviousness that GCP contends would support a conclusion that the asserted claims are not anticipated or obvious. As described above, pursuant to the background section of the '879 patent, it was well recognized and known before the priority date of the '879 patent that waterproofing membranes (for pre-applied and/or post-applied applications) included a flexible carrier sheet, a pressure sensitive adhesive layer on the carrier sheet, and reflective inorganic particles on the adhesive layer. GCP and its predecessor, through it's patent application filings, also knew that reflective inorganic particles could have had a larger diameter size as compared to the thickness of the pressure sensitive adhesive layer, so that the larger sized inorganic particles provided texture to the surface of the membrane.  In view of at least Seth '171, GCP and its predecessor were also aware that such texture prevented blocking or sticking of the membrane surfaces to each other when the membrane was rolled up.  As such, at that time, GCP and its predecessor were fully aware that the membranes of at least Seth '171 did not have, nor did they require, a removable release sheet. GCP and its predecessor, through its patent filings discussed herein, would also have known that providing such highly reflective inorganic particles over almost the entire adhesive layer would have provided the membrane with very high reflectivity to reduce temperatures of the membrane, thereby protecting the underlying layers, especially the adhesive layer, from degradation.

In summary, the prior art teaches all the limitations of the asserted claims in the '879 patent and provides strong reason for a POSITA to combine all of the features and limitations recited in the asserted claims of the '879 patent.


## IX.   SUPPLEMENTAL TESTIMONY

This report is a summary of my stated opinions and the justification for those opinions. I reserve the right to modify and update my opinions as I further review the above-referenced materials and other information, including additional materials produced during the discovery period in the litigation, and will consider other evidence with which I may be presented during this case.

Signed           Date _____9/22/2021_____

Philip D. Dregger

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of Defendant's Expert Report and Disclosure of Philip Dregger has been served on all counsel of record by electronic mail on September 22, 2021.

Respectfully submitted,

**DeLIO PETERSON & CURCIO LLC**

Dated: September 22, 2021        By: __/s/David R. Pegnataro_____
                                              David R. Pegnataro
                                              Attorneys for Defendant
                                              AVM INDUSTRIES, INC.

# APPENDIX A

## CURRICULUM VITAE

## PHILIP D. DREGGER, PE, RRC, FELLOW IIBEC

**2339 Stanwell Circle, Suite A**
**Concord, CA 94520-4875**
**(925) 421-0585 (c) 925-766-3123**
**E-mail: Phil.Dregger@salasobrien.com**
(Above link deactivated to protect against spam)

## SUMMARY

Phil Dregger is a Professional Engineer, Registered Roof Consultant, and Fellow of the International Institute of Building Enclosure Consultants (IIBEC, formerly RCI). Mr. Dregger provides expert testimony (>50 depositions / arbitrations / trials) about a wide range of roofing, waterproofing, and building enclosure systems. Phil has special expertise in California Title 24 Part 6 (Energy Code); roof drainage; wind/hurricane damage; patent litigation and condensation problems; including hygrothermal analysis of wood decay, biological growth, and corrosion using WUFI Pro, ASHRAE Standard 160, and ASTM E3054. Phil lectures often to industry groups, has authored many technical articles, and recently received the ASTM D08 William C Cullen Award and the IIBEC/RCI Lifetime Achievement Award.

## EDUCATION

1978    Master of Science in Civil Engineering
        University of Minnesota - Minneapolis

1976    Bachelor of Science in Civil Engineering
        University of Minnesota - Minneapolis

## REGISTRATIONS

Professional Engineer (PE), State of Nevada, No. 20121, June 2009
Registered Roof Consultant (RRC), No. 0027, March 1993
Professional Engineer (PE), State of California, No. C45646, August 1990
Professional Engineer (PE), State of Minnesota, No. 14746, February 1981

## PROFESSIONAL SERVICE (beyond simple memberships)

RCI (Roof Consultants Institute) - Director (1990 - 1993), Fellow (1997),
        Education Task Force (1992 – 1997)

CRRC (Cool Roof Rating Council) - Board of Directors (2010 to 2018)

SIGDERS (Special Interest Group for Dynamic Evaluation of Roofing Systems)
        Board of Directors (RCI Liaison) (2009 – Present)

RICOWI (Roofing Industry Committee on Weather Issues)
        Executive Committee, RCI Representative (1992 - 2010)
        Researcher, Wind Event Investigation Program (1996 - 2013)
        Researcher, Hail Investigation Program (2011)

RIEI (Roof Industry Educational Institute) - Faculty Member (1993 - 2001)

## EMPLOYMENT

| | |
|---|---|
| 1991 - Present | Vice President |
| | Technical Roof Services, Inc., a Salas O'Brien Company, Concord, California |

Provide full range of roof, waterproofing, building envelope, and solar photovoltaic (PV) consulting services including condition evaluations, failure investigations, defect inspections, expert witness, construction documents, condensation analysis (WUFI, ASHRAE Standard 160, ASTM E3054), and roof moisture surveys.

| | |
|---|---|
| 1989 - 1991 | Senior Engineer |
| | Wiss Janney Elstner Associates Inc., Emeryville, California |

Conducted condition surveys of exterior building enclosures and developed repair recommendations. Investigated roofing, waterproofing, stucco, and masonry failures and provided expert testimony. Served as project manager responsible for project cost control, client liaison, and quality assurance during construction.

| | |
|---|---|
| 1988 - 1989 | Manager, Construction Materials Department |
| | Twin City Testing Corporation, St. Paul, Minnesota |

Developed strategic business and marketing plans. Monitored and controlled financial performance of department's four profit centers. Restructured department and implemented total quality system. Investigated concrete, masonry, roof, and waterproofing failures.

| | |
|---|---|
| 1984 - 1988 | Supervisor, Roofing Department |
| | Twin City Testing Corporation, St. Paul, Minnesota |

Guided development and growth of roof engineering and testing services. Provided expert testimony on roofing failures, technical and administrative supervision for department and training of engineering staff.

| | |
|---|---|
| 1981 - 1984 | Project Engineer, Soils and Geology Department |
| | Twin City Testing Corporation, St. Paul, Minnesota |

Coordinated and directed QC testing services (i.e. soils, concrete, reinforcing steel and NDT) for major construction projects. Investigated and recommended repairs for foundation and materials related problem conditions including moisture intrusion.

| | |
|---|---|
| 1978 - 1981 | Civil Engineer, Soils and Geology Department |
| | Twin City Testing Corporation, St. Paul, Minnesota |

Performed engineering and construction observations on geotechnical and earthwork projects. Expertise in embankments, building foundations, retaining walls, below-grade waterproofing, and pre-stressed rock anchors.

## INDIVIDUAL  HONORS/AWARDS (partial list)

| | |
|---|---|
| 2019 | "Lifetime Achievement Award" |
| | International Institute of Building Enclosure Consultants (formerly RCI) |

| | |
|---|---|
| 2018 | "William C Cullen Award" |
| | ASTM International Committee D08 |

| | |
|---|---|
| 1997 | "Fellow of the Institute" |
| | Roof Consultants Institute |

## PUBLICATIONS (partial list)

"Crowd Consulting Conundrum – KEE Membrane Fractures", <u>RCI Interface</u>, September 2017.

"Leaky" Exhaust Vents – The 500-lb Gorilla of Condensation Problems, <u>RCI Interface</u>, April 2017.

"Good But Potentially Misleading Guidelines", <u>RCI Interface</u>, May/June 2014.

"Rain Collapse – A Roof Consultant's Nightmare", <u>RCI Interface</u>, October 2013

"Cool Roofs Cause Condensation, Fact or Fiction?" <u>Western Roofing</u>, Jan/Feb 2012. (Listed as reference document, Continuing Ed. Center, "Cool Roofing for Cool Climates", November 2019.

"Rooftop Photovoltaics" <u>Proceedings 24th RCI International Convention</u>, March 2009.

"California Energy Code – 2008 Updates" <u>Western Roofing,</u> Nov/Dec 2008.

"California Cool Roofs:  A Snapshot of Installed Costs," <u>Western Roofing,</u> Nov/Dec 2006.

"Hurricanes Charley and Ivan Investigation Report," <u>RICOWI Wind Investigation Program Report,</u> March 2006, authored 1 of 9 Report Sections.

"The Wind Investigator – How to Approximate Wind Velocities at Roof Level," <u>RCI Interface,</u> October 2005.

"Air Infiltration–The Enemy of Wind Resistance & Condensation Control", <u>RCI Interface,</u> June 2002. (Listed as reference document in 2011 Baskaran paper "Air Intrusion and Its Effect on Moisture Transport" and in 2009 ASTM Manual 18, Chapter 16 "Roofs" by Wayne Tobiasson.)

"Steep Roofing-Underlayment Upgrades that Sometimes Aren't", <u>Western Roofing</u>, Jan/Feb 2001 (reprinted in <u>Copper and Common Sense</u>, 8th Edition, 2005, 5.A.4ff).

"Comparing SBS and SEBS Polymers – Factual Statements Can Still Be Misleading", <u>RCI Interface</u>, October 1998.

"Lightweight Decks and FMRC Approvals", <u>RCI Interface</u>, September, 1996.

"Roof Coatings – Selection of Roof Coatings can be Confusing", <u>Western Roofing</u>, Mar/Apr 1995.

"Asking the Impossible — Merging Wood Decks and FM Approved Assemblies is Sometimes Impossible", <u>Western Roofing Magazine</u>, Jan/Feb, 1994.

"Hurricane Force, Understanding and Minimizing the Risk of Wind Damage", <u>Western Roofing</u>, Nov/Dec 1992 (Part I) and Jan/Feb 1993 (Part II).

"Role of Air-Retarders Deserves Closer Scrutiny", <u>Professional Roofing</u>, October, 1991 (Listed as reference document in ANSI/SPRI RP-4-1997 (thru current version) "Wind Design Standard for Ballasted Single Ply Roofing Systems").

"Acrylic Roof Coatings — Not a Quick Fix for Bad Damage", <u>RSI Magazine</u>, October, 1990.

"Cold Weather Roofing Failures", <u>Proceedings - ASCE Cold Regions, Engineering Conference</u>, University of Minnesota, February 1989, co-author Richard Knatterud.

## PRESENTATIONS AND LECTURES (partial list)

2021    "Hygrothermal modeling involving air intrusion and field validation", Advanced WUFI Pro Workshop with Andre Desjarlais, ORNL and Achilles Karagiozis, Owens Corning.

2020    "Three Roof Jobs Gone Wrong – Power Washing Tile, Type B Gas Vents, and Induction Heat Welding" Western Roofing Expo 2020, webinar.

2019    "Rooftop Fire Resistance - Lessons from Northern California Fires and Elsewhere", RICOWI Seminar, Orlando, FL.

2018    "Hurricane Maria – Tips For Investigating Not So Obvious Wind Damage", RICOWI Seminar, Houston, TX.

2017    "Hygrothermal Modeling – Explaining the Past Is Not the Same as Predicting the Future", Advanced WUFI Pro Workshop, Napa, CA (with Andre Desjarlais, ORNL and Achilles Karagiozis, Owens Corning).

2017    "Common Sense Approaches to Reducing Condensation Problems Associated with Reflective Roofing on Western Wood Framed Decks", IRE (trade show), Las Vegas.

2017    "Well Installed Roofs That Aren't – Four examples where following common practice was not good enough", RCI SoCal Winter Workshop – Honolulu.

2016    "Advanced Roof Wind Forensics – Navigating the changing seas of roof wind design requirements", RCI SoCal Winter Workshop – Maui.

2014    "Hygrothermal modeling involving wood decay and mold growth", Advanced WUFI Pro Workshop, Napa (w Andre Desjarlais, ORNL & Achilles Karagiozis, Owens Corning).

2014    "2013 California Energy Code – Will Higher Reflectance Requirements Cause Condensation?" 2014 NRCA International Roofing Expo, Las Vegas, NV"

2012    "Roof Drainage – What You Don't Know CAN Hurt You", WSRCA/RCI Convention, Las Vegas, NV; RICOWI Fall Seminar Fort Collins, CO

2009    "Condensation – The Overwhelming Impact of Air Intrusion", RICOWI Fall Seminar, Portland, Oregon

2008    "Rooftop Photovoltaics – How To Save Money on Energy and Avoid Spending It All On Roof Repairs", RICOWI Fall Seminar, Charleston, South Carolina.

2007    "Wind Design - ASCE 7, Minimum Design Loads for Buildings and Other Structures" RCI SoCal Chapter 'Road to the RRC' Lecture Series, Los Angeles, California

2006    "Cool Roofs and Code in California – A Consultant's Perspective," RCI Convention, Phoenix, Arizona

2005    "Performance of Low-Sloped Roofs during Hurricane Ivan – Team 4," Preliminary Report, RICOWI Wind Investigator Program, Miami, Florida

2003    "Roof Moisture Surveys – How Do Different Methods Compare?" RCI/WSRCA Convention, Las Vegas, Nevada

2002    "Retrofitting with Lightweight Insulating Concrete – Tips to Avoid Surprises" RCI Winter Workshop, Honolulu, Hawaii

2002    "Condensation – The Hidden Source of Moisture" ASCE Forensic Engineering Technical Group, Irvine, California

1998    "Condensation in Non-Vented Roofs" RCI Building Envelope Symposium, Chicago and Oakland

1996    "Ways to Limit Contractor Liability" National Roofing Legal Resource Center, Palm Springs, California

## PRESENTATIONS (continued)

1995-1996    "Roof Wind Damage – How It Begins and Progresses"
RICOWI WIP Training – ORNL Oak Ridge TN and NRCC, Ottawa, ON.

1995    "A Survey of Built-Up Roof Systems"
American Institute of Architects, Oakland California Chapter

1994    "Roof Coatings — A Consultant's Perspective"
Roof Coating Manufacturers Association

1994    "Roof Tile Fastening Considerations"
Roof Consultants Institute, Oakland, California

1993    "Assessing Wind Damages - Hurricane Iniki"
Roof Consultants Institute, Honolulu, Hawaii

1993    "Roping In An Ally — The Professional Roof Consultant"
Single Ply Roofing Institute's 11th Annual Conference

## ACADEMIC  HONORS

- Graduated with "high distinction", Civil Engineering, Class of 1976, University of Minnesota
- Sommerfeld Grant for Academic Achievement, 1976-1978
- 1976 American Society of Civil Engineering Student Award

## SPECIAL  PROJECTS

2018 – 2019    **Performance Based Design for Wind** - Peer review of "Pre-Standard for Performance–Based Design for Wind" research report by Charles Pankow Foundation and ASCE.

2012    **Roof Drain Research** - Peer review of ASPE Foundation Research project report, "Flow Rate Through Roof Drains" by Julius Ballanco, PE, CPD, FASPE.

2012    **Overseas Federal Project -** Consulting services, including wind uplift calculations, for new construction at USAG Camp Humphreys in Pyongtaek, South Korea.

2005 – Present    **Solar PV (Roof Covering Related) –** Project development, construction related services, technology assessment, advanced support, and dispute resolution services.  Clients include San Francisco Public Utility Commission (thru AEPC), PowerLight Corporation, SunLink Corporation, and individual property owners (e.., Sakata Seed).

2006 – Present    **Patent Analysis** – Infringement and validity analyses of patents involving roof tile, roof ventilation, and roof mounting systems.

2005 – 2011    **CA Title 24 Part 6 –** Technical assistance to association of roof manufacturers regarding California Energy Code (CA Title 24 Part 6)

2000 – Present    **Manufacturer's Advisory Panels -** Participated on consultant advisory panels to manufacturers regarding attributes and limitations of current and proposed roof system products (e.g., Johns Manville, Georgia Pacific, Durolast, Carlisle, GAF).

1989 – Present    **University of California -** Condition evaluations, leakage investigations, specifications and drawings, repair recommendations regarding roof and waterproofing considerations for several Halls on the Berkeley campus.

## SPECIAL PROJECTS (continued)

| | |
|---|---|
| 1999 – 2008 | **County of Santa Cruz -** Schematic design, contract documents and construction observations for several reroof projects over critical facilities.  Design requirements included completion of documents in a three-week period and restrictive controls on "fume" and "noise" generation during reroof work. |
| 1996 – 1998 | **San Francisco City Hall Restoration -** Member of consultant team for project that received the Building Design and Construction "Reconstruction Project" Award and the National Trust for Historic Preservation Honor Award. |
| 1991 – 1998 | **Mervyn's Stores** – Technical assistance on several projects including leak investigation, condition evaluation, reroof consideration, and earthquake damage. |
| 1992 – 1997 | **Pacific Bell Facilities, Northern California –** Contract documents and construction observations for reroof projects on critical facilities including high-rise metropolitan and remote mountainous sites.  Special design requirements to maintain weather protection during code level windstorms and moderate seismic events. |
| 1997 | **Spelling Mansion, Los Angeles, California –** Expert consulting and trial testimony regarding roof systems on Los Angeles, California, Spelling Residence. |
| 1991 – 1994 | **Kaiser Medical Centers -** Roof management programs for seven (7) medical centers with over 300 roofs and more than 800,000 square feet of roofing. |
| 1995 – Present | **Historic Preservation -** Technical consulting and reroof document preparation regarding reroofing of historic structures.  Roof systems include clay tile, sculpted wood shingles, slate, tin and flat-seam copper. |
| 1989 – Present | **Dispute Resolution –** Expert consulting and expert witness assistance regarding roof and waterproofing legal claims.  Participated in mediations, settlement conferences, arbitrations, depositions and/or trial testimony in over 50 actions. |
| 1989 – Present | **Insurance Claims** – Investigation into causes and extent of damage to low-sloped roofs, steep-sloped roofs, and to waterproofing systems due to hail, wind, and fire. |
| 1997 | **NFPA Firewise Construction** – Technical input and peer review for National Fire Protection Association (NFPA) task group "Firewise Construction" videotape series. |
| 1996 - 2013 | **National Wind Design Standards** – Served on canvassing committees and assisted in development of commentaries.  **ANSI/SPRI ES 1**, "Wind Design Standard for Edge Systems Used with Low Slope Roofing Systems, 2013.  **ANSI/SPRI RP-4**, "Wind Design Standard for Ballasted Single Ply Systems, 1996 – 2001. |
| 1994 - 1996 | **Wind Research Project** – Served on Steering Committee for Roof Edge Metal Research at Texas Tech University in Lubbock, Texas. |
| 1996 | **NRLRC Mock Trial** – Invited to participate as expert witness in mock trial as part of National Roofing Legal Resource Center Seminar "Ways to Limit Contractor Liability" in Palm Springs, California. |
| 1994 | **Earthquake Damage** – Assistance to client on Southern California low-sloped and steep-sloped roof projects after Northridge Earthquake. |
| 1993 - 2018 | **Hurricane Damage** – Assessment of roof wind damage in Kauai Hawaii following Hurricane Iniki, in Pensacola Florida following Hurricane Ivan, in Houston Texas following Hurricane Ike, and in Puerto Rico following Hurricane Maria. |

_cv_20210507.docx

# APPENDIX B

# PHILIP D. DREGGER, P.E., R.R.C.
## EXPERT DEPOSITIONS

| YEAR | CASE/COURT | SIDE RETAINED | CONSTRUCTION / ISSUE |
|---|---|---|---|
| 2021 | Parks v Pettigrew<br>Alameda County Superior Court | Plaintiff | low sloped roof maintenance, drainage, tree debirs |
| 2019 | EcoFasten v SolarHooks<br>US District Court, Eastern California | Defense | roof mount system, patent infringement and validity. |
| 2019 | T-12 Three v Turner Construction<br>Orange County Superior Court | Defense | single ply roof, taper system, concrete deck, walk protection, impact damage. |
| 2017 | Gaona v JC Penney<br>US District Court, Eastern District CA | Defense | single ply roof, steel deck, TPO weathering, deterioration, leaks, ceiling collapse |

# PHILIP D. DREGGER, P.E., R.R.C.
# TRIAL TESTIMONY

| YEAR | CASE | TRIAL TYPE, SIDE RETAINED | CONSTRUCTION / ISSUES |
|------|------|---------------------------|-----------------------|
| 2021 | Khoshcar v R&R Enterprises Yolo County Superior Court | Judge, Defense | modified bitumen roof, code compliance. |

**PHILIP D. DREGGER, P.E., R.R.C.**
**ARBITRATION TESTIMONY**

| YEAR | PROJECT / CASE | SIDE RETAINED | CONSTRUCTION / ISSUE | |
|------|----------------|---------------|----------------------|---|
| 2021 | Roofco v Hilbers Concord, CA | Defense | built up roofing, laboratory sample testing, industry tolerances, | AAA, Stephen B Walker arbitrator |

# APPENDIX C

Douglas G. Muehlhauser (SBN 179495)
doug.muehlhauser@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Peter W. Peterson (*pro hac vice*)
David R. Pegnataro (*pro hac vice*)
delpet@delpet.com
DeLIO PETERSON & CURCIO LLC
700 State Street, Suite 402
New Haven, Connecticut 06511
Phone:  (203) 787-0595
Facsimile:   (203) 787-5818

Attorneys for Defendant
AVM INDUSTRIES, INC.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GCP APPLIED TECHNOLOGIES INC., <br><br> Plaintiff, <br><br> v. <br><br> AVM INDUSTRIES, INC., <br><br> Defendant. | ) <br> ) <br> ) Case No. 2:19-cv-07475-MWF-FFM <br> ) <br> ) Hon. Michael W. Fitzgerald <br> ) <br> ) **DECLARATION OF PAUL** <br> ) **MILLER** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

-1-

I, Paul Miller, hereby declare as follows:

1.   I am the Vice President of defendant, AVM Industries, Inc. ("AVM"), in the above-entitled action. I have personal knowledge of the matters set forth herein and, if called upon to testify, I could and would testify competently thereto.

2.   I submit this Declaration in support of the Expert Report of Philip Dregger.

3.   I have personally examined the products labeled as Preprufe® 160R and Preprufe® 300R that were sent to AVM's warehouse last week.

4.   Attached as Exhibit A are true and correct copies of photographs of the products received by AVM referred to in paragraph 3 herein, including the packaging the products were received in with batch numbers printed on the packaging.

5.   Preprufe® 160R and Preprufe® 300R are waterproofing membrane products manufactured and sold by plaintiff GCP Applied Technologies, Inc. ("GCP"), and previously by W.R. Grace-Conn., plaintiff GCP's predecessor-in-interest. Preprufe® waterproofing membrane products have been available for sale in the United States since the mid-1990's.

6.   Prior to my current position as Vice President at AVM, I was previously employed by W.R. Grace-Conn. for many years and personally inspected millions of square feet of Preprufe® throughout my career while employed at W.R. Grace-Conn.

7.   In addition to the packaging, there are a few distinguishing features that help identify the products received by AVM as Preprufe® 160R and Preprufe® 300R. The membrane rolls each include a release liner that covers the full width of the roll. Each product has a blue or red line that indicates the edge of the protective layer and exposed selvedge lap. A blue line denotes the product as

Preprufe® 300R and a red line denotes the product as Preprufe® 160R.

8.   In my professional experience, the products received by AVM have the same construction and whiteness/surface reflectivity as the Preprufe® 160R and Preprufe® 300R sold in the United States by W.R. Grace-Conn. before February 8, 2009.

9.   I personally spoke with Expert Philip Dregger and told him that the Preprufe® 160R and Preprufe® 300R products received by AVM last week looked the same as the original Preprufe® 160R and Preprufe® 300R products sold before February 8, 2009.

10. I also confirmed with Philip Dregger that the received Preprufe® 160R and Preprufe® 300R products appeared to have the same reflectivity and whiteness as the original Preprufe® 160R and Preprufe® 300R products sold before February 8, 2009.


 I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


 Executed this 22nd day of September 2021 at   __Canoga Park__   , California.


Dated: September 22, 2021         By: _____

                                           Paul Miller

# EXHIBIT A



Photos:

**Preprufe 160R:**









**Preprufe 300R:**

 

 

# APPENDIX D

# AMENDED EXHIBIT A - INVALIDITY CASE LAW IN SUPPORT OF PHILIP DREGGER'S EXPERT REPORT

| BASIS FOR INVALIDITY | LEGAL STANDARD |
|---|---|
| **ANTICIPATION UNDER 35 U.S.C. § 102** | "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of California,* 814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987). "When a claim covers several structures or compositions, either generically or as alternatives, the claim is deemed anticipated if any of the structures or compositions within the scope of the claim is known in the prior art." *Brown v. 3M,* 265 F.3d 1349, 1351, 60 USPQ2d 1375, 1376 (Fed. Cir. 2001). In some circumstances, it is permissible to use multiple references in a 35 U.S.C. § 102 rejection (*See, MPEP* § 2131.01). |
|  | A rejection under 35 U.S.C. § 102 has been held to be proper when the extra reference is used as extrinsic evidence to explain, but not expand, the meaning of terms and phrases used in the reference relied upon as anticipatory of the claimed subject matter. *In re Baxter Travenol Labs.,* 952 F.2d 388, 21 USPQ2d 1281 (Fed. Cir. 1991) (one of ordinary skill in the art would have known that "commercial blood bags" are bags containing DEHP, an additive to the plastic which improved the bag's red blood cell storage capability, and thus, claims were held to be anticipated) (*See also, MPEP* § 2131.01). |
|  | A rejection under 35 U.S.C. § 102 has also been held to be proper when the extra reference shows an inherent characteristic of the thing taught by the primary reference.  "To serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence. Such evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Continental Can Co. USA v. Monsanto Co.,* 948 F.2d 1264, 1268, 20 USPQ2d 1746, 1749-50 (Fed. Cir. 1991). As long as there is evidence of record establishing inherency, failure of those skilled in the art to contemporaneously recognize an inherent property, function or ingredient of a prior art reference does not preclude a finding of anticipation. *Atlas Powder Co. v. IRECO, Inc.,* 190 F.3d 1342, 1349, 51 USPQ2d 1943, 1948 (Fed. Cir. 1999). |
|  | "Arguments that the alleged anticipatory prior art is 'nonanalogous art' or 'teaches away from the invention' or is not recognized as solving the problem |

solved by the claimed invention, [are] not 'germane' to a rejection under section 102." Twin Disc, Inc.v. United States, 231 USPQ 417, 424 (Cl. Ct. 1986) (quoting In re Self, 671 F.2d 1344, 213 USPQ 1, 7 (CCPA 1982)). See also State Contracting & Eng' g Corp. v. Condotte America, Inc., 346 F.3d 1057, 1068, 68 USPQ2d 1481, 1488 (Fed. Cir. 2003) (The question of whether a reference is analogous art is not relevant to whether that reference anticipates. A reference may be directed to an entirely different problem than the one addressed by the inventor, or may be from an entirely different field of endeavor than that of the claimed invention, yet the reference is still anticipatory if it explicitly or inherently discloses every limitation recited in the claims.) (*See also, MPEP* § 2131.05).

AVM asserts that a court would likely find that independent claims 1 and 15, and dependent claims 2-8, 10-14 and 16-17, of the '879 Patent are invalid as being anticipated by one or more references and reasons as set forth herein.

| | |
|---|---|
| **OBVIOUSNESS UNDER 35 U.S.C. § 103** | A claim is obvious over a combination of prior art references if, at the time of the invention, the claimed subject matter as a whole would have been obvious to a person of ordinary skill in the art. *See Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010); 35 U.S.C. §103. In assessing obviousness, a court considers (1) the scope and content of the prior art; (2) the differences between the prior art and the asserted claims; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations. *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)). Before a court may hold a claim obvious over a combination of elements in the prior art, it must identify a reason, suggestion or motivation for combining the prior art. *Id.* at 1238. A patent claim is obvious if it is merely "the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007); *Wyers*, 616 F.3d at 1245.<br><br>AVM asserts that a court would likely find that independent claims 1 and 15, and dependent claims 2-8, 10-14 and 16-17, are invalid for obviousness based on the combinations of references and reasons as set forth herein. GCP's asserted independent claims 1 and 15 are set forth above and herein. |
| **INDEFINITENESS UNDER 35 U.S.C. § 112** | 35 USC §112, ¶2, requires "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." A patent claim is indefinite if, when "read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).<br><br>All claims of the '879 Patent are ultimately dependent on claim 1, which is directed to a "waterproofing membrane" article (i.e., as the final product). Claim 1 includes limitations relative to the "average thickness" of the "pressure sensitive adhesive" layer, which has "an outer exposed surface," and the absence of a "*removable release sheet.*" When read in light of the specification of the '879 Patent, its prosecution history, and this Court's Claim Construction Order (Dkt. 101), the terms discussed below fail to inform those skilled in the art the scope of the invention with reasonable certainty, and as such, render Claim 1, and subsequently all of the '879 Patent claims, indefinite. |

| | |
|---|---|
| **INEQUITABLE CONDUCT** | Inequitable conduct is an equitable defense to patent infringement that bars enforcement of a patent. To establish inequitable conduct, a party must prove, by clear and convincing evidence, that a specific individual charged with a duty of candor to the PTO, such as an inventor or prosecuting attorney (1) failed to disclose material information, or submitted materially false information, or made an affirmative misrepresentation of a material fact; and (2) did so with a specific intent to deceive the PTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (*en banc*); *Exergen Corp. v. Wal-Mart Stores. Inc.*, 575 F.3d 1312, 1327 n.3 (Fed. Cir. 2009) (internal citation omitted); *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 872 (Fed. Cir. 1988). <br><br> To meet the clear and convincing evidence standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1366 (Fed.Cir.2008)). Whether information is "material" turns on whether, but-for the misrepresentation, nondisclosure, or false disclosure, the outcome of the PTO process would have been different. *Therasense*, 649 F.3d at 1291. |

# APPENDIX E

**AMENDED EXHIBIT D – INEQUITABLE CONDUCT CLAIM CHART**

**OF U.S. PATENT NO. 8,713,879 IN SUPPORT OF PHILIP DREGGER'S EXPERT REPORT**

| U.S 8,713,879 Claim 1 | U.S. 6,746,764 to Anspach in view of U.S. 5,496,615 to Bartlett in view of PREPRUFE® 300R/160R and/or PREPRUFE® 300R/160R Technical Datasheets |
|---|---|
| *A waterproofing membrane comprising* | **BARTLETT '615  (U.S. 5,496,615)**<br><br>"… the present invention relates to novel waterproofing membranes comprised of a carrier sheet, a bituminous or non-bituminous adhesive layer, a protective layer coating on said adhesive layer, and a second bituminous or non-bituminous adhesive layer located on the other side of said carrier layer." (Col. 1, ll. 14-19.)<br><br>"An objective of the present invention is to provide a waterproofing membrane which can be pre-applied to a concrete form and which can adhere strongly to the post cast concrete." (Col. 2, ll. 27-31.)<br><br>"…  the present waterproofing membranes may be pre-applied to a substrate, such as concrete, mortar, cement, shotcrete, grout, metal, particle board, gypsum board, plywood, a drainage device, a lagging form, or a combination thereof. Cementitious materials which may be cast against the membrane include concrete, cement, shotcrete, grout, mortar, or a combination thereof, can subsequently be cast against the membrane." (Col. 5, ll. 34-42.)<br><br>**ANSPACH '764  (U.S. 6,746,764)**<br><br>"self-adhering surface covering having a pressure-sensitive adhesive layer and a barrier layer to substantially prevent undesired or premature bonding to a surface and a method of making the same." (Col. 1, ll. 9-13.)<br><br>***[NOT DISCLOSED TO PTO EXAMINER]* PREPRUFE® 300R/160R Technical Datasheets**<br><br>"Pre-applied waterproofing membranes that bond integrally to poured concrete for use below slabs or behind basement walls on confined sites"<br><br>**WIERCINSKI '877 (U.S. 7,634,877)**<br><br>"the present invention includes a method of waterproofing a roof or floor by unrolling … [a] skid resistant flexible article and applying it to the roof or floor .. ." (Wiercinski '877, Col. 3, ll. 20-24.)<br><br>"a skid-resistant flexible article comprising a flexible substrate coated with an elastomeric non-skid coating (or skid resistant layer) that is skid resistant |

| | |
|---|---|
| | particularly when wet and after outdoor exposure. (Wiercinski '877, Col. 3, l. 66 to Col. 4, l. 3.) |
| *a flexible carrier sheet with two opposed surfaces* | **BARTLETT '615**<br><br>"As shown in FIG. 1, an exemplary membrane of the invention comprises a carrier layer 4, having a first pressure-sensitive adhesive layer 5, and a protective coating layer 3." (Col. 3, ll. 37-39.)<br><br>"The carrier layer of the present invention can be fabricated from a thermoplastic, rubber, or metal in the form of a continuous film, a woven material, glass, or a non-woven material. Thermoplastics particularly suited for use in the present invention include high density polyethylene (HDPE), polyethylene terephthalate (PET), polystyrene (PS), polyvinyl chloride (PVC), polyamides (PA), or combinations thereof." (Col. 3, ll. 50-54.)<br><br>**ANSPACH '764**<br><br>"The self-adhering surface covering 10 comprises a substrate 12, a pressure-sensitive adhesive layer 18, and a barrier layer 22. As illustrated in FIG. 1, the substrate 12 has a first surface 14 and a second surface 16." (Col. 4, ll. 14-18.)<br><br>"The substrate 12 can be selected from, but not limited to, sheet, tile, strip, board, parquet, and the like. Such substrates 12 comprises monomers, polymers, plastics, resins, including reinforced resins, rubbers, papers, cloths, metals, wood, composites thereof in desired combinations, veniers thereof in desired combinations, and laminates thereof in desired combinations, to name only a few." (Col. 4, ll. 49-55.)<br><br>***[NOT DISCLOSED TO PTO EXAMINER]* Wiercinski Deposition Testimony 4/20/2021 on PREPRUFE® 300R/160R**<br><br>Q    … Did the original Preprufe [300R/160R] product have a carrier sheet?<br>A    Oh, yes. (106:13-15.)<br><br>***[NOT DISCLOSED TO PTO EXAMINER]* Philip Dregger 9/13/2021 Test Results on PREPRUFE® 300R/160R**<br><br>"Preprufe® 300R/160R waterproofing membrane products include a carrier sheet" |
| *an approximately uniform layer of a waterproofing pressure sensitive adhesive on one* | **BARTLETT '615**<br><br>"The geometric configuration of the present invention comprises a carrier, the synthetic or non-bituminous adhesive layer affixed to one face of the carrier, and the protective layer affixed to the exposed face of the synthetic adhesive layer." (Col. 5, ll. 16-20.) |

| | |
|---|---|
| *surface of the carrier sheet* | "Pressure-sensitive adhesives are preferred. Preferably, the synthetic adhesive is a pressure sensitive hot melt adhesive block copolymer of SIS, SBS or SEBS." (Col. 4, ll. 9-12.)<br><br>**ANSPACH '764**<br><br>"The adhesive layer 18 is disposed on the second surface 16 of the substrate 12 and has an adhesive surface 20 that is distal from the second surface 16." (Col. 4, ll. 18-21.)<br><br>"Various pressure-sensitive adhesives are known and can be utilized in the present invention to comprise the adhesive layer 18." (Col. 5, ll. 1-3.)<br><br>"The adhesive is applied to the substrate 12 by a conventional coating apparatus (not shown) such as a reverse roll coater, a forward roll coater, a doctor blade, an air knife, or other similar coating apparatus." (Col. 5, ll. 3-6.)<br><br>"Examples of such pressure-sensitive adhesives include rubber-type adhesives, acrylic adhesives, including e-beam curable acrylic adhesives, vinyl acetate-type adhesives, urethane-type adhesives, and combinations thereof." (Col. 5, ll. 29-33.)<br><br>*[NOT DISCLOSED TO PTO EXAMINER]* **Wiercinski Deposition Testimony 4/20/2021 on PREPRUFE® 300R/160R**<br><br>Q       … Did the original Preprufe product have a waterproofing adhesive?<br>A       It had a pressure-sensitive waterproofing adhesive. (106:19-22.)<br><br>*[NOT DISCLOSED TO PTO EXAMINER]* **Philip Dregger 9/13/2021 Test Results on PREPRUFE® 300R/160R**<br><br>"Preprufe® 300R/160R waterproofing membrane products have an approximately uniform layer of pressure-sensitive waterproofing adhesive on carrier sheet"<br><br>**WIERCINSKI '877**<br><br>"The elastomeric non-skid coating 13 generally comprises an elastomeric polymer composition, preferably an elastomeric polymer composition with the characteristics of a pressure sensitive adhesive." (Wiercinski '877, Col. 5, ll. 31-34.)<br><br>"..embodiments where the non-skid coating 13 is a pressure sensitive adhesive, the pressure sensitive adhesive exhibits a minimum peel adhesion … to the support sheet." (Wiercinski '877, Col. 8, ll. 25-28.) |
| *the pressure sensitive adhesive has an* | **BARTLETT '615**<br><br>"The preferred thickness of an exemplary non-bituminous adhesive layer of the present invention is from about 0.005 inches [127 μm] to about 0.080 inches |

| | |
|---|---|
| *average thickness in the range of 75 µm to 500 µm and has an outer exposed surface* | [2032 µm], preferably greater than about 0.020 inches [508 µm]." (Col. 4, ll. 34-38.)<br><br>**ANSPACH '764**<br><br>".. the adhesive layer 18 typically has a thickness of about 1 to about 2 mils [51 µm], but can be either less than 1 mil [25 µm] or greater than 2 mils [51 µm], depending upon the adhesive employed." (Col. 5, ll. 26-29.)<br><br>***[NOT DISCLOSED TO PTO EXAMINER]* Wiercinski Deposition Testimony 4/20/2021 on PREPRUFE® 300R/160R**<br><br>Q       Okay. Let's -- let me rephrase that. Had you been aware of any waterproofing membranes that had a waterproofing pressure-sensitive adhesive on a carrier sheet where the adhesive had a thickness in the range of 75 microns to 500 microns?<br>A       Any previous membranes?<br>Q       Yes.<br>A       Yes.<br>Q       Okay. And which were those?<br>A       I mean, both -- I mean, Preprufe 300R, Preprufe 160R, Preprufe 300 Plus and Preprufe 160 Plus I believe all have approximately 15 mils of pressure-sensitive adhesive. Multiply that by 25, and you get microns.<br>Q       Okay. I am going to try that. Okay. So multiplying 15 mils times 25.4, I get 381 microns.<br>...<br>Q       Yes. Okay. So the prior Preprufe products had pressure-sensitive adhesive layers with about 381 micron thickness, give or take?<br>A       Yes. (183:19-185:2) |
| *substantially reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive* | **BARTLETT '615**<br><br>"… embodiments of the invention comprise a carrier 3, a non-bituminous waterproofing adhesive layer 5, a protective coating 6 disposed on the non-bituminous adhesive layer 5, and a layer of finely divided particulate matter 15 that is adhered to the protective coating layer 6." (Col. 8, ll. 13-18.)<br><br>"FIG. 2 also illustrates an exemplary membrane 10 of the invention which further comprises a layer 15 comprising finely divided particulate material. The term "finely divided particulate material" means and refers to granules, particles, powders, dust, or ground material. Such particulate material, for example, can comprise calcium carbonate, sand, silicate sand, cement, talc, titanium dioxide, carbon black, slate dust, granite dust, clay, and the like. Calcium carbonate and sand are preferred." (Col. 7, ll. 48-56; Fig. 2.) |

"It is believed that the particulate layer 15 will be partially embedded into the protective coating layer." (Col. 7, ll. 58-59.)

## ANSPACH '764

"… at least some of the particles 24 may be partially embedded in the adhesive layer 14." (Col. 5, ll. 15-16.)

"Particles 24 are distributed randomly and substantially uniformly over the adhesive surface 20 in one embodiment of the present invention. Further, in an alternative embodiment, at least a portion of the particles 24 are distributed over the adhesive surface 20 in a pattern or design." (Col. 4, ll. 32-34.)

"Examples of such particles 24 include inorganic and organic particles and mixtures thereof." (Col. 6, ll. 62-64.)

***[NOT DISCLOSED TO PTO EXAMINER] Wiercinski Deposition Testimony 4/20/2021 on PREPRUFE® 300R/160R***

Q      Okay. Yeah, you had indicated the Preprufe used calcium carbonate particles, right?

A      Right. (60:16-20)

Q      … And in that original Preprufe product, that third layer, protective coating, did it have a reflectivity greater than or equal to 55 percent as measured by a reflectometer perpendicular to a surface illuminated at a 45-degree angle?

A      Yes. (109:8-15.)

***[NOT DISCLOSED TO PTO EXAMINER] PREPRUFE® 300R/160R Technical Datasheets***

"Solar Reflective – reduced temperature gain"

***[NOT DISCLOSED TO PTO EXAMINER] Philip Dregger 9/13/2021 Test Results on PREPRUFE® 300R/160R***

"Preprufe® 300R/160R waterproofing membrane products have reflective inorganic particles adhered directly to the outer exposed surface of the pressure sensitive adhesive providing surface reflectivity measures of:  PrePrufe 160R: 77.1% reflectance and PrePrufe 300R: 80.1% reflectance"

## WIERCINSKI '877

"The elastomeric non-skid coating may optionally include inorganic filler particles … ." (Wiercinski '877, Col. 4, ll. 7-8.)

| | |
|---|---|
| | "Suitable inorganic fillers include calcium carbonate, silica, clay, talc, vermiculite, mica, titanium dioxide, fly ash, alumina trihydrate, and slag. Calcium carbonate is preferred." (Wiercinski '877, Col. 9, ll. 26-29.) |
| *wherein the substantially reflective inorganic particles have an average diameter of about 100 µm to about 600 µm that is approximately equal to or greater than the average thickness of the pressure sensitive adhesive layer* | **BARTLETT '615**<br><br>"The preferred thickness of an exemplary non-bituminous adhesive layer of the present invention is from about 0.005 inches [127 µm] to about 0.080 inches [2032 µm], preferably greater than about 0.020 inches [508 µm]." (Col. 4, ll. 34-38.)<br><br> "The thickness of the protective coating is from about 0.001 inches [25 µm] to about 0.020 inches [508 µm], preferably about 0.003 inches [76 µm]." (Col. 5, ll. 9-15.)<br><br> "A preferred particle size range is about 0.1-1000 microns, and more preferably the range is about 0.2-100 microns. It is believed that the selection of suitable particle sizes would be within the skill of those in the art." (Col. 7, ll. 59-63.)<br><br>"The particle layer 15 size should preferably be sufficient to further reduce the tack on the surface of the membrane, yet be capable of allowing a cementitious material to be cast against it to bond with the underlying adhesive 5 and protective coating 6 layers." (Col. 7, ll. 63-67.)<br><br>**ANSPACH '764**<br><br> "… particles 24 have a diameter that is at least about equal to or greater than the thickness of the adhesive layer, thereby providing interstitial space 26 between the adhesive layer and a potential bonding surface. In other words, the particle diameter/adhesive layer thickness ratio is at least equal to or greater than about 1." (Col. 4, ll. 27-32.)<br><br>"In the barrier layer 22, the particles 24 have an average particle size about equal to or greater than the thickness of the adhesive layer 18, typically between about 2 to about 6 mils [51 and 152 µm] and are either solid, porous, or hollow. Accordingly, the average particle size can be less than 2 mils [51 µm] and greater than 6 mils [152 µm]." (Col. 6, ll. 39-43.)<br><br>"…the particles 24 crush at a load of about 20 psi or greater, thereby permitting the crushed particles 24 to be embedded within the adhesive layer 18." (Col. 6, ll. 45-48.)<br><br>"Examples of such particles 24 include inorganic and organic particles and mixtures thereof. Inorganic particles include, but are not limited to, calcium carbonate or limestone, barium carbonate, calcium sulfate, barium sulfate, aluminum sulfate, molybdenum disulfide, titanium oxide, aluminum hydroxide, alumina, silica, magnesium oxide, calcium oxide, calcium hydroxide, ferrous |

| | |
|---|---|
| | oxide, ferric oxide, derivatives thereof, and combinations thereof." (Col. 6, l. 62 to Col. 7, l. 3.) |
| *wherein the substantially reflective particles cover approximately 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface* | **BARTLETT '615**<br><br>"Another exemplary membrane comprises a carrier layer 4, an adhesive layer 5, a protective coating layer 6, and a finely divided particulate material layer 15 (as shown in FIG. 2)." (Col. 3, ll. 46-49.) Figure 2 of Bartlett shows up to 100% of the surface covered with finely divided particulate material layer 15.<br><br><br><br>FIG. 2<br><br>**ANSPACH '764**<br><br>"Particles 24 are distributed randomly and substantially uniformly over the adhesive surface 20 in one embodiment of the present invention. Further, in an alternative embodiment, at least a portion of the particles 24 are distributed over the adhesive surface 20 in a pattern or design." (Col. 4, ll. 32-34.)<br><br>"The amount of the particles 24 can be easily selected and determined experimentally as required by those skilled in the art depending upon the degree of softness or hardness of the pressure-sensitive adhesive, the thickness of the adhesive layer 18, the particle size conditions and type of the particles 24 employed, the distributed state of the particles 24 on the adhesive surface 20 of the adhesive layer 18, the desired initial adhesion strength, etc." (Col. 7, ll. 21-28.)<br><br>***[NOT DISCLOSED TO PTO EXAMINER]* Wiercinski Deposition Testimony 4/20/2021 on PREPRUFE® 300R/160R**<br><br>Q    … And in that original Preprufe product, that third layer, protective coating, did it have a reflectivity greater than or equal to 55 percent as measured by a reflectometer perpendicular to a surface illuminated at a 45-degree angle?<br>A    Yes. (109:8-15.)<br><br>Q    Okay. Did anyone measure the reflectivity of the calcium carbonate or the white sand particles that you tested?<br><br>A    I don't recollect doing that.<br><br>Q    Do you know if that reflectivity would have been above 55 percent? |

| | | |
|---|---|---|
| A | I would presume that it was just from, you know, its appearance as being – as being pretty white. (38:5-14) | |
| Q | Okay. How was the calcium carbonate particles used on these other waterproofing membranes? | |
| A | Preprufe 300 and Preprufe -- Preprufe 300R and Preprufe 160R, which I alluded to earlier, comprise three layers: There is a carrier sheet, a pressure-sensitive adhesive, and a protective layer. And the protective layer is a coating that comprises calcium carbonate in an acrylic polymer. (39:11-22) | |
| Q | Let's say the first four pages is A212. Can you identify those first four pages? | |

(The deponent read the document.)

| | | |
|---|---|---|
| A | I mean, just based on the subject matter, without reading through the whole thing, they -- this email stream deals with the performance of Dusty, which is a nickname for PV100, and its patentability. |

…

| | | |
|---|---|---|
| Q | Yes. So on that email there, it's on the lower half of that page, it's from May Ding to you. It says in the next to the last paragraph: "I remember based on our last round discussion, if we cannot find differences from white hydrated cement to white cement, the chance to get patent protection is low." Do you see that? |
| A | Yes, I do. (82:1-83:71) |

…

| | | |
|---|---|---|
| Q | In the second sentence there: "Were you ever able to demonstrate that use of white hydrated cement particulate offers some performance enhancement versus other particulates like sand?" Do you see that? |
| A | Yes, I do. |
| Q | Okay. Why did you bring that up with May Ding? |
| A | I presume I would want to know if white hydrated cement was preferable to other particulates. |
| Q | Other particulates like sand, correct? |
| A | As long as they were re – you know, reflective, like sand -- like white sand or calcium carbonate. (84:15-85:7) |
| Q | Now, the original Preprufe that you said came out in the '90s, the 300R and 160R, did that have a high-surface reflectivity? |

A     Yes.

Q     And what did that measure as?

A     I -- I didn't measure it, but I would venture that it had a high-surface reflectivity.

Q     Meaning above 50 percent?

A     Yeah. It would be --

Q     Or above 50, I should say, yeah.

A     It would be greater than 50 percent. (102:5-17)


Q     Okay. And what was the reason for the reflectivity of the surface of the prior Preprufe products?

A     The same purpose as for the reflectivity requirement for the inorganic particles of PV100, to retard degradation of the membrane and provide for better bond to concrete after weatherability and UV exposure, as opposed to the situation for a darker or nonreflective-surfaced membrane. (34:11-21)


**[NOT DISCLOSED TO PTO EXAMINER] PREPRUFE® 300R/160R Technical Datasheets**

"Solar Reflective – reduced temperature gain"

**[NOT DISCLOSED TO PTO EXAMINER] Philip Dregger 9/13/2021 Test Results on PREPRUFE® 300R/160R**

"Preprufe® 300R/160R waterproofing membrane products have substantially reflective particles covering 70% to 100% of the outer exposed surface of the pressure sensitive adhesive so as to provide the membrane with a substantially reflective surface having reflectivity measures of PrePrufe 160R: 77.1% reflectance and PrePrufe 300R: 80.1% reflectance"

## WIERCINSKI '877

"…the article surface is substantially reflective to highly reflective. Such reflective articles may be pigmented white to off white or light gray or light blue. The most reflective surface would reflect 100% of incident light. Preferred articles of the present invention reflect 50% to 100% of incident light, most preferably 75% to 100% of incident light. Reflectance is measured according to ASTM C1549 using a portable specular reflectometer … ." (Wiercinski '877, Col. 7, ll. 1-10.)

"The non-skid article of the present invention becomes tacky (or maintains its tackiness) after direct exposure to sunlight. After long term exposure to

| | |
|---|---|
| | sunlight, tack may diminish somewhat. Substantially reflective articles remain tacky longer after direct exposure to sunlight than a similar article with a less reflective surface, such as one pigmented grey to black." (Wiercinski '877, Col. 7, ll. 13-19.)<br><br>"Inorganic filler particles are included in an amount of at least about 25 percent by volume of the non-skid coating, …most preferably at least 50% by volume. Use of a high filler volume, including amounts up to about 75%, insures that the non-skid layer is textured….If the filler volume is too low, the layer is relatively smooth." (Wiercinski '877, Col. 9, ll. 10-18.) |
| *wherein the waterproofing membrane does not include a removable release sheet.* | **ANSPACH '764**<br><br>"Self-adhering surface coverings allow the installer to eliminate a time consuming and often times messy adhesive spreading step. However, the release paper adds to the cost of the product and has the disadvantage of requiring the installer to collect the discarded release paper and provide proper disposal thereof. This disadvantage ranges from an inconvenience on small installation projects to a significant disposal problem on large projects. Regardless of the job size, disposal of the release paper provides an environmental burden in that it is generally not recyclable and often requires its disposal in limited land-fill space." (Col. 1, ll. 29-40.)<br><br>"Despite existing self-adhering surface coverings which employ particles to prevent undesired adherence to surfaces, the need remains for a self-adhering surface covering which does not employ a release layer and is inexpensively produce. Further, there remains a need for a method of manufacturing such a self-adhering surface covering. Accordingly, it is to the provision of a self-adhering surface covering that meets these needs that the present invention is primarily directed." (Col. 3, ll. 3-10.)<br><br>"This invention overcomes the disadvantages of the prior art by providing a self-adhering surface covering which avoids undesired adherence of the surface covering under loads which can be experienced during shipping and storage to surfaces without employing a release layer or paper." (Col. 3, ll. 13-18.)<br><br>"…the adhesive layer comprises a substantially non-stringing adhesive. Accordingly, the self-adhering surface covering 10 is separately stackable and/or rollable, barrier layer 22 to the first surface 14 of substrate 12, without employing a release layer between adjacent surface coverings 10." (Col. 4, ll. 42-48.)<br><br>"In one aspect of the present invention, by disposing the barrier layer 22 onto the adhesive layer 18, the adhesive layer 18 has substantially no tack at about 10 psi at about 140.degree. F. when placed in contact with a substantially non-adhesive surface, yet has tack when subjected to a load of about 20 psi or greater at about 75° F" (Col. 4, ll. 37-41.)<br><br>**WIERCINSKI '877** |

|  | "The non-skid coating 13 may optionally include inorganic filler particles. The term "particles" as used herein is intended to encompass particles having regular (e.g., spherical) or irregular shapes, as well as shards. The inorganic filler particles provide for a textured surface … [that] enhances the ability to unroll an underlayment or other rollable non-skid product by decreasing the contact area, in rolled form, of the top side of the membrane with the backside of the membrane vs. the situation for a non-skid surface of the present invention that does not comprise inorganic filler particles." (Wiercinski '877, Col. 8, ll. 43-56.) |
|---|---|
| **U.S 8,713,879 Claim 7** | **U.S. 6,746,764 to Anspach in view of U.S. 5,496,615 to Bartlett in view of PREPRUFE® 300R/160R and/or PREPRUFE® 300R/160R Technical Datasheets** |
| *7. The waterproofing membrane according to claim 1 wherein the reflective surface of the membrane exhibits a whiteness value greater than 55%.* | ***[NOT DISCLOSED TO PTO EXAMINER]*** **Wiercinski Deposition Testimony 4/20/2021 on PREPRUFE® 300R/160R**<br><br>Q … And in that original Preprufe product, that third layer, protective coating, did it have a reflectivity greater than or equal to 55 percent as measured by a reflectometer perpendicular to a surface illuminated at a 45-degree angle?<br>A Yes. (109:8-15.)<br><br>***[NOT DISCLOSED TO PTO EXAMINER]*** **PREPRUFE® 300R/160R Technical Datasheets**<br><br>"Solar Reflective – reduced temperature gain"<br><br>"Physical Properties: Colour: white"<br><br>"Install Bituthene Preprufe membrane to all areas. . . the treated white coating surface facing the new concrete." |
|  | Preprufe® 300R & 160R Technical Datasheet:  "Preprufe® 300R & 160R Pre-applied Waterproofing Membranes That Bond Integrally To Poured Concrete For Use Below Slabs Or Behind Basement Walls On Confined Sites", Pg. 1, Copyright 2002. W. R. Grace (S) Pte Ltd 110-BIT-5 Printed in Singapore 01/02;<br>and<br>Preprufe® 300R & 160R Technical Datasheet:  "Preprufe® 300R & 160R Pre-applied Waterproofing Membranes That Bond Integrally To Poured Concrete For Use Below Slabs Or Behind Basement Walls On Confined Sites", Pg. 1, Copyright 2007. W. R. Grace (S) Pte Ltd 110-BIT-5 Printed in Singapore 09/07.<br><br>Preprufe® 160R Technical Datasheet:  "Preprufe 160  Sheet Tanking  and Waterproofing Membrane", Pg. 3, Copyright March 2008. Nuplex Construction Products, Technical Manual, Penrose, Auckland, NZ. |

Exhibit 115

1  Douglas G. Muehlhauser (SBN 179495)
   doug.muehlhauser@knobbe.com
2  KNOBBE, MARTENS, OLSON & BEAR, LLP
3  2040 Main Street, Fourteenth Floor
   Irvine, CA  92614
4  Telephone: (949) 760-0404
5  Facsimile: (949) 760-9502

6  Peter W. Peterson (*pro hac vice*)
7  David R. Pegnataro (*pro hac vice*)
   delpet@delpet.com
8  DeLIO PETERSON & CURCIO LLC
9  700 State Street, Suite 402
   New Haven, Connecticut 06511
10 Phone:  (203) 787-0595
11 Facsimile:   (203) 787-5818

12 Attorneys for Defendant
13 AVM INDUSTRIES, INC.

14
15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

16
17

| | |
|---|---|
| GCP APPLIED TECHNOLOGIES INC., | Case No. 2:19-cv-07475-MWF-FFM |
| Plaintiff, | Hon. Michael W. Fitzgerald |
| v. | **DECLARATION OF PAUL MILLER** |
| AVM INDUSTRIES, INC., | |
| Defendant. | |

18
19
20
21
22
23
24
25
26
27
28

I, Paul Miller, hereby declare as follows:

1.   I am the Vice President of defendant, AVM Industries, Inc. ("AVM"), in the above-entitled action. I have personal knowledge of the matters set forth herein and, if called upon to testify, I could and would testify competently thereto.

2.   I submit this Declaration in support of the Expert Report of Philip Dregger.

3.   I have personally examined the products labeled as Preprufe® 160R and Preprufe® 300R that were sent to AVM's warehouse last week.

4.   Attached as Exhibit A are true and correct copies of photographs of the products received by AVM referred to in paragraph 3 herein, including the packaging the products were received in with batch numbers printed on the packaging.

5.   Preprufe® 160R and Preprufe® 300R are waterproofing membrane products manufactured and sold by plaintiff GCP Applied Technologies, Inc. ("GCP"), and previously by W.R. Grace-Conn., plaintiff GCP's predecessor-in-interest. Preprufe® waterproofing membrane products have been available for sale in the United States since the mid-1990's.

6.   Prior to my current position as Vice President at AVM, I was previously employed by W.R. Grace-Conn. for many years and personally inspected millions of square feet of Preprufe® throughout my career while employed at W.R. Grace-Conn.

7.   In addition to the packaging, there are a few distinguishing features that help identify the products received by AVM as Preprufe® 160R and Preprufe® 300R. The membrane rolls each include a release liner that covers the full width of the roll. Each product has a blue or red line that indicates the edge of the protective layer and exposed selvedge lap. A blue line denotes the product as

Preprufe® 300R and a red line denotes the product as Preprufe® 160R.

8.   In my professional experience, the products received by AVM have the same construction and whiteness/surface reflectivity as the Preprufe® 160R and Preprufe® 300R sold in the United States by W.R. Grace-Conn. before February 8, 2009.

9.   I personally spoke with Expert Philip Dregger and told him that the Preprufe® 160R and Preprufe® 300R products received by AVM last week looked the same as the original Preprufe® 160R and Preprufe® 300R products sold before February 8, 2009.

10. I also confirmed with Philip Dregger that the received Preprufe® 160R and Preprufe® 300R products appeared to have the same reflectivity and whiteness as the original Preprufe® 160R and Preprufe® 300R products sold before February 8, 2009.

  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

  Executed this 22nd day of September 2021 at ___Canoga Park___, California.

Dated: September 22, 2021          By: _____

                                         Paul Miller

# EXHIBIT A



Photos:

**Preprufe 160R:**









**Preprufe 300R:**






Exhibit 116



Deposition of:
# Douglas R. Stieve

*October 27, 2021*

In the Matter of:

# GCP Applied Techs., Inc.v. AVM Industries, Inc.

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA

2
               CASE NO. 2:19-CV-07475-MWF-RAO

3

    GCP APPLIED TECHNOLOGIES, INC.,

4
        Plaintiff,                    REMOTE

5                                 DEPOSITION OF:
        vs.                       DOUGLAS R. STIEVE

6
    AVM INDUSTRIES, INC.,

7
        Defendant.

8   _____
9       TRANSCRIPT of the stenographic notes of the
10  proceedings in the above-entitled matter, as
11  taken by and before RITA GARDNER, a Notary
12  Public and Certified Court Reporter of the State
13  of New Jersey, held REMOTELY VIA ZOOM, on
14  Wednesday, October 27, 2021, commencing at 9:00
15  a.m. EDT.
16
17
18
19
20
21
22
23
24
25

```
                                              Page 2

 1      A P P E A R A N C E S :
 2
            BAKER HOSTETLER LLP
 3          By:  JEFFREY J. LYONS, ESQUIRE
            2929 Arch Street
 4          12th Floor, Cira Centre
            Philadelphia, Pennsylvania 19104
 5          Jjlyons@bakerlaw.com
            Attorneys for the Plaintiff
 6
            DELIO PETERSON & CURCIO LLC
 7          By:  PETER W. PETERSON, ESQUIRE
            And  TODD A. BAYNE, JR., ESQUIRE
 8          And  BRIAN SCHLOSSER, ESQUIRE
            700 State Street, Suite 402
 9          New Haven, Connecticut 06511
            Ppeterson@delpet.com
10          (203) 787-0595
            Attorneys for the Defendant
11
        A L S O   P R E S E N T:
12
            BEN PELTA-HELLER, Veritext Technician
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                    INDEX TO WITNESS

2    WITNESS                 DIRECT   CROSS   REDIRECT

3    DOUGLAS R. STIEVE

4    By Mr. Peterson              4                84

5    By Mr. Lyons                      76

6

7                    INDEX TO EXHIBITS

8    EXHIBIT        DESCRIPTION              PAGE

9    100            Document DS004, Notice of   6
                    Deposition of Douglas R.
10                  Stieve

11   101            Document DS005, a report    7
                    authored by Douglas R.
12                  Stieve

13   102            Exhibits attached to       29
                    Douglas R. Stieve's report

14

15

16

17

18

19

20

21

22

23

24

25

```
                                            Page 4

  1     DOUGLAS R. STIEVE, 1350 Broadway, Suite 910, New

  2     York, New York 10018, having been duly sworn,

  3     was examined and testified as follows:

  4     DIRECT EXAMINATION BY MR. PETERSON

  5              Q.      Good morning, Mr. Stieve.

  6              A.      Good morning.

  7              Q.      Just for the record, could you

  8     please give us your name and address?

  9              A.      Sure.  Douglas Stieve, S-T-I-E-V-E.

 10     My work address is 1350 Broadway, Suite 910, New

 11     York, New York 10018.

 12              Q.      Have you been deposed before?

 13              A.      Yes.

 14              Q.      Today, if at any time you need to

 15     take a break, please let me know and we will do

 16     so.

 17              A.      I may take you up on that.  The same

 18     goes for you guys too.

 19              Q.      We will probably take a break every

 20     hour or so.

 21                      You have been hired by the plaintiff

 22     GCP, correct?

 23              A.      Correct.

 24              Q.      When did they first contact you?

 25              A.      Just -- I am assuming by our project
```

DOUGLAS R. STIEVE

Page 26

 1    difference between a claim directed to a method

 2    and a claim directed to, for example, a product,

 3    an article or an apparatus?

 4            A.      I am not.

 5            Q.      Are you aware of what are called

 6    product-by-process claims?

 7            A.      No.

 8            Q.      And is it your understanding that

 9    Claim 1 is directed to a waterproofing membrane,

10    that is a completed waterproofing membrane

11    article?

12                    MR. LYONS:   Object to form.

13            A.      It is in reference to a completed

14    product, which is a waterproofing membrane.

15    BY MR. PETERSON:

16            Q.      Now, let's go to the accused AVM

17    Aussie Skin 550 and 560 products that you looked.

18                    Now, these products have inorganic

19    particles adhered directly to the outer-exposed

20    surface of the pressure sensitive adhesive,

21    correct?

22            A.      Yes.

23            Q.      And those products, both the

24    inorganic particles and the outer-exposed

25    adhesive surface are normally accessible to have

DOUGLAS R. STIEVE

Page 27

1    concrete cast directly against them, correct?

2         A.    Yes.

3         Q.    And is that the same -- your

4    understanding for the 550G and 560G Aussie Skin

5    products?

6         A.    Yes.

7         Q.    And then adjacent to those particles

8    that are adhered to the surface of the pressure

9    sensitive adhesive, is it fair to say that the

10   accused Aussie Skin products have, on the

11   membrane, a selvedge edge with the pressure

12   sensitive adhesive that has no adhered particles?

13              MR. LYONS:   Object to form.

14        A.    Yes.

15   BY MR. PETERSON:

16        Q.    Thank you.  And that selvedge edge

17   on the accused Aussie Skin products is normally

18   not accessible to have concrete cast against it,

19   is that correct?

20        A.    Correct.

21        Q.    And that selvedge edge is used to

22   overlap and adhere to an adjoining membrane,

23   correct?

24        A.    Yes.

25        Q.    Now, if we can go to your report,

DOUGLAS R. STIEVE

Page 28

1    Exhibit 101, I would ask you to turn to Paragraph

2    68.

3              This paragraph is in the section

4    where you are discussing the pressure sensitive

5    adhesive has an average thickness in the range of

6    75 microns to 500 microns and has an

7    outer-exposed surface, correct.

8         A.    Yes.

9         Q.    Now, is it correct to say that GCP

10   has determined the average thickness of the

11   pressure sensitive adhesive on the selvedge edge

12   of the Aussie Skin products by a micrometer

13   measurement on the completed waterproofing

14   membrane particle?

15             MR. LYONS:   Object to form.

16        A.    Yes.

17   BY MR. PETERSON:

18        Q.    Now, let's go to the exhibits that

19   you had referenced in your report, and in

20   particular, Exhibits 11, 12 and 15.

21             MR. LYONS:   Pete, I am going to say

22   now that I would like to designate this

23   transcript as attorneys' eyes only?

24             MR. PETERSON:   Understood.

25        A.    11, 12, and 15.

DOUGLAS R. STIEVE

Page 31

1     and on.  Again, that is referring to the testing

2     on the pressure sensitive adhesive has an average

3     thickness in the range of 75 microns to 500

4     microns and has an outer-exposed surface?

5          A.    Yes, that is Paragraph No. 4 on that

6     sheet, correct?

7          Q.    Yes.  Right.  And then beyond that

8     there is Paragraph 67.  And it actually goes

9     through Paragraph 77 on the next page.

10              Do you see those?

11         A.    Yes.

12         Q.    Is it true that GCP has not

13    determined the average thickness of the pressure

14    sensitive adhesive on the portion having the

15    particles by a micrometer measurement on the

16    completing waterproofing membrane article?

17         A.    Can you repeat the question.

18              (The following was read by the

19    reporter.  "Question.  Is it true that GCP has

20    not determined the average thickness of the

21    pressure sensitive adhesive on the portion having

22    the particles by a micrometer measurement on the

23    completing waterproofing membrane article?")

24         A.    I do not believe they used a

25    micrometer, at least not to measure the thickness

DOUGLAS R. STIEVE

Page 32

1    at the areas with the particles.

2    BY MR. PETERSON:

3         Q.    So is it true that there was no

4    direct measurement of the adhesive thickness to

5    the completed undisturbed Aussie Skin product?

6               MR. LYONS:   Object to the form.

7         A.    That is incorrect.

8    BY MR. PETERSON:

9         Q.    What was the direct measurement made

10   on the completed undisturbed Aussie Skin product?

11        A.    When I was there, a micrometer was

12   used to measure the difference in thickness at

13   the selvedge edge resulting in the average

14   thickness of the adhesive.

15        Q.    But referring to the portion of the

16   Aussie Skin product where the particles were, is

17   it true that there was no direct measurement made

18   of adhesive thickness on the undisturbed Aussie

19   Skin product?

20        A.    Not while a was --

21              MR. LYONS:   Object to form.

22        A.    Not while I was present.

23   BY MR. PETERSON:

24        Q.    So you agree there was no direct

25   measurement on the particle portion?

DOUGLAS R. STIEVE

Page 33

1          MR. LYONS:   Object to form.

2          A.      With a micrometer in my presence.

3     BY MR. PETERSON:

4          Q.      And then instead of doing the direct

5     measurement, is it true that GCP attempted to

6     determine the thickness of the pressure sensitive

7     adhesive in the particle portion by a so-called

8     solvent method?

9          MR. LYONS:   Object to form.

10         A.      I believe so.

11    BY MR. PETERSON:

12         Q.      Did you observe the solvent method

13    tests on the Aussie Skin products?

14         A.      No.

15         Q.      Did you have access to the raw test

16    data for the solvent test method?

17         A.      I am not sure.

18         Q.      What test data did you have access

19    to?

20         A.      A lot of test data that was supplied

21    by GCP.

22         Q.      And did it go beyond what was shown

23    in your exhibits?

24         A.      Most likely, yes.

25         Q.      And what was the nature of the test

DOUGLAS R. STIEVE

                                                    Page 35

1              A.      I am not sure.

2      BY MR. PETERSON:

3              Q.      Now, Mr. Stieve, is it correct to

4      say that in order to measure the average

5      thickness of the pressure sensitive adhesive on

6      the Aussie Skin products that have the inorganic

7      particles adhered, you have to take the Aussie

8      Skin product apart?

9                      MR. LYONS:   Object to form.

10             A.      That is how I understand the test

11     procedure.

12     BY MR. PETERSON:

13             Q.      And then is it correct to say that

14     to use a solvent method to measure the average

15     thickness of the pressure sensitive adhesive in

16     the particle portion, you have to first cut out a

17     selected area that has the particles adhered?

18                     MR. LYONS:   Object to form.

19             A.      I don't know if that is the first

20     step.  But that is one of the steps.

21     BY MR. PETERSON:

22             Q.      And then on that part that you cut

23     out, is it true that you then dissolve the

24     pressure sensitive adhesive?

25             A.      That is how I understand the test is

DOUGLAS R. STIEVE

Page 36

1    run.  Again, I am not a material scientist.  I am

2    an architect waterproofing consultant.  That is

3    how I understand the test is performed.

4           Q.    Do you know what solvent was used to

5    dissolve the pressure sensitive adhesive on the

6    Aussie Skin samples?

7                 MR. LYONS:   Object to form.

8           A.    No.

9    BY MR. PETERSON:

10          Q.    And then is it true that after you

11   dissolve the adhesive, you remove from that

12   selected area the dissolved adhesive and the

13   inorganic particles that had been adhered the

14   adhesive?

15                MR. LYONS:   Object to form.

16          A.    I believe that the particles are

17   removed first.

18   BY MR. PETERSON:

19          Q.    And then at some point you remove

20   the dissolved adhesive from that sample area?

21                MR. LYONS:   Object to form.

22          A.    I understand that then the solvent

23   is evaporated, leaving the adhesive.

24   BY MR. PETERSON:

25          Q.    Was that done at room temperature or

DOUGLAS R. STIEVE

Page 37

1     some other elevated temperature?

2                    MR. LYONS:   Object to form.

3            A.     I do not know.

4     BY MR. PETERSON:

5            Q.     Now, do you know if the solvent that

6     was used to dissolve the adhesive interact with

7     the inorganic particles?

8                    MR. LYONS:   Object to form.

9            A.     I do not know.

10    BY MR. PETERSON:

11           Q.     Do you know if that solvent

12    dissolves any of the inorganic particles?

13                   MR. LYONS:   Object to form.

14           A.     I do not.

15    BY MR. PETERSON:

16           Q.     Do you know if the solvent that was

17    used to dissolve the adhesive interact with the

18    membrane?

19           A.     I do not.

20           Q.     Do you know if the solvent used to

21    dissolve the adhesive dissolves any of the

22    membrane?

23           A.     I do not, but I don't believe it

24    does.  I am just saying I do not because I am not

25    a material scientist.  I understand that it

DOUGLAS R. STIEVE

Page 38

1    doesn't; but I have no direct knowledge of that.

2    That is what I am told.  And that response

3    applies to all the previous questions.

4            Q.      Thank you.  And is it your

5    understanding that the membrane and particles are

6    washed with the solvent used to dissolve the

7    adhesive?

8                    MR. LYONS:  Object to form.

9            A.      I am not sure of the exact

10   procedure, how it is done.

11   BY MR. PETERSON:

12           Q.      After all this is done, how is the

13   thickness of the adhesive calculated?

14           A.      I believe it is the product of the

15   mass and the solvent method is getting you the

16   mass.  It is the product of the mass times the

17   product of the area and the density, I believe.

18                   Again, I am not a material

19   scientist.  This is what I am told.

20           Q.      Do you know if any controls were run

21   in the solvent method test to determine if there

22   was any effect in dissolving the inorganic

23   particles?

24                   MR. LYONS:  Object to form.

25           A.      I do not know if they were or were

DOUGLAS R. STIEVE

Page 39

1    not.

2    BY MR. PETERSON:

3         Q.    Do you know if there were any

4    controls run to determine if the solvent used to

5    dissolve the adhesive dissolved any of the

6    membrane?

7         A.    I do not know either way.

8         Q.    Do you know what the composition of

9    the adhesive is on the Aussie Skin product?

10        A.    No.

11        Q.    How was the density of the adhesive

12    determined if you didn't know the composition of

13    the adhesive?

14             MR. LYONS:  Object to form.

15        A.    I don't know.  It doesn't mean that

16    the material scientists don't know it.

17    BY MR. PETERSON:

18        Q.    Does different pressure sensitive

19    adhesives have different densities?

20        A.    I do not know.

21        Q.    So is it correct to say then that

22    the solvent method measures the average thickness

23    of the adhesive in the area where the particles

24    are as if it had no inorganic particles adhered

25    to it?

DOUGLAS R. STIEVE

Page 40

```
 1                    MR. LYONS:  Object to form.
 2          A.     No.  I mean, you are measuring it
 3      after the particles have been extracted.
 4      BY MR. PETERSON:
 5          Q.     Right.  So if the particles have
 6      been extracted, then is it correct to say that
 7      you are measuring it as if there were no
 8      particles to the adhesive?
 9                    MR. LYONS:  Object to form.
10                    (The following was read by the
11      reporter.  "Question.  Right.  So if the
12      particles have been extracted, then is it correct
13      to say that you are measuring it as if there were
14      no particles to the adhesive?")
15          A.     From my perspective, I think it is
16      fair.
17      BY MR. PETERSON:
18          Q.     So is it correct to say that the
19      solvent method measures the average thickness of
20      the pressure sensitive adhesive before the
21      inorganic particles are adhered directly to the
22      adhesive?
23                    MR. LYONS:  Object to form.
24          A.     No.  I believe it is after the
25      particles because they have been extracted at
```

DOUGLAS R. STIEVE

Page 41

1    that point.

2    BY MR. PETERSON:

3         Q.    But the measurement that is made, is

4    it equivalent to what the adhesive thickness

5    would have also been before the particles were

6    applied?

7              MR. LYONS:  Object to form.

8         A.    If you use the same methodology, if

9    you use the same solvent methodology, just

10   without the particles, it would be a similar

11   test.

12   BY MR. PETERSON:

13        Q.    Now, does the '879 Patent contain

14   any description or reference to the solvent

15   method of testing?

16        A.    I do not believe it does.

17        Q.    Does the '879 Patent contain any

18   description to any equivalent testing method to

19   determine the average thickness of the

20   pressure-sensitive adhesive?

21        A.    Without rereading the whole

22   document, again, I do not believe it defines how

23   to measure thickness.

24        Q.    Would a person of ordinary skill in

25   the art know how to use the solvent method to

DOUGLAS R. STIEVE

Page 43

1    correct method?

2             MR. LYONS:  Object to form.

3        A.    I know from -- I don't think there

4    is a correct method, because there is no method

5    specified in the patent.  I believe from

6    discussions with our material scientists, that

7    the solvent method is the most reliable.

8    BY MR. PETERSON:

9        Q.    Are there other methods that might

10   be used?

11       A.    Yes.

12       Q.    Would persons of ordinary skill in

13   the art have reason to think that there is more

14   than one method that might be used?

15            MR. LYONS:  Object to form.

16       A.    Yes, I think they would have thought

17   that there may have been a few.

18   BY MR. PETERSON:

19       Q.    Now, the adhesive applied to the

20   membrane and the Aussie Skin products, that is

21   incompressible, correct?

22       A.    No, I do not believe that is

23   correct.

24       Q.    By incompressible, I mean the

25   density doesn't change as pressure is applied to

DOUGLAS R. STIEVE

Page 46

1                    MR. LYONS:  Object to form.

2          A.    Of just the adhesive, but not the

3    membrane itself, because the particles also are

4    bonded to the concrete.

5    BY MR. PETERSON:

6          Q.    Correct.  So just referring to the

7    outer-exposed surface of the adhesive that is

8    between the particles, is it correct to say that

9    as the particles are embedded, the distance

10   between the outer-exposed surface and the

11   membrane increases?

12                   MR. LYONS:  Object to form.

13         A.    At those areas, it likely increases

14   in a uniform manner, assuming that the particle

15   sizes are all relatively consistent, which I

16   believe they are.

17   BY MR. PETERSON:

18         Q.    So is it correct to say that the

19   thickness of the adhesive at the portion between

20   the particles increases as the particles are

21   embedded into the adhesive?

22         A.    I believe that to be correct.

23         Q.    So in the completed membrane, could

24   the thickness of the pressure sensitive adhesive

25   be understood by one of ordinary skill in the art

DOUGLAS R. STIEVE

Page 47

1      to be that portion between the particles?

2                      MR. LYONS:  Object to form.

3              A.     No, I don't think they would dissect

4      it to that degree.

5      BY MR. PETERSON:

6              Q.     You think persons of the ordinary

7      skill might disagree about that?

8                      MR. LYONS:  Object to form.

9              A.     Yes.  I mean, "person of ordinary

10     skill" is a pretty loose term.  So, yes, I am

11     sure you could have debate between different

12     people.

13     BY MR. PETERSON:

14             Q.     So reasonable minds can differ?

15                     MR. LYONS:  Object to form.

16             A.     That is why we are here.

17     BY MR. PETERSON:

18             Q.     Very true.  Thank you.

19                     (Remote deposition recessed at 10:25

20     a.m. EDT and resumed at 10:35 a.m. EDT.)

21     BY MR. PETERSON:

22             Q.     Mr. Stieve, just going back to the

23     displacement of the adhesive as the particles are

24     imbedded into it, would the upward displacement

25     of the adhesive change by the particle size?

DOUGLAS R. STIEVE

Page 51

1    approximately uniform, as it was applied to the

2    HDPE sheet and before the particles were added."

3            A.      Got it.   Thank you.

4            Q.      So is it fair to say that GCP's

5    evidence of the uniformity of the adhesive on the

6    Aussie Skin products is based on the thickness of

7    the adhesive as it was applied to the HDPE

8    carrier sheet before the particles were added?

9                   MR. LYONS:   Object to form.

10           A.      I think it is my opinion, not GCP's

11   opinion.   I am not sure they agree with that or

12   not.

13   BY MR. PETERSON:

14           Q.      So how did you reach your opinion to

15   use this method of considering the uniformity

16   before the particles were added?

17                  MR. LYONS:   Object to form.

18           A.      That is based upon my experience and

19   understanding of how waterproofing membranes are

20   manufactured.

21   BY MR. PETERSON:

22           Q.      Now, does the '879 Patent state that

23   one is to measure the uniformity of the adhesive

24   layer before the particles are added?

25           A.      I believe it is silent on that

DOUGLAS R. STIEVE

Page 52

1    matter.

2         Q.    Do you know that your way is the way

3    the '879 Patent intended that uniformity was to

4    be determined?

5              MR. LYONS:  Object to form.

6         A.    I don't know intent.  I just know

7    what is in the patent.

8    BY MR. PETERSON:

9         Q.    Could persons of ordinary skill in

10   the art reasonably differ on the way uniformity

11   is to be determined?

12             MR. LYONS:  Object to form.

13        A.    In terms of uniformity, I don't

14   think there is going to be much objection.

15   BY MR. PETERSON:

16        Q.    Let's go to your Exhibit 10, and

17   that would be in the Deposition Exhibit 102.  It

18   would be just before the previous exhibits that

19   we had referenced there, Page 460 or thereabouts.

20   I am sorry.  It would be Page 641 of the .pdf.

21             So that photo there on the right

22   side, it says membrane thickness optical.

23             Do you see that, Mr. Stieve?

24        A.    Yes, sir.

25        Q.    Is that the same photo that you

DOUGLAS R. STIEVE

Page 53

1    referenced right after Paragraph 64 of your

2    report on the top of Page 15?

3            A.    I believe it is.

4            Q.    Going back to Exhibit 10, the second

5    page of that exhibit, Mr. Stieve, that photo that

6    you referenced at the end of Paragraph 64, that

7    is from a March 2016 analysis that GCP made of an

8    Aussie Skin membrane, correct?

9            A.    Yes.

10           Q.    Are you aware that Aussie Skin in

11   2016 was made using silica sand particles, not

12   concrete particles, as in the accused products?

13                 MR. LYONS:  Object to form.

14           A.    I am not aware of that.

15   BY MR. PETERSON:

16           Q.    And that photo -- let's go back to

17   the photo that we had referenced in Exhibit 10.

18   That photo on the right, does that show adhesive

19   displaced upwards by the particles there?

20           A.    Yes, it does.

21           Q.    Now, let's go to your report,

22   Paragraph 66.  It is on Page 15 of your report.

23           A.    Yes.

24           Q.    Now, that indicates that direct

25   measurements of the adhesive thickness was taken

DOUGLAS R. STIEVE

Page 54

1      on the selvedge edge of the Aussie Skin product,

2      correct?

3              A.      Yes.

4              Q.      Is it true that there were no direct

5      measurements made on the pressure sensitive

6      adhesive on the article portion of the accused

7      product?

8                      MR. LYONS:  Object to form.

9              A.      Not while I was present.

10     BY MR. PETERSON:

11             Q.      Does the evidence of the uniformity

12     of adhesive thickness take into account any

13     differences in height of the outer-exposed

14     surface of the adhesive between the different

15     particles?

16                     MR. LYONS:  Object to form.

17             A.      In terms of uniformity or overall

18     thickness?

19     BY MR. PETERSON:

20             Q.      Uniformity.

21             A.      No.  I think as long as that is

22     consistent, it would be uniform.

23             Q.      Does it take into account the

24     differences of height of the outer-exposed

25     surface between the particles, as opposed to the

DOUGLAS R. STIEVE

Page 55

1    thickness the selvedge edge?

2                    MR. LYONS:  Object to form.

3           A.    Does it -- can you repeat the

4    question?

5                    (The following was read by the

6    reporter.  "Question.  Does it take into account

7    the differences of height of the outer-exposed

8    surface between the particles, as opposed to the

9    thickness the selvedge edge?")

10                   MR. LYONS:  Object to form.

11          A.    No, it -- this is referencing a

12   thickness at the selvedge edge.  So, no, it does

13   not take into account the particle area and the

14   particles.

15   BY MR. PETERSON:

16          Q.    Does the '879 Patent contain any

17   description on what deviations in thickness would

18   constitute an approximately uniform layer of a

19   waterproofing membrane pressure sensitive

20   adhesive?

21                   MR. LYONS:  Object to form.

22          A.    Without reading the entire patent, I

23   do not believe it gives a tolerance of what would

24   be consistent or uniform.

25   BY MR. PETERSON:

DOUGLAS R. STIEVE

                                            Page 56

 1          Q.     Now, what deviations would a person

 2     of ordinary skill in the art use to constitute a

 3     uniform layer?

 4          A.     It kind of depends.  Are you

 5     manufacturing waterproofing membrane or are we

 6     building the space shuttle?  There is going to be

 7     a lot of deviations.  You know, how consistently

 8     can you crush the limestone or the silica to get

 9     it to be within a uniform range?

10               I think that, you know, what we have

11     here is uniform and consistent within the

12     tolerance of manufacturing.

13     BY MR. PETERSON:

14          Q.     For the claimed waterproofing

15     membrane, what deviations would a person of

16     ordinary skill in the art believe to constitute a

17     uniform layer of adhesive thickness?

18               MR. LYONS:  Object to form.

19          A.     Just knowing how some public

20     entities and their inspectors are, if they are a

21     person of ordinary skill, they probably have a

22     ruler and try to measure it or try to measure it

23     maybe with a caliper.  So I think it would have

24     to be a lot more ununiform for them to say we

25     have an issue.

DOUGLAS R. STIEVE

Page 57

1    BY MR. PETERSON:

2         Q.     How ununiform would it have to be

3    before this is an issue?

4                MR. LYONS:  Object to form.

5         A.     Something that is visibly

6    noticeable, either to the naked eye with a ruler

7    or with a caliper.

8    BY MR. PETERSON:

9         Q.     Can you describe that further?  Is

10   there a numerical limitation?

11               MR. LYONS:  Object to form.

12        A.     None is defined.  We are talking

13   about a product with a patent.  So there is no

14   ASTM standards for this.

15               If it was a more common commodity

16   type of material, they would have ASTM standards

17   and it would be easy to take that subject

18   membrane, test it either for thickness, whatever

19   and be able to tell if it is within or outside of

20   the standard.  But there is no standard for this

21   product.

22   BY MR. PETERSON:

23        Q.     Can persons of ordinary skill in the

24   art reasonably disagree with what constitutes a

25   relatively uniform layer of adhesive?

DOUGLAS R. STIEVE

Page 58

1              MR. LYONS:  Object to form.

2         A.    Yes.

3    BY MR. PETERSON:

4         Q.    Let's go to Exhibits 13 and 14 of

5    the deposition Exhibit No. 102.

6              So looking over in the right-hand --

7    the second from the right-hand column that says

8    Aussie Skin 560 XIA 2019.

9              Do you see that column?

10        A.    Yes.

11        Q.    Do you see the adhesive thickness in

12   microns there being 306.5?

13        A.    Adhesive thickness in microns, yes.

14        Q.    And below that is the selvedge

15   adhesive thickness in microns and you see that it

16   is 463 microns?

17        A.    Yes.

18        Q.    Does that constitute a uniform layer

19   of adhesive?

20              MR. LYONS:  Object to form.

21        A.    If we are getting consistent

22   readings of 306 in the field of the sheet, where

23   the particles are imbedded and we are getting

24   consistent thickness in the selvedge edge of 450,

25   475, in that range, across the whole sheet, as it

DOUGLAS R. STIEVE

Page 59

1    it is manufactured and across the next sheet, as

2    it is manufactured, and across the next sheet as

3    it is manufactured, yes, I think that is

4    consistent and uniform.

5    BY MR. PETERSON:

6         Q.    So would you say, as you go across

7    the sheet -- and by "across" I mean perpendicular

8    to the length of the roll -- if you go from an

9    adhesive thickness of 463 microns in the selvedge

10   area and then you go to an adhesive thickness of

11   306.5 in the particle area, would you call that a

12   uniform thickness?

13              MR. LYONS:  Object to form.

14        A.    As long as it is the same in both

15   areas, I would consider it uniform.  There is

16   going to be a tolerance.  So as long as you are

17   within the tolerance of whatever the manufacturer

18   allows, because there are no ASTM standards for

19   this, I think it is uniform and consistent.

20   BY MR. PETERSON:

21        Q.    So what is your standard for

22   uniformity between at selvedge edge and the

23   particle area looking at the adhesive?

24              MR. LYONS:   Object to form.

25              You can answer.

DOUGLAS R. STIEVE

Page 60

```
 1        A.    There is not going to be uniform
 2   between the two, because one has the particles
 3   and one that doesn't face the concrete doesn't
 4   hold the particles.
 5   BY MR. PETERSON:
 6        Q.    So is it true then that your
 7   standard for uniformity looks at the selvedge
 8   edge separately from the particle area?
 9             MR. LYONS:  Object to form.
10        A.    We are not comparing the selvedge
11   edge to the areas that have the particles after
12   the particles have been applied to the sheet.
13   BY MR. PETERSON:
14        Q.    So in other words, you are not
15   comparing the uniformity of thickness in the
16   selvedge area to the uniformity of thickness in
17   the particle area of the adhesive?
18             MR. LYONS:  Object to form.
19        A.    I don't think you can, because in my
20   understanding of how the membrane is probably
21   manufactured, with the roll coming through the
22   adhesive applied and then the particles, there is
23   a second step that happens in the areas with the
24   particles, be it the application of the
25   particles.
```

DOUGLAS R. STIEVE

Page 61

```
 1              So I don't think you can therefore
 2     compare one to the other that way.
 3     BY MR. PETERSON:
 4         Q.    So when you are looking at the
 5     uniformity of the adhesive thickness, you are
 6     looking at the uniformity of the adhesive
 7     thickness in the selvedge area differently than
 8     you are looking at the uniformity of adhesive
 9     thickness in the particle area, correct?
10              MR. LYONS:  Object to form.
11         A.    I don't think we are looking at it
12     differently.  We realize there are going to be
13     different values because of the application of
14     the particles and the way the membranes are
15     manufactured.
16     BY MR. PETERSON:
17         Q.    Let's take a hypothetical.
18              If the selvedge area and adhesive
19     thickness varied from 306.5 to 463, would that be
20     considered uniform?
21         A.    Again, similar to my previous
22     answer, I think that a reputable manufacturer
23     determine that that is out of manufacturing
24     tolerance and kick that sheet out.
25         Q.    And then if -- again, a
```

DOUGLAS R. STIEVE

Page 63

1          Q.     And this would be the thickness of

2     the adhesive on both the selvedge area and the

3     area in which the particles were to be added,

4     correct?

5          A.     Correct.

6          Q.     So that you would expect -- for

7     uniformity, you would have uniformity of

8     thickness in both the selvedge area and the area

9     that the particles are to be added, correct?

10          A.     At the time in manufacturing before

11     the particles are applied.

12          Q.     So now in manufacturing the

13     particles are applied to areas that are not the

14     selvedge edge, correct?

15          A.     That is my understanding, yes.

16          Q.     Then how can there be uniformity of

17     thickness if in the example in Exhibit 13 the

18     adhesive in the selvedge edge is quite a bit

19     larger than the adhesive thickness in the

20     particle area?

21                MR. LYONS:  Object to form.

22          A.     Again, it is different, but in my

23     opinion, as long as it is uniform and within the

24     manufacturers tolerance, I don't know what they

25     are for either product.  I would consider it

DOUGLAS R. STIEVE

Page 64

 1    uniform.

 2    BY MR. PETERSON:

 3         Q.    And again, you are looking at

 4    uniformity in the particle area of the adhesive

 5    differently than uniformity in the selvedge area,

 6    correct?

 7                   MR. LYONS:  Object to form.

 8         A.    Yes, I believe you have to because

 9    there is a second part of the manufacturer that

10    -- you know, applying the particles is a step

11    that hasn't occurred to the area of adhesive in

12    the selvedge edge.  I think you have to look at

13    them differently after the particles were

14    applied.

15    BY MR. PETERSON:

16         Q.    Now, Mr. Stieve, let's go to a

17    different subject.

18                   You had referenced the reflectivity

19    of the Aussie Skin products, correct?

20         A.    Correct.

21         Q.    And you had also tested the Aussie

22    Skin G products, that is products that have a

23    slightly gray concrete particle surface?

24                   MR. LYONS:  Object to form.

25         A.    Myself, I am not sure if I

DOUGLAS R. STIEVE

Page 81

1    the adhesive where the particles had been adhered
2    to it, is that correct?
3          A.    That is correct.
4          Q.    Can you look down at 1[c] in
5    Paragraph 39?
6               Do you see that where it says the
7    pressure sensitive adhesive has an average
8    thickness in the range of 75 microns to 500
9    microns?
10         A.    Yes.
11         Q.    Does the average thickness of the
12   pressure sensitive adhesive change when the
13   particles have been added to it?
14         A.    Does the average thickness change?
15   Yes.
16         Q.    So you are saying the particles
17   change how much adhesive is on the membrane?
18         A.    No.  It just -- in little areas
19   where -- I think we talked about this before.  In
20   little areas where the particles -- it is the
21   same amount of adhesive is still there.  It is
22   just in a different area because it has been
23   impacted by the application of the particles.
24   Same amount of adhesive.  No difference.
25         Q.    I believe earlier, when you were

Page 86

```
 1

 2                          CERTIFICATE

 3

 4              I, RITA GARDNER, Notary Public of the

 5      State of New Jersey and a Certified Court

 6      Reporter, do hereby certify that prior to the

 7      commencement of the examination, DOUGLAS R.

 8      STIEVE was duly sworn by me to testify to the

 9      truth, the whole truth and nothing but the

10      truth.

11              I DO FURTHER CERTIFY that the

12      foregoing is a true and accurate transcript of

13      the remote testimony as taken stenographically

14      by and before me at the time and on the date

15      hereinbefore set forth.

16              I DO FURTHER CERTIFY that I am

17      neither a relative nor employee nor attorney nor

18      counsel of any of the parties to this action,

19      and that I am neither a relative or employee of

20      such attorney or counsel, and that I am not

21      fina                             .ion.

22

23      Notary Public of the State of New Jersey

24

25      Dated:   October 27, 2021
```

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.